## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| IRONNET, INC., *et al.*,[1] | ) Case No. 23-11710 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DECLARATION OF CAMERON PFORR,
## PRESIDENT AND CHIEF FINANCIAL OFFICER OF THE DEBTORS,
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

Under 28 U.S.C. § 1764, Cameron Pforr, declares as follows under the penalty of perjury:

1.     Since September 2022, I have served as the Chief Financial Officer ("**CFO**") of IronNet, Inc. ("**IRNT**") and its wholly-owned direct or indirect subsidiaries, including IronNet Cybersecurity, Inc. ("**Cybersecurity**"), which, along with certain other affiliates, are debtors and debtors in possession (collectively, the "**Debtors**" or the "**Company**") in the above-captioned cases (collectively, these "**Chapter 11 Cases**").  On July 11, 2023, in addition to my duties as CFO, I was appointed President of the Company.  I hold a B.S. in Computer Science from the College of William and Mary, an M.A. in International Studies from the University of Pennsylvania, and an M.B.A. from the University of Pennsylvania's Wharton School.  Prior to my employment with the Company, I served as President of Fidelis Cybersecurity, as well as CFO prior to my appointment as President.  Prior to that, I have held senior management roles at Jenzabar, a provider of information technology services and consulting for the higher education

---

[1]     The Debtors in the above captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  IronNet, Inc. (9446), IronNet Cybersecurity, Inc. (2655), IronNet International, LLC (7621), IronCAD LLC (1162), and HighDegree, LLC (8474).  The Debtors' corporate headquarters is located at 7900 Tysons One Place, Suite 400, McLean, VA 22102.

industry, Permabit Technology Corporation, a software company, and WhipTail Technologies, Inc., a data storage array company.  Earlier in my career I was an investment banker with Revolution Partners and Deutsche Bank Securities, as well as a consultant with Bain and Company.  I also served as a Foreign Service Officer for the U.S. Department of State and an analyst for the U.S. Department of Defense.  I am over the age of 18 and I am authorized by each of the Debtors to submit this declaration (this "**Declaration**") on behalf of the Debtors.

2.     As the Debtors' President and CFO, I am one of four executives collectively responsible for the day-to-day operations of the Debtors.  Thus, I have personal knowledge of the Debtors' financial affairs and business operations.  In addition, I have been responsible for overseeing the Debtors' preparations for these Chapter 11 Cases, their business plans, the prepetition marketing process, and the procurement of debtor-in-possession financing.  I have further familiarized myself with the Debtors' day-to-day operations, financial affairs, business affairs, and books and records by reviewing key financial documents and engaging in discussions with other members of the management team.  Except as otherwise stated in this Declaration, the statements set forth herein are based on (a) my personal knowledge or opinion derived from my experience, (b) information that I have received from the Debtors' employees working directly with me or under my supervision, direction, or control, or from the various advisors of the Debtors, and/or (c) my review of relevant documents.  Any references to the Bankruptcy Code (as defined below), the chapter 11 process, and related legal matters herein reflect my understanding of such matters based on the explanations and advice counsel to the Debtors has provided.  If called upon, I would testify competently to the facts set forth in this Declaration.

3.     I submit this Declaration to assist the United States Bankruptcy Court for the District of Delaware (the "**Court**") and parties in interest in understanding the circumstances

that compelled the commencement of these Chapter 11 Cases and in support of: (a) the Debtors'

petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532

(the "**Bankruptcy Code**") filed on the date hereof (the "**Petition Date**"); and (b) certain motions

and applications described herein (collectively, the "**First Day Motions**").

4.      The First Day Motions seek relief necessary to avoid immediate and

irreparable harm to the Debtors by allowing them to continue their operations and minimize

disruptions to their business that could otherwise result from the commencement of the

Chapter 11 Cases. I have reviewed the Debtors' petitions and the First Day Motions, or have

otherwise had their contents explained to me, and it is my belief that the relief sought therein is

essential to ensure the uninterrupted operation of the Debtors' businesses and to successfully

maximize the value of the Debtors' estates.

5.      To familiarize the Court with the Debtors, their businesses, the

circumstances leading to the commencement of these Chapter 11 Cases, the objectives of such

cases, and the relief the Debtors are seeking in the First Day Motions, this Declaration is organized

as follows:

- Part I provides an overview of the Company's business and organizational structure;

- Part II provides an overview of the Company's prepetition capital structure and indebtedness;

- Part III provides an overview of the circumstances leading to the commencement of these Chapter 11 Cases by the Debtors, the objectives of these Chapter 11 Cases, and the means for implementing these Chapter 11 Cases; and

- Part IV provides an overview of the First Day Motions.

I.      **The Company's Business and Organizational Structure**

   A.      **Overview of the Business**

      6.      The Company is a global cybersecurity company, which competes in the Network Detection and Response ("**NDR**") category, which is a growing aspect of modern enterprise security.

      7.      The Company distinguishes itself from its competitors through its pioneering Collective Defense Platform, a revolutionary solution that empowers organizations to identify, intercept, and neutralize advanced cyber-attacks with unprecedented speed and efficiency.  This platform serves as a real-time early-warning system, providing timely, actionable, and contextual alerts and intelligence on threats aimed at enterprise networks.

      8.      The Collective Defense Platform is comprised of the Company's IronDefense, introduced in 2016, and IronDome, introduced in 2018, products, from which the Company derives the majority of its revenue.  IronDefense is an advanced network detection and response cybersecurity product that uses artificial intelligence driven behavioral analytics to detect and prioritize anomalous activity inside enterprises.  IronDome is a threat-sharing solution that facilitates a crowdsource-like environment in which the IronDefense threat detections from an individual company are shared among members of the Collective Defense Platform community, which consists of the Company's customers who have elected to permit their information to be anonymously shared and cross-correlated by the Company's IronDome systems.

      9.      In late-2022, the Company introduced IronRadar, an easy-to-install threat intelligence feed that enables cybersecurity teams to proactively detect and block ransomware command and control ("**C2**") infrastructure before an attack, expanding our offering with a solution intended for, and obtainable by, organizations of all sizes.

10.     The Company describes its go-to-market strategy for the Collective Defense platform as driving a critical public-private partnership for cybersecurity that is needed to better secure companies, sectors and nations at a time when a siloed approach to cyber defense is no longer practical and detection and response must be nearly real-time. The approach is to secure as partners and customers both large public sector entities, including both government, military, and their supply chains, as well as large, private sector organizations with a sophisticated cyber stack and frequently businesses that support critical infrastructure. The Company's goal over time is to reach a level of scale and sector diversity from organizations of similar industry sector, state, country, supply chain, or tailored business ecosystem such that as each Collective Defense community grows, so does the volume of shared data, and the value of our platform for each of those members thereby expands both technically and commercially.

11.     Currently, some of the world's largest enterprises, US government organizations, high-profile brands, and foreign governments trust the Company to protect their networks. The Company's customers are diversified across multiple industries including energy, communications, government, space development, financial services, and healthcare. Our value proposition particularly resonates at the current time with organizations protecting critical infrastructure.

12.     In sum, the Company takes a differentiated and potentially transformational approach to the cybersecurity problem facing every organization today. With an ever-increasing cybersecurity threat posed by advanced persistent threat ("**APT**") actors, the Company's team of experts, many with national security experience, has developed a solution that automates and scales knowledge about how APTs operate and their tactics, techniques and procedures, in order to defeat them; few individuals and even fewer companies have that knowledge or capability.

B.       **Ownership History and Current Corporate Structure**

13.       The Debtors were founded in 2014 by General Keith Alexander, a retired four-star general of the United States Army, in order to solve the major cybersecurity problem he witnessed and defined during his tenure as former head of the National Security Agency (NSA) and founding Commander of the United States Cyber Command: *You can't defend against threats you can't see*.

14.       On August 26, 2021, the Company expanded its capabilities through a business combination (the "**Business Combination**") between IRNT and LGL Systems Acquisition Corp., which resulted in IRNT becoming a publicly traded company.   The transaction resulted in gross proceeds of approximately $136.7 million to IRNT, which the Company used to generally support corporate infrastructure for growth and global expansion.   All IRNT shareholders rolled 100% of their equity holdings into the new public company created by the Business Combination.

15.       In response to significant financial struggles and tightening liquidity, on June 16, 2023, IRNT entered into a Letter Agreement (the "**Letter Agreement**") with C5 CC Ferrous, LLC, a Delaware limited liability company (the "**JV**," and together with IRNT, the "**Parties**"), which went effective on July 11, 2023.  The JV is an affiliate of C5 Capital Limited ("**C5**"), a beneficial owner of more than 5% of IRNT's outstanding common stock.  Pursuant to the Letter Agreement, the JV agreed to provide certain funding to IRNT, and IRNT has agreed to take certain steps, including with respect to the privatization of IRNT and the de-listing from the public securities markets.  Specifically, the Letter Agreement obligated IRNT to (a) identify and effectuate a stock split structure for IRNT and implement a related recapitalization involving the issuance of preferred stock to the JV, (b) become current in its Exchange Act reporting obligations, (c) file a proxy statement relating to the planned stock split and the issuance of a series of preferred

stock in connection with a contemplated recapitalization, and (d) take all steps otherwise necessary to consummate the take private transaction contemplated by the Letter Agreement (the "**Take-Private Transaction**").

16.     In connection with the Letter Agreement, on July 11, 2023, IRNT appointed Linda Zecher as its Chief Executive Officer (the "**CEO**"), and on the same day, the board of directors of IRNT (the "**Board**"), upon recommendation of the Nominating and Governance Committee of the Board, appointed Ms. Zecher as a director of IRNT.  Ms. Zecher is the Debtors' current CEO, and also previously served as Chairman of C5.

17.     Also in connection with the Letter Agreement, on July 17, 2023, the Company notified the New York Stock Exchange of its intent to voluntarily delist its securities, which became effective on or about August 6, 2023.  Following delisting, the Company's common stock has been traded on over-the-counter markets.

18.     A chart illustrating the Company's organizational structure, as of the date hereof, is attached hereto as **Exhibit A**.  The Company has its headquarters in McLean, Virginia, and has operations in the United States, Singapore, and the United Kingdom.

19.     As of January 31, 2023, the Company had 104 full-time employees.  Of these employees, 96 were in the United States and eight were in international locations.  On September 2, 2023, as a result of its liquidity position, the Company furloughed almost all of its employees. On September 29, 2023, given the unavailability of additional sources of liquidity and after considering strategic alternatives, as described in greater detail below, all remaining employees of the Company were terminated.

II.     **Prepetition Capital Structure**

A.      **Director and C5 Notes - Secured**

20.     In December 2022, April 2023, May 2023, and August 2023, IRNT issued and sold senior secured promissory notes in an aggregate principal amount of $8,475,000 (the "**Director Notes**") to a total of eight lenders (the "**Director Noteholders**").  The Director Notes bear interest at a rate of 13.8% per annum.  None of the Director Noteholders have received payments on account of their Director Notes.[2]

21.     On December 30, 2022, IRNT issued a senior secured convertible promissory note in the principal amount of $2,000,000 (the "**C5 Note**") to an affiliate of C5 (together with the Director Noteholders, the "**Prepetition Secured Creditors**"), a beneficial owner of more than 5% of the Company's outstanding common stock.  In January 2023, February 2023, April 2023, May 2023, and September 2023, IRNT issued additional senior secured convertible promissory notes to affiliates of C5 (together with the C5 Note, the "**C5 Notes**", and together with the Director Notes, the "**Prepetition Secured Notes**") in principal amounts of $3,000,000, $6,250,000, $600,000, $2,300,000, and $300,000, respectively.  Each of the C5 Notes bears interest at a rate of 13.8% per annum.

22.     IRNT's obligations under the Director Notes and the C5 Notes are secured by substantially all of IRNT's assets, excluding intellectual property.

23.     As of the Petition Date, approximately $25,300,00 of indebtedness under the Prepetition Secured Notes was outstanding, which amount is comprised of $23,800,000 in principal amount and accrued and unpaid interest, premiums, and fees in the amount of $1,500,000.

---

[2]     The Director Notes include advances made by VADM Jan E. Tighe (Ret.) and Donald R. Dixon on August 29, 2023 to satisfy accrued and unpaid employee payroll-related obligations the Company.

**B.    Prepetition Bridge Facility - Secured**

24.    Pursuant to DIP Term Sheet and the applicable documentation (the "**Bridge Documentation**"), an affiliate of C5, as bridge lender (the "**Bridge Lender**"), advanced $1,244,000 to the Debtors on October 10, 2023 and $256,000 to the Debtors on October 11, 2023 to allow for the orderly transition of the Debtors into these chapter 11 cases (the "**Bridge Facility Obligations**").  Pursuant to the Bridge Documentation, each Debtor granted to the Bridge Lender a security interest in and lien on all assets of each Debtor (the "**Bridge Facility Liens**").  On October 12, 2023, the Bridge Lender filed a UCC-1, as well as certain intellectual property security agreements, against each Debtor perfecting the Bridge Facility Liens.

**C.    KORR Note – Unsecured**

25.    On July 21, 2023, IRNT issued that certain secured promissory to Korr Acquisitions Group, Inc. ("**Korr**") in the aggregate principal amount of $500,000 (the "**Korr Note**").  The Korr Note is purportedly secured by receivables owing from time to time to IRNT under certain support, solutions or services contracts.  IRNT cannot verify that a UCC-1 has been filed with respect to the Korr Note.

26.    IRNT believes $513,608 is outstanding under the Korr Note as of the Petition Date.

**D.    3i Note - Unsecured**

27.    On September 14, 2022, IRNT entered into a Securities Purchase Agreement (the "**SPA**") with 3i, LP ("**3i**"), under which IRNT agreed to sell and issue senior unsecured convertible promissory notes to 3i in an aggregate principal amount of up to approximately $25,800,000, which are convertible into shares of common stock.  On September 15, 2022, IRNT issued a convertible note under the SPA in the aggregate principal amount of $10,300,000 (the "**3i Note**").  On August 23, 3023, 3i sent a Notice of Default stating that, among

other things, the Company is in purported payment default and purported covenant default under the 3i Note.

28.    IRNT believes $7,900,000 outstanding under the 3i Note as of the Petition Date.

**E.    Other Unsecured Debt**

29.    In the ordinary course, the Debtors incur trade debt with certain vendors and suppliers in connection with the operation of their business.  In addition, the Debtors have other potential and contingent liabilities related to litigation, pension, and employee obligations, certain of which are described herein.

**F.    Securities Class Action**

30.    On April 4, 2022, a securities class action lawsuit (the "**Lawsuit**") was filed against the Company on behalf of investors who purchased IRNT between between September 15, 2021 and December 15, 2021. The lawsuit was filed in the United States District Court for the Eastern District of Virginia (the "**Virginia District Court**") and alleges violations of the Securities Exchange Act.  On August 9, 2023, the Virginia District Court entered an order denying the Company's motion to dismiss, and the Lawsuit remains pending.

**III.    Key Events Leading to Commencement of These Chapter 11 Cases**

**A.    The Circumstances Prior to the Petition Date**

31.    Simply put, the Company ran out of money, as well as the ability to access sufficient capital to continue to fund go-forward operations under its current capital structure.

32.    Compounding these issues, the Company has experienced delays in collecting certain accounts receivable from foreign governments, as well as finalizing awards of new business.  As a result of these factors, among other financial and operating difficulties, the Company has been operating under a cloud of uncertainty that has strained the Company's cash

flows and negatively affected liquidity to the point that certain of IRNT's directors provided a loan to IRNT to fund the Company's August 31st payroll and partially fund a wind-down of the Company.

33.      As noted above, due to the Company's liquidity position at the beginning of September 2023, the Board authorized the furlough of almost all of the Company's employees. Notwithstanding the furlough, the Company's management continued to explore and pursue financing options, as well as potential new customers.  More specifically, the Company explored financing sources that would allow it to (a) continue to service its customers, (b) take on new customer awards, and (c) deleverage its balance sheet in a value maximizing process, while simultaneously protecting the Company's most valuable asset—its intellectual property.  With that in mind, the Company resisted efforts by potential financing parties to enter into financing transactions that, as part of their respective terms, sought to (i) impose onerous terms in exchange for a lien on its unencumbered intellectual property, such that the lender would inevitably foreclose on such intellectual property, and/or (ii) restrict the Company's ability to fulfill its fiduciary duties in a chapter 11 process.

34.      On September 29, 2023, the Company filed an 8-K indicating that, due to the apparent unavailability of additional sources of liquidity, it was ceasing all activities and terminating its remaining employees.  The Company further indicated that it did not believe that it would be able to file a chapter 11 bankruptcy and believe that it would have to file for chapter 7 bankruptcy.  Nonetheless, the Company continued to engage with parties regarding financing for a potential chapter 11 bankruptcy, and on the same weekend that the Company filed the aforementioned 8-K, it held conversations with two parties, RevTek Capital ("**RevTek**") and the DIP Lender, both of which were interested in funding a chapter 11 bankruptcy.

35.     The DIP Lender proposed a holistic restructuring, and while the Company attempted to bring in RevTek to provide incremental liquidity as well as exit financing, as of the Petition Date, the Company could not get comfortable with the terms proposed by RevTek, which required significant fees payable by reorganized equity.

36.     As the Company finalized terms with the DIP Lender, it experienced further operational challenges, including AWS shutting down its service.

### B.     Amazon Web Services

37.     The Company's IronDefense and IronDome solutions are built on the Amazon Web Service ("**AWS**") platform using key components of that infrastructure.   The Company replatformed its solution several years ago to run in the cloud on AWS as it transitioned from being primarily an on-premise solution provider to providing a Saas solution.   The Company's analytics are performed in the cloud using data collected from Company sensors in customer networks and cloud environments.   As the Company encountered liquidity problems beginning in the Fall of 2022, it began to fall behind on most of its vendor payments including those to AWS.

38.     By December 2022, the Company entered into its first payment plan with AWS to catch up on payments of past due invoices over a course of several months.   By March 2023, the Company had paid all its past due obligations.   However, the Company began to fall behind again on invoice payments in mid-March after C5 Capital began to have problems meeting its commitments to fund the company per its December term sheet to acquire the Company. Throughout the summer the Company negotiated with AWS and paid invoices as collections from its customer payments made possible.

39.     By September 2023, the Company had fallen behind on obligations owed to AWS.   In September 2023, the Government of Bahrain finally made a long delayed payment of

$1,782,000 for its Saas usage.  The payment was made through the AWS Marketplace, and on September 26, 2023, Amazon retained the entire Bahrain payment to satisfy a portion of the Company's past due obligations.

40.    On September 29, 2003, AWS shut down the Company's AWS access and customer instances due to a remaining past due payment of $18,000.  The Company remitted payment for the past due amount an hour after service was discontinued.  However, service was not restored.

41.    On October 2, 2023, AWS sent the Company a notice of contract cancellation due to late payment of the past due amount and the Company's 8-K announcing termination of its employees.  However, with the materialization of DIP Facility over the days earlier, the Company began negotiating with AWS to restore services so it could restart operations.  The Company made a series of offers to pay all past due invoices, pre-pay for services during the period of bankruptcy protection and shorten the contract term to protect AWS from having to provide services indefinitely if the Company were to file Chapter 7.  However, AWS insisted that the Company first seek protection under chapter 11 and file a motion with the Court to enter into the AWS Reinstatement Agreement before taking payment and restoring service.

42.    Ultimately, following arm's-length, good faith negotiations, the Debtors and AWS have agreed to the terms of a Reinstatement Agreement, which, pursuant to the terms of the agreement, the Debtors are required to assume before AWS will reinstate IronNet's AWS account and AWS services.  This relief is included among the First Day Motions.

### C.    The Company's Sale and Marketing Process

43.    In light of the foregoing issues and their liquidity position, beginning on or around December 2022, the Company began evaluating all available options, including a sale of the Company, financing transactions, and loan restructuring.  To that end, in December 2022, the

Company retained Guggenheim Partners ("**Guggenheim**") and Young Conaway Stargatt & Taylor, LLP to assist it in exploring these alternatives, including a potential filing under the Bankruptcy Code.  During the ten months preceding the Petition Date, Guggenheim contacted a wide array of potential bidders, but these efforts ultimately proved unsuccessful.

44.    Without any actionable proposals from Guggenheim's pre-petition marketing process, the Company began discussing the terms of a potential restructuring with the Prepetition Secured Creditors, including the Director Noteholders and C5 (a beneficial owner of more than 5% of IRNT's outstanding common stock (as discussed above)), and the DIP Lenders, including ITC Global Advisers LLC ("**ITC Global**") and C5, that would de-leverage the Debtors' balance sheet and position the Company for future success.  Over the past few months, the Debtors and their advisors engaged extensively with the Prepetition Secured Creditors and the DIP Lenders, culminating in the execution of the DIP Term Sheet on October 10, 2023.

45.    Pursuant to the DIP Term Sheet, the DIP Lenders agreed to provide funding for these Chapter 11 Cases, including funding for up to a 60-day post-petition marketing and sale process to test the value of the Debtors' assets and equity in the marketplace.  In connection therewith, the Debtors terminated Guggenheim's retention as investment banker and are in the process of retaining an investment banker.  If no actionable proposals result from the post-petition marketing and sale process, the DIP Term Sheet sets forth the framework for a chapter 11 plan of reorganization (the "**Plan**") that includes the following terms:

- The DIP Loans will be equitized, subject to dilution for MIP Equity (as defined below).

- Any additional post-petition financing, including a "first-out" or "senior" financing facility, on terms acceptable to the DIP Lenders shall either (i) be repaid in full, (ii) roll into an exit facility or (iii) convert into equity of the reorganized Debtors.

- The claims of the Prepetition Secured Creditors will be impaired on a consensual basis.

- Trade claims and other liabilities will be unimpaired, other than holders of notes issued by IRNT.

- Holders of notes at IRNT will receive the following recovery:

  o All debt claims shall receive a new note (each a "**Compromise Note**" and together the "**Compromise Notes**") in the principal amount of funds initially advanced, less any payments made to such lender on account of such note. For the avoidance of doubt, the Compromise Notes shall not include any accrued interest or fees, regardless of whether such interest or fees accrued pre- or post-petition.

  o All Compromise Notes shall contain a maturity of at least thirty-six (36) months from the effective date of the Plan (the "**Effective Date**"); provided that no interest will accrue or be paid for the first twelve (12) months after the Effective Date.

  o Holders of notes may have the option of receiving equity on account of their note claims, so long as such treatment does or would not (i) render its claim unimpaired; (ii) provide for a recovery greater than the amount of its claims; or (iii) violate the provisions of the Bankruptcy Code, or otherwise render the Plan unconfirmable.

  o The reorganized Company shall have two classes of shares: common and preferred (in each case consistent with 1123(a)(6) of the Bankruptcy Code) and employee stock options exercisable for the purchase of common shares not to exceed 15% on a fully diluted basis ("**MIP Equity**") at the discretion of the new board of the reorganized Company. The DIP Loans and any debt held by C5 that C5 agrees to convert into equity of the reorganized Company shall be in the form of preferred stock, which preferred stock shall have a senior liquidation preference and such other rights, preferences and privileges as may be agreed to by the DIP Lenders and C5; provided that any such preferred stock issuance would not (i) render its claim unimpaired; (ii) provide for a recovery greater than the amount of its claims; or (iii) violate the provisions of the Bankruptcy Code, or otherwise render the plan unconfirmable.

46.     In connection with the Debtors' proposed section 363 sale and/or Plan process, the DIP Term Sheet sets forth the following milestones, among others:

- The Debtors shall file a motion for approval of bidding and sale procedures (the "**Bidding Procedures Motion**") for the Debtors' assets or reorganized equity within fifteen (15) days of the Petition Date.

- The Court shall have entered an order approving the Bidding Procedures Motion within thirty-five (35) days of the Petition Date.

- The Debtors shall have conducted an auction for the sale (if necessary) and selected the successful bidder and/or identified an alternate Plan sponsor providing higher and better treatment and consistent with the Debtors' fiduciary duties no later than sixty-five (65) days after entry of the interim order approving the DIP Facility.

- No later than the date that is ninety (90) days following the entry of the interim order approving the DIP Facility, the Court shall have entered an order approving the sale or order confirming the plan of reorganization.

- On or before the date that is one hundred five (105) days after the Petition Date, provided that the Court has waived the stay imposed by Bankruptcy Rule 6004(h), or such later date to which the DIP Facility Agent consents in writing in its sole discretion, the sale shall be closed.

47.     The Debtors believe that the proposed timeline set forth above maximizes the prospect of receiving the highest or best offer for the Debtors' assets while ensuring that the Debtors can close the sale no later than January 24, 2024, as contemplated under the DIP Term Sheet.  This outside date was one of the substantive negotiated deal points upon which the DIP Lenders insisted as a condition to agreeing to enter into the DIP Term Sheet and fund a marketing process in these Chapter 11 Cases.  The Debtors submit that, particularly in light of the extensive pre-petition marketing process, a further lengthy sale process would only foster uncertainty among the Debtors' vendors, customers (including foreign governments), and workforce, each of which is a key business partner whose confidence and cooperation is necessary to achieve the Debtors' goals in these Chapter 11 Cases.

48.     The Debtors submit that a prompt sale of their assets or the equity in the reorganized Debtors through a competitive process is the best option available to maximize value for all

stakeholders in these Chapter 11 Cases. While there is a real need for expediency here, the Debtors recognize that conducting a postpetition market check on their assets and the equity in the reorganized Debtors is appropriate and necessary, particularly given IRNT's substantial shareholders. To that end, on October 10, 2023, the Board authorized the appointment of Ivona Smith, as an independent director that will have full authority over matters related to the restructuring and the post-petition marketing process.

## IV.    **DIP Motion and Other First Day Motions**[3]

49.    Concurrently herewith, the Debtors filed the First Day Motions seeking relief related to the administration of the Chapter 11 Cases, the Debtors' operations, and the Debtors' financing needs, to ensure a smooth entry into chapter 11. I am familiar with the contents of each First Day Motion (including the exhibits to such motions) and believe that the relief sought in each First Day Motion: (i) will enable the Debtors to operate in chapter 11 with minimal disruptions; (ii) is critical to the Debtors' chapter 11 efforts; and (iii) best serves the interests of the Debtors' estates and creditors. Further, I believe that the relief sought in the First Day Motions is, in each case, narrowly tailored and necessary to achieve the goals identified above.

50.    Following the realization that a restructuring process would need to be conducted within the context of a chapter 11 proceeding, the Debtors and their advisors attempted to identify financing sources that would provide sufficient liquidity so that the Debtors could continue operations in the ordinary course and fund the additional expenses that would be incurred during a bankruptcy process.

---

[3]    Unless otherwise defined herein, all capitalized terms in this Part IV shall have the meanings ascribed to them in the applicable First Day Pleadings.

51.     Accordingly, by the *Debtors' Emergency Motion for Entry of Interim and Final Order (A) Authorizing the Debtors to (I) Obtain Post-Petition Financing and (II) Use Cash Collateral, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Granting Adequate Protection to Prepetition Secured Parties, (D) Modifying the Automatic Stay, (E) Scheduling a Final Hearing, and (F) Granting Related Relief* (the "**DIP Motion**"), the Debtors are seeking approval of, among other things, a $10 million superpriority, senior secured debtor-in-possession credit facility (the "**DIP Facility**") to be provided by ITC Global (in such capacity, the "**DIP Lender**") and under which a party selected by the DIP Lender will act as administrative agent (in such capacity, the "**DIP Agent**").  The DIP Facility will be committed financing for the Debtors upon entry of the Proposed Interim Order.  Prior to entry of the Proposed Final Order, the Debtors will be able to borrow up to $4.5 million under the DIP Facility (less the Prepetition Bridge Facility Obligations (defined below)), with the remaining balance available upon entry of the Proposed Final Order.

52.     I believe that the terms and amount of the proposed DIP Facility will permit the Debtors to meet their business and other obligations in connection with these Chapter 11 Cases in accordance with the Budget, the Proposed Interim Order, and the DIP Documents, which are expressly premised on approval of the DIP Facility on an interim and final basis.

53.     The Debtors have a critical need to use the DIP Facility's proceeds, as well as Cash Collateral, to operate their business and preserve their going-concern value.  Specifically, access to the DIP Facilities and Cash Collateral will permit the Debtors to:  (a) continue to serve their customers and generate revenue during these chapter 11 cases; (b) provide working capital for their business; (c) fund payments to their workforce; (d) fund other general corporate purposes; (e) fund the payments authorized by the Court pursuant to the First Day Motions filed on the

Petition Date; (f) operate the Cash Management System as described in the Cash Management Motion; and (g) satisfy administrative costs and expenses of the Debtors incurred in these Chapter 11 Cases.  Additionally, as demonstrated by the Budget, the need for access to the DIP Facility is further underscored by the fact that I do not believe it would be prudent, or even possible, to administer these Chapter 11 Cases solely on a "cash collateral" basis with no access to additional capital.

54.     As set forth more fully in my Declaration in support of the DIP Motion, the Debtors could not obtain post-petition financing from another source, including a facility that would be on an unsecured, administrative expense basis.  Under the circumstances, including the nature and amount of the Prepetition Liens and the Debtors' other outstanding prepetition debt obligations, obtaining the financing needed by the Debtors as unsecured debt, or even debt secured by liens junior to the liens of the Prepetition Secured Creditors, was simply not a realistic option.  And the Prepetition Secured Creditors would not consent to be primed by any party other than the DIP Lender.  No other lender would be willing to provide the financing necessary to fund the Debtors' business and the contemplated restructuring process on terms more favorable than those provided in the DIP Facility, which includes certain Milestones that I believe are reasonable under the circumstances of these Chapter 11 Cases, and will allow the Debtors to conduct a fulsome value-maximizing process.

55.     It is important to note that the Debtors negotiated with the DIP Lender in good faith and otherwise to ensure that the terms of the DIP Facility and related interim order are customary, consistent with what I believe (based on my own experience as well as discussions with counsel for the Debtors) are reasonable to the Debtors and their estates given the current

circumstances.  To that end, the Debtors, on the one hand, and the DIP Lender, on the other hand, each had separate professional advisors negotiating the DIP Facility.

56.    Based on my experience, and in my business judgment, I believe that the terms of the DIP Facility is reasonable to the Debtors and appropriate under the circumstances, and that good and sufficient cause exists to grant the relief requested in the DIP Motion.  As explained above, the DIP Facility is necessary as it will provide the Debtors with liquidity to administer these Chapter 11 Cases and conduct the contemplated restructuring process, without which the Debtors' ability to successfully prosecute these Chapter 11 Cases will be jeopardized, to the detriment of all of the Debtors' stakeholders.   Further, I believe that the absence of the DIP Facility and access to Cash Collateral would cause immediate and irreparable harm to the Debtors' estates, their creditors, and other stakeholders by compromising the Debtors' ability to, among other things, maintain business relationships and pay vendors that are providing necessary goods and services.

57.    The First Day Motions, other than the DIP Motion, include:

**A.    Administrative and Procedural Motions**

- *Debtors' Motion for an Order Authorizing the Joint Administration of the Debtors' Chapter 11 Cases*

- *Debtors' Application for Appointment of Stretto, Inc. as Claims and Noticing Agent, Effective as of the Petition Date*

**B.    Substantive Motions**

- *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing (I) Payment of Accrued Prepetition Employee Wages, Salaries, and Other Compensation, (II) Payment of Prepetition Employee Business Expenses, (III) Contributions to Prepetition Employee Benefit Programs and Continuation of Such Programs in the Ordinary Course, (IV) Payment of Workers' Compensation Obligations, (V) Payments for Which Prepetition Payroll Deductions Were Made, (VI) Payment of All Costs and Expenses Incident to the Foregoing Payments and Contributions, and  (VII) Payment to Third Parties of All Amounts Incident to the Foregoing Payments and*

> *Contributions, (B) Authorizing the Debtors, In Their Discretion, to Re-Hire Previously Terminated Employees, and (C) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto*

- *Debtors' motion for Entry of Interim and Final Order (A) Authorizing and Approving Continued Use of Cash Management System, (B) Authorizing Use of Prepetition Bank Accounts and Business Forms, (C) Authorizing Performance of Intercompany Transactions in the Ordinary Course of Business and Granting Administrative Expense Status for Postpetition Intercompany Claims, (D) Waiving Strict Compliance with Section 345(b) of the Bankruptcy Code and Certain Operating Guidelines, as Applicable, and (E) Granting Certain Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations, and (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto*

- *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Insurance Programs, Including Payment of Policy Premiums and Broker Fees, and (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Establishing Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock Of IronNet, Inc. and Claims Against the Debtors and (II) Granting Related Relief*

- *Debtors' Emergency Motion for an Order (I) Approving and Authorizing (A) the Debtors' Entry Into the Reinstatement Agreement with Amazon Web Services, Inc. and Amazon Web Services Emea Sarl, (B) the Settlement of Claims and Releases Thereunder, and (C) the Assumption of the Customer Agreement Thereunder; and (II) Granting Related Relief*

58.    I have reviewed and discussed with counsel each of the First Day Motions (including the exhibits thereto), and I believe the facts stated therein to be accurate and correct to the best of my knowledge, with appropriate reliance on corporate officers, business records, and advisors.  I incorporate by reference the factual statements set forth in each of the First Day Motions as though set forth herein.

59.     I believe that the relief sought in each of the First Day Motions is necessary for the success of the Debtors' chapter 11 efforts and the maximization of the value of the Debtors' estates. It is my further belief that, with respect to those First Day Motions requesting the authority to pay specific prepetition claims or continue selected prepetition programs, the relief requested is essential to the Debtors' chapter 11 efforts and necessary to avoid immediate and irreparable harm to the Debtors' estates.  The success of the Chapter 11 Cases depends upon the Debtors' ability to maintain operations in the ordinary course post-petition and maximize estate value.  The relief requested in the First Day Motions is critical to preserving uninterrupted business operations and the confidence of key constituencies necessary to implement a successful restructuring.

## V.      Conclusion

60.     In conclusion, for the reasons stated herein and in each of the First Day Motions, I respectfully request that each First Day Motion be granted in its entirety, together with such other and further relief as this Court deems just and proper.

*/s/ Cameron Pforr*
Cameron Pforr
President and Chief Financial Officer

**<u>EXHIBIT A</u>**

**Organizational Structure**



**IronNet, Inc. Corporate Structure**