## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| IRONNET, INC., *et al.*,[1] | Case No. 23-11710 (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO (I) OBTAIN POSTPETITION FINANCING AND (II) USE CASH COLLATERAL, (B) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (C) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (D) MODIFYING THE AUTOMATIC STAY, (E) SCHEDULING A FINAL HEARING, AND (F) GRANTING RELATED RELIEF**

IronNet, Inc. ("**IRNT**") and its affiliated debtors and debtors in possession (collectively, the "**Debtors**" or the "**Company**") hereby submit this motion (this "**Motion**"), pursuant to sections 105, 361, 362, 363, 364, 503, 506(c), 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), for entry of an interim order, in substantially the form attached hereto as **Exhibit A** (the "**Proposed Interim Order**"),[2] and a final order (the "**Proposed Final Order**" and, together with the Proposed Interim Order, the "**Proposed**

---

[1]    The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  IronNet, Inc. (9446), IronNet Cybersecurity, Inc. (2655), IronNet International, LLC (7621), IronCAD LLC (1162), and HighDegree, LLC (8474).  The Debtors' corporate headquarters is located at 7900 Tysons One Place, Suite 400, McLean, VA 22102.

[2]    Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Proposed Interim Order.

Orders")[3] granting the relief requested below.  In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Cameron Pforr, President and Chief Financial Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**") and the *Declaration of Cameron Pforr in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "**DIP Declaration**"), filed contemporaneously herewith.  In further support of this Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT[4]

1.      As set forth in greater detail in the First Day Declaration and the DIP Declaration, in order to implement their planned restructuring (the "**Restructuring**"), it is imperative that the Debtors have access to DIP financing ("**DIP Financing**") and the use of Cash Collateral during these chapter 11 cases.  Without DIP Financing and authority to use Cash Collateral, the Debtors will not have sufficient liquidity, whether in the form of unencumbered cash on hand or generated from operations, to pay their necessary operating expenses or to implement the Restructuring.  As such, the Debtors have an immediate need for the DIP Financing and would suffer immediate and irreparable harm without it.

2.      Accordingly, by this Motion, the Debtors seek approval of, among other things, the DIP Financing, which consists of a superpriority, senior secured debtor-in-possession

---

[3]    The Debtors will file the form of Proposed Final Order prior to the Final Hearing (as defined below).

[4]    Capitalized terms used but not otherwise defined in this Preliminary Statement have the meanings given to such terms below.

credit facility (the "**DIP Facility**") in an aggregate principal amount not to exceed $10.0 million to be provided by ITC Global Advisers LLC ("**DIP Lender**") and under which a party selected by the DIP Lender will act as administrative agent (in such capacity, the "**DIP Agent**").  The DIP Facility will be committed financing for the Debtors upon entry of the Proposed Interim Order. Prior to entry of the Proposed Final Order, the Debtors will be able to borrow up to $4.5 million under the DIP Facility (less the Prepetition Bridge Facility Obligations (defined below)), with the remaining balance available upon entry of the Proposed Final Order.

3.    By this Motion, the Debtors also seek approval of the continued use of the Prepetition Secured Creditors' collateral, including Cash Collateral.  The Prepetition Secured Creditors have consented to the use of their Cash Collateral, subject to the adequate protection contemplated by the Proposed Orders.

4.    The use of Cash Collateral, together with the DIP Financing, will provide the Debtors with sufficient liquidity to implement the Restructuring and maintain uninterrupted business operations during these chapter 11 cases.  Without the liquidity afforded by the DIP Financing and use of Cash Collateral, the Debtors would be forced to confront business and operational pressures that would impair their ability to consummate the Restructuring, ultimately to the detriment of the Debtors' various stakeholders.  Therefore, the DIP Financing and use of Cash Collateral is critical to the Debtors' reorganization.

5.    For these reasons, and as discussed more fully below, the Debtors respectfully submit that entry into the proposed DIP Facility represents a sound exercise of their business judgment and should be approved.

## JURISDICTION AND VENUE

6.    The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the

30843488.4

*Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final judgment or order absent consent of the parties.

7.    The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, 506(c), 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rule 4001-2.

## **BACKGROUND**

### A.    General Background

8.    On the date hereof (the "**Petition Date**"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committees have been appointed in these chapter 11 cases, and no request has been made for the appointment of a trustee or an examiner.

9.    The First Day Declaration sets forth additional information regarding the Debtors' businesses, their capital structure, and the circumstances leading to the filing of these chapter 11 cases.

### B.    Prepetition Indebtedness

    *i.    Director and C5 Notes - Secured*

10.    In December 2022, April 2023, May 2023, and August 2023, IRNT issued and sold senior secured promissory notes in an aggregate principal amount of $8,475,000 (the

"**Director Notes**") to a total of eight lenders (the "**Director Noteholders**"). The Director Notes bear interest at a rate of 13.8% per annum. None of the Director Noteholders have received payments on account of their Director Notes.

11.     On December 30, 2022, IRNT issued a senior secured convertible promissory note in the principal amount of $2,000,000 (the "**C5 Note**") to an affiliate of C5 Capital Limited ("**C5**", and together with the Director Noteholders, the "**Prepetition Secured Creditors**"), a beneficial owner of more than 5% of the Company's outstanding common stock. In January 2023, February 2023, April 2023, May 2023, and September 2023, IRNT issued additional senior secured convertible promissory notes to affiliates of C5 (together with the C5 Note, the "**C5 Notes**", and together with the Director Notes, the "**Prepetition Secured Notes**") in principal amounts of $3,000,000, $6,250,000, $600,000, $2,300,000, and $300,000, respectively. Each of the C5 Notes bears interest at a rate of 13.8% per annum.

12.     IRNT's obligations under the Director Notes and the C5 Notes are secured by substantially all of IRNT's assets, excluding intellectual property.

13.     As of the Petition Date, approximately $25,300,00 of indebtedness under the Prepetition Secured Notes was outstanding, which amount is comprised of $23,800,000 in principal amount and accrued and unpaid interest, premiums, and fees in the amount of $1,500,000.

*ii.     Prepetition Bridge Facility - Secured*

14.     On October 6, 2023, the Debtors and the DIP Lender entered into the Superpriority Secured Debtor-in-Possession Credit Facility Term Sheet attached to the Proposed Interim Order as Exhibit 1 (the "**DIP Term Sheet**"). Pursuant to DIP Term Sheet and the applicable documentation (the "**Bridge Documentation**"), an affiliate of C5, as bridge lender (the "**Bridge Lender**"), advanced $1,244,000 to the Debtors on October 10, 2023 and $256,000

to the Debtors on October 11, 2023 to allow for the orderly transition of the Debtors into these chapter 11 cases (the "**Bridge Facility Obligations**").  Pursuant to the DIP Term Sheet, as security for the Prepetition Bridge Facility Obligations, each Debtor granted to the DIP Lender a security interest in and lien on all assets of each Debtor (the "**Bridge Facility Liens**").  On October 12, 2023, the DIP Lender filed a UCC-1, as well as certain intellectual property security agreements, perfecting its Bridge Facility Liens.

    *iii.*    *KORR Note*

15.    On July 21, 2023, IRNT issued that certain secured promissory to Korr Acquisitions Group, Inc. ("**Korr**") in the aggregate principal amount of $500,000 (the "**Korr Note**").  The Korr Note is purportedly secured by receivables owing from time to time to IRNT under certain support, solutions or services contracts.  IRNT cannot verify that a UCC-1 has been filed with respect to the Korr Note.

16.    IRNT believes $513,608 is outstanding under the Korr Note as of the Petition Date.

    *iv.*    *3i Note - Unsecured*

17.    On September 14, 2022, IRNT entered into a Securities Purchase Agreement (the "**SPA**") with 3i, LP ("**3i**"), under which IRNT agreed to sell and issue senior unsecured convertible promissory notes to 3i in an aggregate principal amount of up to approximately $25,800,000, which are convertible into shares of common stock.  On September 15, 2022, IRNT issued a convertible note under the SPA in the aggregate principal amount of $10,300,000 (the "**3i Note**").  On August 23, 3023, 3i sent a Notice of Default stating that, among other things, the Company is in purported payment default and purported covenant default under the 3i Note.

18.    IRNT believes $7,900,000 is outstanding under the 3i Note as of the Petition Date.

*v.*    *Other Unsecured Debt*

19.    In the ordinary course, the Debtors incur trade debt with certain vendors and suppliers in connection with the operation of their business.  In addition, the Debtors have other potential and contingent liabilities related to litigation, pension, and employee obligations, certain of which are described herein.

## C.    Material Terms of the DIP Facility[5]

20.    Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, the following is a concise summary of the proposed material terms of the DIP Documents (as defined below) and the Proposed Interim Order.[6]

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| **Borrowers**<br><br>Bankruptcy Rule 4001(c)(1)(B) | IRNT, in its capacity as a debtor and debtor-in-possession, and each of IRNT's subsidiaries and affiliates that becomes a debtor and debtor-in-possession (collectively with IRNT, the "**DIP Facility Borrowers**"), in their capacities as such, in the chapter 11 cases. | DIP Term Sheet at p. 1 |
| **Guarantor**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Any Debtors that are not otherwise DIP Facility Borrowers (the "**Guarantors**" and, collectively with the DIP Facility Borrowers, the "**Loan Parties**"). | DIP Term Sheet at p. 1 |
| **DIP Agent**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The administrative agent and the collateral agent for the DIP Lender with respect to the DIP Facility (in such capacities, the "**DIP Facility Agent**") shall be a party selected by, and qualified to perform the duties customarily | DIP Term Sheet at p. 2 |

---

[6]    Capitalized terms used in this summary but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Documents and the Proposed Orders, as applicable.  The summary above is qualified in its entirety by reference to the applicable provisions of the DIP Documents and the Proposed Orders.  To the extent of any inconsistency or conflict between this concise statement and the provisions of the DIP Documents and Proposed Orders, the provisions of the DIP Documents and Proposed Orders, as applicable, shall control.  The Debtors reserve the right to supplement the statements made pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2 herein.

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| | associated with such roles, as determined by the DIP Lender and reasonably acceptable to the Debtors. | |
| **DIP Lender**<br><br>Bankruptcy Rule 4001(c)(1)(B) | ITC Global Advisers LLC, and/or its respective designated affiliates and/or related funds or accounts, and such other lender parties that have agreed or may agree from time to time to provide commitments to fund the DIP Facility (each a "**DIP Lender**," and collectively, the "**DIP Lender**"). | DIP Term Sheet at p. 2 |
| **Borrowing Limits/ Commitment**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule<br><br>4001-2(a)(i)(A) | A senior (priming) secured and superpriority debtor-in-possession delayed-draw term loan credit facility in an aggregate principal amount not to exceed $10,000,000 (the "**Maximum Facility Amount**"), consisting of up to $8,500,000 of term loans (the "**DIP Term Loans**") and $1,500,000 of the Bridge Amount (collectively, the "**DIP Loans**"). Until the entry of the Final Order (defined below), a maximum amount of up to $4,500,000 of the DIP Facility (inclusive of the Bridge Amount) will be available on an interim basis (the "**Interim Maximum Amount**").<br><br>Subject to the consent of the DIP Lender and approval from the Court, and consistent with the Debtors' fiduciary duties, (i) the Maximum Facility Amount may be increased or (ii) the Debtors may obtain additional post-petition financing, including a "first-out" or "senior" financing facility, on terms acceptable to the DIP Lender (the "**Incremental DIP**"); provided however, any Incremental DIP shall not mature any earlier than the Maturity Date hereunder. | DIP Term Sheet at p. 2 |
| **Maturity and Termination**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule<br><br>4001-2(a)(i) | The DIP Lender's commitment to provide the DIP Facility shall terminate, and the aggregate principal amount owing under the DIP Facility, all accrued and unpaid interest thereon, and all fees and expenses incurred by the DIP Facility Agent and DIP Lender as provided herein in connection with the DIP Facility (collectively, the "**DIP Obligations**") shall be repaid in full, on the earliest to occur of (the "**Maturity Date**"): (a) the date which is 180 days after the Petition Date, unless extended by agreement of the DIP Facility Agent in its sole discretion; (b) the effective date of any chapter 11 plan confirmed in any of the chapter 11 cases; (c) the entry of an order for the dismissal or conversion to chapter 7 of any of the chapter 11 cases; (d) the closing of a sale of all or substantially all assets or equity of the Loan Parties; or (e) the date of any Event of Default under the DIP Credit Agreement or any of the DIP Documents and the election of the DIP Facility Agent to terminate the DIP Facility commitments following such Event of Default and the expiration of all applicable notice and cure periods. | DIP Term Sheet at pp. 3-4 |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| **Borrowing Conditions and Restrictions on Use of Proceeds**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule<br><br>4001-2(a)(i) | All proceeds under the DIP Facility shall be used only in accordance with the Budget, subject to Permitted Variances, in each case, as provided below.  Unless otherwise agreed, no borrowing shall be made more frequently than weekly and all proceeds under the DIP Facility shall only be used for the following purposes: (a) to fund, to the extent that usage of cash collateral and available cash are not sufficient to cover such expenses, post-petition operating expenses and working capital needs of the Debtors, including, but not limited to, those activities required to remain in, or return to, compliance with laws in accordance with 28 U.S.C. § 1930; (b) to fund fees and expenses incurred in connection with the Restructuring; (c) to pay permitted prepetition claim payments and adequate protection payments, if any; (d) to pay professional fees in connection with these chapter 11 cases; and (e) to pay other costs and expenses of administration of the chapter 11 cases. | DIP Term Sheet at p. 3 |
| **Interest Rate**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule<br><br>4001-2(a)(i)(B) | The DIP Facility shall accrue PIK interest at a rate of 16% per annum.<br><br>An additional 2% per annum, effective upon the occurrence of any Event of Default. | DIP Term Sheet at p. 4 |
| **Fees and Expenses**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(B), 4001-2(a)(i)(K) | $300,000 Agency Fee | DIP Term Sheet at p. 4 |
| **Provisions Limiting Court's Power or Discretion to Enter Future Orders**<br><br>Local Rule 4001-2(a)(i)(C) | N/A | |
| **Provisions Providing for Funding of Non-Debtor Affiliates**<br><br>Local Rule | N/A | |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| 4001-2(a)(i)(D) | | |
| **Material Conditions to Closing and Borrowing, Including Budgets**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(E) | As a condition precedent to the DIP Facility, there shall be established a 13-week cash flow budget updated on a monthly basis (the "**Budget**") for the Debtors' cash receipts and expenses (including professional fees and expenses). Any updates or revisions to the Budget, other than with respect to professional fees and expenses, shall require the prior written consent of the DIP Facility Agent. The Budget shall be due on the first Monday of each month.<br><br>Additional conditions to commitment, closing, and funding to include usual and customary for DIP facilities of this type, including, without limitation, entry of the Proposed Interim Order and Proposed Final Order and execution and delivery of the DIP Documents. | DIP Term Sheet at p. 7 |
| **Carve Out**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii)<br><br>Local Rule 4001-2(a)(i)(F) | The DIP Liens, AP Liens, Prepetition Liens, and the DIP Superiority Claims and the AP Superiority Claims, shall be subject to a carve-out (the "Carve-Out") for the following, and in the following priority (i) all fees (and interest) required to be paid to the Clerk of the Bankruptcy Court and to the United States Trustee; (ii) subject to any applicable restrictions in the Interim Order, the amount of allowed and unpaid fees, costs, and expenses of the estate's court-approved professionals in the Case incurred from and after the occurrence of an Event of Default, in an aggregate amount not to exceed (1) $250,000 in the case of the Debtor's court-approved professionals and (2) $75,000 in the case of court-approved professionals retained by any Creditors' Committee; and (iii) subject to any applicable restrictions in the Interim Order, the amount of allowed and unpaid fees, costs, and expenses of the estate's court-approved professionals in these chapter 11 cases incurred prior to the occurrence of an Event of Default, not to exceed the amounts set forth in applicable lines of the Budget as of any applicable date of determination; provided that in no event shall the DIP Lenders be obligated to loan funds to pay any claims benefiting from the Carve Out (or to advance any funds following a Carve-Out Event), including to the extent that such amounts would, when combined with the amounts advanced under the DIP Facility, exceed the maximum principal amount of commitments under the DIP Facility. | Proposed Interim Order at ¶ 18 |
| **Security and Priority Under the DIP Facility** | <u>DIP Liens</u>. Effective immediately upon entry of the Interim Order, and without any further action under state law, as security for the DIP Obligations and subject in all respects to the Carve-Out, pursuant to sections 361, 362, | Proposed Interim Order ¶¶ 5-6 |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii)<br><br>Local Rule<br><br>4001-2(a)(i)(G), 4001-2(a)(i)(N), 4001-2(a)(i)(P) | 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted valid, binding, continuing, enforceable, non-avoidable, and automatically and properly perfected security interests and liens on all assets and properties of the Debtors (whether tangible, intangible, real, personal, or mixed), whether now owned or hereafter acquired and wherever located, before or after the Petition Date, including, without limitation, all cash, cash equivalents, accounts, inventory, equipment, equity interests or capital stock in domestic and foreign subsidiaries (subject to any limitation in the DIP Documents), investment property, instruments, chattel paper, real property, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, receivables, all claims or causes of action (including, any commercial tort claims or causes of action, and subject to entry of the Final Order, the proceeds of Avoidance Actions and all products, offspring, profits, and proceeds thereof) (all of the foregoing collateral, collectively, the "DIP Collateral," and the Security Interests (as defined below) thereon and therein, the "DIP Liens"); provided that, and notwithstanding anything to the contrary herein, the DIP Collateral shall not include Avoidance Actions themselves. For the avoidance of doubt, the DIP Collateral shall include the Prepetition Collateral.<br><br>DIP Lien Priority. The DIP Liens shall be, in all cases, subject to the Carve Out, and have the priority set forth as follows: (a) pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Obligations shall be secured by a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all DIP Collateral that, on or as of the Petition Date, is not subject to any existing liens; (b) pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Obligations shall be secured by a valid, binding, continuing, enforceable, fully-protected junior security interest and lien upon all DIP Collateral that, on or as of the Petition Date, is not subject to any existing liens that, under applicable law, are senior to, and have not been subordinated to, the Prepetition Liens; and (c) pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Obligations shall be secured by a valid, binding, continuing, enforceable, fully-perfected first priority priming security interest in and lien on all DIP Collateral, senior in priority to the Prepetition Liens; and (d) The DIP Liens shall be subject, and immediately junior, to valid, perfected, and non-avoidable Senior Permitted Liens in existence on the Petition Date that are not subject to | |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| | subordination and were either properly perfected as of the Petition Date or subsequently perfected pursuant to section 546(b) of the Bankruptcy Code, including (i) liens arising by operation of law in favor of warehousemen, landlords, carriers, mechanics, materialmen, laborers or suppliers, in each case incurred in the ordinary course of business and not in connection with the borrowing of money, (ii) liens incurred in the ordinary course of business in connection with workers' compensation and other unemployment insurance, or to secure the performance of tenders, surety and appeal bonds, bids, leases, government contracts, trade contracts and other similar obligations (exclusive of obligations for the payment of borrowed money), (iii) rights of setoff or bankers' liens upon deposits of cash in favor of banks or other depository institutions and (iv) any liens at IronNet Cybersecurity as set forth in Exhibit 3 to the Interim Order. | |
| **Milestones**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vi)<br><br>Local Rule 4001-2(a)(i)(H) | The Debtors shall conduct a process (the "**Sale Process**") for the sale of substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code or the equity of the reorganized Debtor (the "**Sale**") and concurrently seek the confirmation of the Acceptable Plan in accordance with the below Milestones (the "**Milestones**"). The Debtors' failure to satisfy any of the following Milestones shall constitute an Event of Default under the DIP Documents:<br>(a) No later than October 12, 2023, the Petition Date shall have occurred;<br>(b) No later than the date that is three (3) calendar days following the Petition Date (or if such third day is not a business day, the first succeeding business day thereafter), the Court shall have entered the Proposed Interim Order,<br>(c) No later than the date that is fifteen (15) business days following the Petition Date (or if such third day is not a business day, the first succeeding business day thereafter), the Debtors shall have (i) filed a motion, in form and substance acceptable to the DIP Facility Agent, requesting entry of an order approving procedures for the post-petition marketing of the Debtors' assets or reorganized equity to determine if a higher and better offer can be obtained to "top" the proposed treatment under an Acceptable Plan, including whether the Debtors can obtain exit financing on better terms will be proposed by DIP Lender (the "**Sale Procedure Order**");<br>(d) No later than the date that is thirty-five (35) calendar days following the Petition Date, the Court shall have entered the Sale Procedure Order and the Proposed Final Order; and<br>(e) No later than the date that is sixty-five days (65) days following the entry of the Proposed Interim Order, the Debtors shall have conducted an auction for the Sale (if | DIP Term Sheet at pp. 7-8 |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| | necessary) and selected the successful bidder and/or identified an alternate plan sponsor providing higher and better treatment and consistent with the Debtors' fiduciary duties;<br><br>(f) No later than the date that is ninety (90) days following the entry of the Proposed Interim Order, the Court shall have entered an order approving the Sale or order confirming the Plan of Reorganization; and<br><br>(g) On or before the date that is one hundred five (105) days after the Petition Date, provided that the Court has waived the stay imposed by Bankruptcy Rule 6004(h), or such later date to which the DIP Facility Agent consents in writing in its sole discretion, the Sale shall be closed. | |
| **Prepayment**<br><br>Local Rule 4001-2(a)(i)(I) | N/A | |
| **Provisions Governing Joint Liability**<br><br>Local Rule 4001-2(a)(i)(J) | N.A | |
| **Provisions Requiring Debtors to Pay Agent or Lender's Expenses and Attorneys' Fees Without Notice or Review**<br><br>Local Rule 4001-2(a)(i)(K) | N/A | Proposed Interim Order at ¶ 22 |
| **Provisions Prohibiting Use of Estate Funds to Investigate Liens and Claims of Prepetition Lenders**<br><br>Local Rule 4001-2(a)(i)(L) | No proceeds of the DIP Facility, the Carve-Out, or any Cash Collateral may be used by the Debtors or any other party in interest, or their representatives, to (or support any other party to) (a) investigate or finance any investigation (including discovery proceedings), initiation or prosecution of any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the DIP Agent or the DIP Lenders, or their respective rights and remedies under or in respect of the DIP Facility, (b) in connection with challenging, invalidating, disallowing, recharacterizing, setting aside, avoiding, subordinating (other than to the Carve-Out), in whole or in part, or taking or attempting to take any other action to render unenforceable, the liens, claims, interests and adequate protection of the DIP Agent | Proposed Interim Order at ¶ 20 |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| | and the DIP Lenders, including for the avoidance of doubt, objecting to or contesting the validity, extent, amount, perfection, priority, or enforceability of the obligations under the DIP Facility or the DIP Liens, (c) for any purpose that is prohibited under the Bankruptcy Code, the Interim Order, the Final Order, or the DIP Documents, or (d) seek approval of any superpriority claims or grant any lien that is senior to or pari passu with the DIP Liens or DIP Superpriority Claims, except as contemplated by the DIP Term Sheet, the Interim Order or any DIP Document; provided, however, that the Debtors shall not be precluded from using Cash Collateral and/or proceeds from DIP Loans to contest whether an Event of Default has occurred and is continuing under the DIP Documents, and/or prepare for and participate at any hearing held by the Bankruptcy Court regarding any exercise of rights or remedies under the DIP Documents; provided, further, that up to $10,000 shall be made available to any Creditors' Committee to investigate (but not object to or commence an action or proceeding with respect to) the Prepetition Senior Secured Notes Obligations and the Prepetition Liens.  No portion of such amount may be used to prosecute or support any claims. | |
| **Termination or Events of Default**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule<br><br>4001-2(a)(i)(M) | The DIP Documents shall include events of default that are customary and appropriate for similar debtor-in-possession financings, including, without limitation: (a) if any of the chapter 11 cases shall be converted to a case under chapter 7 of the Bankruptcy Code or be dismissed; (b) the appointment of a trustee under section 1104 of the Bankruptcy Code; (c)  the appointment of an examiner with expanded or enlarged powers (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; (d) the Debtors fail to make all payments under the DIP Facility when due (e) variance from Budget that is not a permitted variance; and (f) failure to comply with any of the Milestones herein and such failure has not been cured within five (5) business days after notice of such failure has been provided by the DIP Facility Agent to the Debtors. | DIP Term Sheet at pp. 6-7 |
| **Provisions (a) Granting Cross-Collateralization Protection, (b) Elevating Prepetition Debt to Admin. Expense, or (c) Securing Prepetition** | N/A | |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| **Debt with Liens on Postpetition Assets**<br><br>Local Rule<br><br>4001-2(a)(i)(N) | | |
| **"Roll-Up" Provisions**<br><br>Local Rule<br><br>4001- 2(a)(i)(O) | Upon entry of the Proposed Interim Order, the Bridge Amounts shall be deemed "rolled up" and converted to DIP Loans on a cashless, dollar-for-dollar basis.<br><br>The "Bridge Amounts" shall be the amounts advanced on or after October 6, 2023, through the Petition Date, but not to exceed $1,500,000. | DIP Term Sheet at pp. 2-3 |
| **Priming Provisions**<br><br>Local Rule<br><br>4001-2(a)(i)(P) | Pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Obligations shall be secured by a valid, binding, continuing, enforceable, fully-perfected first priority priming security interest and lien on all DIP Collateral, senior in priority to the Prepetition Liens. | Proposed Interim Order at ¶ 6(c) |
| **Provisions or Findings of Fact (i) Binding Estate or Parties in Interest w/r/t Validity, Perfection, or Amount of Prepetition Liens or the Waiver of Claims Against the Secured Creditor Without Giving Parties in Interest at Least Seventy-Five (75) Days from the Entry of the Initial Interim Order to Investigate Such Matters[7]**<br><br>Bankruptcy Rule 4001(c)(1)(B)(viii)<br><br>Local Rule | N/A | Proposed Interim Order at ¶ 24 |

---

[7] The Debtors are not, as part of the Proposed Interim Order, seeking any releases with respect to the Director Notes, however, the Debtors reserve their right to seek, as part of the Proposed Final Order, certain relief related to the Director Noteholder, solely in their capacity as a lender, to the extent the Debtors' Independent Director believes any such relief should be sought.

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| 4001-2(a)(i)(Q) | | |
| **Provisions Immediately Approving All Terms and Conditions of the DIP Credit Agreement**<br><br>Local Rule<br><br>4001-2(a)(i)(R) | N/A | |
| **Waivers/ Modification of Automatic Stay and Provisions Allowing Lenders to Enforce Remedies Without at Least Five (5) Days Written Notice**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv)<br><br>Local Rule 4001-2(a)(i)(S) | N/A | Proposed Interim Order at ¶ 17 |
| **Provisions Limiting What Parties in Interest (Other Than the Debtors) May Raise**<br><br>Local Rule 4001-2(a)(i)(T) | N/A | Proposed Interim Order at ¶ 17 |
| **Immediate Liens on Avoidance Actions**<br><br>Bankruptcy Rule 4001(c)(1)(b)<br><br>Local Rule 4001-2(a)(i)(U) | N/A | Proposed Interim Order at ¶ 5 |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| **Immediate Section 506(c), 552(b) "Equities of the Case," and Marshalling Waivers**<br><br>Bankruptcy Rule 4001(c)(1)(B)(x);<br><br>Local Rule 4001-2(a)(i)(V)-(X) | N/A | Proposed Interim Order at ¶¶ 26-28 |
| **Adequate Protection**<br><br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii)<br><br>Local Rule 4001-2(a)(i)(B), 4001-2(a)(i)(K), 4001-2(a)(i)(N), 4001-2(a)(i)(P) | The Prepetition Secured Creditors are entitled, pursuant to sections 361, 362, 363, 364, and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the applicable Prepetition Collateral, including Cash Collateral, to the extent of any Diminution. Accordingly, as adequate protection, the Prepetition Secured Creditors are hereby granted the following:<br><br>Adequate Protection Liens. Subject to the Carve-Out, to the extent there is Diminution, the Prepetition Secured Creditors, are hereby granted subject to the terms and conditions set forth below, pursuant to sections 361, 363, 364, and 507 of the Bankruptcy Code, valid, binding, enforceable and perfected replacement liens on and security interests in the DIP Collateral, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions (such adequate protection replacement Liens, the "AP Liens"), which AP Liens on the DIP Collateral shall be junior and subordinate only to the Carve-Out and the DIP Liens. The AP Liens shall otherwise be senior to all other security interests in or liens on any of the DIP Collateral. The AP Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the Prepetition Secured Creditors and not in substitution therefor.<br><br>Prepetition Secured Creditor Adequate Protection Superpriority Claims. Subject only to the Carve-Out and the DIP Superpriority Claims, to the extent of Diminution, the Prepetition Secured Creditors are hereby further granted an allowed superpriority administrative claim (such adequate protection superpriority claims, the "AP Superpriority Claim"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and priority and other unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in | Proposed Interim Order at ¶ 10 |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| | or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726 , 1113, 1114, or any other provision of the Bankruptcy Code or otherwise, junior only to the Carve-Out and the DIP Superpriority Claims to the extent provided herein and in the DIP Documents, and payable from and having recourse to all prepetition and postpetition property of the Prepetition Secured Creditors and all proceeds thereof (including, subject to entry of the Final Order granting such relief, all proceeds of Avoidance Actions). | |
| **Loan Covenants**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i) | N/A | N/A |
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | N/A | N/A |

## **RELIEF REQUESTED**

21.    The Debtors respectfully request entry of the Proposed Orders:

(i)    authorizing the Debtors, in their capacity as borrowers, to obtain postpetition financing and other financial accommodations on a joint and several basis in connection with the debtor in possession financing, comprising, among other things, the DIP Facility, which consists of a multi-draw credit loan facility in an aggregate principal amount of up to $10 million, which shall be made available to the Debtors (a) in a roll up (the "**DIP Roll-Up Loans**") of the approximately $1.5 million in outstanding Prepetition Bridge Facility Obligations in accordance with the terms substantially set forth in the DIP Term Sheet upon entry of the Proposed Interim Order, (b) up to $4.5 million minus the aggregate amount of the Roll-Up Loans in accordance with the terms substantially set forth in the DIP Term Sheet upon entry of the Proposed Interim Order, and (c) the remaining principal amount available under the DIP Facility in accordance with the terms of the DIP Documents upon entry of the Proposed Final Order (such loans described in this paragraph, the "**DIP Loans**") to be funded by the DIP Lender;

(ii)     authorizing the Debtors to execute the DIP Term Sheet and the other documents, agreements, and instruments delivered pursuant thereto or executed or filed in connection therewith, all as may be reasonably requested by the DIP Lender (as the same may be amended, restated, supplemented or otherwise modified from time to time, collectively, the "**DIP Documents**");

(iii)    authorizing the Debtors to use the proceeds of the DIP Loans and Cash Collateral (as defined in the Proposed Interim Order), as further described herein, to, among other things, pay for working capital needs of the Debtors in the ordinary course of business and for the costs and expenses of administering these chapter 11 cases;

(iv)    granting adequate protection, with respect to each of the Debtors, to the Prepetition Secured Creditors;

(v)     authorizing, on the terms set forth herein, the Debtors to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due, and payable, including, without limitation, an agency fee of $300,000 (the "**Agency Fee**") and reasonable fees and disbursements of the DIP Agent's legal and financial advisor pursuant to the DIP Term Sheet;

(vi)    granting superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code against each of the Debtors' estates to the DIP Lender, with respect to all obligations owing and outstanding thereunder and under the DIP Documents, as applicable, and the Proposed Interim Order and any Proposed Final Order, as applicable (collectively, the "**DIP Obligations**"), with priority over any and all administrative expenses of any kind or nature subject and subordinate only to the Carve-Out (as defined in the Proposed Interim Order) on the terms and conditions set forth herein and in the DIP Term Sheet;

(vii)   subject to the Carve-Out, granting to the DIP Agent, for the benefit of itself and the DIP Lender, valid, enforceable, nonavoidable, automatically, validly and fully perfected security interests in and liens on all of the DIP Collateral (as defined in the Proposed Interim Order) pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, including all property constituting Cash Collateral;

(viii)   subject to and effective upon entry of the Proposed Final Order, in each case except to the extent of the Carve-Out, determining that (a) the Debtors have waived any right to surcharge any collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise; (b) the equitable doctrine of marshaling and other similar doctrines shall not apply; and (c) the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply; *provided*, that upon entry of the Proposed Final Order, any DIP Superpriority Claims may be collected out of the proceeds of any Avoidance Actions (each as defined in the Proposed Interim Order);

(ix)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Proposed Interim Order; and

(x)    scheduling a final hearing (the "**Final Hearing**") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing.

<u>**BASIS FOR RELIEF REQUESTED**</u>

**A.    Entry into the DIP Documents is an Exercise of the Debtors' Sound Business Judgment**

22.    The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the proceeds of the DIP Facility, and continue using Cash Collateral. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed below. Courts grant debtors considerable deference in acting in accordance with their business judgment in obtaining post-petition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying the Bankruptcy Code. *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a post-petition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

23.    Bankruptcy courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a

30843488.4

reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assoc.'s*, 14 B.R. 506, 513-14 (Bankr. D. Utah. Oct 8, 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code"). To determine whether the business judgment test is met, the court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).

24.      In determining whether the Debtors have exercised sound business judgment in entering into the DIP Documents, the Court should consider the economic terms of the DIP Facility under the totality of circumstances. *See* Hr'g Tr. at 734–35:24, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009) (recognizing that "the terms that are now available for DIP financing in the current economic environment aren't as desirable" as they once were previously, referring to the period following the 2008 financial markets collapse); *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP Lender, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *In re Elingsen McLean Oil Co., Inc.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization). Moreover, the Court may appropriately consider non-economic benefits to debtors offered under a proposed postpetition facility. *See In re ION Media Networks, Inc.*, No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (holding that "a business decision to obtain credit from a particular lender is almost never based purely on economic terms. . . . Relevant features of the financing must be evaluated, including non-economic

elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. . . .").

25.     The Debtors' decision to enter into the DIP Documents is an exercise of their sound business judgment.  As further discussed in the First Day Declaration and the DIP Declaration, the DIP Facility was a product of good faith arm's length negotiation among the Debtors and the DIP Lender, the best (and only) available source of post-petition financing, and an essential aspect of the Restructuring.  Against the backdrop of an imminent chapter 7, the Debtors ultimately decided that moving forward with the proposed DIP Facility was an appropriate step given that the DIP Facility will allow the Debtors to fund these chapter 11 cases and implement the Restructuring for the benefit of the Debtors' creditors and all stakeholders. Ultimately, the Debtors and their advisors determined that the DIP Facility was appropriate and in the Debtors' best interests under the totality of circumstances.  The incremental liquidity provided under the DIP Facility is needed to ensure adequate working capital and funding for the other administrative expenses associated with these chapter 11 cases.  Without this funding, the Debtors would be unable to sustain operations throughout their reorganization process and would be forced to liquidate.  Accordingly, estate value would be significantly impaired without the DIP Facility funding.  In light of the above, the Debtors determined that entry into the DIP Facility was the best path available, and they have obtained the best terms currently achievable under the circumstances.

**B.      The DIP Roll-Up Loans Should Be Approved.**

26.     The DIP Roll-Up Loans contemplate refinancing all outstanding Prepetition Bridge Facility Obligations as of the Petition Date.  Specifically, the DIP Roll-Up Loans roll up, on a dollar-for-dollar basis, the Prepetition Bridge Facility Obligations into DIP Loans upon entry of the Proposed Interim Order.

27.     The Debtors submit that the DIP Roll-Up Loans are appropriate and reasonable under the circumstances for a number of reasons.  First, the DIP Lender's primary desire was to fund a bankruptcy process.  However, as discussed in the First Day Declaration and the DIP Declaration, the Company needed funds to prepare an organized chapter 11 filing, and the DIP Lender agreed to advance those funds on the eve of these cases on the express condition that the DIP Roll-Up Loans would be part of the DIP Facility.  Given the thorough negotiations with the DIP Lender and the Debtors' assessment that they were unlikely to find better alternatives given their circumstances, agreeing to the DIP Roll-Up Loans was a reasonable exercise of the Debtors' business judgment.  Notably, the DIP Roll-Up Loans total $1.5 million, a small fraction of the $10 million DIP facility offered by the DIP Lender to fund these cases.

28.     The DIP Roll-Up Loans were advanced in express contemplation of, and on the eve of the commencement of, these cases.  If the Debtors could have waited to borrow funds until after the Court's approval, they would have.  However, the Debtors would not been able to seek the requested relief without the DIP Lender's advancement of funds hours prior to the filing of these cases.  While the Debtors have the utmost respect for the legal principles surrounding the petition date and automatic stay, given the Debtors' dire need for funding and the DIP Lender's agreement to provide such funding to facilitate the filing of these cases on what the Debtors' believe to be fair terms that provide the Debtors with flexibility, the Debtors believe that, based on the facts of these cases, approving the DIP Roll-Up Loans is appropriate.

29.     Finally, to protect their estates, the Debtors have required—and the Proposed Interim Order contains—a provision that would terminate the security interests in and liens on any of the assets of the Debtors, other than the assets of IronNet, Inc., effective as of prior to the Petition Date, if the DIP Lender fails to fund any of DIP Loans after entry of the Proposed

Interim Order.  Thus, if the DIP Lender's DIP Roll-Up Loans are approved in the Proposed Interim

Order, and the DIP Lender subsequently fails to fund the DIP Loans, the DIP Lender will lose its

security interest in and liens on the Debtors' intellectual property.

**C.      The Debtors Should be Authorized to Grant Liens and Superpriority Claims**

30.      In connection with the DIP Facility, the Debtors propose to provide security

interests and liens as set forth in the DIP Documents and described above.  The Debtors satisfy the

requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to

incur secured or superpriority debt under certain circumstances.  Specifically, section 364(c) of the

Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1)
> of this title as an administrative expense, the court, after notice and a hearing, may
> authorize the obtaining of credit or the incurring of debt:
>
> (1) with priority over any or all administrative expenses of the kind specified in
> section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien;
> or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien . . . .

11 U.S.C. § 364(c).

31.      To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need

only demonstrate "by a good faith effort that credit was not available" to the debtor on an

unsecured or administrative expense basis.  *Bray v. Shenandoah Fed.  Savs. & Loan Ass'n (In re

Snowshoe Co.),* 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Crouse Grp., Inc.,* 71 B.R. 544, 549

(Bankr. E.D. Pa. 1987) (finding that secured credit under section 364(c) of the Bankruptcy Code

is authorized, after notice and hearing, upon a showing that unsecured credit cannot be obtained).

"The statute imposes no duty to seek credit from every possible lender before concluding that such

credit is unavailable."  *In re Snowshoe Co.,* 789 F.2d, at 1088*; see also Pearl-Phil GMT (Far East)*

*Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (finding that superpriority administrative expenses should be authorized where debtor could not obtain credit as an administrative expense). When few lenders are likely to be willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. *Anchor Sav. Bank FSB v. Sky Valley Inc.*, 99 B.R. 117 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d at 1088 (finding that credit was unavailable absent a senior priming lien because the debtor had made unsuccessful contact with other financial institutions in the relevant geographic area); *In re Stanley Hotel, Inc.,* 15 B.R. 660, 663 (D. Colo. 1981) (finding that the fact that two national banks refused to grant unsecured loans was sufficient to support the conclusion that the requirements of section 364 were met); *In re Ames Dep't Stores, Inc.,* 115 B.R. at 40 (approving financing facility and finding that debtor made reasonable efforts to satisfy the requirements of section 364(c) by approaching four lending institutions, two of which refused to provide financing, and selecting the most favorable of the two offers it received).

   32. Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

   i. the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code (i.e., by allowing a lender only an administrative claim);

   ii. the credit transaction is necessary to preserve the assets of the estate; and

   iii. the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 37–40; *Norris Square Civic Ass'n v. St. Mary Hosp.  (In re St. Mary Hosp.)*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp., 71 B.R. at 549.*

33.     Furthermore, if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c).

34.     As described above, the Debtors do not believe alternative financing is presently available on an unsecured or administrative priority only basis.  Notwithstanding the Debtors' lack of viable, unencumbered collateral, the Debtors solicited offers for potential alternative post-petition financing.   However, no other party was willing to extend unsecured credit or lend on a junior basis to the Prepetition Secured Creditors.  Also, the Prepetition Secured Creditors would not consent to the priming of their existing liens by a third-party lender, other than the DIP Lender, which therefore would require litigation to obtain any alternative post-petition financing on a secured basis.  Potential third-party sources of DIP financing were unwilling to engage in litigation to lend on a post-petition, senior-secured basis.  The Debtors, therefore, determined that the DIP Facility provided the best and only opportunity available to the Debtors under the circumstances to fund these chapter 11 cases.  For the foregoing reasons, approving superpriority claims in favor of the DIP Lender is reasonable and appropriate.

35.     Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Consent by the secured creditors to priming obviates the need to show adequate protection. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Secured Creditors support the priming or (b) the Prepetition Secured Creditors' interests in collateral are adequately protected.

36.     While the Prepetition Secured Creditors' liens are being primed by the DIP Liens, the Prepetition Secured Creditors consent to such priming.[8] Moreover, the DIP Documents provide the Prepetition Secured Creditors with adequate protection liens on all DIP Collateral. The AP Liens (as defined in the Proposed Interim Order), subject only to the Carve-Out, the DIP Liens, and the Permitted Liens, grant the Prepetition Secured Creditors allowed administrative expense claims to the extent of any post-petition diminution in value of the Prepetition Secured Creditors' interests. Finally, the Debtors have attempted to find but are unaware of any available financing on equal or better terms than those offered by the DIP Lender, absent the granting of first priority liens on the DIP Collateral. Therefore, the Debtors submit that the requirement of section 364 of

---

[8]     As the Debtors cannot identify a UCC-1 Financing Statement for the Korr Note, they did not seek Korr's consent to priming. The Debtors reserve the right to seek a modification to the Proposed Interim Order to the extent that the parties agree that a perfected security interest existed as of the Petition Date.

the Bankruptcy Code—that alternative credit on more favorable terms be unavailable to the debtor—is satisfied.

**D.      Prepetition Secured Parties' Interests are Adequately Protected**

37.      Parties with an interest in cash collateral are entitled to adequate protection. *See* 11 U.S.C. § 363(e). Adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims.  Thus, what constitutes adequate protection is decided on a case-by-case basis. *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech.  Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re Columbia Gas Sys., Inc.*, No. 91-803, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 COLLIER ON BANKRUPTCY ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

38.      The adequate protection package provided to the Prepetition Secured Creditors, as described above, appropriately safeguards the Prepetition Secured Creditors from the diminution in the value of their interests in the Prepetition Collateral (as defined in the Proposed Interim Order), if any.  The Debtors submit that their provision of adequate protection to the Prepetition Secured Creditors is fair and reasonable and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

**E.      The Debtors Should be Authorized to Use Cash Collateral**

39.      Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell, or lease cash collateral unless "(a) each entity that has an interest in such cash collateral

consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."

40.     The Debtors have an urgent need for the immediate use of their Prepetition Collateral, including the Cash Collateral, and seek to use all Cash Collateral existing on or after the Petition Date pursuant to the terms of the DIP Documents.  The Debtors need the Cash Collateral to pay operating expenses, including essential vendors, to ensure a continued supply of goods and services essential to the Debtors' business and fund these chapter 11 cases so they can successfully consummate the Restructuring.

41.     The Debtors believe that the terms and conditions of their use of the Cash Collateral (including the provision of adequate protection described above) are appropriate and reasonable and that such adequate protection is sufficient to secure any adequate protection obligations under the circumstances.  Furthermore, the Prepetition Secured Creditors have consented to the Debtors' use of the Cash Collateral subject to the terms and conditions of the DIP Documents and the Proposed Interim Order.  Therefore, the Debtors submit that they should be authorized to use the Cash Collateral on the terms set forth in the DIP Documents.

**F.      The Rates and Fees of the DIP Facility Are Reasonable**

42.     Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the DIP Agent and the DIP Lender, including the Agent Fee, as set forth above.

43.     The Debtors and the DIP Lender agree that the collateral terms, covenants, interest rates, and fees were subject to negotiation and are an integral component of the overall terms of the DIP Facility, and were required by the DIP Lender as consideration for the extension of the DIP Facility.   Moreover, the fees are customary and usual and in line with debtor-in-possession financings of this kind.  The Debtors considered the fees when determining

30843488.4

in their sound business judgment whether the DIP Facility constituted the best terms on which the Debtors could obtain sufficient debtor-in-possession financing.  The Debtors believe paying these fees to obtain the DIP Facility is in the best interests of the Debtors' estates.  Notably, despite the Debtors' financial and operational situation, the DIP Lender is only receiving a cash fee of $300,000 to serve as agent.  There are no other fees associated with the financing, and the interest rate PIKs during the cases.

44.    Under the circumstances, the interest rates and fees reflected in the DIP Documents are reasonable and substantially in line with other debtor-in-possession financings generally, including debtor-in-possession financings recently approved by the Court in other comparable chapter 11 cases.

## G.    The Milestones Imposed by the DIP Facility Are Reasonable

45.    As set forth in the chart above, the DIP Term Sheet also contemplates, as a condition to providing the DIP Facility, certain (i) conditions precedent; (ii) milestones (the "**Milestones**") in connection with these chapter 11  cases; and (iii) events of default, all of which are customary for post-petition financing in chapter 11.

46.    The DIP Facility is an important component of the Debtors' chapter 11 efforts because it provides the Debtors with the stability and certainty needed to fund their cases and pursue the Restructuring.  The continued operation of the Debtors' business during these cases would not be possible absent access to the DIP Facility.  The DIP Facility will prevent interruptions to the Debtors' operations, preserve the Debtors' ability to maintain ordinary course relationships with vendors, customers, and suppliers, and satisfy working capital needs in the ordinary course during the reorganization process.  Moreover, the Milestones are reasonable under the circumstances and are not designed to make the Debtors disproportionately susceptible to a breach

of such terms.  Accordingly, the Milestones and other conditions precedent and events of default are reasonable and should be approved.

## H.      The Carve-Out Is Appropriate

47.      The liens granted pursuant to the Proposed Orders, and the superpriority claims of the DIP Lender, are subject and subordinate to the Carve-Out.  The Carve-Out contains similar terms to others that the Court has found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel.  Without the Carve-Out, the Debtors' estates may be deprived of possible rights and powers if the services for which professionals may be compensated is restricted.  *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  Additionally, the Carve-Out protects against administrative insolvency during the course of these chapter 11 cases by ensuring that assets remain for the payment of fees to the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") and professional fees.  Accordingly, the Carve-Out is appropriate and should be approved.

## I.      The DIP Lender Should be Deemed Good Faith Lenders

48.      Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such

> authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

49.     Here, the Debtors believe the DIP Facility embodies the most favorable terms on which the Debtors could obtain post-petition financing. As described in the First Day Declaration and the DIP Declaration, negotiations of the terms of the DIP Facility with the DIP Lender were conducted in good faith and at arms'-length.    The terms and conditions of the DIP Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, and in accordance with the Proposed Orders and the DIP Documents, including, for the avoidance of doubt, the Budget. Further, no consideration is being provided to any party to the DIP Documents other than as described herein, in the DIP Documents, the First Day Declaration, and the DIP Declaration. Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code, and is entitled to all of the protections afforded by that section.

## J.      Modification of the Automatic Stay Is Warranted

50.     The relief requested herein contemplates a modification of the automatic stay to permit the Debtors to, among other things:  (a) grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (b) upon the occurrence of an Event of Default (as defined in the DIP Documents), subject to the notice periods set forth in the Proposed Orders, for the DIP Lender to exercise any remedies available to them; and (c) implement the terms of the Proposed Orders, including payment of all amounts referred to in the DIP Documents.

30843488.4

51.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.

### REQUEST FOR A FINAL HEARING

52.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request the Court set a date for the Final Hearing that is as soon as practicable, and in no event later than November 14, 2023, in accordance with the Milestones set forth in the DIP Term Sheet, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

### BANKRUPTCY RULE 6003

53.     The Court may grant the relief requested in this Motion immediately if the "relief is necessary to avoid immediate and irreparable harm." Bankruptcy Rule 6003; *see also In re First NLC Fin. Servs., LLC*, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008). The Third Circuit Court of Appeals has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions. In that context, the Third Circuit has instructed that irreparable harm is that which "cannot be redressed by a legal or an equitable remedy following a trial." *Instant Air Freight Co. v. C.F. Air Freight, Inc*., 882 F.2d 797, 801 (3d Cir. 1989). As explained above and in the First Day Declaration and the DIP Declaration, access to the DIP Facility and the use of Cash Collateral, in the interim amounts proposed, are essential, and the relief requested is narrowly tailored to only the relief that is necessary to prevent immediate and irreparable damage to the Debtors' operations, and therefore, Bankruptcy Rule 6003 is satisfied.

### BANKRUPTCY RULE 6004(a) AND (h) WAIVERS ARE APPROPRIATE

54.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and waive the 14-day stay of an order authorizing the use, sale, or lease of property under

Bankruptcy Rule 6004(h).  As explained above and in the First Day Declaration and the DIP Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

**DEBTORS' STATEMENT PURSUANT TO LOCAL RULE 4001-2(a)(iii)**

55.     The Debtors believe that the Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the Budget.

**RESERVATION OF RIGHTS**

56.     Except as otherwise provided in the Proposed Orders, nothing contained herein is intended or shall be construed as (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder; or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.

**NOTICE**

57.     Notice of this Motion has been provided to: (a) the U.S. Trustee; (b) holders of the thirty (30) largest unsecured claims on a consolidated basis against the Debtors; (c) counsel to the DIP Lender; (d) the Prepetition Secured Creditors; (e) Korr; (f) 3i; (g) the Internal Revenue Service; (h) the Office of the United States Attorney for the District of Delaware; (i) the Banks; (j) any party known after a reasonable inquiry to have asserted a lien against the Debtors' assets; and (k) all parties that have filed a notice of appearance and request for service of papers pursuant

to Bankruptcy Rule 2002.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter the Proposed Interim Order, substantially in the form annexed hereto as **Exhibit A**, and the Proposed Final Order, granting the relief requested herein and such other and further relief as the Court deems appropriate under the circumstances.

Dated:  October 12, 2023                 **YOUNG CONAWAY STARGATT & TAYLOR, LLP**
        Wilmington, Delaware

                                         */s/ Kenneth J. Enos*
                                         Sean M. Beach (No. 4070)
                                         Kenneth J. Enos (No. 4544)
                                         Elizabeth S. Justison (No. 5911)
                                         Timothy R. Powell (No. 6894)
                                         Kristin L. McElroy (No. 6871)
                                         Rodney Square
                                         1000 N. King Street
                                         Wilmington, Delaware 19801
                                         Telephone:  (302) 571-6600
                                         Emails:  sbeach@ycst.com
                                                  kenos@ycst.com
                                                  ejustison@ycst.com
                                                  tpowell@ycst.com
                                                  kmcelroy@ycst.com

                                         *Proposed Counsel for the Debtors and*
                                         *Debtors in Possession*

## **EXHIBIT A**

**Proposed Interim Order**

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| IRONNET, INC., *et al.*,[1] | ) | Case No. 23-11710 (___) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | Ref. Docket No. _____ |

**INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO (I) OBTAIN
POSTPETITION FINANCING AND (II) USE CASH COLLATERAL, (B) GRANTING
LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,
(C) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED
PARTIES, (D) MODIFYING THE AUTOMATIC STAY, (E) SCHEDULING
A FINAL HEARING, AND (F) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "**Motion**")[2] of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") for entry of an interim order (this "**Interim Order**") and a final order (the "**Final Order**," and together with the Interim Order, the "**DIP Orders**"), pursuant to sections 105, 361, 362, 363, 364(c), 364(d), 364(e), 503, 507, and 552(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rules 2002-1, 4001-1(b), 4002-1, and 9013-1:

a.    authorizing the Debtors, in their capacity as borrowers, to obtain postpetition financing and other financial accommodations on a joint and several basis in connection with the debtor in possession financing, comprising, among other things, a superpriority senior secured facility (the "**DIP Facility**") which consists of a multi-draw credit loan facility in an aggregate principal amount of up to $10 million, which shall be made available to the Debtors (i) in a roll up (the "**DIP Roll-Up Loans**") of the approximately $1.5 million in outstanding Prepetition Bridge Facility Obligations (defined below) in accordance with the terms substantially set

---

[1]    The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  IronNet, Inc. (9446), IronNet Cybersecurity, Inc. (2655), IronNet International, LLC (7621), IronCAD LLC (1162), and HighDegree, LLC (8474).  The Debtors' corporate headquarters is located at 7900 Tysons One Place, Suite 400, McLean, VA 22102.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the DIP Documents (as defined below), as applicable.

forth in the Superpriority Secured Debtor-in-Possession Credit Facility Term Sheet attached hereto as Exhibit 1 (the "**DIP Term Sheet**") upon entry of this Interim Order, (ii) up to $4.5 million (including the aggregate amount of the Roll-Up Loans) in accordance with the terms substantially set forth in the DIP Term Sheet upon entry of this Interim Order, and (iii) the remaining principal amount available under the DIP Facility in accordance with the terms of the DIP Documents upon entry of the Final Order (such loans described in this paragraph, the "**DIP Loans**") to be funded by ITC Global Advisers, LLC and an affiliate of C5 (defined below) as further described in the DIP Term Sheet (collectively, the "**DIP Lenders**");

b.       authorizing the Debtors to execute the DIP Term Sheet and the other documents, agreements and instruments delivered pursuant thereto or executed or filed in connection therewith, including the Bridge Documents (as defined below), all as may be reasonably requested by the DIP Lenders (as the same may be amended, restated, supplemented or otherwise modified from time to time, collectively, the "**DIP Documents**");

c.       authorizing the Debtors to use the proceeds of the DIP Loans and Cash Collateral, as further described herein, to, among other things, pay for working capital needs of the Debtors in the ordinary course of business and for the costs and expenses of administering these chapter 11 cases;

d.       granting adequate protection, with respect to each of the Debtors, to the Prepetition Secured Creditors;

e.       authorizing, on the terms set forth herein, the Debtors to pay, the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable, including, without limitation, the an agency fee of $300,000 (the "**Agency Fee**") and reasonable fees and disbursements of the DIP Agent's legal and financial advisor pursuant to the DIP Term Sheet;

f.       granting superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code against each of the Debtors' estates to the DIP Lender, with respect to all obligations owing and outstanding thereunder and under the DIP Documents, as applicable, and this Interim Order and any Final Order, as applicable (collectively, the "**DIP Obligations**"), with priority over any and all administrative expenses of any kind or nature subject and subordinate only to the Carve Out (as defined below) on the terms and conditions set forth herein, in the DIP Term Sheet and the DIP Documents;

g.      subject to the Carve-Out, granting to the DIP Agent, for the benefit of itself and the DIP Lender, valid, enforceable, nonavoidable, automatically, validly and fully perfected security interests in and liens on all of the DIP Collateral (as defined below) pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, including all property constituting Cash Collateral;

h.      subject to and effective upon entry of the Final Order, in each case except to the extent of the Carve-Out, determining that (i) the Debtors have waived any right to surcharge any collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, (ii) the equitable doctrine of marshaling and other similar doctrines shall not apply, and (iii) the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply; *provided*, that upon entry of the Final Order, any DIP Obligations and AP Superpriority Claims (as defined below) may be collected out of the proceeds of any Avoidance Actions;

i.      vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order; and

j.      scheduling a final hearing (the "**Final Hearing**") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing.

This Court having considered the Motion, the exhibits attached thereto, the *Declaration of Cameron Pforr in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* and the *Declaration of Cameron Pforr, President and Chief Financial Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings*, and the evidence submitted and arguments made at the interim hearing held on October [*], 2023 (the "**Interim Hearing**"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002,

4001(b), (c) and (d), and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved, or overruled by this Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties-in-interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Term Sheet and the other DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THIS COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A. **Petition Date**. On October 12, 2023 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

B. **Debtors in Possession**. The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C. **Jurisdiction and Venue**. This Court has jurisdiction over these chapter 11 cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C.

---

[3] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

§ 1334.  Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue for these chapter 11 cases and proceedings with respect to the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The bases for the relief sought in the Motion and grated in this Interim Order are sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and the Local Bankruptcy Rules.

    D. **Committee Formation**.  As of the date hereof, the United States Trustee for the District of Delaware (the "**U.S. Trustee**") has not yet appointed an official committee of unsecured creditors in these chapter 11 cases (a "**Creditors' Committee**") pursuant to section 1102 of the Bankruptcy Code.

    E. **Notice**.  As described in the Motion, notice of the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be required.

    F. **Debtors' Acknowledgements and Stipulations**.  In entering into the DIP Documents and in exchange for and as a material inducement to the DIP Lenders to agree to provide the DIP Facility, and to the Prepetition Secured Parties in exchange for their consent to use Cash Collateral and to subordinate their liens as provided for herein, the Debtors acknowledge, represent, stipulate and agree, for themselves and their estates, subject to the challenge rights set forth in paragraph 24 herein, as follows:

    1. Prepetition Director Notes.  On December 2022, April 2023, May 2023, and August 2023, IRNT issued and sold senior secured promissory notes in an aggregate principal amount of $8,475,000 million (the "**Director Notes**") to a total of eight

lenders (the "**Director Noteholders**"), which included seven lenders who are either Company directors or entities affiliated with Company directors.

2. <u>Prepetition C5 Notes.</u>  On December 30, 2022, IRNT issued a senior secured convertible promissory note in the principal amount of $2,000,000 (the "**Initial C5 Note**") to an affiliate of C5 Capital Limited ("**C5**," and together with the Director Noteholders, the "**Prepetition Secured Creditors**").  In January 2023, February 2023, April 2023, and May 2023, and September 2023, IRNT issued additional senior secured convertible promissory notes to affiliates of C5 (together with the Initial C5 Note, the "**C5 Notes**," and together with the Director Notes, the "**Prepetition Secured Notes**") in principal amounts of $3,000,000, $6,250,000, $600,000, and $2,300,000, and $300,000, respectively.

3. <u>Prepetition Collateral.</u>  Pursuant to the Prepetition Secured Notes and related documentation (the "**Prepetition Secured Note Documents**"), IRNT's obligations under the Prepetition Secured Notes are secured by substantially all of IRNT's assets, excluding certain intellectual property (the "**Prepetition Collateral**").  All of the Debtors' cash, including the cash in their deposit accounts and other accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral.

4. As of the Petition Date, (a) the Prepetition Secured Notes (i) are secured by legal, valid, binding, enforceable, unavoidable, and perfected liens (the "**Prepetition Liens**") on the Prepetition Collateral, (ii) were granted to, or for the benefit of, the Prepetition Secured Creditors for fair consideration and reasonably equivalent value, (iii) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein), and (iv) are subject and subordinate only to (1) the DIP Liens (after giving effect to this Interim Order) and (2) the

Carve-Out (after giving effect to this Interim Order); and (b) (i) the prepetition obligations under the Prepetition Secured Notes ("**Prepetition Secured Note Obligations**") constitute legal, valid, and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Prepetition Secured Note Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (ii) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition Secured Note Obligations exist, and (iii) no portion of the Prepetition Secured Note Obligations or any payments made to any or all of the Prepetition Secured Creditors are subject to avoidance, disallowance, disgorgement, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in section 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

5.    <u>Amounts Owed under Prepetition Secured Note Documents</u>. As of the Petition Date, approximately $25,300,00 of indebtedness under the Prepetition Secured Notes was outstanding, which amount is comprised of $23,800,000 in principal amount and accrued and unpaid interest, premiums, and fees in the amount of $1,500,000.

6.    The Prepetition Secured Creditors are entitled, pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including the Cash Collateral, to the extent of any diminution in the value of the Prepetition Collateral occurring from and after the Petition Date (the "**Diminution**"), caused by or arising as a result of, among other things, (a) the incurrence and payment of the DIP Obligations, (b) the use of Prepetition Collateral (including Cash Collateral), (c) the granting of the DIP Liens and the DIP Superpriority Claims, (d) the

subordination of the Prepetition Obligations to the DIP Obligations and the Carve-Out, and (e) imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

7.      Bridge Facility.  Pursuant to DIP Term Sheet and the applicable documentation (the "**Bridge Documentation**"), an affiliate of C5, as bridge lender (the "**Bridge Lender**"), advanced $1,244,000 to the Debtors on October 10, 2023 and $256,000 to the Debtors on October 11, 2023 to allow for the orderly transition of the Debtors into these chapter 11 cases (the "**Bridge Facility Obligations**").

8.      Pursuant to the Bridge Documentation, each Debtor granted to the Bridge Lender a security interest in and lien on all assets of each Debtor (the "**Bridge Facility Liens**").  On October 11, 2023, the Bridge Lender filed a UCC-1, as well as certain intellectual property security agreements, against each Debtor perfecting the Bridge Facility Liens.  As of the Petition Date, (a) the Bridge Facility Liens (i) are legal, valid, binding, enforceable, and perfected Liens, (ii) were granted to, or for the benefit of, the Bridge Lender for fair consideration and reasonably equivalent value, (iii) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (iv) are subject and subordinate only to valid, perfected, and unavoidable liens permitted under the Prepetition Secured Note Documents (other than the Prepetition Liens) to the extent that such permitted liens are senior to the Liens granted to the Prepetition Secured Creditors pursuant to the Prepetition Secured Note Documents (the "**Senior Permitted Liens**"); and (b) (i)  the Bridge Facility Obligations constitute legal, valid, and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the DIP Term Sheet, the DIP Documents, the Bridge Facility Documents and this Interim Order, (ii) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Bridge Facility

Obligations exist, and (iii) no portion of the Bridge Facility Obligations are subject to avoidance, disallowance, disgorgement, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in section 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

9.      The DIP Lenders willingness to make the DIP Loans is conditioned upon all Bridge Facility Obligations being automatically converted into DIP Roll-up Loans upon entry of this Interim Order.  The Bridge Facility was made available to the Debtors on the condition that the Debtors would seek to have such obligations treated as DIP Roll-up Loans upon entry of this Interim Order.  The DIP Roll-up Loans shall be authorized and approved upon entry of the Interim Order as compensation for, in consideration for, and on account of, among other things, the agreement of the DIP Lenders to fund amounts, and provide other consideration to the Debtors under the DIP Facility.

G.      **Cash Collateral**.  For purposes of this Interim Order, the term "Cash Collateral" shall mean and include all "cash collateral," as defined in section 363 of the Bankruptcy Code, in or on which the DIP Lenders or the Prepetition Secured Creditors have a lien, security interest or any other interest (including, without limitation, any AP Liens or security interests), whether existing on the Petition Date, arising pursuant to this Interim Order, or otherwise, and shall include, without limitation:

1.      all cash proceeds arising from the collection, sale, lease or other disposition, use or conversion of any real or personal property, in or on which the DIP Lenders or the Prepetition Secured Creditors have a lien or a replacement lien, whether as part of the DIP Collateral or the Prepetition Collateral, or pursuant to an order of this Court or applicable law or

otherwise, and whether such property has been converted to cash, existed as of the commencement of these chapter 11 cases, or arose or was generated thereafter; and

        2.      all of the respective deposits, refund claims and rights in retainers of the Debtors on which the DIP Lenders or the Prepetition Secured Creditors hold a lien or replacement lien, whether as part of the DIP Collateral or Prepetition Collateral or pursuant to an order of this Court or applicable law or otherwise; and the proceeds of any sale, transfer or other disposition of DIP Collateral or Prepetition Collateral.

        H.      **Adequate Protection**.  The Prepetition Secured Creditors are entitled, pursuant to sections 361, 363 and 364 of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral, to the extent of any Diminution resulting from, among other things, (i) the incurrence of the DIP Obligations, (ii) the use of Prepetition Collateral (including Cash Collateral), (iii) the granting of the DIP Liens and the DIP Superpriority Claims, (iv) the subordination of the Prepetition Obligations to the DIP Obligations and the Carve- Out, and (v) imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

        I.      **Purpose and Necessity of Financing**.  The Debtors require the DIP Facility and use of Cash Collateral to (i) permit the continuation of their businesses and maximize and preserve their going concern value, (ii) satisfy payroll obligations and other working capital and general corporate purposes of the Debtors consistent with the terms set forth in the DIP Documents and the Budget (as defined below), (iii) provide adequate protection to the Prepetition Secured Creditors, (iv) pay fees and expenses related to the DIP Documents and these chapter 11 cases, and (v) for such other purposes as set forth in, or otherwise permitted by, the DIP Documents (including the Budget).  If the Debtors do not obtain authorization to use the

Prepetition Collateral (including Cash Collateral) and borrow under the DIP Documents, they will suffer immediate and irreparable harm. The Debtors are unable to obtain adequate unsecured credit allowable only as an administrative expense under section 503 of the Bankruptcy Code, or other sufficient financing under sections 364(c) or (d) of the Bankruptcy Code, on more favorable terms than those set forth in the DIP Documents. A loan facility in the amount provided by the DIP Documents is not available to the Debtors without granting the superpriority claims, liens and security interests, pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, as provided in this Interim Order and the DIP Documents. After considering all alternatives, the Debtors have concluded, in the exercise of their sound business judgment, that the DIP Facility is the best financing available to them at this time.

J.        **Good and Sufficient Cause Shown**. Good and sufficient cause has been shown for entry of this Interim Order. The ability of the Debtors to obtain sufficient working capital and liquidity under the DIP Documents and use of the Prepetition Collateral (including the Cash Collateral) is vital to the Debtors' estates and creditors. The liquidity to be provided under the DIP Documents and this Interim Order will enable the Debtors to continue to operate their businesses in the ordinary course and preserve the value of the Debtors' businesses during the pendency of these chapter 11 cases. Among other things, entry of this Interim Order is necessary to maximize the value of the Debtors' assets and to avoid immediate and irreparable harm to the Debtors and their estates, and, accordingly, is in the best interests of the Debtors, their estates and their creditors.

K.        **Sections 506(c) and 552(b) Waivers**. In light of (i) the DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out, and in exchange

for and as a material inducement to the DIP Lenders to agree to provide the DIP Facility and (ii) the Prepetition Secured Creditors' agreement to subordinate their liens and superpriority claims to the DIP Obligations, the Carve-Out and the DIP Liens, and to permit the use of the Prepetition Collateral (including Cash Collateral) for payments made in accordance with the Budget and the terms of this Interim Order, upon entry of the Final Order, each of the DIP Lenders and the Prepetition Secured Creditors are entitled to a marshalling waiver and a waiver of the provisions of section 506(c) of the Bankruptcy Code, and the exceptions provided in sections 552(b)(1) and (2) of the Bankruptcy Code.

L.    **Good Faith**.    The terms of the DIP Documents, including the Bridge Documentation, and the use of the Prepetition Collateral (including the Cash Collateral) pursuant to this Interim Order, including, without limitation, the interest rates and fees applicable, and intangible factors relevant thereto, are more favorable to the Debtors than those available from alternative sources. Based upon the record before this Court, the terms of the DIP Documents and the use of the Prepetition Collateral (including the Cash Collateral) pursuant to this Interim Order have been negotiated in good faith and at arm's-length among the Debtors, the DIP Lenders and the Prepetition Secured Creditors. Any DIP Loans and other financial accommodations made to the Debtors by the DIP Lenders pursuant to the DIP Documents, including the Bridge Documentation, and this Interim Order shall be deemed to have been extended by the DIP Lenders in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and each of the DIP Lenders shall be entitled to all protections and benefits afforded thereby.

M.    **Fair Consideration and Reasonably Equivalent Value**.    All of the Debtors have received and will receive fair and reasonable consideration by virtue of their

obtaining access to the DIP Loans, the use of the Prepetition Collateral (including the Cash Collateral) pursuant to this Interim Order and all other financial accommodations provided under the DIP Documents, including the Bridge Documentation, and this Interim Order. The terms of the DIP Documents, including the Bridge Documentation, and this Interim Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

N.    **Immediate Entry of Interim Order**.    The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2) and Local Rule 4001-2(b).  The permission granted herein to enter into the DIP Documents, to obtain funds thereunder and to use the Prepetition Collateral (including the Cash Collateral) pursuant to this Interim Order is necessary to avoid immediate and irreparable harm to the Debtors. This Court concludes that entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for access to the financing necessary for the continued flow of supplies and services to the Debtors necessary to sustain the operation of the Debtors' existing businesses and further enhance the Debtors' prospects for a successful sale of substantially all of their assets.

Based upon the foregoing findings and conclusions, the Motion, and the record before this Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor, **IT IS HEREBY ORDERED THAT**:

1.    <u>DIP Facility Approved on Interim Basis</u>.  The relief sought in the Motion is granted to the extent set forth herein, the interim financing described herein, including the conversion of the Bridge Loans into DIP Roll-Up Loans, is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, in each case subject to the terms and

conditions set forth in the DIP Documents, the Bridge Documentation and this Interim Order. All objections to this Interim Order, to the extent not withdrawn, waived, settled, or resolved, are hereby denied and overruled on the merits. This Interim Order shall become effective immediately upon its entry.

2.    <u>Authorization of the DIP Documents and the DIP Facility</u>.

a.          The Debtors are expressly authorized to execute and deliver, and upon such execution and delivery, to perform under the DIP Documents, including the DIP Term Sheet and the Bridge Documentation, which are hereby approved and incorporated herein by reference. Unless and until the Debtors and DIP Lenders enter into the definitive DIP Documents consistent with the terms of the DIP Term Sheet, the Bridge Documentation and this Interim Order, upon entry of this Interim Order, the Debtors, DIP Lenders and DIP Agent shall be bound by (i) the terms and conditions and other provisions set forth in the DIP Term Sheet and the Bridge Documentation, as applicable, and (ii) this Interim Order, and this Interim Order, the Bridge Documentation and the DIP Term Sheet shall govern and control the DIP Facility. A copy of the Bridge Documentation is attached hereto as **<u>Exhibit 2.</u>**

b.    Upon entry of this Interim Order, the Debtors are hereby immediately authorized, subject to the terms and conditions of the DIP Term Sheet, to (i) borrow up to an aggregate principal amount $4.5 million (including the principal amount of the DIP Roll-Up Loans) under the Interim DIP Loan, (ii) incur the DIP Roll-Up Loans and, without any further action by the Debtors or any other party, and (iii) include such DIP Roll-Up Loans in the DIP Obligations.

3.    <u>DIP Obligations</u>. The DIP Term Sheet, the Bridge Documentation, and the other DIP Documents shall constitute legal, valid, binding obligations of the Debtor, DIP Lenders and DIP Agent, enforceable in accordance with their terms and the terms of this Interim

Order.  The obligations of the Debtors thereunder shall be enforceable against the Debtors and their estates and any successors thereto, including any trustee appointed in these chapter 11 cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of these chapter 11 cases or any other chapter of the Bankruptcy Code, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**").

        4.      <u>Amendment of the DIP Documents</u>.  The DIP Documents may from time to time be amended, modified, waived, or supplemented by the parties thereto, in accordance with the terms thereof (and this Interim Order) without further order of this Court if the amendment, modification, waiver, or supplement is non-material and in accordance with the DIP Documents or are necessary to conform the terms of the DIP Documents to this Interim Order. In the case of a material amendment, modification, waiver, or supplement to the DIP Documents (which, for purposes of this paragraph 4, excludes the Budget), the Debtors shall provide notice (which may be provided through electronic mail or facsimile) to counsel to any Creditors' Committee (if appointed),  the U.S. Trustee, the DIP Agent, the DIP Lenders, and the Prepetition Secured Creditors, which parties shall have five (5) Business Days from the date of such notice within which to object, in writing, to such amendment, modification, waiver, or supplement.  If any such party timely objects to such material amendment, modification, waiver, or supplement to the DIP Documents, such material amendment, modification, waiver, or supplement shall only be permitted pursuant to an order of this Court.  The foregoing shall be without prejudice to the Debtors' right to seek approval from this Court of a material amendment, modification, waiver, or supplement with respect to the DIP Documents on an expedited basis.  For the avoidance of doubt, the extension of a Milestone or waiver of the Variance Limit shall not constitute a material amendment, modification, waiver, or supplement to the DIP Documents.

5.     <u>DIP Liens</u>.  Effective immediately upon entry of this Interim Order, and without any further action under state law, as security for the DIP Obligations and subject in all respects to the Carve-Out, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted valid, binding, continuing, enforceable, non-avoidable, and automatically and properly perfected security interests and liens on all assets and properties of the Debtors (whether tangible, intangible, real, personal, or mixed), whether now owned or hereafter acquired and wherever located, before or after the Petition Date, including, without limitation, all cash, cash equivalents, accounts, inventory, equipment, equity interests or capital stock in domestic and foreign subsidiaries (subject to any limitation in the DIP Documents), investment property, instruments, chattel paper, real property, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, receivables, all claims or causes of action (including, any commercial tort claims or causes of action, and subject to entry of the Final Order, the proceeds of Avoidance Actions and all products, offspring, profits, and proceeds thereof) (all of the foregoing collateral, collectively, the "**DIP Collateral**," and the Security Interests (as defined below) thereon and therein, the "**DIP Liens**"); *provided* that, and notwithstanding anything to the contrary herein, the DIP Collateral shall not include Avoidance Actions themselves.  For the avoidance of doubt, the DIP Collateral shall include the Prepetition Collateral.

6.     <u>DIP Lien Priority</u>.  The DIP Liens shall be, in all cases, subject to the Carve-Out, and have the priority set forth as follows:

a.     pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Obligations shall be secured by a valid, binding, continuing, enforceable, fully-perfected first

priority senior security interest in and lien upon all DIP Collateral that, on or as of the Petition Date, is not subject to any existing liens that;

b.        pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Obligations shall be secured by a valid, binding, continuing, enforceable, fully-protected junior security interest and lien upon all DIP Collateral that, on or as of the Petition Date, is not subject to any existing liens that, under applicable law, are senior to, and have not been subordinated to, the Prepetition Liens; and

c.        pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Obligations shall be secured by a valid, binding, continuing, enforceable, fully-perfected first priority priming security interest in and lien on all DIP Collateral, senior in priority to the Prepetition Liens.

d.        The DIP Liens shall be subject, and immediately junior, to valid, perfected, and non-avoidable Senior Permitted Liens in existence on the Petition Date that are not subject to subordination and were either properly perfected as of the Petition Date or subsequently perfected pursuant to section 546(b) of the Bankruptcy Code, including (i) liens arising by operation of law in favor of warehousemen, landlords, carriers, mechanics, materialmen, laborers or suppliers, in each case incurred in the ordinary course of business and not in connection with the borrowing of money, (ii) liens incurred in the ordinary course of business in connection with workers' compensation and other unemployment insurance, or to secure the performance of tenders, surety and appeal bonds, bids, leases, government contracts, trade contracts and other similar obligations (exclusive of obligations for the payment of borrowed money), (iii) rights of setoff or bankers' liens upon deposits of cash in favor of banks

or other depository institutions and (iv) any liens at IronNet Cybersecurity, Inc. appearing on **Exhibit 3** to this Order.[4]

7.     <u>DIP Superpriority Claims</u>.  In addition to the DIP Liens granted herein, effective immediately upon entry of this Interim Order, all of the DIP Obligations and all amounts owing by the Debtors under the DIP Documents, shall constitute allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject and subordinate only to the payment of the Carve-Out, over all other administrative expense claims, adequate protection and other diminution claims, priority and other unsecured claims, and all other claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order), 507(a), 507(b), 546, 726, 1113, and 1114 or any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual lien, levy, or attachment (the "**DIP Superpriority Claims**").  The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions.

8.     <u>Priority of DIP Liens and DIP Superpriority Claims</u>.  Other than as set forth herein or permitted under this Interim Order, the DIP Term Sheet, or the DIP Documents,

---

[4]     Nothing in this Interim Order is or shall be deemed an admission or stipulation by the Debtors as to the validation of any Senior Permitted Lien.  The Debtors reserve the right to seek to prime the Permitted Liens in

the DIP Liens and the DIP Superpriority Claims:  (a) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of the Final Order granting such relief, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552(b) of the Bankruptcy Code; (b) shall not be subordinate to, or *pari passu* with, (i) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (ii) any Liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property; and (c) shall be valid and enforceable against any trustee or any other estate representative elected or appointed in these chapter 11 cases, upon the conversion of any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code or in a Successor Case, and/or upon the dismissal of any of these chapter 11 cases.

9.    Use of Proceeds of the DIP Facility and Cash Collateral.  Subject to the Budget as provided for herein, the Debtors shall use Cash Collateral and the proceeds of borrowings under the DIP Facility only for the purposes specifically set forth in this Interim Order and the DIP Documents, including to (a) pay fees, interest, and expenses associated with the DIP Facility; (b) to fund, to the extent that usage of Cash Collateral and available cash are not sufficient to cover such expenses, post-petition operating expenses and working capital needs of the Debtors, including, but not limited to, those activities required to remain in, or return to, compliance with laws in accordance with 28 U.S.C. § 1930; (c) to fund fees and expenses incurred in connection with the Restructuring; (d) provide for the ongoing working capital and capital expenditure needs of the Debtors during the pendency of these chapter 11 cases; (e) to pay permitted pre-petition claim payments authorized by this Court; (f) to pay professional fees

connection with the Final Order.

in connection with these chapter 11 cases; and (g) fund the costs of the administration of these chapter 11 cases (including the Carve-Out), in each case subject to the terms and conditions in this Interim Order and the DIP Documents.

10.     Adequate     Protection     for     the     Prepetition     Secured     Creditors. The Prepetition Secured Creditors are entitled, pursuant to sections 361, 362, 363, 364, and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the applicable Prepetition Collateral, including Cash Collateral, to the extent of any Diminution.  Accordingly, as adequate protection, the Prepetition Secured Creditors are hereby granted the following:

a.     Adequate Protection Liens.  Subject to the Carve-Out, to the extent there is Diminution, the Prepetition Secured Creditors, are hereby granted subject to the terms and conditions set forth below, pursuant to sections 361, 363, 364, and 507 of the Bankruptcy Code, valid, binding, enforceable and perfected replacement liens on and security interests in the DIP Collateral, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions (such adequate protection replacement Liens, the "**AP Liens**"), which AP Liens on the DIP Collateral shall be junior and subordinate only to the Carve-Out and the DIP Liens. The AP Liens shall otherwise be senior to all other security interests in or liens on any of the DIP Collateral.  The AP Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the Prepetition Secured Creditors and not in substitution therefor.

b.     Prepetition Secured Creditor Adequate Protection Superpriority Claims.  Subject only to the Carve-Out and the DIP Superpriority Claims, to the extent of Diminution, the Prepetition Secured Creditors are hereby further granted an allowed superpriority administrative claim (such adequate protection superpriority claims, the "**AP**

**Superpriority Claim**"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and priority and other unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726 , 1113, 1114, or any other provision of the Bankruptcy Code or otherwise, junior only to the Carve-Out and the DIP Superpriority Claims to the extent provided herein and in the DIP Documents, and payable from and having recourse to all prepetition and postpetition property of the Prepetition Secured Creditors and all proceeds thereof (including, subject to entry of the Final Order granting such relief, all proceeds of Avoidance Actions).

      11.    <u>Budget</u>.

      a.    The Debtors shall use the proceeds of all borrowings under the DIP Facility and Cash Collateral in a manner consistent with the Budget (subject to the Variance Limit (as defined below)), the DIP Term Sheet, DIP Documents, and this Interim Order.  The Budget annexed hereto as **<u>Exhibit 4</u>** shall constitute the initial Budget (the "**Initial Budget**") that reflects on a line-item basis the Debtors' (i) weekly projected cash receipts (including from non-ordinary course assets sales) ("**Receipts**"), (ii) weekly projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses under these chapter 11 cases (including the estimated fees and expenses of the advisors to any parties to these chapter 11 cases payable by the Debtors), capital expenditures, issuances of any letter of credit, including the fees relating thereto, and any other fees and expenses relating to the DIP Facility) ("**Disbursements**"), and (iii) other information reasonably requested by the DIP Lender.

b.      Commencing on November 6, 2023 and on the first business day of each month thereafter, the Debtors will provide to the DIP Agent and the DIP Lenders an updated thirteen (13)-week cash flow forecast, in a form consistent with the Initial Budget, containing line items of sufficient detail to reflect the Debtors' (i) Receipts; (ii) Disbursements; and (iii) other information reasonably requested by the DIP Lender in form and substance reasonably satisfactory to the DIP Lenders (such approved budget, including the Initial Budget, the "**Budget**").

c.      By no later than 5:00 p.m. Eastern Time on the Thursday (or, if such Thursday is not a business day, the immediately succeeding business day) of the fourth week after the Petition Date, and thereafter by not later than 5:00 p.m. Eastern Time on the Thursday (or, if such Thursday is not a business day, the immediately succeeding business day) of every week thereafter, the Debtors will provide to the DIP Agent and the DIP Lenders a variance report for the immediately preceding four-week period (each such period, a "**Testing Period**"), in form and substance reasonably satisfactory to the DIP Agent, detailing the following:  (i) the aggregate Disbursements of the Debtors and aggregate receipts during the applicable Testing Period; (ii) any variance (whether positive or negative, expressed as a percentage) between the aggregate Disbursements made during such Testing Period by the Debtors against the aggregate Disbursements for the Testing Period, as set forth in the applicable Budget (including Disbursements in respect of professional fees incurred in these chapter 11 cases by the Debtors during such Testing Period); and (iii) any variance (whether positive or negative, expressed as a percentage) between the aggregate receipts during such Testing Period by the Debtors against the aggregate receipts for the Testing Period, as set forth in the applicable Budget.  Starting with the first Testing Period, and for any Testing Period

thereafter: (i) the Debtors shall not allow the aggregate Disbursements (excluding Disbursements in respect of professional fees incurred in these chapter 11 cases by the Debtors during such Testing Period) made or incurred by the Debtors during such Testing Period to be greater than [30]% of the aggregate Disbursements for the Debtors set forth in the Budget for such Testing Period; and (ii) aggregate receipts shall not be less than [30]% of the aggregate receipts for the Debtors set forth in the Budget for such Testing Period ((i) and (ii) together, the "**Variance Limit**").

12.   <u>Modification of Automatic Stay</u>.   The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to:   (a) permit the Debtors to grant the DIP Liens, AP Liens, DIP Superpriority Claims, and AP Superpriority Claims; (b) permit the Debtors to perform such acts as the DIP Agent or the Prepetition Secured Creditors each may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Agent under the DIP Documents, the DIP Facility and this Interim Order, as applicable; (d) authorize the Debtors to pay, and the DIP Agent to retain, disburse and/or apply, payments made in accordance with the terms of this Interim Order; and (e) otherwise to the extent necessary to implement and effectuate the provisions of this Interim Order and the DIP Documents.

13.   <u>Automatic Perfection of DIP Liens and Adequate Protection Liens</u>.

a.   This Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection, and priority of the DIP Liens and the AP Liens without the necessity of (i) filing or recording any financing statement, deed of trust, mortgage, security agreement, pledge agreement, control agreement, or other instrument or document that may

otherwise be required under the law of any jurisdiction, obtaining "control" (as defined in any applicable Uniform Commercial Code or other law) over any DIP Collateral, and the DIP Agent, shall be deemed, without any further action, to have control over all the Debtors' deposit accounts, securities accounts, and commodities accounts (within the meaning of such Uniform Commercial Code and other law); (ii) taking any other action to validate or perfect the DIP Liens and the AP Liens or to entitle the DIP Liens and the AP Liens to the priorities granted herein; or (iii) the filing or recording any financing statement, deed of trust, mortgage, security agreement, pledge agreement, control agreement, or other instrument or document with  respect to security interests in any jurisdiction outside of the United States in assets located in, titled or arising or protected under the laws of a jurisdiction outside of the United States.

        b.      Notwithstanding the foregoing, each of the DIP Agent and the Prepetition Secured Creditors may, each in their sole discretion, enter into and file, as applicable, financing statements, mortgages, security agreements, notices of liens, and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been entered into, filed, or recorded as of the Petition Date.  Without limiting the foregoing, each of the DIP Agent's and the Prepetition Secured Creditors (in the latter case, solely with respect to such AP Liens) may, in their discretion, file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction (whether or not located in the United States) in which any Debtor has real or personal property.

14.     <u>Event of Default</u>.   In addition to any events of default under the DIP Documents, the following shall constitute Events of Default under the DIP Facility (each an "**Event of Default**"):

a.      Conversion of any of these chapter 11 cases to a case under Chapter 7 of the Bankruptcy Code;

b.      Dismissal of any of these chapter 11 cases;

c.      Appointment of a trustee under section 1104 of the Bankruptcy Code;

d.      Appointment of an examiner with expanded or enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under 1106(b) of the Bankruptcy Code;

e.      Failure by the Debtors to make any payment under the DIP Facility when due;

f.      A Budget variance shall exceed the Variance Limit;

g.      Failure by the Debtors to comply with its obligations hereunder or under the DIP Documents; and

h.      Failure to comply with a Milestone (as defined in the DIP Term Sheet).

15.     <u>Credit Bidding</u>.   In connection with any sale process authorized by this Court, whether effectuated through sections 363, 725, or 1123 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code, subject to and upon entry of this Interim Order, the DIP Agent (at the direction of the DIP Lender), for the benefit of the DIP Lender, shall have the right to credit bid the full amount of the DIP Obligations.

16.     <u>Milestones</u>.   The Milestones contained in the DIP Term Sheet are hereby approved.

17.     <u>Rights and Remedies Upon Event of Default</u>.   Without requiring further order from this Court and without the need for filing any motion (except as expressly required by

30846956.5

this paragraph 17) for relief from the automatic stay or any other pleading, immediately upon the occurrence of an Event of Default and following five (5) business days' written notice (the "**Notice Period**") by the DIP Agent to the Debtors, counsel to the Debtors, counsel to any Creditors' Committee and the United States Trustee (collectively, the "**Notice Parties**") of the occurrence of such Event of Default, subject to an ability to cure, if such Event of Default is capable of being cured, during the Notice Period, to permit the DIP Agent and the DIP Lenders to take any and all actions and remedies to proceed against, take possession of, protect and realize upon the DIP Collateral and any other property of the estate of any Debtor upon which the DIP Agent or any DIP Lender has been or may hereafter be granted liens and security interests to obtain repayment of the DIP Obligations to the DIP Lenders, including the termination of the DIP Facility and termination of the Debtors' right to use Cash Collateral hereunder; provided, that such notice by the DIP Agent shall not prejudice the rights of the Notice Parties to file a motion during the Notice Period (the "**Opposition Motion**") with this Court opposing the occurrence of an Event of Default; provided, further, that upon the filing of such motion the DIP Agent and the DIP Lenders shall be stayed from taking any actions or remedies against the DIP Collateral until this Court hears and disposes of such motion. During the Notice Period and during the period following the filing of an Opposition Motion, the Debtors may not draw under the DIP Facility but may use Cash Collateral to pay the following amounts and expenses in accordance with the Budget:  (a) expenses that the Debtors have determined in good faith are in the ordinary course and critical to the preservation of the Debtors and their estates, and (b) such other amounts as have been approved in advance in writing by the DIP Lender.

18.    Carve-Out.

a.    The DIP Liens, AP Liens, Prepetition Liens, and the DIP Superpriority Claims and the AP Superpriority Claims, shall be subject to a carve-out (the "**Carve-Out**") for the following, and in the following priority (i) all fees (and interest) required to be paid to the Clerk of the Bankruptcy Court and to the United States Trustee; (ii) subject to any applicable restrictions in this Interim Order, the amount of allowed and unpaid fees, costs, and expenses of the estate's court-approved professionals in the Case incurred from and after the occurrence of an Event of Default, in an aggregate amount not to exceed (1) $250,000 in the case of the Debtor's court-approved professionals and (2) $75,000 in the case of court-approved professionals retained by any Creditors' Committee; and (iii) subject to any applicable restrictions in this Interim Order, the amount of allowed and unpaid fees, costs, and expenses of the estate's court-approved professionals in these chapter 11 cases incurred prior to the occurrence of an Event of Default, not to exceed the amounts set forth in applicable lines of the Budget as of any applicable date of determination; provided that in no event shall the DIP Lenders be obligated to loan funds to pay any claims benefiting from the Carve Out (or to advance any funds following a Carve-Out Event), including to the extent that such amounts would, when combined with the amounts advanced under the DIP Facility, exceed the maximum principal amount of commitments under the DIP Facility.

b.    Upon the occurrence and continuance (beyond any applicable grace period) of an Event of Default (as defined herein or in the DIP Documents), the right of the Debtors to pay fees and expenses of professionals retained by order of the Bankruptcy Court shall immediately terminate (a "**Carve-Out Event**"), other than to satisfy the Carve Out, and upon such occurrence, the Debtors shall provide immediate notice by facsimile and e-mail to all

professionals informing them that a Carve-Out Event has occurred and further advising them that the Debtors' ability to pay estate professionals is subject to the Carve-Out as provided herein.

c. Notwithstanding anything herein to the contrary, prior to a Carve-Out Event, the Debtors shall, in accordance with the Budget and the terms of the DIP Documents and subject to the terms of this Interim Order and any other relevant orders of the Bankruptcy Court, be permitted to pay compensation and reimbursement of expenses to professionals allowed and payable under sections 330 and 331 of the Bankruptcy Code and such orders of the Bankruptcy Court authorizing the payment of compensation and reimbursement of expenses that have been incurred prior to the occurrence of such Carve-Out Event.

d. Nothing herein or in the DIP Documents shall constitute a cap on the amount of professional fees and expenses that may be incurred or allowed in these chapter 11 cases; provided that no payments of such fees and expenses shall be made in excess of the amounts contained within or inconsistent with the Budget.

20. <u>Limitations on Use of DIP Proceeds, Cash Collateral, and Carve-Out</u>. No proceeds of the DIP Facility, the Carve-Out, or any Cash Collateral may be used by the Debtors or any other party in interest, or their representatives, to (or support any other party to) (a) investigate or finance any investigation (including discovery proceedings), initiation or prosecution of any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the DIP Agent or the DIP Lenders, or their respective rights and remedies under or in respect of the DIP Facility, (b) in connection with challenging, invalidating, disallowing, recharacterizing, setting aside, avoiding, subordinating (other than to the Carve-Out), in whole or in part, or taking or attempting to take any other action to render

unenforceable, the liens, claims, interests and adequate protection of the DIP Agent and the DIP Lenders, including for the avoidance of doubt, objecting to or contesting the validity, extent, amount, perfection, priority, or enforceability of the obligations under the DIP Facility or the DIP Liens, (c) for any purpose that is prohibited under the Bankruptcy Code, the Interim Order, the Final Order, or the DIP Documents, or (d) seek approval of any superpriority claims or grant any lien that is senior to or *pari passu* with the DIP Liens or DIP Superpriority Claims, except as contemplated by the DIP Term Sheet, this Interim Order or any DIP Document; *provided*, *however*, that the Debtors shall not be precluded from using Cash Collateral and/or proceeds from DIP Loans to contest whether an Event of Default has occurred and is continuing under the DIP Documents, and/or prepare for and participate at any hearing held by the Bankruptcy Court regarding any exercise of rights or remedies under the DIP Documents; *provided*, *further*, that up to $10,000 shall be made available to any Creditors' Committee to investigate (but not object to or commence an action or proceeding with respect to) the Prepetition Senior Secured Notes Obligations and the Prepetition Liens.  No portion of such amount may be used to prosecute or support any claims.

21.     <u>Good Faith Under Sections 363(m) and 364(e) of the Bankruptcy Code;</u> <u>No Modification or Stay of this Interim Order</u>.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with sections 363(m) or 364(e) of the Bankruptcy Code, as applicable, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, waived, or vacated by a subsequent order of this Court or any other court of competent jurisdiction, each of the DIP Agent, the DIP Lenders and the Prepetition Secured Creditors are entitled to the full protections provided in sections 363(m) and 364(e) of the Bankruptcy Code, as applicable.  Any such modification, amendment, waiver

or vacatur shall not affect the validity and enforceability of any advances previously made, including advances made hereunder, or any lien, claim, or priority authorized or created hereby, unless such authorization and the incurring of such debt, or the granting of such priority or lien, is stayed pending appeal.

22.     <u>Payment of Fees and Expenses</u>. In addition to any fees payable under the DIP Term Sheet, the Bridge Documentation or the DIP Documents, the Debtors shall pay all reasonable and documented fees and out-of-pocket expenses of the DIP Agent and the DIP Lenders, whether incurred before or after the Petition Date or in connection with these chapter 11 cases, the DIP Facility or the Bridge Facility, including the reasonable and documented out-of-pocket expenses of legal counsel to the DIP Agent and each DIP Lender and a financial advisor to the DIP Agent (the "**DIP Professional Fees**").  The DIP Professionals shall not be required to file motions or applications with respect to the DIP Professional Fees, provided, however, that any time such professionals seek payment of fees and expenses from the Debtors, each professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work-product doctrine) by electronic mail to the U.S. Trustee and counsel to any Creditors' Committee contemporaneously with the delivery of such fee and expense statements to the Debtors. The Debtors, any Creditors' Committee, or the U.S. Trustee may dispute the payment of any portion of such invoiced fees and expenses (the "**Disputed Invoiced Fees**") if the Debtors, any Creditors' Committee, or the U.S. Trustee notifies the submitting party in

writing, within five (5) days of the receipt of such fee and expense statement or invoice, setting forth the specific objections to the Disputed Invoiced Fees (to be followed by the filing with this Court, if necessary, of a motion or other pleading, with at least ten (10) days prior written notice to the submitting party of any hearing on such motion or other pleading).  The Debtors shall promptly pay in full all such invoiced fees and expenses other than the Disputed Invoiced Fees.

23.     <u>Release of DIP Agent and DIP Lenders</u>.  Subject to entry of the Final Order, each Debtor shall forever waive, discharge, and release each of the DIP Agent and the DIP Lenders and their respective affiliates and representatives, in each case, solely in such capacity (all of the foregoing, collectively, the "**DIP Secured Party Releasees**") from any and all obligations and liabilities to the Debtors (and their permitted successors and assigns) and from any and all "claims" (as defined in section 101(5) of the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"), defenses, setoff, recoupment, other offset rights, and other rights of disgorgement or recovery against any and all of the DIP Secured Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the DIP Obligations, the DIP Liens, or the debtor–creditor relationship between any of the DIP Lenders, in such capacity, on the one hand, and any of the Debtors, on the other hand, including (a) any recharacterization, subordination, avoidance, disallowance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law, municipal law, or foreign law and (b) any right or basis to challenge or object to the amount, validity, or enforceability of the DIP Obligations or any payments or other transfers made on account of the DIP Obligations, or the validity, enforceability, priority, or non-avoidability of the DIP Liens securing the DIP Obligations, including any right or basis to seek any disgorgement or

recovery of payments of cash or any other distributions or transfers previously received by any of the DIP Secured Party Releasees.  Notwithstanding the foregoing, none of the C5 Lenders, in their capacity as a Prepetition Secured Creditor, shall be released pursuant to the foregoing.

24.    <u>Effect of Stipulations on Third Parties</u>.    The stipulations set forth in paragraph F of this Interim Order shall be binding upon the Debtors upon entry of this Interim Order. In addition, such stipulations shall be binding upon each other party in interest, including any Creditors' Committee unless a party in interest having standing, first, commences, within seventy-five (75) calendar days following the date of entry of this Interim Order (the "**Challenge Period**," and the date that is the next calendar day after the termination of the Challenge Period in the event that either (a) no Challenge (as defined below) is properly raised during the Challenge Period or (b) with respect only to those parties who properly and timely file a Challenge and only for the matters specifically set forth in such Challenge, such Challenge is fully and finally adjudicated, shall be referred to as the "**Challenge Period Termination Date**"), (i) a contested matter, adversary proceeding, or other action or claim (as defined in the Bankruptcy Code) challenging or otherwise objecting to the stipulations set forth in paragraph F of this Interim Order or (ii) a contested matter, adversary proceeding, or other action or claim (as defined in the Bankruptcy Code) against any Prepetition Secured Creditor relating to any pre-Petition Date act, omission or aspect of the relationship between such Prepetition Secured Creditor and the Debtors ((i) and (ii) being, collectively, the "**Challenges**," and each individually, a "**Challenge**"), and, second, obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding or other action. Upon the Challenge Period Termination Date and for all purposes in these chapter 11 cases and any Successor Case(s), (1) any and all such Challenges by

any party in interest shall be deemed to be forever released, waived and barred and (2) the stipulations contained in paragraph F of this Interim Order shall be binding on all parties in interest, including any Creditors' Committee.

25.     No Third-Party Rights.   Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

26.     Section 506(c) Claims.   Except to the extent of the Carve-Out, upon entry of the Final Order, the Debtors shall irrevocably waive and be prohibited from asserting any claim under section 506(c) of the Bankruptcy Code, and no costs or expenses of administration of these chapter 11 cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law.

27.     No Marshaling.   Subject to entry of a Final Order, the DIP Lenders (and after payment in full of the DIP Obligations, the Prepetition Secured Creditors) shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral. Without limiting the generality of the immediately preceding sentence, from and after the entry of the Final Order, no party (other than the DIP Lenders and after payment in full of the DIP Obligations, the Prepetition Secured Creditors) shall be entitled, directly or indirectly, to direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of the DIP Collateral or the Prepetition Collateral (as applicable) after an Event of Default under the DIP Documents.

28.     <u>Section 552(b)</u>.   Upon entry of the Final Order, the DIP Agent, the DIP Lenders and the Prepetition Secured Creditors shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception thereunder shall not apply.

29.     <u>Binding Effect of Interim Order</u>.    The provisions of this Interim Order shall be binding upon and inure to the benefit of the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Secured Creditors, any Creditors' Committee, all other creditors of any of the Debtors and all other parties in interest and, in each case, their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors).   To the extent permitted by applicable law, this Interim Order shall bind any trustee or administrator (whether under U.S. law or the laws of any other jurisdiction) hereafter appointed for the estate of any of the Debtors, whether in these chapter 11 cases or in the event of the conversion of any of these chapter 11 cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case, to a liquidation under chapter 7 of the Bankruptcy Code.   Such binding effect is an integral part of this Interim Order.

30.     <u>No Modification of Interim Order</u>.   Until the DIP Obligations and the AP Superpriority Claims have been paid in full, the Debtors shall be prohibited from seeking or consenting to, directly or indirectly, any modification, stay, vacatur, waiver, or amendment to this Interim Order or any provision hereof without the prior written consent of the DIP Agent and each DIP Lender, and no such consent shall be implied by any action or inaction of the DIP Agent or any DIP Lender.

31.    <u>Interim Order Controls</u>.   In the event of any inconsistency between the terms and conditions of the DIP Term Sheet, any DIP Documents and this Interim Order, the provisions of this Interim Order shall control.

32.    <u>Survival</u>.   The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections granted to the DIP Agent, the DIP Lenders and the Prepetition Secured Creditors pursuant to this either or both this Interim Order and the DIP Term Sheet, notwithstanding the entry of any such order, shall continue in these chapter 11 cases, or following dismissal of these chapter 11 cases, and shall maintain their priority as provided by this Interim Order until all the DIP Obligations and AP Superpriority Claims, pursuant to the DIP Documents and/or this Interim Order, have been indefeasibly paid in full (such payment being without prejudice to any terms or provisions contained in the DIP Facility that survive such discharge by their terms), and all commitments to extend credit under the DIP Facility are terminated.

33.    <u>Final Hearing</u>.   The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) will be held on November [*], 2023, at [*] .m., prevailing Eastern Time. The Debtors shall promptly mail copies of this Interim Order to the notice parties set forth in the DIP Motion, and to any other party that has filed a request for notices with this Court and to any Creditors' Committee after same has been appointed, or the Creditors' Committee's counsel if same shall have filed a request for notice.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (i) counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: Sean M. Beach and Kenneth J. Enos (sbeach@ycst.com and kenos@ycst.com); (ii) the Office of the United States Trustee for the

District of Delaware, J. Caleb Boggs Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Timothy J. Fox (Timothy.Fox@usdoj.gov); and (iii) the DIP Agent; and (iv) counsel to certain of the DIP Lenders, Paul, Weiss, Rifkind, Wharton & Garrison LLP**,** 1285 Avenue of the Americas, New York, New York 10019, Attn: Sean Mitchell (smitchell@paulweiss.com) and Diane Meyers (dmeyers@paulweiss.com) and shall be filed with the Clerk of the Court, in each case, to allow actual receipt of the foregoing no later than 4:00 p.m. (prevailing Eastern Time), on November [*], 2023.

       34.   <u>Retention of Jurisdiction</u>.  This Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

# EXHIBIT 1

## IRONNET, INC.
## TERMS FOR DIP FINANCING

This binding term sheet (the "**Term Sheet**") sets forth the principal terms of a potential superpriority, senior secured debtor-in-possession credit facility (the "**DIP Facility**", the credit agreement evidencing the DIP Facility, the "**DIP Credit Agreement**" and, together with the other definitive documents governing the DIP Facility and the DIP Order (as defined herein), collectively, the "**DIP Documents**,") each of which shall be in form and substance acceptable to the DIP Facility Agent (as defined herein), the DIP Facility Lenders (as defined herein) and the Loan Parties, to be entered into with the Loan Parties (as defined herein) in the Loan Parties' cases (the "**Chapter 11 Cases**") to be commenced under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").  The DIP Facility, and the adequate protection provided therein to the beneficiaries of pre-petition liens and security interests, will be subject to the approval of the Bankruptcy Court in accordance with (i) the interim and final orders of the Bankruptcy Court authorizing the Loan Parties to enter into the DIP Facility (the "**DIP Order**") and (ii) the DIP Documents.

This Term Sheet is provided on a confidential basis, and it is intended to be entitled to the protections of Federal Rule of Evidence 408 and any other applicable statutes or doctrines protecting the disclosure of confidential information and exchange of information; provided however, this Term Sheet may be filed with the Bankruptcy Court and as an exhibit to an 8-K filed by IronNet with the Securities and Exchange Commission.

| | |
|---|---|
| **DIP Facility Borrowers** | IronNet, Inc., a Delaware corporation ("**IronNet**"), in its capacity as a debtor and debtor-in-possession, and each of IronNet's subsidiaries and affiliates that becomes a debtor and debtor-in-possession (collectively with IronNet, the "**DIP Facility Borrowers**"), in their capacities as such, in the Chapter 11 Cases. The date of commencement of the Chapter 11 Cases is referred to herein as the "**Petition Date**". |
| **Guarantors** | Any Debtors that are not otherwise DIP Facility Borrowers (the "**Guarantors**" and, collectively with the DIP Facility Borrowers, the "**Loan Parties**"). |
| **Debtors** | IronNet and each of its subsidiaries and affiliates that become debtors and debtors-in-possession in the Chapter 11 Cases (collectively, the "**Debtors**"), which cases shall be jointly administered. |
| **DIP Facility Agent** | The administrative agent and the collateral agent for the DIP |

| | |
|---|---|
| | Facility Lenders with respect to the DIP Facility (in such capacities, the "**DIP Facility Agent**") shall be a party selected by, and qualified to perform the duties customarily associated with such roles, as determined by the DIP Facility Lenders and reasonably acceptable to the Debtors. |
| **DIP Facility Lenders** | ITC Global Advisers LLC ("**ITC GA**"), and/or their respective designated affiliates and/or related funds or accounts, and such other lender parties that have agreed or may agree from time to time to provide commitments to fund the DIP Facility (each a "**DIP Facility Lender**", and collectively, the "**DIP Facility Lenders**"). |
| **Bridge Amount** | On the date of this Term Sheet, the DIP Facility Lenders shall advance $1,500,000 to the DIP Facility Borrowers (the "**Bridge Amount**").  The Bridge Amount shall be secured by all the assets of the Loan Parties provided however, to the extent the DIP Facility Lenders fail to fund any of the DIP Loans after entry of the Interim Order, such security interest shall be limited to only the assets of IronNet, Inc. and shall not include a security interest in any intellectual property or the assets of IronNet Cybersecurity, Inc., with such revocation of security interest effective as of the date the Bridge Amount is funded. |
| **DIP Facility** | A senior (priming) secured and superpriority debtor-in-possession delayed-draw term loan credit facility in an aggregate principal amount not to exceed $10,000,000 (the "**Maximum Facility Amount**"), consisting of up to $8,500,000 of term loans (the "**DIP Term Loans**") and $1,500,000 of the Bridge Amount (collectively, the "**DIP Loans**"). Until the entry of the Final Order (defined below), a maximum amount of up to $4,500,000 of the DIP Facility (inclusive of the Bridge Amount) will be available on an interim basis (the "**Interim Maximum Amount**").<br><br>Subject to the consent of the DIP Facility Lenders and approval from the Bankruptcy Court, and consistent with the Debtors' fiduciary duties , (i) the Maximum Facility Amount may be increased or (ii) the Debtors may obtain additional post-petition financing, including a "first-out" or "senior" financing facility, on terms acceptable to the DIP Facility Lenders (the "Incremental DIP"); provided however, any Incremental DIP shall not mature any earlier than the Maturity Date hereunder.<br><br>The actual amounts available will be subject to the Budget (as defined below). |

| | |
|---|---|
| | Upon entry of the Interim Order, the Bridge Amounts shall be deemed "rolled up" and converted to DIP Loans on a cashless, dollar-for-dollar basis (the "**Bridge Roll-Up DIP Loan**"). |
| | The "**Bridge Amounts**" shall be the amounts advanced on or after October 10, 2023 through the Petition Date, but not to exceed $1,500,000. |
| **Permitted Use of Proceeds** | All proceeds under the DIP Facility shall be used only in accordance with the Budget, subject to Permitted Variances, in each case, as provided below.  Unless otherwise agreed, no borrowing shall be made more frequently than weekly and all proceeds under the DIP Facility shall only be used for the following purposes: (a) to fund, to the extent that usage of cash collateral and available cash are not sufficient to cover such expenses, post-petition operating expenses and working capital needs of the Debtors, including, but not limited to, those activities required to remain in, or return to, compliance with laws in accordance with 28 U.S.C. § 1930; (b) to fund fees and expenses incurred in connection with the Sale (as defined below) or a plan of reorganization; (c) to pay permitted pre-petition claim payments and adequate protection payments, if any; (d) to pay professional fees in connection with these Chapter 11 Cases; and (e) to pay other costs and expenses of administration of the Chapter 11 Cases. |
| | Notwithstanding the foregoing, prior to seeking approval for the payment of any critical vendors prepetition claims, the Debtors shall obtain the consent of the DIP Facility Lenders which shall not be unreasonably withheld. |
| **Termination Date** | The DIP Facility Lenders' commitment to provide the DIP Facility shall terminate, and the aggregate principal amount owing under the DIP Facility, all accrued and unpaid interest thereon, and all fees and expenses incurred by the DIP Facility Agent and DIP Facility Lenders as provided herein in connection with the DIP Facility (collectively, the "**DIP Obligations**") shall be repaid in full, on the earliest to occur of (the "**Maturity Date**"):  (a) the date which is 180 days after the Petition Date, unless extended by agreement of the DIP Facility Agent in its sole discretion; (b) the effective date of any chapter 11 plan confirmed in any of the Chapter 11 Cases; (c) the entry of an order for the dismissal or conversion to chapter 7 of any of the Chapter 11 Cases; (d) the closing of |

| | |
|---|---|
| | a sale of all or substantially all assets or equity of the Loan Parties; or (e) the date of any Event of Default under the DIP Credit Agreement or any of the DIP Documents and the election of the DIP Facility Agent to terminate the DIP Facility commitments following such Event of Default and the expiration of all applicable notice and cure periods. |
| **Interest Rate and Payments** | The DIP Facility shall accrue PIK interest at a rate of 16% per annum (the "**PIK Interest**"). |
| **Default Rate** | An additional 2% per annum, effective upon the occurrence of any Event of Default. |
| **Agency Fees** | $300,000 |
| **DIP Order** | The DIP Order, which shall be in form and substance reasonably acceptable to the DIP Facility Agent, shall, among other things, authorize and approve (i) the borrowing under the DIP Facility and the making of the loans thereunder, including the Bridge Roll-Up Loan; (ii) the granting of the super-priority claims and senior priming liens against the Loan Parties and their assets in accordance with this Term Sheet and the definitive documentation with respect to the Collateral (as defined herein); (iii) the payment of reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of outside counsel and a financial advisor) of the DIP Facility Agent; (iv) the use of cash collateral, subject to adequate protection; and (v) the covenants, milestones, and other terms described herein. |
| **Collateral** | All indebtedness and obligations of the Debtors under the DIP Facility will be secured by security interests and liens granted pursuant to Sections 364(c)(2), (c)(3), and (d)(1) of the Bankruptcy Code (the "**DIP Facility Liens**"), with priority over all existing and future security interests, liens, claims and encumbrances, in and on all present and after acquired real and personal property of the Debtors, tangible or intangible, wherever located, including all bank accounts, deposits and cash, tax refunds, rebates, royalties, and all other receivables (anticipated or not) (whether now existing or hereafter acquired by the Debtors and the Debtors' bankruptcy estates), and all proceeds, products, rents, revenues and profits of each of the foregoing (all such property, the "**Collateral**"), subject only to the Carve Out (as |

| | |
|---|---|
| | defined below), and certain permitted liens under the DIP Documents.<br><br>For the avoidance of doubt, the DIP Facility Liens shall not prime and shall be immediately junior to the liens identified on the UCC-1 for IronNet Cybersecurity, Inc. attached as an Exhibit to an interim DIP Order; provided that, all parties reserve the right (but the Debtors shall not be required) to seek to prime such liens in connection with the Final DIP Order.<br><br>All of the DIP Facility Liens described above shall be effective and perfected pursuant to, and upon entry of an interim DIP Order. |
| **Superpriority Claims** | To the extent of the outstanding obligations of the Debtors under the DIP Facility, the DIP Facility Agent for the benefit of the DIP Facility Lenders shall be granted, pursuant to Section 364(c)(1), superpriority claims over all other claims against and administrative expenses of the Debtors, subject only to the Carve Out. |
| **Adequate Protection for Pre-Petition Lenders** | DIP Orders to include customary adequate protection package of replacement liens and superpriority claims for any diminution in value of the Senior Secured Noteholders' interests in the Collateral (each subject to the liens and claims of the DIP Facility Lenders). |
| **Waivers, Stipulations, Releases, Protections** | The DIP Facility shall provide that, effective upon entry of the Final Order (i) no costs or expenses of administration shall be imposed against the DIP Facility Lenders or the Collateral under Section 506(c) of the Bankruptcy Code or otherwise, and (ii) the DIP Facility Lenders and the Collateral shall not be subject to the doctrine of marshalling or Section 552 of the Bankruptcy Code "equities of the case" arguments.<br><br>The Debtors shall waive and forever release and discharge any and all claims and causes of action against each of the DIP Facility Agent, the DIP Facility Lenders and ITC GA (and their respective representatives and affiliates) as of the date of the Final DIP Order. |

| | |
|---|---|
| | No proceeds of the DIP Facility or any cash or other amounts may be used to (a) investigate, challenge, object to or contest the extent, validity, enforceability, security, perfection or priority of any of the DIP Facility Liens or DIP Obligations, (b) investigate or initiate any claim or cause of action against any of the DIP Facility Agent or DIP Facility Lenders, (c) object to or seek to prevent, hinder or delay or take any action to adversely affect the rights or remedies of the DIP Facility Agent or DIP Facility Lenders, (d) seek to approve superpriority claims or grant liens or security interests (other than those expressly permitted under this Term Sheet, the DIP Documents and the DIP Orders) that are senior to or *pari passu* with the DIP Facility Liens, DIP Superpriority Claims, the adequate protection liens or claims granted hereunder, or the Prepetition Senior Secured Notes Liens; *provided, however*, no more than $10,000 of the Carve-Out in the aggregate may be used by an Official Committee, if any, to investigate (but not object to or commence an action or proceeding with respect to) the Prepetition Senior Secured Notes Obligations and the Prepetition Senior Secured Notes Liens. <br><br> The DIP Facility Agent, on behalf of the DIP Facility Lenders, shall have the unqualified right to credit bid all DIP Obligations in any sale of Collateral. <br><br> The DIP Facility Agent and DIP Facility Lenders shall be entitled to good faith protection under Section 364(e) of the Bankruptcy Code. |
| **Carve Out** | The DIP Orders shall include a mutually agreed carve out for professional fees through the date of a trigger event, as well as post-trigger event and US Trustee Fees and costs of a Chapter 7 Trustee to the extent required by local practice and rules (the "**Carve Out**"). |
| **Events of Default** | The DIP Documents shall include events of default that are customary and appropriate for similar debtor-in-possession financings, including, without limitation: (a) if any of the Chapter 11 Cases shall be converted to a case under Chapter 7 of the Bankruptcy Code or be dismissed; (b) the appointment of a trustee under Section 1104 of the Bankruptcy Code; (c) the appointment of an examiner with expanded or enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under |

| | |
|---|---|
| | Section 1106(b) of the Bankruptcy Code; (d) the Debtors fail to make all payments under the DIP Facility when due (e) variance from Budget that is not a permitted variance; and (f) failure to comply with any of the Milestones herein and such failure has not been cured within five (5) business days after notice of such failure has been provided by the DIP Facility Agent to the Debtors. |
| **Budget** | As a condition precedent to the DIP Facility, there shall be established a 13-week cash flow budget updated on a monthly basis (the "**Budget**") for the Debtors' cash receipts and expenses (including professional fees and expenses). Any updates or revisions to the Budget, other than with respect to professional fees and expenses, shall require the prior written consent of the DIP Facility Agent.  The Budget shall be due the first Monday of each month. |
| **Milestones** | The Debtors shall conduct a process (the "**Sale Process**") for the sale of substantially all of the assets of the Debtors under Section 363 of the Bankruptcy Code or the equity of the reorganized Debtor (the "**Sale**") and concurrently seek the confirmation of the Acceptable Plan in accordance with the below Milestones (the "**Milestones**"). The Debtors' failure to satisfy any of the following Milestones shall constitute an Event of Default under the DIP Documents: <br><br> (a) No later than October 11, 2023, the Petition Date shall have occurred; <br><br> (b) No later than the date that is three (3) calendar days following the Petition Date (or if such third day is not a business day, the first succeeding business day thereafter), the Bankruptcy Court shall have entered an interim order approving the DIP Facility (the "**Interim DIP Order**"); <br><br> (c) No later than the date that is fifteen (15) business days following the Petition Date (or if such third day is not a business day, the first succeeding business day thereafter), the Debtors shall have (i) filed a motion, in form and substance acceptable to the DIP Facility Agent, requesting entry of an order approving procedures for the post-petition marketing of the Debtors' assets or reorganized equity to determine if a higher and better offer can be obtained to "top" the proposed treatment under an Acceptable Plan, including whether the Debtors can obtain exit financing on better terms will be |

| | |
|---|---|
| | proposed by DIP Facility Lenders (the "**Sale Procedure Order**"); |
| | (c) No later than the date that is thirty-five (35) calendar days following the Petition Date, the Bankruptcy Court shall have entered the Sale Procedure Order and a final order approving the DIP Facility (the "**Final DIP Order")**; and |
| | (d) No later than the date that is sixty-five days (65) days following the entry of the Interim Order, the Debtors shall have conducted an auction for the Sale (if necessary) and selected the successful bidder and/or identified an alternate plan sponsor providing higher and better treatment and consistent with the Debtors fiduciary duties; |
| | (e) No later than the date that is ninety (90) days following the entry of the Interim Order, the Bankruptcy Court shall have entered an order approving the Sale or order confirming the Plan of Reorganization; and |
| | (f) On or before the date that is one hundred five (105) days after the Petition Date, provided that the Bankruptcy Court has waived the stay imposed by Bankruptcy Rule 6004(h), or such later date to which the DIP Facility Agent consents in writing in its sole discretion, the Sale shall be closed. |
| | The DIP Facility Agent and the DIP Facility Lenders shall have the right to "credit bid" any secured obligations owed to them in any sale of the Debtors' assets. |
| | Notwithstanding anything to the contrary herein, the Bankruptcy Court may set dates with respect to the Milestones beyond the outer dates specified above to accommodate its own schedule, and to the extent the Bankruptcy Court makes such an extension, the Milestones hereunder shall be automatically extended by the same period as the Bankruptcy Court's extension. |
| **Fiduciary Out** | The Independent Director shall have a "fiduciary out" to the extent he/she determines it is the best interest of the Company to accept another financing or plan sponsor proposal; provided however, any alternate financing proposal must repay all DIP Loans, including any Payroll Bridge Amounts, fees and expenses, and any accrued and unpaid PIK Interest in full, in cash. |
| **Fees and Expenses** | Loan Parties obligated under the DIP Facility shall pay all reasonable, documented out-of-pocket fees, costs and expenses incurred or accrued by the DIP Facility Agent in connection with any and all aspects of the DIP Facility and |

| | |
|---|---|
| | the Chapter 11 Cases, including, without limitation, the reasonable and documented fees and expenses of legal counsel and financial advisors, hired by or on behalf of the DIP Facility Agent. |
| **Conditions to Commitment/Closing/Funding** | Conditions to commitment, closing and funding to include usual and customary for DIP facilities of this type including, without limitation, entry of the Interim DIP Order and Final DIP Order and execution and delivery of the DIP Documents. |
| **Governing Law** | The laws of the State of New York (excluding the laws applicable to conflicts or choice of law), except as governed by the Bankruptcy Code. |
| **Miscellaneous** | This Term Sheet does not purport to summarize all of the conditions, covenants, representations, warranties, events of default and other terms and provisions which would be contained in definitive credit documentation, if any, relating to matters covered hereby, all of which shall be reasonably acceptable in form and substance to the DIP Facility Agent. |
| **Acceptable Plan** | DIP Facility Lenders and DIP Facility Agent agree to support a plan (an "**Acceptable Plan**") that contains the following treatment:<br>• Provides for the equitization of the DIP Loans (subject to dilution for MIP Equity);<br>• Any Incremental DIP shall either (i) be repaid in full, (ii) roll into an exit facility or (iii) convert into equity of the reorganized debtor.<br>• Unimpairs trade and other liabilities (except for note creditors at IronNet, as discussed below) at IronNet and its subsidiaries;<br>• Provides for a recovery to creditors at IronNet in the following manner:<br>    o All debt claims shall receive a new note ("**Compromise Note**") in the principal amount of funds initially advanced, less any payments made to such lender on account of such note.  For the avoidance of doubt, the new notes shall not include any accrued interest or fees, regardless of whether such interest or fees accrued pre- or post-petition;<br>    o All Compromise Notes shall contain a maturity of at least thirty-six (36) months from |

| | the effective date of the Plan (the "Effective Date"); provided that no interest will accrue or be paid for the first 12 months after the Effective Date; |
| | o   Note Creditors may have the option of receiving equity on account of their note claims, so long as such treatment does or would not (i) render its claim unimpaired; (ii) provide for a recovery greater than the amount of its claims; or (iii) violate the provisions of the Bankruptcy Code, or otherwise render the plan unconfirmable. |
| | The reorganized company shall have two classes of shares: common and preferred (in each case consistent with 1123(a)(6) of the Bankruptcy Code) and employee stock options exercisable for the purchase of common shares not to exceed 15% on a fully diluted basis ("**MIP Equity**") at the discretion of the new board of the reorganized company. The DIP Loans and any debt held by C5 that C5 agrees to convert into equity of the reorganized company shall be in the form of preferred stock, which preferred stock shall have a senior liquidation preference and such other rights, preferences and privileges as may be agreed to by the DIP Facility Lenders and C5; provided that any such preferred stock issuance would not (i) render its claim unimpaired; (ii) provide for a recovery greater than the amount of its claims; or (iii) violate the provisions of the Bankruptcy Code, or otherwise render the plan unconfirmable. |

*Signature Pages Attached*

# EXHIBIT 2

## SENIOR SECURED PROMISSORY NOTE

$1,500,000                                                            October 10, 2023

For value received, **IRONNET, INC.**, a Delaware corporation (the "***Company***"), **IRONNET CYBERSECURITY, INC.**, a Delaware corporation ("***Cybersecurity***"), **IRONNET INTERNATIONAL, LLC**, a Delaware limited liability company ("***IronNet International***"), **IRONCAD LLC**, a Delaware limited liability company ("***IronCAD***"), **HIGHDEGREE, LLC**, a Delaware limited liability company ("***HighDegree***"; and together with the Company, Cybersecurity, IronNet International and IronCAD, the "***Obligors***", and each, an "***Obligor***"), each hereby, jointly and severally, unconditionally promise to pay to the order of **FERROUS INVESTORS LP** or its assigns ("***Holder***"), in lawful money of the United States of America and in immediately available funds, the principal sum of $1,500,000, together with accrued and unpaid interest thereon, due and payable on the date and in the manner set forth below.  Reference is hereby made to that certain term sheet entitled "IRONNET, INC. TERMS FOR DIP FINANCING" in substantially the form attached hereto as Exhibit A (the "***DIP Term Sheet***").  Capitalized terms used herein and not otherwise defined shall have the meaning assigned to such terms in the DIP Term Sheet.

**1. Principal Repayment.**

    **(a)** The outstanding principal amount of this Senior Secured Promissory Note (this "***Note***"), and all accrued and unpaid interest thereon, shall be due and payable on the sixth month anniversary of the date hereof (the "***Stated Maturity Date***"); *provided* that this Note shall be subject to the terms and conditions of the DIP Term Sheet and the DIP Documents upon the conversion of this Note and the loans evidenced hereby into the DIP Facility.

    **(b)** The Obligors may prepay this Note in whole or in part at any time or from time to time without penalty or premium by paying the principal amount to be prepaid together with accrued interest thereon to the date of prepayment.

**2. Interest.** The Obligors further promise to pay interest on the outstanding principal amount hereof from the date hereof, until payment in full, which interest shall be payable at a rate equal to 16.0% per annum, which interest shall be payable in kind on each monthly interest payment date (or in cash on the earlier of prepayment and the Stated Maturity Date).  Interest shall be calculated on the basis of a 360-day year for the actual number of days elapsed. If at any time the interest rate payable on this Note shall exceed the maximum rate of interest permitted under applicable law, such interest rate shall be reduced automatically to the maximum rate permitted.

**3. Place of Payment**. All amounts payable hereunder shall be payable at the office of Holder, unless another place of payment shall be specified inwriting by Holder.

**4. Application of Payments.** The Obligors shall repay the full principal balance of this Note, together with any accrued and unpaid interest thereon, on the Maturity Date. This Note may be prepaid in whole or in part at any time without penalty or premium. Any accrued and unpaid interest on the amounts so prepaid to the date of such prepayment shall be paid at the time of any such prepayment.

**5. Secured Note.** This Note is secured by the "Collateral" under, and as defined in, that certain Security Agreement (the "***Security Agreement***"), dated as of the date hereof, by and among the Obligors, as grantors, and the Holder, as secured party.

**6. Ranking of the Note.** This Note shall rank (i) pari passu in right of payment with (but senior as to any intellectual property collateral as provided in the Security Agreement) (x) any note issued by the Company on a substantially similar basis to this Note to an affiliate of the Holder or its affiliates or designee, (y) the secured promissory notes issued between December 14, 2022 and December 16, 2022 by the Company in the aggregate principal amount of $6.9 million, and (z) any other secured debt issued by the Company (collectively as may be amended and restated, the "***Other Secured Notes***"), (ii) pari passu or senior in right of payment with any other secured debt issued by the other Obligors, (iii) senior in right of payment to all of each Obligor's other existing and future indebtedness for borrowed money (collectively, "***Subordinated Loans***") and all of each Obligor's existing and future reimbursement and indemnification obligations related to bonds or similar surety obligations issued at each Obligors' request (collectively, the "***Indemnification Obligations***"), and (iv) in no event shall any indebtedness under that certain Senior Unsecured Convertible Note, dated as of September 15, 2022 (the "***Convertible Note***"), issued by the Company or any other Obligor in favor of 3iLP be senior in right of payment to this Note. The Obligors agree to execute and deliver from time to time, any documents, instruments or agreements requested by Holder in order to confirm the ranking of this Note to any Subordinated Loan or Indemnification Obligation.

**7. [Reserved]**.

**8. Event of Default.** Each of the following events shall be an "***Event of Default***" hereunder:

    **(a)** any Obligor fails to pay timely (i) any of the principal amount due under this Note on the date the same becomes due and payable or (ii) any accrued interest or other amounts due under this Note within three (3) business days of the date the same becomes due and payable, whether at maturity, by acceleration or otherwise;

    **(b)** any Obligor shall breach any covenant under this Note or the Security Agreement, or any representation or warranty of any Obligor under this Note or the Security Agreement is violated or becomes untrue or misleading (or shall prove to have been untrue or misleading when made) in any material respect (or in any respect, if already qualified by materiality), and such default is not cured within 30 days after written notice thereof from Holder;

**(c)** other than as contemplated by the DIP Term Sheet, any Obligor (A) files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, (B) applies for or consents to the appointment of a receiver, trustee, custodian or liquidator for itself or any part of its property if such appointment is not terminated or dismissed within sixty (60) days, (C) shall be adjudicated as bankrupt or insolvent or (D) makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing;

**(d)** other than as contemplated by the DIP Term Sheet, any Obligor becomes subject to any proceedings under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect (unless such proceeding is dismissed or discharged within sixty (60) days), or have an order of relief entered against it in any proceeding under the United States Bankruptcy Code;

**(e)** [reserved];

**(f)** any material provision of this Note or the Security Agreement shall for any reason cease to be valid and binding on or enforceable against any Obligor party thereto, or any Obligor shall so state in writing; or

**(g)** except as contemplated by the DIP Term Sheet, any Obligor shall (i) fail to pay any principal or interest, regardless of amount, due in respect of the Convertible Note, the Other Secured Notes or any other indebtedness (other than the obligations under this Note), when and as the same shall become due and payable (after giving effect to any applicable grace period), or (ii) fail to observe or perform any other term, covenant, condition or agreement contained in any agreement or instrument evidencing or governing any such indebtedness or any event or condition occurs, if the effect of any failure or occurrence referred to in this clause (ii) is to cause, or to permit the holder or holders of such indebtedness or a trustee on its or their behalf (with or without the giving of notice but giving effect to applicable grace periods) to cause, such indebtedness to become due, or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise) or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made prior to its stated maturity; provided, however, that (x) it shall not constitute an Event of Default pursuant to this paragraph (g) unless the aggregate amount of all such indebtedness referred to in clauses (i) and (ii) exceeds $2.0 million at any one time and (y) the Specified Event of Default shall not constitute an Event of Default pursuant to this paragraph (g) so long as the holders of the Convertible Note have not accelerated prior to its stated maturity due to the Specified Event of Default.

Upon the occurrence of an Event of Default hereunder, under any of the DIP Documents or under the Interim or Final DIP Order, all unpaid principal, accrued interest and other

amounts owing hereunder shall, at the option of the Holder, and upon written notice to the Obligors, and, in the case of an Event of Default pursuant to (c) or (d) above, automatically, be immediately due, payable and collectible by Holder pursuant to applicable law.

"Specified Event of Default" means (A) a default in existence on the date hereof or, solely to the extent resulting from the issuance of promissory notes to the Holder or its affiliates, hereafter arising under the Convertible Note resulting from a breach of (1) Section 9 (Mandatory Redemption at Election of Holder), Section 15(b) (Incurrence of Indebtedness) and Section 15(n) (Restricted Issuances) of the Convertible Note, in each case, arising from the issuance of this Note or the Other Secured Notes and (2) Section 4.16 (Subsequent Debt) and Section 4.17 (Related Party Transactions) of that certain securities purchase agreement, dated as of September 14, 2022, with respect to the Convertible Note, in each case, arising from the issuance of this Note or the Other Secured Notes and (B) a default under the Convertible Note resulting from a breach of Section 2(g) (Effect of Failure to File and Obtain and Maintain Effectiveness of any Registration Statement) of that certain registration rights agreement, dated as of September 14, 2022.

**9. Waivers**. Each Obligor (i) waives presentment, demand, protest or notice of any kind in connection with this Note and (ii) agrees, in the event of an Event of Default and acceleration pursuant to the preceding Section 8, to pay to the Holder of this Note, on demand, all costs and expenses (including reasonable legal fees and expenses as and when incurred), incurred in connection with the enforcement and/or collection of this Note. The right to plead any and all statutes of limitations as a defense to any demands hereunder is hereby waived to the full extent permitted by law.

**10. Notices.** All notices and other communications required to be given under this Note to either Holder or the Obligors, as applicable, shall be in writing.

**11. Entire Agreement; Severability**. This Note and the Security Agreement constitute the entire agreement among the Parties with respect to the matters covered hereby and thereby and supersede all previous written, oral or implied understandings among them with respect to such matters. Any provision of this Note which is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**12. Governing Law; Waiver of Jury Trial.**

    **(a)** In all respects, including all matters of construction, validity and performance, this Note shall be governed by, and construed and enforced in accordance with, the laws of the State of New York applicable to contracts made and performed in such state, without regard to the principles thereof regarding conflict of laws.

4

    **(b)** THE COMPANY AND HOLDER ACKNOWLEDGE AND AGREE THAT ANY DISPUTE OR CONTROVERSY WHICH MAY ARISE UNDER THIS NOTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH OF THE OBLIGORS AND HOLDER IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS NOTE.

**13. Amendment and Waiver**. No amendment, modification or waiver of any provision of this Note nor consent to departure by the Obligors therefrom shall be effective, irrespective of any course of dealing, unless the same shall be in writing and signed by the Obligors and the Holder. The waiver by a Party of any breach hereof for default in the performance hereof shall not be deemed to constitute a waiver of any other default of any succeeding breach or default.

**14. Successors and Assigns**. This Note may be transferred only in compliance with the provisions herein and upon its surrender to the Company for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company. Thereupon, this Note shall be reissued to, and registered in the name of, the transferee, or a new Note for like principal amount and interest shall be issued to, and registered in the name of, the transferee. Interest and principal shall be paid solely to the registered holder of this Note. Such payment shall constitute full discharge of the Obligors' obligation to pay such interest and principal.

**15. Expenses; Indemnification**.

Each Obligor agrees to indemnify and hold harmless Holder and its affiliates, and each of their respective officers, directors, employees, attorneys, agents and representatives (collectively the "***Indemnified Parties***") from and against all Losses (as defined below) and to reimburse the Holder for all Expenses (as defined below) as incurred (payable promptly upon written request) by any Indemnified Party based upon, attributable to, arising out of, resulting from or otherwise with respect to this Note, the DIP Term Sheet, the DIP Documents, the Chapter 11 Cases, any breach by any Obligor of any covenants, representations or warranties in, terms of, or obligations under, this Note or the Security Agreement; provided, such indemnity shall not, as to any Indemnified Party, be available to the extent that such Losses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnified Party.

As used herein, "***Losses***" shall mean any and all losses, costs, obligations, liabilities, settlement payments, awards, judgments, fines, penalties, damages, deficiencies or other charges (excluding incidental, special and consequential damages, including lost profits) suffered or incurred by an Indemnified Party; and "***Expenses***" shall mean any and all documented out-of-pocket costs, expenses and disbursements (including court filing fees, court costs, arbitration fees or costs, witness fees, and reasonable fees and disbursements

of legal counsel, investigators, expert witnesses, consultants, accountants and other professionals).

**16. Joint and Several Liability of the Obligors**. (a) Notwithstanding anything in this Note or the Security Agreement to the contrary, each of the Obligors hereby accepts joint and several liability hereunder and this Note and the Security Agreement in consideration of the financial accommodations to be provided by the Holder, for the mutual benefit, directly and indirectly, of each of the Obligors and in consideration of the undertakings of the other Obligors to accept joint and several liability for the obligations under this Note and the Security Agreement (the "***Obligations***"). Each of the Obligors, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Obligors, with respect to the payment and performance of all of the Obligations (including, without limitation, any Obligations arising under this Section 16), it being the intention of the parties hereto that all of the Obligations shall be the joint and several obligations of each of the Obligors without preferences or distinction among them.  If and to the extent that any of the Obligors shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event, the other Obligors will make such payment with respect to, or perform, such Obligation.  Subject to the terms and conditions hereof, the Obligations of each of the Obligors under the provisions of this Section 16 constitute the absolute and unconditional, full recourse Obligations of each of the Obligors, enforceable against each such Person to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Note, the Security Agreement or any other circumstances whatsoever.

(b) The provisions of this Section 16 are made for the benefit of the Holder and its successors and permitted assigns, and may be enforced by them from time to time against any or all of the Obligors as often as occasion therefor may arise and without requirement on the part of the Holder or such successors or permitted assigns first to marshal any of its or their claims or to exercise any of its or their rights against any of the other Obligors or to exhaust any remedies available to it or them against any of the other Obligors or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy.  The provisions of this Section 16 shall remain in effect until all of the Obligations (other than unasserted contingent indemnification Obligations) shall have been paid in full or otherwise fully satisfied.

(c) Each of the Obligors hereby agrees that it will not enforce any of its rights of contribution or subrogation against the other Obligors with respect to any liability incurred by it hereunder or under the Security Agreement, any payments made by it to the Holder with respect to any of the Obligations or any Collateral (as defined in the Security Agreement), until such time as all of the Obligations (other than unasserted contingent indemnification Obligations) have been paid in full in cash.  Any claim which any Obligor may have against any other Obligor with respect to any payments to the Holder or under the Security Agreement are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations

arising hereunder or thereunder, to the prior payment in full in cash of the Obligations (other than unasserted contingent indemnification Obligations).

[*Signature page follows.*]

IN WITNESS WHEREOF, the Obligors have caused this **SENIOR SECURED PROMISSORY NOTE** to be executed by its duly authorized officer as of the date first set forth above.

**IRONNET, INC.**

By: _____
      Name: Cameron Pforr
      Title:   Chief Financial Officer

**IRONNET CYBERSECURITY, INC.**

By: _____
      Name: Cameron Pforr
      Title:   Chief Financial Officer

[add additional Obligors]

# EXHIBIT 3

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER** (optional)
CSC 800-858-5294

**B. E-MAIL CONTACT AT FILER** (optional)
FILINGDEPT@CSCINFO.COM

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

801 ADLAI STEVENSON DR [108720558]
SPRINGFIELD, IL 62703
US

Delaware Department of State
U.C.C. Filing Section
**Filed: 12:01 PM 12/02/2015**
**U.C.C. Initial Filing No: 2015 5726855**

Service Request No:   20151151991

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | IRONNET CYBERSECURITY, INC. | | | |
| | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 8135 MAPLE LAWN BLVD | FULTON | MD | 20759 | US |

**2. DEBTOR'S NAME:** Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | | | | |
| | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only <u>one</u> Secured Party name (3a or 3b)

| | 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | HEWLETT-PACKARD FINANCIAL SERVICES COMPANY | | | |
| | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 200 CONNELL DRIVE | BERKELEY HEIGHTS | NJ | 07922 | US |

**4. COLLATERAL:** This financing statement covers the following collateral:
ALL EQUIPMENT AND SOFTWARE NOW OR HEREAFTER ACQUIRED, WHICH SECURED PARTY HAS LEASED TO OR FINANCED FOR DEBTOR, INCLUDING, BUT NOT LIMITED TO, COMPUTER, PRINTING, IMAGING, COPYING, SCANNING, PROJECTION AND STORAGE EQUIPMENT, ANY AND ALL RELATED PERIPHERALS, ATTACHMENTS, ACCESSIONS, ADDITIONS, GENERAL INTANGIBLES, SUBSTITUTIONS, SUPPLIES, REPLACEMENTS, AND ANY RIGHT, TITLE OR INTEREST IN ANY LICENSE FOR ANY SOFTWARE USED TO OPERATE OR OTHERWISE INSTALLED IN ANY OF THE FOREGOING, AND PRODUCTS AND PROCEEDS OF ALL OF THE FOREGOING (INCLUDING INSURANCE PROCEEDS).

**5.** Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check <u>only</u> if applicable and check <u>only</u> one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility
**6b.** Check <u>only</u> if applicable and check <u>only</u> one box:
☐ Agricultural Lien ☐ Non-UCC Filing

**7.** ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8.** OPTIONAL FILER REFERENCE DATA:

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)                International Association of Commercial Administrators (IACA)

# UCC FINANCING STATEMENT **AMENDMENT**

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
CSC 800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**
FILINGSDEPT@CSCINFO.COM

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**

801 ADLAI STEVENSON DR [199796236]

SPRINGFIELD, IL 62703

US

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 08:01 AM 10/04/2020**
**U.C.C. Initial Filing No: 2015 5726855**
**Amendment No: 2020 6850061**
**Service Request No:  20207632026**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| | |
|---|---|
| **1a.** INITIAL FINANCING STATEMENT FILE NUMBER<br>**20155726855** | **1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]<br>(or recorded) in the REAL ESTATE RECORDS<br>Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☑ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes: **AND** Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record
☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **OR** 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **OR** 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)

If this is an Amendment authorized by a **DEBTOR**, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **HEWLETT-PACKARD FINANCIAL SERVICES COMPANY** | | | |
| **OR** 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:**

International Association of Commercial Administrators
**FILING OFFICE COPY** — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| GISELLA MELENDEZ 800-331-3282 |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| EFILING@WOLTERSKLUWER.COM |

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

P.O. BOX 29071

GLENDALE, CA 91209-9071

US

Delaware Department of State
U.C.C. Filing Section
Filed: 10:51 AM 04/06/2016
U.C.C. Initial Filing No: 2016 2033106

Service Request No:   20162107687

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

OR

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| IRONNET CYBERSECURITY, INC. | | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 8135 MAPLE LAWN BLVD, SUITE 400 | FULTON | | MD | 20759 | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

OR

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

OR

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| DELL FINANCIAL SERVICES L.L.C. | | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| MAIL STOP-PS2DF-23, ONE DELL WAY | ROUND ROCK | | TX | 78682 | US |

4. COLLATERAL: This financing statement covers the following collateral:

All computer equipment, peripherals, and other equipment (collectively "Equipment") wherever located, financed under and described in the Master Lease Agreement ("MLA") between Lessee and Lessor and all of Lessee's rights, title and interest in and to use any software and services (collectively "Software") financed under and described in the MLA, along with any modifications or supplements to the MLA which are incorporated or evidenced in writing and all substitutions, additions, accessions and replacements to the Equipment or Software now or hereafter installed in, affixed to, or used in conjunction with the Equipment or Software and the proceeds thereof together with all payments, insurance proceeds, credits or refunds obtained by Lessee from a manufacturer, licensor or service provider, or other proceeds and payments due and to become due and arising from or relating to such Equipment, Software or the MLA.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☑ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
DE-0-53335420-51359988

International Association of Commercial Administrators

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
LIEN SOLUTIONS 800-331-3282

**B. E-MAIL CONTACT AT FILER (optional)**
UCCFILINGRETURN@WOLTERSKLUWER.COM

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

P.O. BOX 29071

GLENDALE, CA 91209-9071

US

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 02:30 PM 03/16/2021**
**U.C.C. Initial Filing No: 2016 2033106**
**Amendment No: 2021 2088210**
**Service Request No:  20210927083**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS |
|---|---|
| 20162033106 | Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

**2. ☐ TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3. ☐ ASSIGNMENT** (full or partial):  Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4. ☑ CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5. ☐ PARTY INFORMATION CHANGE:**

Check **one** of these two boxes:      **AND** Check **one** of these three boxes to:

This Change affects ☐ Debtor **or** ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete item 6a or 6b; **and** item 7a or 7b **and** item 7c    ☐ ADD name: Complete item 7a or 7b, **and** item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:**  Complete for Party Information Change - provide only **one** name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**7. CHANGED OR ADDED INFORMATION:**  Complete for Assignment or Party Information Change - provide only **one** name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 7b. INDIVIDUAL'S SURNAME | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**8. ☐ COLLATERAL CHANGE:**  **Also** check **one** of these four boxes: ☐ ADD collateral   ☐ DELETE collateral   ☐ RESTATE covered collateral   ☐ ASSIGN collateral

Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only **one** name (9a or 9b) (name of Assignor, if this is an Assignment)

If this is an Amendment authorized by a **DEBTOR**, check here ☐ and provide name of authorizing Debtor

| | 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | DELL FINANCIAL SERVICES L.L.C. | | | |
| | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:**
DE-0-79472932-60891063- DEBTOR: IRONNET CYBERSECUR

International Association of Commercial Administrators

**FILING OFFICE COPY** — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
CSC 800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**
FILINGDEPT@CSCINFO.COM

**C. SEND ACKNOWLEDGMENT TO:   (Name and Address)**

801 ADLAI STEVENSON DR [205943542]

SPRINGFIELD, IL 62703

US

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 07:18 PM 02/08/2021**
**U.C.C. Initial Filing No: 2021 1047126**

**Service Request No:  20210377547**

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| IRONNET CYBERSECURITY, INC. | | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 8135 MAPLE LAWN BLVD | FULTON | MD | 20759 | | US |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| SHI INTERNATIONAL CORP | | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 1111 OLD EAGLE SCHOOL RD | WAYNE | PA | 19087 | | US |

4. **COLLATERAL:**  This financing statement covers the following collateral:
**All equipment of any make or manufacture financed by or leased to Debtor by Secured Party under Contract Number _500-50231006_, together with all components, additions, upgrades, attachments, accessions, substitutions, replacements and proceeds of the foregoing.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative
6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility   6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing
7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor
8. OPTIONAL FILER REFERENCE DATA:

International Association of Commercial Administrators
**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| --- |
| LIEN SOLUTIONS 800-331-3282 |

| B. E-MAIL CONTACT AT FILER (optional) |
| --- |
| UCCFILINGRETURN@WOLTERSKLUWER.COM |

| C. SEND ACKNOWLEDGMENT TO:   (Name and Address) |
| --- |
| P.O. BOX 29071 |
| GLENDALE, CA 91209-9071 |
| US |

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 11:08 AM 02/09/2022**
**U.C.C. Initial Filing No: 2022 1126705**

**Service Request No:   20220431650**

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| IRONNET CYBERSECURITY, INC. | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 7900 TYSONS ONE PL STE 400 | MCLEAN | VA | 22102 | US |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| VAR TECHNOLOGY FINANCE | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2330 I-30 | MESQUITE | TX | 75150 | US |

4. **COLLATERAL:** This financing statement covers the following collateral:
The following items of equipment:   Juniper Networking, Maintenance Agreements and Software   In addition, the collateral also shall include all parts, accessories, accessions and attachments thereto, and all replacements, substitutions and exchanges (including trade-ins).

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:   ☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility    6b. Check only if applicable and check only one box:   ☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
DE-0-84801332-63127395

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators

# EXHIBIT 4

**IronNet**
**Weekly CF**

| | forecast | forecast | forecast | forecast | forecast | forecast | forecast | forecast | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Start: | 10/7/23 | 10/14/23 | 10/21/23 | 10/28/23 | 11/4/23 | 11/11/23 | 11/18/23 | 11/25/23 | 12/2/23 | 12/9/23 | 12/16/23 | 12/23/23 | 12/30/23 | 1/6/24 |
| Week End: | 10/13/23 | 10/20/23 | 10/27/23 | 11/3/23 | 11/10/23 | 11/17/23 | 11/24/23 | 12/1/23 | 12/8/23 | 12/15/23 | 12/22/23 | 12/29/23 | 1/5/24 | 1/12/24 |
| **Total HC** | 6 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 |
| **Bookings Forecast - Baseline** | - | - | - | 126,000 | - | 195,000 | - | - | - | - | - | - | 565,185 | - |
| **Beg. Cash Balance** | 1,197,864 | 1,446,649 | 3,714,114 | 3,526,908 | 3,301,235 | 4,561,227 | 4,309,759 | 2,472,576 | 2,877,663 | 2,604,065 | 2,395,723 | 1,865,414 | 748,501 | 376,673 |
| Sources of Cash: | | | | | | | | | | | | | | |
| + AR Collections - Annual | - | - | 93,624 | 30,000 | - | - | - | - | - | - | - | - | - | - |
| + AR Collections - Monthly | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| + AR Partial Payment | - | - | - | - | - | - | - | - | - | - | - | - | 204,260 | - |
| + Recurring Billings | - | 50,770 | - | - | - | 34,112 | - | - | - | - | 34,112 | - | - | - |
| + Collections from Baseline Fcst | - | - | - | - | - | 10,000 | - | 70,000 | - | 251,000 | - | - | - | - |
| (+/-) ELOC Financing | | | | | | | | | | | | | | |
| (+/-) Debt | | | | | | | | | | | | | | |
| (+/-) additional investment | 1,500,000 | 3,000,000 | - | 3,000,000 | 1,500,000 | - | - | 1,000,000 | | | | | | |
| **Total Inflow** | 1,500,000 | 3,050,770 | 93,624 | 3,030,000 | 1,500,000 | 44,112 | - | 1,070,000 | - | 251,000 | 34,112 | - | 204,260 | - |
| Uses of Cash: | | | | | | | | | | | | | | |
| (-) Regular Pay - US | (20,912) | - | (118,595) | - | - | (125,596) | - | (118,594) | - | (125,831) | - | (125,831) | - | (125,831) |
| (-) Other Pay - US | (17) | - | (235) | - | - | (235) | - | (235) | - | - | - | - | - | - |
| (-) Payroll Tax - US | (9,252) | - | - | (63,791) | - | (63,791) | (1,036,000) | (63,791) | - | (63,791) | - | (63,791) | - | (63,791) |
| (-) Stock Comp Tax | | | | | | | | | | | | | | |
| (-) Retirement - US | (2,754) | | - | (21,867) | - | (21,867) | - | - | (21,867) | - | (21,867) | - | (21,867) | - |
| (-) Garnish - US | (169) | - | - | (291) | - | (291) | - | (291) | - | (291) | - | (291) | - | (291) |
| (-) Commission - US | - | - | (7,001) | - | - | - | - | (7,002) | - | - | - | - | - | - |
| (-) International Payroll | (23,594) | (73,626) | - | - | - | - | (73,626) | - | - | - | (73,626) | - | - | - |
| (-) AP Schedule | (984,368) | (438,630) | (125,000) | (2,551,000) | (55,000) | (15,000) | (690,089) | - | (100,000) | (123,629) | (431,460) | (927,000) | - | (183,629) |
| (-) Monthly Recurring | (55,148) | (121,048) | (30,000) | (143,723) | (82,508) | (68,800) | (37,468) | - | (149,231) | (145,800) | (37,468) | - | (79,221) | (147,010) |
| Restructuring Fees | (155,000) | (150,000) | - | (475,000) | (102,500) | - | - | (475,000) | (2,500) | - | - | - | (475,000) | - |
| (+/-) Bank Transfers | | | | | | | | | | | | | | |
| **Total Outflow** | (1,096,215) | (633,304) | (280,831) | (2,780,673) | (137,508) | (295,580) | (1,837,183) | (189,913) | (271,099) | (459,342) | (564,421) | (1,116,913) | (101,088) | (520,552) |
| **End Cash Balance** | 1,446,649 | 3,714,114 | 3,526,908 | 3,301,235 | 4,561,227 | 4,309,759 | 2,472,576 | 2,877,663 | 2,604,065 | 2,395,723 | 1,865,414 | 748,501 | 376,673 | (143,879) |