## EXHIBIT A

**Blackline Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| IRONNET, INC., *et al.*,[1] | ) Case No. ~~23——~~ 23-11710 (~~——~~BLS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Ref. Docket No. 12** |

**INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO (I) OBTAIN
POSTPETITION FINANCING AND (II) USE CASH COLLATERAL, (B) GRANTING
LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,
(C) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED
PARTIES, (D) MODIFYING THE AUTOMATIC STAY, (E) SCHEDULING
A FINAL HEARING, AND (F) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "**Motion**")[2] of the above-captioned debtors

and debtors in possession (collectively, the "**Debtors**") for entry of an interim order

(this "**Interim Order**") and a final order (the "**Final Order**," and together with the Interim

Order, the "**DIP Orders**"), pursuant to sections 105, 361, 362, 363, 364(c), 364(d), 364(e), 503,

507, and 552(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014,

and Local Rules 2002-1, 4001-1(b), 4002-1, and 9013-1:

        a.    authorizing the Debtors, in their capacity as borrowers, to obtain postpetition financing and other financial accommodations on a joint and several basis in connection with the debtor in possession financing, comprising, among other things, a superpriority senior secured facility (the "**DIP Facility**") which consists of a multi-draw credit loan facility in an aggregate principal amount of up to $10 million, which shall be made available to the Debtors (i) in a roll up (the "**DIP Roll-Up Loans**") of the approximately $1.5 million in outstanding Prepetition Bridge Facility

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: IronNet, Inc. (9446), IronNet Cybersecurity, Inc. (2655), IronNet International, LLC (7621), IronCAD LLC (1162), and HighDegree, LLC (8474). The Debtors' corporate headquarters is located at 7900 Tysons One Place, Suite 400, McLean, VA 22102.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the DIP Documents (as defined below), as applicable.



Obligations (defined below) in accordance with the terms substantially set forth in the Superpriority Secured Debtor-in-Possession Credit Facility Term Sheet attached hereto as Exhibit 1 (the "**DIP Term Sheet**") upon entry of this Interim Order, (ii) up to $4.5 million (including the aggregate amount of the Roll-Up Loans) in accordance with the terms substantially set forth in the DIP Term Sheet upon entry of this Interim Order, and (iii) the remaining principal amount available under the DIP Facility in accordance with the terms of the DIP Documents upon entry of the Final Order (such loans described in this paragraph, the "**DIP Loans**") to be funded by ITC Global Advisers, LLC and an affiliate of C5 (defined below) as further described in the DIP Term Sheet (collectively, the "**DIP Lenders**");

b.     authorizing the Debtors to execute the DIP Term Sheet and the other documents, agreements and instruments delivered pursuant thereto or executed or filed in connection therewith, including the Bridge Documents (as defined below), all as may be reasonably requested by the DIP Lenders (as the same may be amended, restated, supplemented or otherwise modified from time to time, collectively, the "**DIP Documents**");

c.     authorizing the Debtors to use the proceeds of the DIP Loans and Cash Collateral, as further described herein, to, among other things, pay for working capital needs of the Debtors in the ordinary course of business and for the costs and expenses of administering these chapter 11 cases;

d.     granting adequate protection, with respect to each of the Debtors, to the Prepetition Secured Creditors;

e.     authorizing, on the terms set forth herein, the Debtors to pay, the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable, including, without limitation, the an agency fee of $300,000 (the "**Agency Fee**") and reasonable fees and disbursements of the DIP Agent's legal and financial advisor pursuant to the DIP Term Sheet;

f.     granting superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code against each of the Debtors' estates to the DIP Lender, with respect to all obligations owing and outstanding thereunder and under the DIP Documents, as applicable, and this Interim Order and any Final Order, as applicable (collectively, the "**DIP Obligations**"), with priority over any and all administrative expenses of any kind or nature subject and subordinate only to the Carve Out (as defined below) on the terms and conditions set forth herein, in the DIP Term Sheet and the DIP Documents;

g.     subject to the Carve-Out, granting to the DIP Agent, for the benefit of itself and the DIP Lender, valid, enforceable, nonavoidable, automatically, validly and fully perfected security interests in and liens on all of the DIP Collateral (as defined below) pursuant to sections 364(c)(2), 364(c)(3),



2

and 364(d) of the Bankruptcy Code, including all property constituting Cash Collateral;

h.  subject to and effective upon entry of the Final Order, in each case except to the extent of the Carve-Out, determining that (i) the Debtors have waived any right to surcharge any collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, (ii) the equitable doctrine of marshaling and other similar doctrines shall not apply, and (iii) the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply; *provided*, that upon entry of the Final Order, any DIP Obligations and AP Superpriority Claims (as defined below) may be collected out of the proceeds of any Avoidance Actions;

i.  vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order; and

j.  scheduling a final hearing (the "**Final Hearing**") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing.

This Court having considered the Motion, the exhibits attached thereto, the *Declaration of Cameron Pforr in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* and the *Declaration of Cameron Pforr, President and Chief Financial Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings*, and the evidence submitted and arguments made at the interim hearing held on October [*]13, 2023 (the "**Interim Hearing**"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved, or overruled by this Court; and it appearing that approval of the



interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties-in-interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Term Sheet and the other DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THIS COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.    **Petition Date**.  On October 12, 2023 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

B.    **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.    **Jurisdiction and Venue**.  This Court has jurisdiction over these chapter 11 cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334. Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue for these chapter 11 cases and proceedings with respect to the Motion is

---

[3]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.



proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The bases for the relief sought

in the Motion and grated in this Interim Order are sections 105, 361, 362, 363, 364, 503, 506,

507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and the

Local Bankruptcy Rules.

           D.      **Committee Formation**.  As of the date hereof, the United States Trustee

for the District of Delaware (the "**U.S. Trustee**") has not yet appointed an official committee of

unsecured creditors in these chapter 11 cases (a "**Creditors' Committee**") pursuant to

section 1102 of the Bankruptcy Code.

           E.      **Notice**.  As described in the Motion, notice of the Motion and the Interim

Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and

the Local Rules, and no other or further notice of the Motion with respect to the relief requested

at the Interim Hearing or the entry of this Interim Order shall be required.

           F.      **Debtors' Acknowledgements and Stipulations**.  In entering into the DIP

Documents and in exchange for and as a material inducement to the DIP Lenders to agree to

provide the DIP Facility, and to the Prepetition Secured Parties in exchange for their consent to

use Cash Collateral and to subordinate their liens as provided for herein, the Debtors

acknowledge, represent, stipulate and agree, for themselves and their estates, subject to the

challenge rights set forth in paragraph 24 herein, as follows:

           1.      Prepetition Director Notes.  On December 2022, April 2023,

May 2023, and August 2023, IRNT issued and sold senior secured promissory notes in an

aggregate principal amount of $8,475,000 million (the "**Director Notes**") to a total of eight

lenders (the "**Director Noteholders**"), which included seven lenders who are either Company

directors or entities affiliated with Company directors.



2.      <u>Prepetition C5 Notes.</u>   On December 30, 2022, IRNT issued a senior secured convertible promissory note in the principal amount of $2,000,000 (the "**Initial C5 Note**") to an affiliate of C5 Capital Limited ("**C5**," and together with the Director Noteholders, the "**Prepetition Secured Creditors**").    In January 2023, February 2023, April 2023, and May 2023, and September 2023, IRNT issued additional senior secured convertible promissory notes to affiliates of C5 (together with the Initial C5 Note, the "**C5 Notes**," and together with the Director Notes, the "**Prepetition Secured Notes**") in principal amounts of $3,000,000, $6,250,000, $600,000, and $2,300,000, and $300,000, respectively.

3.      <u>Prepetition Collateral.</u>  Pursuant to the Prepetition Secured Notes and related documentation (the "**Prepetition Secured Note Documents**"), IRNT's obligations under the Prepetition Secured Notes are secured by substantially all of IRNT's assets, excluding certain intellectual property (the "**Prepetition Collateral**").  All of the Debtors' cash, including the cash in their deposit accounts and other accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral.

4.      As of the Petition Date, (a) the Prepetition Secured Notes (i) are secured by legal, valid, binding, enforceable, unavoidable, and perfected liens (the "**Prepetition Liens**") on the Prepetition Collateral, (ii) were granted to, or for the benefit of, the Prepetition Secured Creditors for fair consideration and reasonably equivalent value, (iii) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein), and (iv) are subject and subordinate only to (1) the DIP Liens (after giving effect to this Interim Order) and (2) the Carve-Out (after giving effect to this Interim Order); and (b) (i) the prepetition obligations under the Prepetition Secured Notes ("**Prepetition Secured Note Obligations**") constitute legal, valid,



and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Prepetition Secured Note Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (ii) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition Secured Note Obligations exist, and (iii) no portion of the Prepetition Secured Note Obligations or any payments made to any or all of the Prepetition Secured Creditors are subject to avoidance, disallowance, disgorgement, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in section 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

5.      Amounts Owed under Prepetition Secured Note Documents. As of the Petition Date, approximately $25,300,00 of indebtedness under the Prepetition Secured Notes was outstanding, which amount is comprised of $23,800,000 in principal amount and accrued and unpaid interest, premiums, and fees in the amount of $1,500,000.

6.      The Prepetition Secured Creditors are entitled, pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including the Cash Collateral, to the extent of any diminution in the value of the Prepetition Collateral occurring from and after the Petition Date (the "**Diminution**"), caused by or arising as a result of, among other things, (a) the incurrence and payment of the DIP Obligations, (b) the use of Prepetition Collateral (including Cash Collateral), (c) the granting of the DIP Liens and the DIP Superpriority Claims, (d) the subordination of the Prepetition Obligations to the DIP Obligations and the Carve-Out, and (e) imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.



7.    Bridge Facility.  Pursuant to DIP Term Sheet and the applicable documentation (the "**Bridge Documentation**"), Ferrous Investors LP, an affiliate of C5, as bridge lender (the "**Bridge Lender**"), advanced $1,244,000 to the Debtors on October 10, 2023 and $256,000 to the Debtors on October 11, 2023 to allow for the orderly transition of the Debtors into these chapter 11 cases (the "**Bridge Facility Obligations**").

8.    Pursuant to the Bridge Documentation, each Debtor granted to the Bridge Lender a security interest in and lien on all assets of each Debtor (the "**Bridge Facility Liens**").  On October 11, 2023, the Bridge Lender filed a UCC-1, as well as certain intellectual property security agreements, against each Debtor perfecting the Bridge Facility Liens.  As of the Petition Date, (a) the Bridge Facility Liens (i) are legal, valid, binding, enforceable, and perfected Liens, (ii) were granted to, or for the benefit of, the Bridge Lender for fair consideration and reasonably equivalent value, (iii) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (iv) are subject and subordinate only to valid, perfected, and unavoidable liens permitted under the Prepetition Secured Note Documents (other than the Prepetition Liens) to the extent that such permitted liens are senior to the Liens granted to the Prepetition Secured Creditors pursuant to the Prepetition Secured Note Documents (the "**Senior Permitted Liens**"); and (b) (i)  the Bridge Facility Obligations constitute legal, valid, and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the DIP Term Sheet, the DIP Documents, the Bridge Facility Documents and this Interim Order, (ii) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Bridge Facility Obligations exist, and (iii) no portion of the Bridge Facility Obligations are subject to avoidance, disallowance, disgorgement, recharacterization, recovery, subordination, attack, offset,



counterclaim, defense, or "claim" (as defined in section 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

9.     The DIP Lenders willingness to make the DIP Loans is conditioned upon all Bridge Facility Obligations being automatically converted into DIP Roll-up Loans upon entry of this Interim Order. The Bridge Facility was made available to the Debtors on the condition that the Debtors would seek to have such obligations treated as DIP Roll-up Loans upon entry of this Interim Order. The DIP Roll-up Loans shall be authorized and approved upon entry of the Interim Order as compensation for, in consideration for, and on account of, among other things, the agreement of the DIP Lenders to fund amounts, and provide other consideration to the Debtors under the DIP Facility.

G.     **Cash Collateral**. For purposes of this Interim Order, the term "Cash Collateral" shall mean and include all "cash collateral," as defined in section 363 of the Bankruptcy Code, in or on which the DIP Lenders or the Prepetition Secured Creditors have a lien, security interest or any other interest (including, without limitation, any AP Liens or security interests), whether existing on the Petition Date, arising pursuant to this Interim Order, or otherwise, and shall include, without limitation:

1.     all cash proceeds arising from the collection, sale, lease or other disposition, use or conversion of any real or personal property, in or on which the DIP Lenders or the Prepetition Secured Creditors have a lien or a replacement lien, whether as part of the DIP Collateral or the Prepetition Collateral, or pursuant to an order of this Court or applicable law or otherwise, and whether such property has been converted to cash, existed as of the commencement of these chapter 11 cases, or arose or was generated thereafter; and



2.       all of the respective deposits, refund claims and rights in retainers of the Debtors on which the DIP Lenders or the Prepetition Secured Creditors hold a lien or replacement lien, whether as part of the DIP Collateral or Prepetition Collateral or pursuant to an order of this Court or applicable law or otherwise; and the proceeds of any sale, transfer or other disposition of DIP Collateral or Prepetition Collateral.

H.       **Adequate Protection**.  The Prepetition Secured Creditors are entitled, pursuant to sections 361, 363 and 364 of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral, to the extent of any Diminution resulting from, among other things, (i) the incurrence of the DIP Obligations, (ii) the use of Prepetition Collateral (including Cash Collateral), (iii) the granting of the DIP Liens and the DIP Superpriority Claims, (iv) the subordination of the Prepetition Obligations to the DIP Obligations and the Carve- Out, and (v) imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

I.       **Purpose and Necessity of Financing**.  The Debtors require the DIP Facility and use of Cash Collateral to (i) permit the continuation of their businesses and maximize and preserve their going concern value, (ii) satisfy payroll obligations and other working capital and general corporate purposes of the Debtors consistent with the terms set forth in the DIP Documents and the Budget (as defined below), (iii) provide adequate protection to the Prepetition Secured Creditors, (iv) pay fees and expenses related to the DIP Documents and these chapter 11 cases, and (v) for such other purposes as set forth in, or otherwise permitted by, the DIP Documents (including the Budget).  If the Debtors do not obtain authorization to use the Prepetition Collateral (including Cash Collateral) and borrow under the DIP Documents, they will suffer immediate and irreparable harm.  The Debtors are unable to obtain adequate



unsecured credit allowable only as an administrative expense under section 503 of the Bankruptcy Code, or other sufficient financing under sections 364(c) or (d) of the Bankruptcy Code, on more favorable terms than those set forth in the DIP Documents. A loan facility in the amount provided by the DIP Documents is not available to the Debtors without granting the superpriority claims, liens and security interests, pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, as provided in this Interim Order and the DIP Documents.  After considering all alternatives, the Debtors have concluded, in the exercise of their sound business judgment, that the DIP Facility is the best financing available to them at this time.

J.      **Good and Sufficient Cause Shown**.  Good and sufficient cause has been shown for entry of this Interim Order. The ability of the Debtors to obtain sufficient working capital and liquidity under the DIP Documents and use of the Prepetition Collateral (including the Cash Collateral) is vital to the Debtors' estates and creditors.  The liquidity to be provided under the DIP Documents and this Interim Order will enable the Debtors to continue to operate their businesses in the ordinary course and preserve the value of the Debtors' businesses during the pendency of these chapter 11 cases.  Among other things, entry of this Interim Order is necessary to maximize the value of the Debtors' assets and to avoid immediate and irreparable harm to the Debtors and their estates, and, accordingly, is in the best interests of the Debtors, their estates and their creditors.

K.      **Sections 506(c) and 552(b) Waivers**.  In light of (i) the DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out, and in exchange for and as a material inducement to the DIP Lenders to agree to provide the DIP Facility and (ii) the Prepetition Secured Creditors' agreement to subordinate their liens and superpriority



claims to the DIP Obligations, the Carve-Out and the DIP Liens, and to permit the use of the Prepetition Collateral (including Cash Collateral) for payments made in accordance with the Budget and the terms of this Interim Order, upon entry of the Final Order, each of the DIP Lenders and the Prepetition Secured Creditors are entitled to a marshalling waiver and a waiver of the provisions of section 506(c) of the Bankruptcy Code, and the exceptions provided in sections 552(b)(1) and (2) of the Bankruptcy Code.

L.    **Good Faith**.   The terms of the DIP Documents, including the Bridge Documentation, and the use of the Prepetition Collateral (including the Cash Collateral) pursuant to this Interim Order, including, without limitation, the interest rates and fees applicable, and intangible factors relevant thereto, are more favorable to the Debtors than those available from alternative sources. Based upon the record before this Court, the terms of the DIP Documents and the use of the Prepetition Collateral (including the Cash Collateral) pursuant to this Interim Order have been negotiated in good faith and at arm's-length among the Debtors, the DIP Lenders and the Prepetition Secured Creditors. Any DIP Loans and other financial accommodations made to the Debtors by the DIP Lenders pursuant to the DIP Documents, including the Bridge Documentation, and this Interim Order shall be deemed to have been extended by the DIP Lenders in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and each of the DIP Lenders shall be entitled to all protections and benefits afforded thereby.

M.    **Fair Consideration and Reasonably Equivalent Value**.   All of the Debtors have received and will receive fair and reasonable consideration by virtue of their obtaining access to the DIP Loans, the use of the Prepetition Collateral (including the Cash Collateral) pursuant to this Interim Order and all other financial accommodations provided under



the DIP Documents, including the Bridge Documentation, and this Interim Order. The terms of the DIP Documents, including the Bridge Documentation, and this Interim Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

N.    **Immediate Entry of Interim Order**.    The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2) and Local Rule 4001-2(b).  The permission granted herein to enter into the DIP Documents, to obtain funds thereunder and to use the Prepetition Collateral (including the Cash Collateral) pursuant to this Interim Order is necessary to avoid immediate and irreparable harm to the Debtors. This Court concludes that entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for access to the financing necessary for the continued flow of supplies and services to the Debtors necessary to sustain the operation of the Debtors' existing businesses and further enhance the Debtors' prospects for a successful sale of substantially all of their assets.

Based upon the foregoing findings and conclusions, the Motion, and the record before this Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor, **IT IS HEREBY ORDERED THAT**:

1.    <u>DIP Facility Approved on Interim Basis</u>.  The relief sought in the Motion is granted to the extent set forth herein, the interim financing described herein, including the conversion of the Bridge Loans into DIP Roll-Up Loans, is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, in each case subject to the terms and conditions set forth in the DIP Documents, the Bridge Documentation and this Interim Order. All objections to this Interim Order, to the extent not withdrawn, waived, settled, or resolved,



are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

2.      Authorization of the DIP Documents and the DIP Facility.

a.      The Debtors are expressly authorized to execute and deliver, and upon such execution and delivery, to perform under the DIP Documents, including the DIP Term Sheet and the Bridge Documentation, which are hereby approved and incorporated herein by reference.   Unless  and  until  the  Debtors  and  DIP  Lenders  enter  into  the  definitive  DIP Documents consistent with the terms of the DIP Term Sheet, the Bridge Documentation and this Interim Order, upon entry of this Interim Order, the Debtors, DIP Lenders and DIP Agent shall be bound by (i) the terms and conditions and other provisions set forth in the DIP Term Sheet and the Bridge Documentation, as applicable, and (ii) this Interim Order, and this Interim Order, the Bridge Documentation and the DIP Term Sheet shall govern and control the DIP Facility.  A copy of the Bridge Documentation is attached hereto as **Exhibit 2**.

b.      Upon  entry  of  this  Interim  Order,  the  Debtors  are  hereby immediately authorized, subject to the terms and conditions of the DIP Term Sheet, to (i) borrow up to an aggregate principal amount $4.5 million (including the principal amount of the DIP Roll-Up Loans) under the Interim DIP Loan, (ii) incur the DIP Roll-Up Loans and, without any further action by the Debtors or any other party, and (iii) include such DIP Roll-Up Loans in the DIP Obligations.

3.      DIP Obligations.  The DIP Term Sheet, the Bridge Documentation, and the other DIP Documents shall constitute legal, valid, binding obligations of the Debtor, DIP Lenders and DIP Agent, enforceable in accordance with their terms and the terms of this Interim Order.  The obligations of the Debtors thereunder shall be enforceable against the Debtors and



their estates and any successors thereto, including any trustee appointed in these chapter 11 cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of these chapter 11 cases or any other chapter of the Bankruptcy Code, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**").

   4. <u>Amendment of the DIP Documents</u>.  The DIP Documents may from time to time be amended, modified, waived, or supplemented by the parties thereto, in accordance with the terms thereof (and this Interim Order) without further order of this Court if the amendment, modification, waiver, or supplement is non-material and in accordance with the DIP Documents or are necessary to conform the terms of the DIP Documents to this Interim Order. ~~In the case of a material~~ amendment, modification, waiver, or supplement to the DIP Documents (which, for purposes of this paragraph 4, excludes the Budget); provided that, the Debtors shall provide notice (which may be provided through electronic mail or facsimile) to counsel to any Creditors' Committee (if appointed),  the U.S. Trustee, the DIP Agent, the DIP Lenders, and the Prepetition Secured Creditors, which parties shall have five (5) Business Days from the date of such notice within which to object, in writing, to such amendment, modification, waiver, or supplement.  If any such party timely objects to such amendment, modification, waiver, or supplement to the DIP Documents, such amendment, modification, waiver, or supplement shall only be permitted pursuant to an order of this Court.  Any material amendment, modification, waiver, or supplement to the DIP Documents~~, such material~~ amendment, modification, waiver, ~~or supplement shall only be permitted~~ shall be made only pursuant to ~~an~~Court order ~~of this Court.  The foregoing shall be without prejudice to the Debtors' right to seek approval from this Court of a material amendment, modification, waiver, or supplement with respect to the DIP Documents on an expedited basis~~, after notice and a hearing on parties in interest.  For the

30846956.5
30846956.7

avoidance of doubt, the extension of a Milestone or waiver of the Variance Limit shall not constitute a material amendment, modification, waiver, or supplement to the DIP Documents.

       5.      <u>DIP Liens</u>.  Effective immediately upon entry of this Interim Order, and without any further action under state law, as security for the DIP Obligations and subject in all respects to the Carve-Out, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted valid, binding, continuing, enforceable, non-avoidable, and automatically and properly perfected security interests and liens on all assets and properties of the Debtors (whether tangible, intangible, real, personal, or mixed), whether now owned or hereafter acquired and wherever located, before or after the Petition Date, including, without limitation, all cash, cash equivalents, accounts, inventory, equipment, equity interests or capital stock in domestic and foreign subsidiaries (subject to any limitation in the DIP Documents), investment property, instruments, chattel paper, real property, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, receivables, all claims or causes of action (including, any commercial tort claims or causes of action, and subject to entry of the Final Order, the proceeds of Avoidance Actions and all products, offspring, profits, and proceeds thereof) (all of the foregoing collateral, collectively, the "**DIP Collateral**," and the Security Interests (as defined below) thereon and therein, the "**DIP Liens**"); *provided* that, and notwithstanding anything to the contrary herein, the DIP Collateral shall not include Avoidance Actions themselves.  For the avoidance of doubt, the DIP Collateral shall include the Prepetition Collateral.

       6.      <u>DIP Lien Priority</u>.  The DIP Liens shall be, in all cases, subject to the Carve-Out, and have the priority set forth as follows:



a.      pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Obligations shall be secured by a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all DIP Collateral that, on or as of the Petition Date, is not subject to any existing liens that;

b.      pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Obligations shall be secured by a valid, binding, continuing, enforceable, fully-protected junior security interest and lien upon all DIP Collateral that, on or as of the Petition Date, is not subject to any existing liens that, under applicable law, are senior to, and have not been subordinated to, the Prepetition Liens; and

c.      pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Obligations shall be secured by a valid, binding, continuing, enforceable, fully-perfected first priority priming security interest in and lien on all DIP Collateral, senior in priority to the Prepetition Liens.

d.      The DIP Liens shall be subject, and immediately junior, to valid, perfected, and non-avoidable Senior Permitted Liens in existence on the Petition Date that are not subject to subordination and were either properly perfected as of the Petition Date or subsequently perfected pursuant to section 546(b) of the Bankruptcy Code, including (i) liens arising by operation of law in favor of warehousemen, landlords, carriers, mechanics, materialmen, laborers or suppliers, in each case incurred in the ordinary course of business and not in connection with the borrowing of money, (ii) liens incurred in the ordinary course of business in connection with workers' compensation and other unemployment insurance, or to secure the performance of tenders, surety and appeal bonds, bids, leases, government contracts, trade contracts and other similar obligations (exclusive of obligations for the payment of



borrowed money), (iii) rights of setoff or bankers' liens upon deposits of cash in favor of banks or other depository institutions and (iv) any liens at IronNet Cybersecurity, Inc. appearing on **Exhibit 3** to this Order.[4]

7.      <u>DIP Superpriority Claims</u>.  In addition to the DIP Liens granted herein, effective immediately upon entry of this Interim Order, all of the DIP Obligations and all amounts owing by the Debtors under the DIP Documents, shall constitute allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject and subordinate only to the payment of the Carve-Out, over all other administrative expense claims, adequate protection and other diminution claims, priority and other unsecured claims, and all other claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order), 507(a), 507(b), 546, 726, 1113, and 1114 or any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual lien, levy, or attachment (the "**DIP Superpriority Claims**").  The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions.

---

[4]      Nothing in this Interim Order is or shall be deemed an admission or stipulation by the Debtors as to the validation of any Senior Permitted Lien.  The Debtors reserve the right to seek to prime the Permitted Liens in connection with the Final Order.



8.      <u>Priority of DIP Liens and DIP Superpriority Claims</u>.  Other than as set forth herein or permitted under this Interim Order, the DIP Term Sheet, or the DIP Documents, the DIP Liens and the DIP Superpriority Claims:  (a) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of the Final Order granting such relief, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552(b) of the Bankruptcy Code; (b) shall not be subordinate to, or *pari passu* with, (i) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (ii) any Liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property; and (c) shall be valid and enforceable against any trustee or any other estate representative elected or appointed in these chapter 11 cases, upon the conversion of any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code or in a Successor Case, and/or upon the dismissal of any of these chapter 11 cases.

9.      <u>Use of Proceeds of the DIP Facility and Cash Collateral</u>.  Subject to the Budget as provided for herein, the Debtors shall use Cash Collateral and the proceeds of borrowings under the DIP Facility only for the purposes specifically set forth in this Interim Order and the DIP Documents, including to (a) pay fees, interest, and expenses associated with the DIP Facility; (b) to fund, to the extent that usage of Cash Collateral and available cash are not sufficient to cover such expenses, post-petition operating expenses and working capital needs of the Debtors, including, but not limited to, those activities required to remain in, or return to, compliance with laws in accordance with 28 U.S.C. § 1930; (c) to fund fees and expenses incurred in connection with the Restructuring; (d) provide for the ongoing working capital and capital expenditure needs of the Debtors during the pendency of these chapter 11



cases; (e) to pay permitted pre-petition claim payments authorized by this Court; (f) to pay professional fees in connection with these chapter 11 cases; and (g) fund the costs of the administration of these chapter 11 cases (including the Carve-Out), in each case subject to the terms and conditions in this Interim Order and the DIP Documents.

10.    <u>Adequate Protection for the Prepetition Secured Creditors</u>. The Prepetition Secured Creditors are entitled, pursuant to sections 361, 362, 363, 364, and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the applicable Prepetition Collateral, including Cash Collateral, to the extent of any Diminution.  Accordingly, as adequate protection, the Prepetition Secured Creditors are hereby granted the following:

a.    <u>Adequate Protection Liens</u>.  Subject to the Carve-Out, to the extent there is Diminution, the Prepetition Secured Creditors, are hereby granted subject to the terms and conditions set forth below, pursuant to sections 361, 363, 364, and 507 of the Bankruptcy Code, valid, binding, enforceable and perfected replacement liens on and security interests in the DIP Collateral, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions (such adequate protection replacement Liens, the "**AP Liens**"), which AP Liens on the DIP Collateral shall be junior and subordinate only to the Carve-Out and the DIP Liens. The AP Liens shall otherwise be senior to all other security interests in or liens on any of the DIP Collateral.  The AP Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the Prepetition Secured Creditors and not in substitution therefor.

b.    <u>Prepetition Secured Creditor Adequate Protection Superpriority Claims</u>.  Subject only to the Carve-Out and the DIP Superpriority Claims, to the extent of Diminution, the Prepetition Secured Creditors are hereby further granted an allowed



superpriority administrative claim (such adequate protection superpriority claims, the "**AP Superpriority Claim**"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and priority and other unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726 , 1113, 1114, or any other provision of the Bankruptcy Code or otherwise, junior only to the Carve-Out and the DIP Superpriority Claims to the extent provided herein and in the DIP Documents, and payable from and having recourse to all prepetition and postpetition property of the Prepetition Secured Creditors and all proceeds thereof (including, subject to entry of the Final Order granting such relief, all proceeds of Avoidance Actions).

        11.    Budget.

        a.    The Debtors shall use the proceeds of all borrowings under the DIP Facility and Cash Collateral in a manner consistent with the Budget (subject to the Variance Limit (as defined below)), the DIP Term Sheet, DIP Documents, and this Interim Order. The Budget annexed hereto as **Exhibit 4** shall constitute the initial Budget (the "**Initial Budget**") that reflects on a line-item basis the Debtors' (i) weekly projected cash receipts (including from non-ordinary course assets sales) ("**Receipts**"), (ii) weekly projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses under these chapter 11 cases (including the estimated fees and expenses of the advisors to any parties to these chapter 11 cases payable by the Debtors), capital expenditures, issuances of any letter of credit, including the fees relating thereto, and any other fees and expenses relating to the DIP Facility) ("**Disbursements**"), and (iii) other information reasonably requested by the DIP Lender.


30846956.5
30846956.7

b.      Commencing on November 6, 2023 and on the first business day of each month thereafter, the Debtors will provide to the DIP Agent and the DIP Lenders an updated thirteen (13)-week cash flow forecast, in a form consistent with the Initial Budget, containing line items of sufficient detail to reflect the Debtors' (i) Receipts; (ii) Disbursements; and (iii) other information reasonably requested by the DIP Lender in form and substance reasonably satisfactory to the DIP Lenders (such approved budget, including the Initial Budget, the "**Budget**").

c.      By no later than 5:00 p.m. Eastern Time on the Thursday (or, if such Thursday is not a business day, the immediately succeeding business day) of the fourth week after the Petition Date, and thereafter by not later than 5:00 p.m. Eastern Time on the Thursday (or, if such Thursday is not a business day, the immediately succeeding business day) of every week thereafter, the Debtors will provide to the DIP Agent and the DIP Lenders a variance report for the immediately preceding four-week period (each such period, a "**Testing Period**"), in form and substance reasonably satisfactory to the DIP Agent, detailing the following:  (i) the aggregate Disbursements of the Debtors and aggregate receipts during the applicable Testing Period; (ii) any variance (whether positive or negative, expressed as a percentage) between the aggregate Disbursements made during such Testing Period by the Debtors against the aggregate Disbursements for the Testing Period, as set forth in the applicable Budget (including Disbursements in respect of professional fees incurred in these chapter 11 cases by the Debtors during such Testing Period); and (iii) any variance (whether positive or negative, expressed as a percentage) between the aggregate receipts during such Testing Period by the Debtors against the aggregate receipts for the Testing Period, as set forth in the applicable Budget.  Starting with the first Testing Period, and for any Testing Period



thereafter: (i) the Debtors shall not allow the aggregate Disbursements (excluding Disbursements in respect of professional fees incurred in these chapter 11 cases by the Debtors during such Testing Period) made or incurred by the Debtors during such Testing Period to be greater than [30]% of the aggregate Disbursements for the Debtors set forth in the Budget for such Testing Period; and (ii) aggregate receipts shall not be less than [30]% of the aggregate receipts for the Debtors set forth in the Budget for such Testing Period ((i) and (ii) together, the "**Variance Limit**").

12.   <u>Modification of Automatic Stay</u>.   The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to:  (a) permit the Debtors to grant the DIP Liens, AP Liens, DIP Superpriority Claims, and AP Superpriority Claims; (b) permit the Debtors to perform such acts as the DIP Agent or the Prepetition Secured Creditors each may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Agent under the DIP Documents, the DIP Facility and this Interim Order, as applicable; (d) authorize the Debtors to pay, and the DIP Agent to retain, disburse and/or apply, payments made in accordance with the terms of this Interim Order; and (e) otherwise to the extent necessary to implement and effectuate the provisions of this Interim Order and the DIP Documents.

13.   <u>Automatic Perfection of DIP Liens and Adequate Protection Liens</u>.

a.   This Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection, and priority of the DIP Liens and the AP Liens without the necessity of (i) filing or recording any financing statement, deed of trust, mortgage, security agreement, pledge agreement, control agreement, or other instrument or document that may



23

otherwise be required under the law of any jurisdiction, obtaining "control" (as defined in any applicable Uniform Commercial Code or other law) over any DIP Collateral, and the DIP Agent, shall be deemed, without any further action, to have control over all the Debtors' deposit accounts, securities accounts, and commodities accounts (within the meaning of such Uniform Commercial Code and other law); (ii) taking any other action to validate or perfect the DIP Liens and the AP Liens or to entitle the DIP Liens and the AP Liens to the priorities granted herein; or (iii) the filing or recording any financing statement, deed of trust, mortgage, security agreement, pledge agreement, control agreement, or other instrument or document with  respect to security interests in any jurisdiction outside of the United States in assets located in, titled or arising or protected under the laws of a jurisdiction outside of the United States.

b.       Notwithstanding the foregoing, each of the DIP Agent and the Prepetition Secured Creditors may, each in their sole discretion, enter into and file, as applicable, financing statements, mortgages, security agreements, notices of liens, and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been entered into, filed, or recorded as of the Petition Date.  Without limiting the foregoing, each of the DIP Agent's and the Prepetition Secured Creditors (in the latter case, solely with respect to such AP Liens) may, in their discretion, file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction (whether or not located in the United States) in which any Debtor has real or personal property.



14.     <u>Event of Default</u>.  In addition to any events of default under the DIP Documents, the following shall constitute Events of Default under the DIP Facility (each an "**Event of Default**"):

 a.     Conversion of any of these chapter 11 cases to a case under Chapter 7 of the Bankruptcy Code;

 b.     Dismissal of any of these chapter 11 cases;

 c.     Appointment of a trustee under section 1104 of the Bankruptcy Code;

 d.     Appointment of an examiner with expanded or enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under 1106(b) of the Bankruptcy Code;

 e.     Failure by the Debtors to make any payment under the DIP Facility when due;

 f.     A Budget variance shall exceed the Variance Limit;

 g.     Failure by the Debtors to comply with its obligations hereunder or under the DIP Documents; and

 h.     Failure to comply with a Milestone (as defined in the DIP Term Sheet).

15.     <u>Credit Bidding</u>.  In connection with any sale process authorized by this Court, whether effectuated through sections 363, 725, or 1123 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code, subject to and upon entry of this Interim Order, the DIP Agent (at the direction of the DIP Lender), for the benefit of the DIP Lender, shall have the right to credit bid the full amount of the DIP Obligations. Nothing herein shall prejudice the rights of any party under section 363(k) of the Bankruptcy Code.

16.     Milestones.   The Milestones contained in the DIP Term Sheet are hereby approved.



16.    17.    Rights and Remedies Upon Event of Default.  Without requiring further order from this Court and without the need for filing any motion (except as expressly required by this paragraph 17) for relief from the automatic stay or any other pleading, immediately upon the occurrence of an Event of Default and following five (5) business days' written notice (the "**Notice Period**") by the DIP Agent to the Debtors, counsel to the Debtors, counsel to any Creditors' Committee and the United States Trustee (collectively, the "**Notice Parties**") of the occurrence of such Event of Default, subject to an ability to cure, if such Event of Default is capable of being cured, during the Notice Period, to permit the DIP Agent and the DIP Lenders to take any and all actions and remedies to proceed against, take possession of, protect and realize upon the DIP Collateral and any other property of the estate of any Debtor upon which the DIP Agent or any DIP Lender has been or may hereafter be granted liens and security interests to obtain repayment of the DIP Obligations to the DIP Lenders, including the termination of the DIP Facility and termination of the Debtors' right to use Cash Collateral hereunder; provided, that such notice by the DIP Agent shall not prejudice the rights of the Notice Parties to file a motion during the Notice Period (the "**Opposition Motion**") with this Court opposing the occurrence of an Event of Default; provided, further, that upon the filing of such motion the DIP Agent and the DIP Lenders shall be stayed from taking any actions or remedies against the DIP Collateral until this Court hears and disposes of such motion. During the Notice Period and during the period following the filing of an Opposition Motion, the Debtors may not draw under the DIP Facility but may use Cash Collateral to pay the following amounts and expenses in accordance with the Budget:  (a) expenses that the Debtors have determined in good faith are in the ordinary course and critical to the preservation of the Debtors



and their estates, and (b) such other amounts as have been approved in advance in writing by the DIP Lender.

17.   18.  Carve-Out.

a.    The DIP Liens, AP Liens, Prepetition Liens, and the DIP Superpriority Claims and the AP Superpriority Claims, shall be subject to a carve-out (the "**Carve-Out**") for the following, and in the following priority (i) all fees (and interest) required to be paid to the Clerk of the Bankruptcy Court and to the United States Trustee; (ii) subject to any applicable restrictions in this Interim Order, the amount of allowed and unpaid fees, costs, and expenses of the estate's court-approved professionals in the Case incurred from and after the occurrence of an Event of Default, in an aggregate amount not to exceed (1) $250,000 in the case of the Debtor's court-approved professionals and (2) $75,000 in the case of court-approved professionals retained by any Creditors' Committee; and (iii) subject to any applicable restrictions in this Interim Order, the amount of allowed and unpaid fees, costs, and expenses of the estate's court-approved professionals in these chapter 11 cases incurred prior to the occurrence of an Event of Default, not to exceed the amounts set forth in applicable lines of the Budget as of any applicable date of determination; provided that in no event shall the DIP Lenders be obligated to loan funds to pay any claims benefiting from the Carve Out (or to advance any funds following a Carve-Out Event), including to the extent that such amounts would, when combined with the amounts advanced under the DIP Facility, exceed the maximum principal amount of commitments under the DIP Facility.

b.    Upon the occurrence and continuance (beyond any applicable grace period) of an Event of Default (as defined herein or in the DIP Documents), the right of the Debtors to pay fees and expenses of professionals retained by order of the Bankruptcy Court



shall immediately terminate (a "**Carve-Out Event**"), other than to satisfy the Carve Out, and upon such occurrence, the Debtors shall provide immediate notice by facsimile and e-mail to all professionals informing them that a Carve-Out Event has occurred and further advising them that the Debtors' ability to pay estate professionals is subject to the Carve-Out as provided herein.

c.       Notwithstanding anything herein to the contrary, prior to a Carve-Out Event, the Debtors shall, in accordance with the Budget and the terms of the DIP Documents and subject to the terms of this Interim Order and any other relevant orders of the Bankruptcy Court, be permitted to pay compensation and reimbursement of expenses to professionals allowed and payable under sections 330 and 331 of the Bankruptcy Code and such orders of the Bankruptcy Court authorizing the payment of compensation and reimbursement of expenses that have been incurred prior to the occurrence of such Carve-Out Event.

d.       Nothing herein or in the DIP Documents shall constitute a cap on the amount of professional fees and expenses that may be incurred or allowed in these chapter 11 cases; provided that no payments of such fees and expenses shall be made in excess of the amounts contained within or inconsistent with the Budget.

20.       <u>Limitations on Use of DIP Proceeds, Cash Collateral, and Carve-Out</u>.  No proceeds of the DIP Facility, the Carve-Out, or any Cash Collateral may be used by the Debtors or any other party in interest, or their representatives, to (or support any other party to) (a) investigate or finance any investigation (including discovery proceedings), initiation or prosecution of any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the DIP Agent or the DIP Lenders, or their respective rights and remedies under or in respect of the DIP Facility, (b) in connection with challenging, invalidating,



disallowing, recharacterizing, setting aside, avoiding, subordinating (other than to the Carve-Out), in whole or in part, or taking or attempting to take any other action to render unenforceable, the liens, claims, interests and adequate protection of the DIP Agent and the DIP Lenders, including for the avoidance of doubt, objecting to or contesting the validity, extent, amount, perfection, priority, or enforceability of the obligations under the DIP Facility or the DIP Liens, (c) for any purpose that is prohibited under the Bankruptcy Code, the Interim Order, the Final Order, or the DIP Documents, or (d) seek approval of any superpriority claims or grant any lien that is senior to or *pari passu* with the DIP Liens or DIP Superpriority Claims, except as contemplated by the DIP Term Sheet, this Interim Order or any DIP Document; *provided*, *however*, that the Debtors shall not be precluded from using Cash Collateral and/or proceeds from DIP Loans to contest whether an Event of Default has occurred and is continuing under the DIP Documents, and/or prepare for and participate at any hearing held by the Bankruptcy Court regarding any exercise of rights or remedies under the DIP Documents; *provided*, *further*, that up to $10,000 shall be made available to any Creditors' Committee to investigate (but not object to or commence an action or proceeding with respect to) the Prepetition Senior Secured Notes Obligations and the Prepetition Liens.  No portion of such amount may be used to prosecute or support any claims.

21.    <u>Good Faith Under Sections 363(m) and 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order</u>.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with sections 363(m) or 364(e) of the Bankruptcy Code, as applicable, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, waived, or vacated by a subsequent order of this Court or any other court of competent jurisdiction, each of the DIP Agent, the DIP Lenders and



the Prepetition Secured Creditors are entitled to the full protections provided in sections 363(m) and 364(e) of the Bankruptcy Code, as applicable.  Any such modification, amendment, waiver or vacatur shall not affect the validity ~~and enforceability~~ of any advances previously made, including advances made hereunder, or any priority or lien~~, claim, or priority authorized or created hereby~~ granted, including liens granted hereunder, unless ~~such authorization and the incurring of such debt~~the advances made, or the granting of ~~such~~the priority or lien, is stayed pending appeal.

22.    <u>Payment of Fees and Expenses</u>. In addition to any fees payable under the DIP Term Sheet, the Bridge Documentation or the DIP Documents, the Debtors shall pay all reasonable and documented fees and out-of-pocket expenses of the DIP Agent and the DIP Lenders, whether incurred before or after the Petition Date or in connection with these chapter 11 cases, the DIP Facility or the Bridge Facility, including the reasonable and documented out-of-pocket expenses of legal counsel to the DIP Agent and each DIP Lender and a financial advisor to the DIP Agent (the "**DIP Professional Fees**"); provided however, that the Debtors may defer the payment of any such fees and expenses if and to the extent liquidity constraints so dictate in the Debtors' reasonable judgment.  The DIP Professionals shall not be required to file motions or applications with respect to the DIP Professional Fees, provided, however, that any time such professionals seek payment of fees and expenses from the Debtors, each professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney



work-product doctrine) by electronic mail to the U.S. Trustee and counsel to any Creditors' Committee contemporaneously with the delivery of such fee and expense statements to the Debtors. The Debtors, any Creditors' Committee, or the U.S. Trustee may dispute the payment of any portion of such invoiced fees and expenses (the "**Disputed Invoiced Fees**") if the Debtors, any Creditors' Committee, or the U.S. Trustee notifies the submitting party in writing, within ~~five~~fourteen (~~5~~14) days of the receipt of such fee and expense statement or invoice, setting forth the specific objections to the Disputed Invoiced Fees (to be followed by the filing with this Court, if necessary, of a motion or other pleading, with at least ten (10) days prior written notice to the submitting party of any hearing on such motion or other pleading).  The Debtors shall promptly pay in full all such invoiced fees and expenses other than the Disputed Invoiced Fees.

23.    <u>Release of DIP Agent and DIP Lenders</u>.  Subject to entry of the Final Order, each Debtor shall forever waive, discharge, and release each of the DIP Agent and the DIP Lenders and their respective affiliates and representatives, in each case, solely in such capacity (all of the foregoing, collectively, the "**DIP Secured Party Releasees**") from any and all obligations and liabilities to the Debtors (and their permitted successors and assigns) and from any and all "claims" (as defined in section 101(5) of the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"), defenses, setoff, recoupment, other offset rights, and other rights of disgorgement or recovery against any and all of the DIP Secured Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the DIP Obligations, the DIP Liens, or the debtor–creditor relationship between any of the DIP Lenders, in such capacity, on the one hand, and any of the Debtors, on the other hand, including (a) any recharacterization, subordination, avoidance,



disallowance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law, municipal law, or foreign law and (b) any right or basis to challenge or object to the amount, validity, or enforceability of the DIP Obligations or any payments or other transfers made on account of the DIP Obligations, or the validity, enforceability, priority, or non-avoidability of the DIP Liens securing the DIP Obligations, including any right or basis to seek any disgorgement or recovery of payments of cash or any other distributions or transfers previously received by any of the DIP Secured Party Releasees.   Notwithstanding the foregoing, none of the C5 Lenders, in their capacity as a Prepetition Secured Creditor, shall be released pursuant to the foregoing.

24.     <u>Effect of Stipulations on Third Parties</u>.   The stipulations set forth in paragraph F of this Interim Order shall be binding upon the Debtors upon entry of this Interim Order. In addition, such stipulations shall be binding upon each other party in interest, including any Creditors' Committee unless a party in interest having standing, first, commences, within seventy-five (75) calendar days following the date of entry of this Interim Order (the "**Challenge Period**," and the date that is the next calendar day after the termination of the Challenge Period in the event that either (a) no Challenge (as defined below) is properly raised during the Challenge Period or (b) with respect only to those parties who properly and timely file a Challenge and only for the matters specifically set forth in such Challenge, such Challenge is fully and finally adjudicated, shall be referred to as the "**Challenge Period Termination Date**"), (i) a contested matter, adversary proceeding, or other action or claim (as defined in the Bankruptcy Code) challenging or otherwise objecting to the stipulations set forth in paragraph F of this Interim Order or (ii) a contested matter, adversary proceeding, or other action or claim (as



defined in the Bankruptcy Code) against any Prepetition Secured Creditor relating to any pre-Petition Date act, omission or aspect of the relationship between such Prepetition Secured Creditor and the Debtors ((i) and (ii) being, collectively, the "**Challenges**," and each individually, a "**Challenge**"), and, second, obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding or other action. The filing of a motion seeking standing to file a Challenge Action before the Challenge Period, which attaches a proposed Challenge Action, shall extend the Challenge Period with respect to that party until two business days after the Court approves the standing motion, or such other time period ordered by the Court in approving the standing motion. Upon the Challenge Period Termination Date and for all purposes in these chapter 11 cases and any Successor Case(s), (1) any and all such Challenges by any party in interest shall be deemed to be forever released, waived and barred and (2) the stipulations contained in paragraph F of this Interim Order shall be binding on all parties in interest, including any Creditors' Committee.

25.     <u>No Third-Party Rights</u>.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

26.     <u>Section 506(c) Claims</u>.  Except to the extent of the Carve-Out, upon entry of the Final Order, the Debtors shall irrevocably waive and be prohibited from asserting any claim under section 506(c) of the Bankruptcy Code, and no costs or expenses of administration of these chapter 11 cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code shall be charged



against or recovered from the DIP Collateral or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law.

        27.   <u>No Marshaling</u>.  Subject to entry of a Final Order, the DIP Lenders (and after payment in full of the DIP Obligations, the Prepetition Secured Creditors) shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral. Without limiting the generality of the immediately preceding sentence, from and after the entry of the Final Order, no party (other than the DIP Lenders and after payment in full of the DIP Obligations, the Prepetition Secured Creditors) shall be entitled, directly or indirectly, to direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of the DIP Collateral or the Prepetition Collateral (as applicable) after an Event of Default under the DIP Documents.

        28.   <u>Section 552(b)</u>.  Upon entry of the Final Order, the DIP Agent, the DIP Lenders and the Prepetition Secured Creditors shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception thereunder shall not apply.

        29.   <u>Binding Effect of Interim Order</u>.  The provisions of this Interim Order shall be binding upon and inure to the benefit of the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Secured Creditors, any Creditors' Committee, all other creditors of any of the Debtors and all other parties in interest and, in each case, their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the



property of the estate of any of the Debtors).  To the extent permitted by applicable law, this Interim Order shall bind any trustee or administrator (whether under U.S. law or the laws of any other jurisdiction) hereafter appointed for the estate of any of the Debtors, whether in these chapter 11 cases or in the event of the conversion of any of these chapter 11 cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case, to a liquidation under chapter 7 of the Bankruptcy Code.  Such binding effect is an integral part of this Interim Order.

30.    <u>No Modification of Interim Order</u>.  Until the DIP Obligations and the AP Superpriority Claims have been paid in full, the Debtors shall be prohibited from seeking or consenting to, directly or indirectly, any modification, stay, vacatur, waiver, or amendment to this Interim Order or any provision hereof without the prior written consent of the DIP Agent and each DIP Lender, and no such consent shall be implied by any action or inaction of the DIP Agent or any DIP Lender.

31.    <u>Interim Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the DIP Term Sheet, any DIP Documents and this Interim Order, the provisions of this Interim Order shall control.

32.    <u>Survival</u>.  The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections granted to the DIP Agent, the DIP Lenders and the Prepetition Secured Creditors pursuant to this either or both this Interim Order and the DIP Term Sheet, notwithstanding the entry of any such order, shall continue in these chapter 11 cases, or following dismissal of these chapter 11 cases, and shall maintain their priority as provided by this Interim Order until all the DIP Obligations and AP Superpriority Claims, pursuant to the DIP Documents and/or this Interim Order, have been indefeasibly paid in full (such payment being without prejudice to any terms or provisions contained in the DIP



Facility that survive such discharge by their terms), and all commitments to extend credit under the DIP Facility are terminated.

33.    <u>Final Hearing</u>.  The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) will be held on November [*]14, 2023, at [*] .m1:00 p.m., prevailing Eastern Time. The Debtors shall promptly mail copies of this Interim Order to the notice parties set forth in the DIP Motion, and to any other party that has filed a request for notices with this Court and to any Creditors' Committee after same has been appointed, or the Creditors' Committee's counsel if same shall have filed a request for notice.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (i) counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: Sean M. Beach and Kenneth J. Enos (sbeach@ycst.com and kenos@ycst.com); (ii) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Timothy J. Fox (Timothy.Fox@usdoj.gov); and (iii) the DIP Agent; and (iv) counsel to certain of the DIP Lenders, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, Attn: Sean Mitchell (smitchell@paulweiss.com) and Diane Meyers (dmeyers@paulweiss.com) and shall be filed with the Clerk of the Court, in each case, to allow actual receipt of the foregoing no later than 4:00 p.m. (prevailing Eastern Time), on November [*]7, 2023.

34.    <u>Retention of Jurisdiction</u>.  This Court has and will retain jurisdiction to enforce this Interim Order according to its terms.



# EXHIBIT 2

## SECURITY AGREEMENT

**This Security Agreement**, dated as of October 10, 2023 ("*Security Agreement*"), is made by and among **IronNet, Inc.**, a Delaware corporation ("*Parent*"), **IronNet Cybersecurity, Inc.**, a Delaware corporation ("*IronNet Cybersecurity*"), **IronNet International, LLC**, a Delaware limited liability company ("*IronNet International*"), **IronCAD LLC**, a Delaware limited liability company ("*IronCAD*"), **HighDegree, LLC**, a Delaware limited liability company ("*HighDegree*"; and together with Parent, IronNet Cybersecurity, IronNet International and IronCAD, the "*Grantors*" and each, a "*Grantor*"), and **Ferrous Investors LP** (the "*Secured Party*").

### Recitals

WHEREAS, reference is made to that certain Senior Secured Promissory Note, dated as of October 10, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*Existing Note*"; and together with each Additional Note, the "*Notes*", and each, a "*Note*"), issued by the Grantors, as co-borrowers, in favor of the Secured Party in the aggregate principal amount of $1,500,000; and

WHEREAS, the Secured Party has made or has agreed to make certain advances of money and to extend certain financial accommodations to the Grantors subject to the terms and conditions set forth in the applicable Note, and the obligations of the Secured Party to extend such credit are conditioned upon, among other things, the execution and delivery of this Security Agreement.

**NOW, THEREFORE**, the parties hereto agree as follows.

1.    **Defined Terms**.  When used in this Security Agreement the following terms shall have the meanings set forth below (such meanings being equally applicable to both the singular and plural forms of the terms defined).  Any term used in the UCC and not defined herein shall have the meaning given to such term in the UCC.

"*Additional Note*" shall have the meaning assigned to such term in **Section 12.6** of this Security Agreement.

"*Bankruptcy Code*" means Title XI of the United States Code.

"*Collateral*" shall have the meaning assigned to such term in **Section 2** of this Security Agreement.

"*Contracts*" means all contracts (including any customer, vendor, supplier, service or maintenance contract), personal property leases, licenses, undertakings, purchase orders, permits, franchise agreements or other agreements (other than any right evidenced by Chattel Paper, Documents or Instruments), whether in written or electronic form, in or under which any Grantor now holds or hereafter acquires any right, title or interest, including, without limitation, with respect to an Account, any agreement relating to the terms of payment or the terms of performance thereof.

"*Copyright License*" means any agreement, whether in written or electronic form, in which any Grantor now holds or hereafter acquires any interest, granting any right in or to any Copyright or Copyright registration (whether any Grantor is the licensee or the licensor thereunder) including, without limitation, licenses pursuant to which any Grantor has obtained the exclusive right to use a copyright owned by a third party.

"*Copyrights*" means all of the following now owned or hereafter acquired or created (as a work for hire for the benefit of any Grantor) by any Grantor or in which any Grantor now holds or hereafter acquires or receives any right or interest, in whole or in part: (a) all copyrights, whether registered or unregistered, held pursuant to the laws of the United States, any State thereof or any other country; (b) registrations, applications, recordings and proceedings in the United States Copyright Office or in any similar office or agency of the United States, any State thereof or any other country; (c) any continuations, renewals or extensions thereof; (d) any registrations to be issued in any pending applications, and shall include any right or interest in and to work protectable by any of the foregoing which are presently or in the future owned, created or authorized (as a work for hire for the benefit of any Grantor) or acquired by any Grantor, in whole or in part; (e) prior versions of works covered by copyright and all works based upon, derived from or incorporating such works; (f) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to copyrights, including, without limitation, damages, claims and recoveries for past, present or future infringement; (g) rights to sue for past, present and future infringements of any copyright; and (h) any other rights corresponding to any of the foregoing rights throughout the world.

"*Event of Default*" means any "Event of Default" as defined in the Notes.

"*Intellectual Property*" means any intellectual property, in any medium, of any kind or nature whatsoever, now or hereafter owned or acquired or received by any Grantor or in which any Grantor now holds or hereafter acquires or receives any right or interest, and shall include, in any event, any Copyright, Trademark, Patent, License, trade secret, customer list, marketing plan, internet domain name (including any right related to the registration thereof), proprietary or confidential information, mask work, source, object or other programming code, invention (whether or not patented or patentable), technical information, procedure, design, knowledge, know-how, software, data base, data, skill, expertise, recipe, experience, process, model, drawing, material or record.

"*License*" means any Copyright License, Patent License, Trademark License or other license of rights or interests, whether in-bound or out-bound, whether in written or electronic form, now or hereafter owned or acquired or received by any Grantor or in which any Grantor now holds or hereafter acquires or receives any right or interest, and shall include any renewals or extensions of any of the foregoing thereof.

"*Lien*" means any mortgage, lien, deed of trust, charge, pledge, security interest or other encumbrance.

"*Loans*" means advances, future advances, and financial accommodations provided pursuant to the Notes.

2

"***Patent License***" means any agreement, whether in written or electronic form, in which any Grantor now holds or hereafter acquires any interest, granting any right with respect to any invention on which a Patent is in existence (whether any Grantor is the licensee or the licensor thereunder).

"***Patents***" means all of the following in which any Grantor now holds or hereafter acquires any interest: (a) all letters patent of the United States or any other country, all registrations and recordings thereof and all applications for letters patent of the United States or any other country, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country; (b) all reissues, divisions, continuations, renewals, continuations-in-part or extensions thereof; (c) all petty patents, divisionals and patents of addition; (d) all patents to issue in any such applications; (e) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to patents, including, without limitation, damages, claims and recoveries for past, present or future infringement; and (f) rights to sue for past, present and future infringements of any patent.

"***Permitted Lien***" means: (a) any Liens existing on the date of this Security Agreement and set forth on Schedule A attached hereto; (b) Liens for taxes, fees, assessments or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings; (c) Liens (i) upon or in any Equipment acquired or held by any Grantor to secure the purchase price of such Equipment or indebtedness (including capital leases) incurred solely for the purpose of financing the acquisition of such Equipment or (ii) existing on such Equipment at the time of its acquisition, *provided* that the Lien is confined solely to the Equipment so acquired, improvements thereon and the Proceeds of such Equipment; (d) leases or subleases and licenses or sublicenses granted to others in the ordinary course of any Grantor's business; (e) any right, title or interest of a licensor under a license; (f) Liens arising from judgments, decrees or attachments to the extent and only so long as such judgment, decree or attachment has not caused or resulted in an Event of Default; (g) easements, reservations, rights-of-way, restrictions, minor defects or irregularities in title and other similar Liens affecting real property not interfering in any material respect with the ordinary conduct of the business of any Grantor; (h) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods; (i) Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of setoff or similar rights and remedies as to deposit accounts or other funds maintained with a creditor depository institution; (j) Liens in favor of a depository bank or a securities intermediary pursuant to such depository bank's or securities intermediary's customary customer account agreement; *provided* that any such Liens shall at no time secure any indebtedness or obligations other than customary fees and charges payable to such depository bank or securities intermediary; (k) statutory or common law Liens of landlords and carriers, warehousemen, mechanics, suppliers, materialmen, repairmen and other similar Liens, arising in the ordinary course of business and securing obligations that are not yet delinquent or are being contested in good faith by appropriate proceedings; (l) Liens incurred or deposits made to secure the performance of tenders, bids, leases, statutory or regulatory obligations, surety and appeal bonds, government contracts, performance and return-of-money bonds, and other obligations of like nature, in each case, in the ordinary course of business; (m) Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security; (n) pledges and

3

deposits securing liability for reimbursement or indemnification obligations in respect of letters of credit or bank guarantees for the benefit of landlords; (o) Liens securing subordinated debt (*provided* such Liens are subordinated to Secured Party's security interest on terms acceptable to Secured Party); and (p) Liens incurred in connection with the extension, renewal or refinancing of indebtedness secured by Liens permitted under the preceding clauses, *provided* that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the indebtedness being extended, renewed or refinanced does not increase.

"***Secured Obligations***" means the obligation of each Grantor to repay the Secured Party all of the unpaid principal amount of, and accrued interest on (including any interest that accrues after the commencement of bankruptcy), the Loans.

"***Security Agreement***" means this Security Agreement and all Schedules hereto, as the same may from time to time be amended, modified, supplemented or restated.

"***Trademark License***" means any agreement, whether in written or electronic form, in which any Grantor now holds or hereafter acquires any interest, granting any right in and to any Trademark or Trademark registration (whether any Grantor is the licensee or the licensor thereunder).

"***Trademarks***" means any of the following in which any Grantor now holds or hereafter acquires any interest: (a) any trademarks, tradenames, corporate names, company names, business names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations and recordings thereof and any applications in connection therewith, including, without limitation, registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country (collectively, the "***Marks***"); (b) any reissues, extensions or renewals thereof; (c) the goodwill of the business symbolized by or associated with the Marks; (d) income, royalties, damages, claims and payments now and hereafter due and/or payable with respect to the Marks, including, without limitation, damages, claims and recoveries for past, present or future infringement; and (e) rights to sue for past, present and future infringements of the Marks.

"***UCC***" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York (and each reference in this Security Agreement to an Article thereof (denoted as a Division of the UCC as adopted and in effect in the State of New York) shall refer to that

Article (or Division, as applicable) as from time to time in effect; *provided, however,* in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of the Secured Party's security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "*UCC*" shall mean the Uniform Commercial Code (including the Articles thereof) as in effect at such time in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions related to such provisions.

4

**2.      Grant of Security Interest**.  As collateral security for the full, prompt, complete and final payment and performance when due (whether at stated maturity, by acceleration or otherwise) of all the Secured Obligations and in order to induce the Secured Party to cause the Loans to be made, each Grantor hereby collaterally assigns, conveys, mortgages, pledges, hypothecates and transfers to the Secured Party, and hereby grants to the Secured Party, a security interest in all of such Grantor's right, title and interest in, to and under the following, whether now owned or hereafter acquired (all of which being collectively referred to herein as the "*Collateral*"):

(a)      All Accounts;

(b)      All Chattel Paper;

(c)      All Commercial Tort Claims;

(d)      All Commodity Accounts;

(e)      All Contracts;

(f)      All Deposit Accounts;

(g)      All Documents;

(h)      All General Intangibles, including Intellectual Property;

(i)      All Goods**,** including, without limitation, Equipment, Inventory, and Fixtures;

(j)      All Instruments, including, without limitation, Promissory Notes;

(k)      All Investment Property;

(l)      All Letter-of-Credit Rights and Letters of Credit;

(m)      All Money;

(n)      All Securities Accounts;

(o)      All Supporting Obligations;

(p)      All personal property of such Grantor held by the Secured Party, or any other party for whom the Secured Party is acting as agent, including, without limitation, all property of every description now or hereafter in the possession or custody of or in transit to the Secured Party or such other party for any purpose, including, without limitation, safekeeping, collection or pledge, for the account of such Grantor, or as to which such Grantor may have any right or power;

(q)      All other goods and personal property, wherever located, whether tangible or intangible, and whether now owned or hereafter acquired, existing, leased or consigned by or to such Grantor; and

(r)     To the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for and rents, profits and products of each of the foregoing.

Notwithstanding the foregoing provisions of this **Section 2**, the grant, assignment and transfer of a security interest as provided herein shall not extend to, and the term "*Collateral*" shall not include: any real property, assets of and equity interests in any person to the extent a security interest is not permitted to be granted by the terms of such person's organizational documents or joint venture documents as long as any such limitation was not created in contemplation of this Security Agreement, any intent-to-use trademark application prior to the filing with and acceptance by the United States Patent and Trademark Office of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application (or any resulting registration) under applicable federal law, motor vehicles, airplanes and other assets subject to certificates of title, to the extent a Lien therein cannot be perfected by the filing of a UCC financing statement, Account, Chattel Paper, General Intangible or Promissory Note in which Grantor has any right, title or interest if and to the extent such Account, Chattel Paper, General Intangible or Promissory Note includes a provision containing a restriction on assignment such that the creation of a security interest in the right, title or interest of Grantor therein would be prohibited and would, in and of itself, cause or result in a default thereunder enabling another person party to such Account, Chattel Paper, General Intangible or Promissory Note to enforce any remedy with respect thereto; *provided* that the foregoing exclusion shall not apply if (i) such prohibition has been waived or such other person has otherwise consented to the creation hereunder of a security interest in such Account, Chattel Paper, General Intangible or Promissory Note or (ii) such prohibition would be rendered ineffective pursuant to Sections 9-406(d), 9-407(a) or 9-408(a) of the UCC, as applicable and as then in effect in any relevant jurisdiction, or any other applicable law (including the Bankruptcy Code) or principles of equity; *provided further* that immediately upon the ineffectiveness, lapse or termination of any such provision, the Collateral shall include, and Grantor shall be deemed to have granted on the date hereof a security interest in, all its rights, title and interests in and to such Account, Chattel Paper, General Intangible or Promissory Note as if such provision had never been in effect; and *provided further that* the foregoing exclusion shall in no way be construed so as to limit, impair or otherwise affect the Secured Party's unconditional continuing security interest in and to all rights, title and interests of Grantor in or to any payment obligations or other rights to receive monies due or to become due under any such Account, Chattel Paper, General Intangible or Promissory Note and in any such monies and other proceeds of such Account, Chattel Paper, General Intangible or Promissory Note. Notwithstanding anything to the contrary herein, no actions shall be required with respect to the perfection of any security interest in Intellectual Property in any jurisdiction outside the United States.

3.      **Rights Of Secured Party; Collection Of Accounts**.

(a)     Notwithstanding anything contained in this Security Agreement to the contrary, each Grantor expressly agrees that it shall remain liable under each of its Contracts, Chattel Paper, Documents, Instruments, and Licenses to observe and perform all the conditions and obligations to be observed and performed by it thereunder and that it shall perform all of its duties and obligations thereunder, all in accordance with and pursuant to the terms and provisions

of each such Contract, Chattel Paper, Document, Instrument, and License.  The Secured Party shall not have any obligation or liability under any such Contract, Chattel Paper, Document, Instrument or License by reason of or arising out of this Security Agreement or the granting to the Secured Party of a lien therein or the receipt by the Secured Party of any payment relating to any such Contract, Chattel Paper, Document, Instrument or License pursuant hereto, nor shall the Secured Party be required or obligated in any manner to perform or fulfill any of the obligations of any Grantor under or pursuant to any such Contract, Chattel Paper, Document, Instrument or License, or to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by it or the sufficiency of any performance by any party under any such Contract, Chattel Paper, Document, Instrument or License, or to present or file any claim, or to take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(b)     The Secured Party authorizes each Grantor to collect its Accounts.  Upon the occurrence and during the continuance of any Event of Default, at the written request of the Secured Party, each Grantor shall deliver all original and other documents evidencing and relating to the performance of labor or service which created such Accounts, including, without limitation, all original orders, invoices and shipping receipts.

(c)     The Secured Party may at any time, upon the occurrence and during the continuance of any Event of Default, notify Account Debtors of the Grantors, parties to the Contracts of the Grantors, obligors in respect of Instruments of the Grantors, and obligors in respect of Chattel Paper of the Grantors that the Accounts and the right, title and interest of the applicable Grantor in and under such Contracts, Instruments and Chattel Paper have been assigned to the Secured Party and that payments shall be made directly to Secured Party.  Upon the occurrence and during the continuance of any Event of Default, upon the written request of the Secured Party, each applicable Grantor shall so notify such Account Debtors, parties to such Contracts, obligors in respect of such Instruments and obligors in respect of such Chattel Paper. The Secured Party may, in its name or in the name of others, communicate with such Account Debtors, parties to such Contracts, obligors in respect of such Instruments and obligors in respect of such Chattel Paper to verify with such parties, to such Secured Party's reasonable satisfaction, the existence, amount and terms of any such Accounts, Contracts, Instruments or Chattel Paper.

4.     **Representations And Warranties**.  Each Grantor hereby represents and warrants to the Secured Party that:

(a)     Except for the security interest granted to the Secured Party under this Security Agreement and Permitted Liens, each Grantor is the sole legal and equitable owner of each item of the Collateral in which it purports to grant a security interest hereunder.

(b)     [Reserved].

(c)     This Security Agreement creates a legal and valid security interest on and in all of the Collateral in which each Grantor now has rights.

(d)     Each Grantor's correct legal name and taxpayer identification number are set forth on the signature page hereof.  The jurisdiction under whose law each Grantor was

organized is set forth on the signature page hereof. Each Grantor's chief executive office, principal place of business, and the place where such Grantor maintains its records concerning the Collateral are presently located at the address set forth on the signature page hereof.

**5.**      **Covenants**.  Unless the Secured Party otherwise consents (which consent shall not be unreasonably withheld), each Grantor covenants and agrees with the Secured Party that from and after the date of this Security Agreement and until the Secured Obligations have been performed and paid in full and any commitment of the Secured Party to make Loans to any Grantor has expired or terminated:

5.1      **Disposition of Collateral**.  Each Grantor shall not sell, lease, transfer or otherwise dispose of any of the Collateral (each, a "***Transfer***"), or attempt or contract to do so, other than (a) the sale of Inventory in the ordinary course of business, (b) the granting of Licenses in the ordinary course of business, (c) the disposal of worn-out or obsolete Equipment, and (d) Transfers of Collateral for fair market value as determined by such Grantor in its good faith business judgment.

5.2      **Change of Name, Jurisdiction of Organization, Relocation of Business**. Each Grantor shall not change its name or jurisdiction of organization or relocate its chief executive office, principal place of business or its records from such address(es) provided to the Secured Party pursuant to **Section 4(d)** above without at least seven (7) days prior notice to the Secured Party.

5.3      **Limitation on Liens on Collateral**.  Each Grantor shall not, directly or indirectly, create, permit or suffer to exist, and shall defend the Collateral against and take such other action as is necessary to remove, any Lien on the Collateral or Intellectual Property, except (a) Permitted Liens and (b) the Lien granted to the Secured Party under this Security Agreement.

5.4      **Insurance**.  Each Grantor shall maintain insurance policies insuring the Collateral against loss or damage from such risks and in such amounts and forms and with such companies as are customarily maintained by businesses similar to such Grantor.

5.5      **Taxes, Assessments, Etc.**  Each Grantor shall pay promptly when due all property and other taxes, assessments and government charges or levies imposed upon, and all claims (including claims for labor, materials and supplies) against, the Collateral, except to the extent the validity or amount thereof is being contested in good faith and adequate reserves are being maintained in connection therewith.

5.6      **Defense of Intellectual Property**.  Each Grantor shall use commercially reasonable efforts to (i) protect, defend and maintain the validity and enforceability of all Copyrights, Patents and Trademarks material to such Grantor's business and (ii) detect infringements of all Copyrights, Patents and Trademarks material to such Grantor's business.

5.7      **Further Assurances**.  At any time and from time to time, upon the written request of the Secured Party, and at the sole expense of each Grantor, each Grantor shall promptly and duly execute and deliver any and all such further instruments and documents and take such further action as the Secured Party may reasonably deem necessary or desirable to obtain the full benefits of this Security Agreement, including, without limitation,

(a)     executing, delivering and causing to be filed any financing or continuation statements under the UCC with respect to the security interests granted hereby, (b) filing or cooperating with the Secured Party in filing any forms or other documents required to be recorded with the United States Patent and Trademark Office or the United States Copyright Office, (c) at the Secured Party's reasonable request, placing the interest of the Secured Party as lienholder on the certificate of title (or similar evidence of ownership) of any vehicle, watercraft or other Equipment constituting Collateral owned by any Grantor which is covered by a certificate of title (or similar evidence of ownership), (d) executing and delivering and using commercially reasonable efforts to cause the applicable depository institution, securities intermediary, commodity intermediary or issuer or nominated party under a Letter of Credit to execute and deliver a collateral control agreement with respect to any Deposit Account, Securities Account or Commodity Account or Letter-of-Credit Right in or to which any Grantor now or hereafter has any right or interest and (e) at the Secured Party's reasonable request, using commercially reasonable efforts to obtain acknowledgments from bailees having possession of any Collateral and waivers of liens from landlords of any location where any of the Collateral may from time to time be stored or located. Each Grantor also hereby authorizes the Secured Party to file any such financing or continuation statement without the signature of Grantor.

**6.      Secured Party's Appointment as Attorney-in-Fact; Performance by Secured Party**.

(a)     Subject to **Section 6(b)** below, each Grantor hereby irrevocably constitutes and appoints the Secured Party, and any officer or agent of Secured Party, effective upon the occurrence and during the continuance of an Event of Default, with full power of substitution, as its true and lawful attorney-in-fact with full, irrevocable power and authority in the place and stead of such Grantor and in the name of such Grantor or in its own name, from time to time, at the Secured Party's discretion, for the purpose of carrying out the terms of this Security Agreement, upon the written consent of the Secured Party, to take any and all appropriate action and to execute and deliver any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Security Agreement and, without limiting the generality of the foregoing, hereby gives the Secured Party, upon the written consent of the Secured Party, the power and right, on behalf of such Grantor, without notice to or assent by such Grantor to do the following:

(i)     to ask, demand, collect, receive and give acquittances and receipts for any and all monies due or to become due under any Collateral and, in the name of such Grantor, in its own name or otherwise to take possession of, endorse and collect any checks, drafts, notes, acceptances or other Instruments for the payment of monies due under any Collateral and to file any claim or take or commence any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Secured Party for the purpose of collecting any and all such monies due under any Collateral whenever payable;

(ii)    to pay or discharge any Liens, including, without limitation, any tax lien, levied or placed on or threatened against the Collateral, to effect any repairs or any insurance called for by the terms of this Security Agreement and to pay all or any part of the premiums therefor and the costs thereof, which actions shall be for the benefit of the Secured Party and not such Grantor;

(iii)    to (1) direct any person liable for any payment under or in respect of any of the Collateral to make payment of any and all monies due or to become due thereunder directly to the Secured Party or as the Secured Party shall direct, (2) receive payment of any and all monies, claims and other amounts due or to become due at any time arising out of or in respect of any Collateral, (3) sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications and notices in connection with Accounts and other Instruments and Documents constituting or relating to the Collateral, (4) commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any part thereof and to enforce any other right in respect of any Collateral, (5) defend any suit, action or proceeding brought against such Grantor with respect to any Collateral, (6) settle, compromise or adjust any suit, action or proceeding described above, and in connection therewith, give such discharges or releases as the Secured Party may deem appropriate, (7) license, or, to the extent permitted by an applicable License, sublicense, whether general, special or otherwise, and whether on an exclusive or non-exclusive basis, any Copyright, Patent or Trademark throughout the world for such term or terms, on such conditions and in such manner as the Secured Party shall in its discretion determine, and (8) sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Secured Party were the absolute owner thereof for all purposes; and

(iv)    to do, at the Secured Party's option and such Grantor's expense, at any time, or from time to time, all acts and things which the Secured Party may reasonably deem necessary to protect, preserve or realize upon the Collateral and the Secured Party's security interest therein in order to effect the intent of this Security Agreement, all as fully and effectively as such Grantor might do.

(b)    The Secured Party agree that, except upon the occurrence and during the continuation of an Event of Default, they shall not exercise the power of attorney or any rights granted to the Secured Party pursuant to this **Section 6**. Each Grantor hereby ratifies, to the extent permitted by law, all that said attorney shall lawfully do or cause to be done by virtue hereof.  The power of attorney granted pursuant to this **Section 6** is a power coupled with an interest and shall be irrevocable until the Secured Obligations are completely and indefeasibly paid and performed in full and the Secured Party no longer have any commitment to make any Loans to such Grantor.

(c)    If a Grantor fails to perform or comply with any of its agreements contained herein and the Secured Party, as provided for by the terms of this Security Agreement, shall perform or comply, or otherwise cause performance or compliance, with such agreement, the reasonable expenses, including reasonable attorneys' fees and costs, of the Secured Party incurred in connection with such performance or compliance, together with interest thereon at a rate of interest equal to the highest per annum rate of interest charged on the Loans, shall be payable by such Grantor to the Secured Party within five (5) business days of demand and shall constitute Secured Obligations secured hereby.

**7.     Rights And Remedies Upon Default.**  Beginning on the date which is ten (10) business days after any Event of Default shall have occurred and while such Event of Default is continuing:

(a)     The Secured Party may exercise in addition to all other rights and remedies granted to them under this Security Agreement or the Notes all rights and remedies of a secured party under the UCC.  Without limiting the generality of the foregoing, each Grantor expressly agrees that in any such event the Secured Party, without demand of performance or other demand, advertisement or notice of any kind (except the notice specified below of time and place of public or private sale) to or upon such Grantor or any other person, may (i) reclaim, take possession, recover, store, maintain, finish, repair, prepare for sale or lease, shop, advertise for sale or lease and sell or lease (in the manner provided herein) the Collateral, and in connection with the liquidation of the Collateral and collection of the accounts receivable pledged as Collateral, use any Trademark, Copyright, or process used or owned by such Grantor and (ii) forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and may forthwith sell, lease, assign, give an option or options to purchase or sell or otherwise dispose of and deliver said Collateral (or contract to do so), or any part thereof, in one or more parcels at public or private sale or sales, at any exchange or broker's board or at any Secured Party's offices or elsewhere at such prices as they may deem commercially reasonable, for cash or on credit or for future delivery without assumption of any credit risk. Each Grantor further agrees, at the Secured Party's request, to assemble the Collateral and make it available to the Secured Party at places which the Secured Party shall reasonably select, whether at such Grantor's premises or elsewhere.  The Secured Party shall apply the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale as provided in **Section 7(e)**, below, with such Grantor remaining liable for any deficiency remaining unpaid after such application.  Each Grantor agrees that the Secured Party need not give more than twenty (20) days' notice of the time and place of any public sale or of the time after which a private sale may take place and that such notice is reasonable notification of such matters.

(b)     As to any Collateral constituting certificated securities or uncertificated securities, if, at any time when Secured Party shall determine to exercise their right to sell the whole or any part of such Collateral hereunder, such Collateral or the part thereof to be sold shall not, for any reason whatsoever, be effectively registered under Securities Act of 1933, as amended (as so amended the "***Act***"), the Secured Party may, in its discretion (subject only to applicable requirements of law), sell such Collateral or part thereof by private sale in such manner and under such circumstances as the Secured Party may deem necessary or advisable, but subject to the other requirements of this **Section 7(b)**, and shall not be required to effect such registration or cause the same to be effected.  Without limiting the generality of the foregoing, in any such event the Secured Party may, in its discretion, (i) in accordance with applicable securities laws, proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Collateral or part thereof could be or shall have been filed under the Act; (ii) approach and negotiate with a single possible purchaser to effect such sale; and (iii) restrict such sale to a purchaser who will represent and agree that such purchaser is purchasing for its own account, for investment, and not with a view to the distribution or sale of such Collateral or part thereof.  In addition to a private sale as provided above in this **Section 7(b)**, if any of such Collateral shall not be freely distributable to the public without registration under the Act at the time of any proposed sale hereunder, then the Secured Party shall not be required to effect such registration or cause the same to be effected but may, in its discretion (subject only to applicable requirements of law),

11

require that any sale hereunder (including a sale at auction) be conducted subject to such restrictions as the Secured Party may, in its discretion, deem necessary or appropriate in order that such sale (notwithstanding any failure so to register) may be effected in compliance with the Bankruptcy Code and other laws affecting the enforcement of creditors' rights and the Act and all applicable state securities laws.

(c)     Each Grantor also agrees to pay all reasonable and documented fees, costs and expenses of the Secured Party, including, without limitation, reasonable and documented attorneys' fees, incurred in connection with the enforcement of any of their rights and remedies hereunder.

(d)     Each Grantor hereby waives presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this Security Agreement or any Collateral.

(e)     The Proceeds of any sale, disposition or other realization upon all or any part of the Collateral shall be distributed by the Secured Party in the following order of priorities:

**First**, to the Secured Party in an amount sufficient to pay in full the costs of the Secured Party in connection with such sale, disposition or other realization, including all fees, costs, expenses, liabilities and advances incurred or made by the Secured Party in connection therewith, including, without limitation, reasonable attorneys' fees;

**Second**, to the Secured Party in an amount sufficient to pay in full the then unpaid Secured Obligations; and

**Finally**, upon payment in full of the Secured Obligations, to the Grantors or their representatives, in accordance with the UCC or as a court of competent jurisdiction may direct.

(f)     The costs of enforcing or pursuing any right or remedy hereunder, including without limitation any repossession, sale, possession and management (including, without limitation, reasonable attorneys' fees), and distribution shall be borne by the Secured Party.

**8.**     **[Reserved]**.

**9.**     **[Reserved]**

**10.**     **Indemnity**.  Each Grantor agrees to defend, indemnify and hold harmless the Secured Party and its officers, employees, and agents against all obligations, demands, claims, and liabilities claimed or asserted by any other party in connection with the transactions contemplated by this Security Agreement and (b) all losses or expenses in any way suffered, incurred, or paid by any Secured Party as a result of or in any way arising out of, following or consequential to the transactions contemplated by this Security Agreement (including without limitation, reasonable attorney's fees and expenses), except for losses arising from or out of such Secured Party's gross negligence or willful misconduct.

**11.**     **Reinstatement**.  This Security Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against any Grantor for liquidation or reorganization, should any such Grantor become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of such Grantor's property and assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Secured Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Secured Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Secured Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

**12.**     **Miscellaneous**.

12.1     **Waivers; Modifications**.  None of the terms or provisions of this Security Agreement may be waived, altered, modified or amended except by an instrument in writing, duly executed by each Grantor and the Secured Party.

12.2     **Termination of this Security Agreement**.

(a)     Subject to **Section 11** hereof, this Security Agreement shall terminate upon the payment and performance in full of the Secured Obligations (other than contingent indemnification obligations not then due and owing) and the expiration or termination of any commitment of the Secured Party to make Loans to the Grantors.

(b)     The security interests in any Collateral created hereby shall be automatically released and such Collateral sold free and clear of the Lien and security interests created hereby, in each case with no further action on the part of any person upon any disposition of Collateral permitted to be sold, transferred or assigned by a Grantor pursuant or in connection with a transaction permitted hereunder.

(c)     Upon any termination or release pursuant to the preceding paragraph (a) or (b), the Secured Party shall, at Grantors' expense and written request, execute and deliver to Grantors or otherwise authorize the filing of such documents as Grantors shall reasonably request, including financing statement amendments to evidence such termination or release.  The Secured Party shall promptly deliver to the

13

applicable Grantor any Collateral in its possession upon written request by the issuer, holder or owner thereof in connection with any release of such Collateral in accordance with the foregoing provisions of this Section 12.2.

12.3    **Successor and Assigns**.  This Security Agreement and all obligations of each Grantor hereunder shall be binding upon the successors and assigns of such Grantor, and shall, together with the rights and remedies of the Secured Party hereunder, inure to the benefit of the Secured Party, any future holder of any of the Secured Obligations and their respective successors and assigns.  No sales of participations in the Secured Obligations or any portion thereof or interest therein, and no sales, assignments, transfers or other dispositions of any agreement governing or instrument evidencing the Secured Obligations or any portion thereof or interest therein, shall in any manner affect the lien granted to the Secured Party hereunder.

12.4    **Governing Law**.  In all respects, including all matters of construction, validity and performance, this Security Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York applicable to contracts made and performed in such state, without regard to the principles thereof regarding conflict of laws, except to the extent that the UCC provides for the application of the law of a different jurisdiction.

12.5    **[Reserved]**.

12.6    **Other Secured Obligations**.  On or after the date hereof and so long as not prohibited by the Notes then in effect, the Parent may from time to time designate obligations in respect of indebtedness issued on or after the date hereof to the Secured Party or any affiliates thereof (it being understood and agreed that any fund or other person controlled or advised by C5 Capital Ltd. or its affiliates shall be deemed an affiliate of the Secured Party) ("***Additional Notes***") to be secured on a *pari passu* basis with the then-outstanding Secured Obligations by (a) delivering the Secured Party a certificate (i) identifying the obligations so designated and the initial aggregate principal amount or face amount thereof and (ii) stating that such obligations are designated as "Additional Notes" for purposes hereof. The rights and obligations of each party to this Agreement shall remain in full force and effect notwithstanding the addition of any Additional Notes to this Agreement.

12.7    **Counterparts; Facsimile or PDF Copies**.  This Security Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same agreement.  Executed copies of the signature pages of this Security Agreement sent by facsimile or transmitted electronically in Portable Document Format ("PDF"), or any similar format, shall be treated as originals, fully binding and with full legal force and effect, and the parties waive any rights they may have to object to such treatment.

[*Signature pages follow*.]

**In Witness Whereof**, each of the parties hereto has caused this Security Agreement to be executed and delivered by its duly authorized officer on the date first set forth above.

> **IRONNET, INC.,**
> **IRONNET CYBERSECURITY, INC.,**
> **IRONNET INTERNATIONAL, LLC,**
> **IRONCAD LLC**,
> **HIGHDEGREE, LLC**, each as Grantor
>
>
> By: _____*Cameron Pforr*_____
>     Name: Cameron Pforr
>     Title:   President and Chief Financial Officer
>
>
>
> **Address of each Grantor**
>
> 7900 Tysons One Place
> Suite 400
> McLean, VA  22102
>
>
> **Jurisdiction of Organization of each Grantor:**
> **Delaware**

DocuSign Envelope ID: 8187B41A-EE4F-4591-B846-FC93C2D164C3

**Accepted And Acknowledged By:**
**FERROUS INVESTORS LP,** as Secured Party

By: _____
     Name: Andre Pienaar
     Title:   Chief Executive Officer

[*Signature Page to Security Agreement*]

**Schedule A**

**LIENS EXISTING ON THE DATE OF THIS SECURITY AGREEMENT**

Liens granted pursuant to that certain Amended and Restated Security Agreement, dated as of January 11, 2023, by and among the IronNet, Inc., C5 Space Data LP, Theodore E. Schlein, VADM Jan E. Tighe (Ret.), Hon. Michael J. Rogers, General Keith B. Alexander (ret.), ADM John M. McConnell (Ret.), Russell D. Richardson, Forgepoint Cybersecurity Fund I, L.P., Forgepoint Cyber Affiliates Fund I, L.P., C5 Cyber Partners II SCSP RAIF, C5 Transatlantic Investors LP, Ferrous Investors LP, Donald Dixon, and each other secured party from time to time party thereto, as amended by that certain Amendment to Amended and Restated Security Agreement, dated as of September 22, 2023.

## About Preview Public Record

"Preview public record" uses your application information to provide a sample view of what information will be publicly available and how it will appear in the public catalog if the U.S. Copyright Office approves your application. Layout and formatting may differ from the actual record. Some information will not be available until the application is approved and your document is recorded (i.e., actual Date of Recordation and Document Number).  This page is neither a legal document nor the public record. Recordation is conditioned on examination of your application for compliance with all applicable statutory and regulatory requirements.

The date of recordation listed below is for preview purposes only and is estimated based on the date your submission and payment were or would be received by the Office.  Any changes made to the document, document certifications, or fee after submission will affect the date of recordation.

If you spot an error in the information you submitted, you can navigate back to the application review page to initiate a correction.

This public record preview will only display up to 500 works.

## Preview: Base Record

| | |
|---|---|
| **Type of work:** | (Preview Mode) Recorded Document |
| **Document number:** | _____ |
| **Date of recordation:** | 2023-10-12 |
| **Entire copyright document:** | _____ |
| **Date of execution:** | 10/11/2023 |
| **Title:** | IRONCAD 2022.; Reg: TX0009061132 and 14 other titles. |
| **Notes:** | Grant of Security Interest in Copyrights. |
| **Party 1:** | IRONCAD LLC |
| **Party 2:** | FERROUS INVESTORS LP |
| **Names:** | IRONCAD LLC |
| | FERROUS INVESTORS LP |

## Preview: Generated List of Titles

This list contains titles in document    _____

Document title:    Grant of Security Interest in Copyrights

The complete document is:    _____

List of titles:

001    IRONCAD 2022.; Reg: TX0009061132.

002    INOVATE 2022.; Reg: TX0009057468.

003    INOVATE 2020.; Reg: TX0008876936.

004    IRONCAD CONFIGURATOR 2020.; Reg: TX0008876926.

005    IRONCAD 2020.; Reg: TX0008876924.

006    IRONCAD 2016.; Reg: TX0008254444.

007    IRONCAD COMPOSE 2016.; Reg: TX0008254443.

008    INOVATE 2016.; Reg: TX0008254442.

009    Inovate 2009.; Reg: TX0007292621.

010    IronCAD 2009.; Reg: TX0007234158.

011    TeamVault 5.0.; Reg: TX0005836986.

012    Inovate 5.0.; Reg: TX0005836985.

013    IronCAD 6.0.; Reg: TX0005836984.

014    Inovate 6.0.; Reg: TX0005836983.

015    IronCAD 5.0.; Reg: TX0005836982.

End of titles list for document    _____

## Preview: Title Record

|  |  |
|---|---|
| **Type of Work:** | (Preview Mode) Recorded Document |
| **Document Number:** | _____ |
| **Date of recordation:** | 2023-10-12 |
| **Entire Copyright Document:** | _____ |
| **Registration Number Not Verified:** | TX0009061132 |
| **Title:** | IRONCAD 2022.; Reg: TX0009061132. |

|  |  |
|---|---|
| **Type of Work:** | (Preview Mode) Recorded Document |
| **Document Number:** | _____ |
| **Date of recordation:** | 2023-10-12 |

This is not a legal document or the actual public record

Entire Copyright Document: _____

Registration Number Not Verified: TX0009057468

Title: INOVATE 2022.; Reg: TX0009057468.

---

Type of Work: (Preview Mode) Recorded Document

Document Number: _____

Date of recordation: 2023-10-12

Entire Copyright Document: _____

Registration Number Not Verified: TX0008876936

Title: INOVATE 2020.; Reg: TX0008876936.

---

Type of Work: (Preview Mode) Recorded Document

Document Number: _____

Date of recordation: 2023-10-12

Entire Copyright Document: _____

Registration Number Not Verified: TX0008876926

Title: IRONCAD CONFIGURATOR 2020.; Reg: TX0008876926.

---

Type of Work: (Preview Mode) Recorded Document

Document Number: _____

Date of recordation: 2023-10-12

Entire Copyright Document: _____

Registration Number Not Verified: TX0008876924

Title: IRONCAD 2020.; Reg: TX0008876924.

---

Type of Work: (Preview Mode) Recorded Document

Document Number: _____

Date of recordation: 2023-10-12

Entire Copyright Document: _____

Registration Number Not Verified: TX0008254444

Title: IRONCAD 2016.; Reg: TX0008254444.

---

Type of Work: (Preview Mode) Recorded Document

Document Number: _____

Date of recordation: 2023-10-12

Entire Copyright Document: _____

This is not a legal document or the actual public record

Registration Number Not Verified:  TX0008254443

Title:  IRONCAD COMPOSE 2016.; Reg: TX0008254443.

---

Type of Work:  (Preview Mode) Recorded Document

Document Number:  _____

Date of recordation:  2023-10-12

Entire Copyright Document:  _____

Registration Number Not Verified:  TX0008254442

Title:  INOVATE 2016.; Reg: TX0008254442.

---

Type of Work:  (Preview Mode) Recorded Document

Document Number:  _____

Date of recordation:  2023-10-12

Entire Copyright Document:  _____

Registration Number Not Verified:  TX0007292621

Title:  Inovate 2009.; Reg: TX0007292621.

---

Type of Work:  (Preview Mode) Recorded Document

Document Number:  _____

Date of recordation:  2023-10-12

Entire Copyright Document:  _____

Registration Number Not Verified:  TX0007234158

Title:  IronCAD 2009.; Reg: TX0007234158.

---

Type of Work:  (Preview Mode) Recorded Document

Document Number:  _____

Date of recordation:  2023-10-12

Entire Copyright Document:  _____

Registration Number Not Verified:  TX0005836986

Title:  TeamVault 5.0.; Reg: TX0005836986.

---

Type of Work:  (Preview Mode) Recorded Document

Document Number:  _____

Date of recordation:  2023-10-12

Entire Copyright Document:  _____

Registration Number Not Verified:  TX0005836985

This is not a legal document or the actual public record

**Title:** Inovate 5.0.; Reg: TX0005836985.

---

**Type of Work:** (Preview Mode) Recorded Document

**Document Number:** _____

**Date of recordation:** 2023-10-12

**Entire Copyright Document:** _____

**Registration Number Not Verified:** TX0005836984

**Title:** IronCAD 6.0.; Reg: TX0005836984.

---

**Type of Work:** (Preview Mode) Recorded Document

**Document Number:** _____

**Date of recordation:** 2023-10-12

**Entire Copyright Document:** _____

**Registration Number Not Verified:** TX0005836983

**Title:** Inovate 6.0.; Reg: TX0005836983.

---

**Type of Work:** (Preview Mode) Recorded Document

**Document Number:** _____

**Date of recordation:** 2023-10-12

**Entire Copyright Document:** _____

**Registration Number Not Verified:** TX0005836982

**Title:** IronCAD 5.0.; Reg: TX0005836982.

This is not a legal document or the actual public record

**CSC**
www.cscglobal.com

CSC- Wilmington

251 Little Falls Drive
Wilmington, DE 19808
800-927-9800
302-636-5454 (Fax)

**Matter#**    23396-014
**Project Id :**  23396-014
**Additional Reference :**  DAVID TARR

**Order#**        1289763-1
**Order Date**        10/11/2023

| | |
|---|---|
| **Entity Name:** | **IRONCAD LLC (Debtor) / Ferrous Investors LP (Secured Party)** |
| **Jurisdiction:** | **DE - Secretary Of State** |
| **Request for:** | **UCC Filing** |
| **File Type:** | ORIGINAL UCC FILING |
| **Result:** | **Filed** |
| **File Number:** | 20236968688 |
| **Filing Date:** | 10/11/2023 |

Ordered by THOMAS O'NEILL at PAUL WEISS RIFKIND WHARTON & GARRISON LLP

Thank you for using CSC. For real-time 24 hour access to the status of any order placed with CSC, access our website at www.cscglobal.com.

If you have any questions concerning this order or CSCGlobal, please feel free to contact us.

Jeffrey Boyle
jeboyle@cscinfo.com

The responsibility for verification of the files and determination of the information therein lies with the filing officer; we accept no liability for errors or omissions.

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 04:19 PM 10/11/2023**
**U.C.C. Initial Filing No: 2023 6968688**

**Service Request No: 20233709719**

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION          THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. **DEBTOR'S** NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | IRONCAD LLC | | | |
| | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 7900 Tysons One Place, Suite 400 | McLean | VA | 22102 | USA |

2. **DEBTOR'S** NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | | | | |
| | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. **SECURED PARTY'S** NAME (or NAME of ASSIGNEE of ASSIGNOR Secured Party): Provide only one Secured Party name (3a or 3b)

| | 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | Ferrous Investors LP | | | |
| | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1701 Pennsylvania Avenue, NW | Washington | DC | 20006 | USA |

4 **COLLATERAL:** This financing statement covers the following collateral:

This financing statement covers all assets of the Debtor, whether now existing or hereafter arising.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (se UCC1Ad, Item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box     6b. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility     ☐ Agricultural Lien  ☐ Non-USS Filing

7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA
File with: DE SOS

FILING OFFICE COPY – UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/01/23)                    International Association of Commercial Administrators (IACA)

**CSC**
www.cscglobal.com

CSC- Wilmington

251 Little Falls Drive
Wilmington, DE 19808
800-927-9800
302-636-5454 (Fax)

**Matter#**    23396-014
**Project Id :**  23396-014
**Additional Reference :**  DAVID TARR

**Order#**    1289763-2
**Order Date**    10/11/2023

| | |
|---|---|
| **Entity Name:** | **IRONNET, INC. (Debtor) / Ferrous Investors LP (Secured Party)** |
| **Jurisdiction:** | **DE - Secretary Of State** |
| **Request for:** | **UCC Filing** |
| **File Type:** | ORIGINAL UCC FILING |
| **Result:** | **Filed** |
| **File Number:** | 20236968654 |
| **Filing Date:** | 10/11/2023 |

Ordered by THOMAS O'NEILL at PAUL WEISS RIFKIND WHARTON & GARRISON LLP

Thank you for using CSC. For real-time 24 hour access to the status of any order placed with CSC, access our website at www.cscglobal.com.

If you have any questions concerning this order or CSCGlobal, please feel free to contact us.

Jeffrey Boyle
jeboyle@cscinfo.com

The responsibility for verification of the files and determination of the information therein lies with the filing officer; we accept no liability for errors or omissions.

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER** (optional)

**B. E-MAIL CONTACT AT FILER** (optional)

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION

Delaware Department of State
U.C.C. Filing Section
Filed: 04:19 PM 10/11/2023
U.C.C. Initial Filing No: 2023 6968654

Service Request No: 20233709715

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR | IRONNET, INC. | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 7900 Tysons One Place,  Suite 400 | McLean | VA | 22102 | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR Secured Party): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR | Ferrous Investors LP | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1701 Pennsylvania Avenue, NW | Washington | DC | 20006 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:

This financing statement covers all assets of the Debtor, whether now existing or hereafter arising.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (se UCC1Ad, Item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-USS Filing

**7. ALTERNATIVE DESIGNATION** (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA**
File with: DE SOS

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY – UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/01/23)

**CSC**

www.cscglobal.com

CSC- Wilmington

251 Little Falls Drive
Wilmington, DE 19808
800-927-9800
302-636-5454 (Fax)

**Matter#**      23396-014
**Project Id :**  23396-014
**Additional Reference :**  DAVID TARR

**Order#**        1289763-3
**Order Date**    10/11/2023

| | |
|---|---|
| **Entity Name:** | **HIGHDEGREE, LLC (Debtor) / Ferrous Investors LP (Secured Party)** |
| **Jurisdiction:** | **DE - Secretary Of State** |
| **Request for:** | **UCC Filing** |
| **File Type:** | ORIGINAL UCC FILING |
| **Result:** | **Filed** |
| **File Number:** | 20236968639 |
| **Filing Date:** | 10/11/2023 |

Ordered by THOMAS O'NEILL at PAUL WEISS RIFKIND WHARTON & GARRISON LLP

Thank you for using CSC. For real-time 24 hour access to the status of any order placed with CSC, access our website at www.cscglobal.com.

If you have any questions concerning this order or CSCGlobal, please feel free to contact us.

Jeffrey Boyle
jeboyle@cscinfo.com

The responsibility for verification of the files and determination of the information therein lies with the filing officer; we accept no liability for errors or omissions.

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| --- |

| B. E-MAIL CONTACT AT FILER (optional) |
| --- |

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY  10019

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 04:19 PM 10/11/2023**
**U.C.C. Initial Filing No: 2023 6968639**

**Service Request No:   20233709718**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S  NAME:  Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
| --- | --- | --- | --- |
| OR  HIGHDEGREE, LLC | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 7900 Tysons One Place,  Suite 400 | McLean | VA | 22102 | USA |

2. DEBTOR'S  NAME:  Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the individual Debtor's name will not fit in line 2b, leave all of Item 2 blank, check here ☐ and provide the Individual Debtor information in Item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
| --- | --- | --- | --- |
| OR | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S  NAME (or NAME of ASSIGNEE of ASSIGNOR Secured Party):  Provide only <u>one</u> Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
| --- | --- | --- | --- |
| OR  Ferrous Investors LP | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1701 Pennsylvania Avenue, NW | Washington | DC | 20006 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

This financing statement covers all assets of the Debtor, whether now existing or hereafter arising.

5. Check <u>only</u> if applicable and check <u>only</u> one box:  Collateral is ☐ held in a Trust (se UCC1Ad, Item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check <u>only</u> if applicable and check <u>only</u> one box | 6b. Check <u>only</u> if applicable and check <u>only</u> one box: |
| --- | --- |
| ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien ☐ Non-USS Filing |

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA
File with: DE SOS

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY – UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/01/23)

**CSC**

www.cscglobal.com

CSC- Wilmington

251 Little Falls Drive
Wilmington, DE 19808
800-927-9800
302-636-5454 (Fax)

**Matter#**     23396-014
**Project Id :**  23396-014
**Additional Reference :**  DAVID TARR

**Order#**          1289763-4
**Order Date**     10/11/2023

| | |
|---|---|
| **Entity Name:** | **IRONNET INTERNATIONAL, LLC (Debtor) / Ferrous Investors LP (Secured Party)** |
| **Jurisdiction:** | **DE - Secretary Of State** |
| **Request for:** | **UCC Filing** |
| **File Type:** | ORIGINAL UCC FILING |
| **Result:** | **Filed** |
| **File Number:** | 20236968613 |
| **Filing Date:** | 10/11/2023 |

Ordered by THOMAS O'NEILL at PAUL WEISS RIFKIND WHARTON & GARRISON LLP

Thank you for using CSC. For real-time 24 hour access to the status of any order placed with CSC, access our website at www.cscglobal.com.

If you have any questions concerning this order or CSCGlobal, please feel free to contact us.

Jeffrey Boyle
jeboyle@cscinfo.com

The responsibility for verification of the files and determination of the information therein lies with the filing officer; we accept no liability for errors or omissions.

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) | Delaware Department of State |
|---|---|
| | U.C.C. Filing Section |
| B. E-MAIL CONTACT AT FILER (optional) | Filed: 04:19 PM 10/11/2023 |
| | U.C.C. Initial Filing No: 2023 6968613 |
| C. SEND ACKNOWLEDGMENT TO: (Name and Address) | Service Request No: 20233709717 |

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION          THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR  IRONNET INTERNATIONAL, LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 7900 Tysons One Place,  Suite 400 | McLean | VA | 22102 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR Secured Party): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR  Ferrous Investors LP | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1701 Pennsylvania Avenue, NW | Washington | DC | 20006 | USA |

4 COLLATERAL: This financing statement covers the following collateral:

This financing statement covers all assets of the Debtor, whether now existing or hereafter arising.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (se UCC1Ad, Item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box
☐ Agricultural Lien ☐ Non-USS Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA
File with: DE SOS

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY – UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/01/23)

**CSC**
www.cscglobal.com

CSC- Wilmington

251 Little Falls Drive
Wilmington, DE 19808
800-927-9800
302-636-5454 (Fax)

**Matter#**          23396-014
**Project Id :**  23396-014
**Additional Reference :**  DAVID TARR

**Order#**          1289763-5
**Order Date**          10/11/2023

| | |
|---|---|
| **Entity Name:** | **IronNet Cybersecurity, Inc. (Debtor) / Ferrous Investors LP (Secured Party)** |
| **Jurisdiction:** | **DE - Secretary Of State** |
| **Request for:** | **UCC Filing** |
| **File Type:** | ORIGINAL UCC FILING |
| **Result:** | **Filed** |
| **File Number:** | 20236968589 |
| **Filing Date:** | 10/11/2023 |

Ordered by THOMAS O'NEILL at PAUL WEISS RIFKIND WHARTON & GARRISON LLP

Thank you for using CSC. For real-time 24 hour access to the status of any order placed with CSC, access our website at www.cscglobal.com.

If you have any questions concerning this order or CSCGlobal, please feel free to contact us.

Jeffrey Boyle
jeboyle@cscinfo.com

The responsibility for verification of the files and determination of the information therein lies with the filing officer; we accept no liability for errors or omissions.

██████████████
██████████████
██████████████
██████████████

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A.  NAME & PHONE OF CONTACT AT FILER (optional) |
|---|

| B.  E-MAIL CONTACT AT FILER (optional) |
|---|

C.  SEND ACKNOWLEDGMENT TO:  (Name and Address)

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY  10019

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 04:19 PM 10/11/2023**
**U.C.C. Initial Filing No: 2023 6968589**

**Service Request No:   20233709716**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S  NAME:  Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR  IronNet Cybersecurity, Inc. | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 7900 Tysons One Place,  Suite 400 | McLean | VA | 22102 | USA |

2. DEBTOR'S  NAME:  Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the individual Debtor's name will not fit in line 2b, leave all of Item 2 blank, check here ☐ and provide the individual Debtor information in Item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S  NAME (or NAME of ASSIGNEE of ASSIGNOR Secured Party):  Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR  Ferrous Investors LP | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1701 Pennsylvania Avenue, NW | Washington | DC | 20006 | USA |

4 COLLATERAL: This financing statement covers the following collateral:

This financing statement covers all assets of the Debtor, whether now existing or hereafter arising.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (se UCC1Ad, Item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check only if applicable and check only one box | 6b. Check only if applicable and check only one box |
|---|---|
| ☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien  ☐ Non-USS Filing |

7. ALTERNATIVE DESIGNATION (if applicable)  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA
File with: DE SOS

FILING OFFICE COPY – UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/01/23)

International Association of Commercial Administrators (IACA)



**United States Patent and Trademark Office**



Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help

*Electronic Patent Assignment System*

# Confirmation Receipt

Your assignment has been received by the USPTO.
The coversheet of the assignment is displayed below:

## PATENT ASSIGNMENT COVER SHEET

Electronic Version v1.1
Stylesheet Version v1.2

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | SECURITY INTEREST |

**CONVEYING PARTY DATA**

| Name | Execution Date |
|---|---|
| IRONNET CYBERSECURITY, INC. | 10/11/2023 |
| IRONCAD LLC | 10/11/2023 |

**RECEIVING PARTY DATA**

| | |
|---|---|
| Company Name: | FERROUS INVESTORS LP |
| Street Address: | 1701 PENNSYLVANIA AVE, NW |
| City: | WASHINGTON |
| State/Country: | D.C. |
| Postal Code: | 20006 |

**PROPERTY NUMBERS  Total: 19**

| Property Type | Number |
|---|---|
| Patent Number: | 9306965 |
| Application Number: | 17531696 |
| Application Number: | 17330313 |
| Patent Number: | 9910993 |
| Patent Number: | 9875360 |
| Application Number: | 17136582 |

| Patent Number: | 11507291 |
|---|---|
| Application Number: | 17990601 |
| Application Number: | 18231689 |
| Patent Number: | 11477223 |
| Application Number: | 17958625 |
| Patent Number: | 11716350 |
| Application Number: | 18209645 |
| Patent Number: | 11716337 |
| Application Number: | 18209657 |
| Patent Number: | 10445435 |
| Patent Number: | 9734266 |
| Patent Number: | 10192022 |
| Patent Number: | 7479959 |

## CORRESPONDENCE DATA

**Fax Number:**          (212)492-0722
**Phone:**          (212) 373-3722
**Email:**          rjerry@paulweiss.com, mmcguire@paulweiss.com
*Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.*
**Correspondent Name:**          RUEL V JERRY
**Address Line 1:**          1285 AVENUE OF THE AMERICAS
**Address Line 2:**          PAUL WEISS RIFKIND WHARTON &GARRISON LLP
**Address Line 4:**          NEW YORK,  NEW YORK   10019-6064

| NAME OF SUBMITTER: | RUEL V JERRY |
|---|---|
| Signature: | /Ruel Jerry/ |
| Date: | 10/12/2023 |

**Total Attachments: 5**
source=IronNet - Notice of Grant of Security Interest in Patents (Executed)#page1.tif
source=IronNet - Notice of Grant of Security Interest in Patents (Executed)#page2.tif
source=IronNet - Notice of Grant of Security Interest in Patents (Executed)#page3.tif
source=IronNet - Notice of Grant of Security Interest in Patents (Executed)#page4.tif
source=IronNet - Notice of Grant of Security Interest in Patents (Executed)#page5.tif

## RECEIPT INFORMATION

**EPAS ID:**          PAT8216762
**Receipt Date:**          10/12/2023

**Return to home page**



**United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help

*Electronic Trademark Assignment System*

# Confirmation Receipt

Your assignment has been received by the USPTO.
The coversheet of the assignment is displayed below:

| TRADEMARK ASSIGNMENT COVER SHEET |
|---|

Electronic Version v1.1
Stylesheet Version v1.2

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | SECURITY INTEREST |

**CONVEYING PARTY DATA**

| Name | Formerly | Execution Date | Entity Type |
|---|---|---|---|
| IRONNET CYBERSECURITY, INC. | | 10/11/2023 | Corporation: DELAWARE |
| IRONCAD LLC | | 10/11/2023 | Limited Liability Company: DELAWARE |

**RECEIVING PARTY DATA**

| Name: | FERROUS INVESTORS LP |
|---|---|
| Street Address: | 1701 Pennsylvania Ave, NW |
| City: | Washington |
| State/Country: | D.C. |
| Postal Code: | 20006 |
| Entity Type: | Limited Partnership: DELAWARE |

**PROPERTY NUMBERS  Total: 18**

| Property Type | Number | Word Mark |
|---|---|---|
| Registration Number: | 2034285 | INTELLISHAPE |
| Registration Number: | 7078225 | IRONCAD |
| Registration Number: | 5023333 | SMART EBEHAVIOR |
| Registration Number: | 5028737 | SMART ECONTENT |
| Serial Number: | 97109709 | SMARTSNAP |
| Registration Number: | 7071809 | S SYNERGY |
| Registration Number: | 2099986 | TRIBALL |
| Registration Number: | 7071810 | S SYNERGY |
| Registration Number: | 5576450 | DATA DRIVEN DEFENSE |
| Registration Number: | 5525357 | |
| Registration Number: | 5376136 | |
| Registration Number: | 5628294 | IRONDEFENSE |
| Registration Number: | 5525358 | IRONDEFENSE |
| Registration Number: | 5525359 | IRONDOME |
| Registration Number: | 5628295 | IRONDOME |
| Registration Number: | 5525356 | IRONNET |

| Number: | | |
| Registration Number: | 5376135 | IRONNET |
| Serial Number: | 97662781 | IRONRADAR |

**CORRESPONDENCE DATA**

| | |
|---|---|
| Fax Number: | 2124920722 |
| Phone: | (212) 373-3722 |
| Email: | rjerry@paulweiss.com, mmcguire@paulweiss.com |

*Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.*

| | |
|---|---|
| Correspondent Name: | Ruel V Jerry |
| Address Line 1: | 1285 Avenue of the Americas |
| Address Line 2: | Paul Weiss Rifkind Wharton &Garrison LLP |
| Address Line 4: | New York,  NEW YORK   10019-6064 |

| ATTORNEY DOCKET NUMBER: | 023396 |
|---|---|

| NAME OF SUBMITTER: | Ruel V Jerry |
|---|---|

| Signature: | /Ruel Jerry/ |
|---|---|

| Date: | 10/12/2023 |
|---|---|

**Total Attachments: 5**
source=IronNet - Notice of Grant of Security Interest in Trademarks (Executed)#page1.tif
source=IronNet - Notice of Grant of Security Interest in Trademarks (Executed)#page2.tif
source=IronNet - Notice of Grant of Security Interest in Trademarks (Executed)#page3.tif
source=IronNet - Notice of Grant of Security Interest in Trademarks (Executed)#page4.tif
source=IronNet - Notice of Grant of Security Interest in Trademarks (Executed)#page5.tif

**RECEIPT INFORMATION**

| | |
|---|---|
| ETAS ID: | TM845478 |
| Receipt Date: | 10/12/2023 |
| Fee Amount: | $465 |

## Return to ETAS home page

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

# EXHIBIT 4

**IronNet**
**Weekly CF**  % of critical vendors

*forecast* labels appear above columns: 10/21/23, 10/28/23, 11/4/23, 11/11/23, 11/18/23, 11/25/23

| | 10/7/23 | 10/14/23 | 10/21/23 | 10/28/23 | 11/4/23 | 11/11/23 | 11/18/23 | 11/25/23 | 12/2/23 | 12/9/23 | 12/16/23 | 12/23/23 | 12/30/23 | 1/6/24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week End:** | 10/13/23 | 10/20/23 | 10/27/23 | 11/3/23 | 11/10/23 | 11/17/23 | 11/24/23 | 12/1/23 | 12/8/23 | 12/15/23 | 12/22/23 | 12/29/23 | 1/5/24 | 1/12/24 |
| **Total HC** | 6 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 |
| **Bookings Forecast - Baseline** | - | - | - | 126,000 | - | 195,000 | - | - | - | - | - | - | 565,185 | - |
| **Beg. Cash Balance** | 1,197,864 | 1,452,899 | 726,614 | 1,745,658 | 2,376,235 | 2,017,477 | 3,147,259 | 691,326 | 452,663 | 1,560,315 | 1,233,223 | 2,084,164 | 848,501 | 832,923 |
| Sources of Cash: | | | | | | | | | | | | | | |
| + AR Collections - Annual | - | - | 93,624 | 30,000 | - | - | - | - | - | - | - | - | - | - |
| + AR Collections - Monthly | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| + AR Partial Payment | - | - | - | - | - | - | - | - | - | - | - | - | 204,260 | - |
| + Recurring Billings | - | 50,770 | - | - | - | 34,112 | - | - | - | - | 34,112 | - | - | - |
| + Collections from Baseline Fcst | - | - | - | - | - | 10,000 | - | 70,000 | - | 251,000 | - | - | - | - |
| (+/-) ELOC Financing | | | | | | | | | | | | | | |
| (+/-) Debt | | | | | | | | | | | | | | |
| (+/-) additional investment | 1,500,000 | - | 1,500,000 | 1,500,000 | | 1,500,000 | 1,500,000 | - | 1,500,000 | - | 1,500,000 | - | - | - |
| **Total Inflow** | **1,500,000** | **50,770** | **1,593,624** | **1,530,000** | **-** | **1,544,112** | **1,500,000** | **70,000** | **1,500,000** | **251,000** | **1,534,112** | **-** | **204,260** | **-** |
| Uses of Cash: | | | | | | | | | | | | | | |
| (-) Regular Pay - US | (20,912) | - | (118,595) | - | - | (125,596) | - | (118,594) | - | (125,831) | - | (125,831) | - | (125,831) |
| (-) Other Pay - US | (17) | - | (235) | - | - | (235) | - | (235) | - | - | - | - | - | - |
| (-) Payroll Tax - US | (9,252) | - | - | (63,791) | - | (63,791) | (1,036,000) | (63,791) | - | (63,791) | - | (63,791) | - | (63,791) |
| (-) Stock Comp Tax | | | | | | | | | | | | | | |
| (-) Retirement - US | (2,754) | | - | (21,867) | - | (21,867) | - | - | (21,867) | - | (21,867) | - | (21,867) | - |
| (-) Garnish - US | (169) | - | - | (291) | - | (291) | - | (291) | - | (291) | - | (291) | - | (291) |
| (-) Commission - US | (23,594) | (73,626) | (7,001) | - | - | - | - | - | - | - | - | - | - | - |
| (-) International Payroll | - | - | - | - | - | - | (73,626) | (7,002) | - | - | (73,626) | - | - | - |
| (-) AP Schedule | (1,008,118) | (432,380) | (418,750) | (218,750) | (276,250) | - | (2,808,839) | (118,750) | (102,500) | (239,379) | (550,210) | (1,045,750) | - | (183,629) |
| (-) Monthly Recurring | (55,148) | (121,048) | (30,000) | (143,723) | (82,508) | (68,800) | (37,468) | - | (149,231) | (145,800) | (37,468) | - | (79,221) | (147,010) |
| Restructuring Fees | (125,000) | (150,000) | - | (451,000) | - | (133,750) | - | - | (118,750) | (3,000) | - | - | (118,750) | - |
| (+/-) Bank Transfers | | | | | | | | | | | | | | |
| **Total Outflow** | **(1,119,965)** | **(627,054)** | **(574,581)** | **(448,423)** | **(358,758)** | **(280,580)** | **(3,955,933)** | **(308,663)** | **(273,599)** | **(575,092)** | **(683,171)** | **(1,235,663)** | **(101,088)** | **(520,552)** |
| **End Cash Balance** | **1,452,899** | **726,614** | **1,745,658** | **2,376,235** | **2,017,477** | **3,147,259** | **691,326** | **452,663** | **1,560,315** | **1,233,223** | **2,084,164** | **848,501** | **832,923** | **312,371** |