IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| IRONNET, INC., *et al.*,[1] | ) Case No. 23-11710 (BLS) |
| Debtors. | ) (Jointly Administered) |
| | ) **Hearing Date:** November 14, 2023 at 1:00 p.m. (ET) |
| | ) **Objection Deadline:** November 7, 2023 at 4:00 p.m. (ET) |
| | ) Local Rule 2016-2(d) Waiver Requested |

**DEBTORS' APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF CAPSTONE CAPITAL MARKETS LLC AS INVESTMENT BANKER, EFFECTIVE AS OF OCTOBER 24, 2023**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") hereby submit this application (this "**Application**") for the entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**"), pursuant to sections 327(a) and 328(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2014-1 and 2016-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), authorizing the retention and employment of Capstone Capital Markets LLC ("**Capstone**") as their investment banker, effective as October 24, 2023, in accordance with the terms and conditions set forth in that certain engagement agreement, dated as of October 24, 2023

---

[1] The Debtors in the above captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: IronNet, Inc. (9446), IronNet Cybersecurity, Inc. (2655), IronNet International, LLC (7621), IronCAD LLC (1162), and HighDegree, LLC (8474). The Debtors' corporate headquarters is located at 7900 Tysons One Place, Suite 400, McLean, VA 22102.

30882682.4

(the "**Engagement Agreement**"),[2] a copy of which is attached as Exhibit 1 to the Proposed Order. In support of this Application, the Debtors submit the *Declaration of Jamie Lisac in Support of Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Capstone Capital Markets LLC as Investment Bank, Effective as of October 24, 2023* (the "**Lisac Declaration**"), attached hereto as **Exhibit B**. In further support of this Application, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1. The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012 (the "**Amended Standing Order**"). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution. Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409. Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Application if it is determined that the Court would lack Article III jurisdiction to enter such final judgment or order absent consent of the parties.

2. The statutory and legal predicates for the relief requested herein are sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rules 2014 and 2016, and Local Rules 2014-1 and 2016-2.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Engagement Agreement.

**BACKGROUND**

3. On October 12, 2023 (the "**Petition Date**"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors are authorized to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No official committees have been appointed in these chapter 11 cases and no request has been made for the appointment of a trustee or an examiner.

4. Additional information regarding the Debtors' business, their capital structure, and the circumstances leading to the filing of these chapter 11 cases is set forth in the *Declaration of Cameron Pforr, President and Chief Financial Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 4] (the "**First Day Declaration**").

**RELIEF REQUESTED**

5. By this Application, the Debtors seek entry of the Proposed Order authorizing the retention and employment of Capstone, effective as of October 24, 2023, as investment banker.

**CAPSTONE'S QUALIFICATIONS**

6. The Debtors require the services of an experienced investment banking firm to provide advice with respect to the Debtors' proposed sale process. The Debtors selected Capstone as their investment banker in connection with these chapter 11 cases because of the firm's diverse experience and extensive knowledge in the restructuring of troubled companies. Capstone has a dedicated restructuring investment banking group of various professionals with extensive experience advising companies, creditors' committees, and other constituents in complex situations involving underperforming or unsuitably capitalized businesses facing difficult financing conditions, liquidity crises, out-of-court restructurings, or bankruptcy proceedings. Investment bankers at Capstone have advised on, or been involved with, numerous

restructuring-related or distressed transactions, both out-of-court and in chapter 11 cases, including, without limitation, sale, restructuring, reorganization, financing, and special situation transactions. Some representative engagements that investment bankers at Capstone have led in prior chapter 11 cases and restructurings include: *Allegiance Coal USA Limited*, No. 23-10234 (Bankr. D. Del. Feb. 21, 2023); *Party City Holdco Inc*, No. 23-90005 (Bankr. S.D. TX. Jan. 17, 2023); *Taronis Fuels Inc.,* No. 22-11121 (Bankr. D. Del. Nov. 11, 2022); *Red River Waste Solutions, LP*, No. 21- 42423 (ELM) (Bankr. N.D. TX. Oct. 14, 2021); *SEGA Biofuels, LLC*, No. 18-50142 (MJK) (Bankr. S.D. Ga. Mar. 7, 2018); *Karmaloop, Inc.*, No. 15-10635 (MFW) (Bankr. D. Del. Mar. 23, 2015); and *Gamma Medica-Ideas (USA) Inc.*, No. (C.D. Cal. Aug. 20, 2012); *Boston Generating, LLC*, No. 10-14419 (Bankr. S.D.N.Y 2010). As such, Capstone is well qualified to perform the work required in these chapter 11 cases.

7. The resources, capabilities, and experience of Capstone are important to the Debtors' efforts to maximize value for their stakeholders. An investment banker with Capstone's resources, capabilities, and experience to assist them in pursuing the sale process are crucial to the success of these chapter 11 cases. An investment bank, such as Capstone, fulfills a critical service that complements the services provided by the Debtors' other professionals. The Debtors seek to retain Capstone as their investment banker because, among other things, Capstone has considerable expertise and experience and an excellent reputation in providing high quality financial advice and investment banking services to financially distressed companies and to creditors, purchasers, bondholders, and other constituencies in chapter 11 as well as in out-of-court proceedings.

8. Capstone has familiarized itself with the Debtors' corporate and capital structure, management, operations, and various other aspects of their businesses. Capstone has

knowledge of the Debtors' financial history and business operations and is well suited to provide the Debtors with the investment banking services contemplated by the Engagement Agreement. For these reasons, the Debtors submit that the retention of Capstone as investment banker is in the best interests of the Debtors' estates and is important to the Debtors' efforts to maximize value for their stakeholders.

## SERVICES TO BE PROVIDED

9.  The Engagement Agreement governs the current relationship between Capstone and the Debtors. The terms and conditions of the Engagement Agreement were negotiated in good faith and at arm's length and reflect the parties' mutual agreement as to the substantial efforts and resources that have been and will continue to be required in connection with Capstone's engagement.

10. Subject to further order of the Court, and as more fully set forth in this Application and the Engagement Agreement, Capstone has performed and will continue to perform a broad range of necessary investment banking services to the Debtors, in each case as the Debtors request, and as Capstone and the Debtors deem appropriate and feasible, in order to advise the Debtors in the course of these chapter 11 cases in consideration for the compensation contemplated therein. The Engagement Agreement sets forth the following services to be provided by Capstone:

Sale Transaction Services:

    a.    formulating a market strategy for a Sale Transaction;[3]

    b.    preparing a Confidential Memorandum and presentations for use in the Sale Transaction process;

---

[3] Sale Transaction means: "The sale of all or substantially all of the Company by means of a merger, consolidation, recapitalization, business combination, reorganization pursuant to a chapter 11 plan, including as a result of a credit bid issued in accordance with section 363(k) of title 11 of the United States Code, spin-off, exchange offer, tender offer, sale of stock or assets, or other similar transactions."

    c.    identifying and contacting appropriate potential strategic and/or financial acquirers ("**Prospective Acquirers**");

    d.    coordinating the receipt and comparison of any offers or proposals forthcoming from Prospective Acquirers;

    e.    assessing and analyzing proposed valuations, transaction structures, and related terms and conditions;

    f.    providing the Company (and its stakeholders) with periodic status reports and being available to the Company at all reasonable times to discuss any matters relating to the Sale Transaction;

    g.    conducting an auction, if necessary, under section 363 of the Bankruptcy Code; and

    h.    negotiating and consummating definitive agreements, including where appropriate, responding to the Company's reasonable requests for assistance in coordinating the due diligence and transaction closing processes.

Exit Financing Transaction Services:

    a.    analyzing the Company's financial situation and assist the Company in determining the form and quantum of required financing;

    b.    preparing a Confidential Memorandum describing the Company, its operations, management, and financial data, based upon information provided by the Company, to facilitate securing and structuring the financing;

    c.    identifying and contacting appropriate prospective capital providers to the Exit Financing Transaction;

    d.    assisting and advising the Company in negotiating the terms and structure of a potential Exit Financing Transaction;

    e.    assisting the Company and its legal counsel with document preparation to secure financing commitment(s) with the goal of obtaining such financing commitment in a timely fashion;

    f.    assisting with document preparation, procedural execution and closing of the Exit Financing Transaction, working with the Company's counsel;

    g.    providing the Company (and its stakeholders) with periodic status reports and be available to the Company at all reasonable times to discuss any matters relating to the Exit Financing Transaction; and

    h.  performing other financial advisory services relating to the foregoing as necessary and agreed between the parties.

  11. Capstone will not provide any legal, regulatory, accounting, appraisal, or tax advice, or develop any tax strategies, or provide any opinion, for the Debtors. If the Debtors request that Capstone provide any services other than those services expressly set out in Section 2 of the Engagement Agreement, the Debtors and Capstone will enter into an additional agreement that will set forth the nature and scope of such services, appropriate compensation and other customary matters, as mutually agreed between the Debtors and Capstone. To the extent that the parties amend the Engagement Agreement, any such amendments will be subject to the Court's approval upon proper application by the Debtors.

  12. Capstone is well qualified and able to provide the foregoing services to the Debtors. The Debtors believe that Capstone's services will not duplicate the services that other professionals will be providing to the Debtors in these chapter 11 cases. Capstone will use reasonable efforts to coordinate with the Debtors' other retained professionals to avoid unnecessary duplication of services.

## **PROFESSIONAL COMPENSATION**

  13. The Debtors request that the Court authorize the retention of Capstone under the terms and conditions set forth in the Engagement Agreement, and the Debtors request authority to compensate and reimburse Capstone in accordance with the payment terms, procedures, and conditions set forth in the Engagement Agreement for services rendered and expenses incurred in connection with these chapter 11 cases.

  14. As set forth more fully in the Engagement Agreement, and subject thereto, Capstone will be compensated, subject to Court approval, as follows (the "**Fee Structure**"):

    a. *Engagement Retainer.* The Debtors will pay Capstone a non-refundable retainer of $25,000 payable upon the execution of

the Engagement Agreement and approval of the Capstone retention by the Court, and will pay an additional $25,000 due upon the first monthly anniversary of the execution of the Engagement Agreement (together, the "**Retainer**"). The Retainer paid by the Company to Capstone shall be fully credited against the Sale Transaction Fee (as defined below).

b. *Sale Transaction Fee.* Concurrent with the closing of a Sale Transaction, Capstone shall receive a cash fee (the "**Sale Transaction Fee**") equal to the following:

   i. five percent (5.0%) of the Aggregate Transaction Value (as defined in the Engagement Agreement) greater than the total outstanding pre-petition debt of the Company, plus the DIP Loans and Incremental DIP Loans[4] funded and outstanding as of the closing of a Sale Transaction, payable immediately upon the closing of a Sale Transaction, provided that under no circumstances will the Sale Transaction Fee payable at closing be less than $475,000 (the "**Minimum Transaction Fee**").

c. *Exit Financing Transaction Fee.* Concurrent with the closing of an Exit Financing Transaction, Capstone shall receive a cash fee (the "**Exit Financing Transaction Fee**") equal to the following:

   i. two percent (2.0%) of the Commitment Amount (as defined in the Engagement Agreement) of all forms of senior debt invested or committed to be invested by third party investors;

   ii. four percent (4.0%) of the Commitment Amount of all forms of junior debt invested or committed to be invested by third party investors; and

   iii. five percent (5.0%) of the Commitment Amount of all forms of equity invested or committed to be invested by third party investors.

d. *Expert Valuation Work Fee.* To the extent such work is requested by the Company, Capstone shall be separately compensated at its current hourly rates (described in the Engagement Agreement) for

---

[4] For the avoidance of doubt, no fee shall be payable to Capstone with respect to the DIP Loans and Incremental DIP Loans.

any expert valuation work, including diligence, drafting an expert valuation report, and testimony in connection therewith.

| | |
|---|---|
| **Managing Director** | **$775 - $875** |
| Director | $675 - $725 |
| Vice President | $625 - $675 |
| Associate | $550 - $625 |
| Analyst | $450 - $500 |

15. Further, subject to the Engagement Agreement, the Debtors shall reimburse Capstone for all reasonable expenses related to the services described in the Engagement Agreement.

16. The Debtors believe that the Fee Structure set forth in the Engagement Agreement is reasonable. The Fee Structure appropriately reflects the nature of the services to be provided by Capstone and the fee structures typically utilized by leading financial advisory and investment banking firms of similar stature to Capstone for comparable engagements, both in and out of court. The Fee Structure is consistent with Capstone's normal and customary billing practices for cases of this size and complexity that require the level and scope of services outlined herein. Moreover, the Fee Structure is reasonable in light of (a) industry practice, (b) market rates charged for comparable services both in and out of the chapter 11 context, (c) Capstone's substantial experience with respect to financial advisory and investment banking services, and (d) the nature and scope of work to be performed by Capstone in these chapter 11 cases.

17. Capstone's fees and expenses will remain subject to Court approval, consistent with the proposed compensation set forth in the Engagement Agreement. Further, because the Debtors seek to retain Capstone under section 328(a) of the Bankruptcy Code, the Debtors believe that Capstone's compensation should not be subject to any additional standard of review under section 330 of the Bankruptcy Code and should not constitute a "bonus" or fee enhancement under applicable law. Notwithstanding the foregoing, the Office of the United States

Trustee for the District of Delaware (the "**U.S. Trustee**") shall retain the right to review the reasonableness of Capstone's fees under the standard of section 330 of the Bankruptcy Code.

18.  In accordance with section 504 of the Bankruptcy Code, Capstone has informed the Debtors that there is no agreement or understanding between Capstone and any other entity, other than the members and employees of Capstone, for the sharing of compensation received or to be received for services rendered in connection with these chapter 11 cases.

### **RECORD KEEPING AND APPLICATIONS FOR COMPENSATION**

19.  It is not the general practice of investment banking firms, including Capstone, to keep detailed time records similar to those customarily kept by attorneys and required by Local Rule 2016-2. Because Capstone does not ordinarily maintain contemporaneous time records in one-tenth hour (0.1) increments or provide or conform to a schedule of hourly rates for professional services, the Debtors request that Capstone be excused from compliance with such requirements and instead should only be required to maintain time records in half-hour (0.5) increments, setting forth, in a summary format, a reasonably detailed description of services rendered by each professional and the amount of time spent on each date by each such individual in rendering services on behalf of the Debtors.

20.  Capstone will also maintain detailed records of any actual and necessary costs and expenses incurred in connection with the aforementioned services.

21.  Capstone's compensation and expense reimbursement will be paid by the Debtors pursuant to the terms of the Engagement Agreement and the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable procedures established by the Court.

**CAPSTONE'S DISINTERESTEDNESS**

22. To the best of the Debtors' knowledge, information, and belief, and except to the extent disclosed herein and in the Lisac Declaration, Capstone is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code.

23. To the best of the Debtors' knowledge and based upon the Lisac Declaration, Capstone does not hold or represent an interest adverse to the Debtors' estates. To the best of the Debtors' knowledge and based upon the Lisac Declaration, (a) Capstone's connections to the Debtors, creditors, and any other party in interest are disclosed in the Lisac Declaration, and (b) Capstone and the Capstone professionals working on this matter are not relatives of, and do not have connections with, the U.S. Trustee, or any known employee in the office thereof, or the United States Bankruptcy Judges for the District of Delaware.

24. Capstone did not receive any payments from the Debtors prior to the Petition Date.

25. Capstone has not provided, and will not provide, any professional services to any of the creditors, parties in interest, or their respective attorneys and accountants with regard to any matter related to these chapter 11 cases.

**INDEMNIFICATION AND LIMITATION OF LIABILITY**

26. Section 8 of the Engagement Agreement (the "**Indemnification Provision**") provides that the Debtors will (a) indemnify Capstone, its officers, directors, members, managers, employees, affiliates, consultants, and agents or assignees (collectively, the "**Capstone Indemnified Persons**") against any and all losses, claims, damages, or liabilities to which the Capstone Indemnified Persons may become subject arising in any manner out of or in connection with the rendering of services by Capstone under the Engagement Agreement unless it is finally determined by a court or arbitral tribunal that such losses, claims, damages, or liabilities

are solely the result of Capstone's gross negligence or willful misconduct; and (b) reimburse each Capstone Indemnified Person promptly for all legal and other expenses reasonably incurred by it in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuits, investigations, claims, or other proceedings arising in any manner out of or in connection with the rendering of services by Capstone under the Engagement Agreement.

27. The Debtors and Capstone believe that the indemnification, contribution, reimbursement, and other related provisions contained in the Engagement Agreement are customary and reasonable for investment banking engagements, both in and out of court, and, as modified by the Proposed Order, reflect the qualifications and limitations on indemnification provisions that are customary in this district and other jurisdictions.

28. Moreover, the terms and conditions of the Engagement Agreement, including the Indemnification Provision, were negotiated by the Debtors and Capstone at arm's length and in good faith. The Debtors respectfully submit that the Indemnification Provision contained in the Engagement Agreement, viewed in conjunction with the other terms of Capstone's proposed retention, are reasonable and in the best interests of the Debtors, their estates, and their creditors in light of the fact that the Debtors require Capstone's service for a successful result in these chapter 11 cases.

## BASIS FOR RELIEF

29. The Debtors seek authority to employ and retain Capstone as their investment banker under section 327 of the Bankruptcy Code, which provides that a debtor is authorized to employ professional persons "that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [Debtors] in carrying out the [Debtors'] duties under this title." 11 U.S.C. § 327(a). Section 1107(b) of the Bankruptcy Code

elaborates upon sections 101(14) and 327(a) of the Bankruptcy Code in cases under chapter 11 of the Bankruptcy Code and provides that "a person is not disqualified for employment under section 327 of [the Bankruptcy Code] by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case." 11 U.S.C. § 1107(b).

30.    In addition, the Debtors seek approval of the Engagement Agreement (including the Fee and Expense Structure and the indemnification, contribution, reimbursement and other related provisions) pursuant to section 328(a) of the Bankruptcy Code, which provides, in relevant part, that the Debtors "with the court's approval, may employ or authorize the employment of a professional person under section 327. . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis." 11 U.S.C. § 328(a). Section 328 of the Bankruptcy Code permits the compensation of professionals, including investment bankers, on more flexible terms that reflect the nature of their services and market conditions. As the United States Court of Appeals for the Fifth Circuit recognized in *Donaldson Lufkin & Jenrette Sec. Corp. v. Nat'l Gypsum Co.* (*In re Nat'l Gypsum Co.*), 123 F.3d 861 (5th Cir. 1997):

> Prior to 1978 the most able professionals were often unwilling to work for bankruptcy estates where their compensation would be subject to the uncertainties of what a judge thought the work was worth after it had been done. That uncertainty continues under the present § 330 of the Bankruptcy Code, which provides that the court award to professional consultants "reasonable compensation" based on relevant factors of time and comparable costs, etc. Under present § 328 the professional may avoid that uncertainty by obtaining court approval of compensation agreed to with the trustee (or debtor or committee).

*Id.* at 862 (citations omitted), *cited in Riker, Danzig, Scherer, Hyland & Perretti LLP v. Official Comm. of Unsecured Creditors* (*In re Smart World Techs. LLC*), 383 B.R. 869, 874 (S.D.N.Y. 2008).

31. The Engagement Agreement appropriately reflects (a) the nature and scope of services to be provided by Capstone, (b) Capstone's substantial experience with respect to investment banking services, and (c) the Fee and Expense Structures typically utilized by Capstone and other leading investment bankers.

32. Similar fixed and contingency fee arrangements have been approved and implemented by courts in other large chapter 11 cases. *See*, *e.g.*, *In re Independent Pet Partners Holdings, LLC*, Case No. 23-10153 (Bankr. D. Del. Apr. 4, 2023); *In re Arcapita Bank B.S.C.*, Case No. 14-01849 (Bankr. S.D.N.Y. March 17, 2014); *In re Buffets Holdings, Inc.*, Case No. 12-10238 (Bankr. D. Del. Jan. 18, 2012); and *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. Sept. 15, 2008). Accordingly, the Debtors believe that Capstone's retention on the terms and conditions proposed herein is appropriate.

## NOTICE

33. Notice of this Application has been provided to: (a) the U.S. Trustee; (b) the holders of the thirty (30) largest unsecured claims on a consolidated basis against the Debtors; (c) counsel to the DIP Facility Lenders; (d) counsel to the Prepetition Secured Creditors; (e) counsel to Korr; (f) counsel to 3i; and (g) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

[*Remainder of page intentionally left blank*]

## **CONCLUSION**

WHEREFORE, the Debtors request entry of the Proposed Order, granting the relief requested herein and such other and further relief as is just and proper.

Dated: October 24, 2023

                                        */s/ Cameron Pforr*
                                        Cameron Pforr
                                        President and Chief Financial Officer
                                        IronNet, Inc., *et al.*