## **EXHIBIT 1**

**Proposed Further Interim Order**

30970095.1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| IRONNET, INC., *et al.*,[1] | ) Case No. 23-11710 (BLS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Ref. Docket Nos. 12 & 47** |

**SECOND INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO (I) OBTAIN POSTPETITION FINANCING AND (II) USE CASH COLLATERAL, (B) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (C) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (D) MODIFYING THE AUTOMATIC STAY, (E) SCHEDULING A FINAL HEARING, AND (F) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "**Motion**")[2] of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") for entry of an interim order (the "**First Interim Order**") and a final order (the "**Final Order**," and together with the First Interim Order and this Second Interim Order (as defined below), the "**DIP Orders**"), pursuant to sections 105, 361, 362, 363, 364(c), 364(d), 364(e), 503, 507, and 552(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rules 2002-1, 4001-1(b), and 4002-1,:

    a.      authorizing the Debtors, in their capacity as borrowers, to obtain postpetition financing and other financial accommodations on a joint and several basis in connection with the debtor in possession financing, comprising, among other things, a superpriority senior secured facility (the "**DIP Facility**") which consists of a multi-draw credit loan facility in an aggregate principal amount of up to $10 million, which shall be made available to the Debtors (i) upon entry of the Final Order, in a roll up (the "**DIP Roll-Up Loans**") of the approximately $1.5 million in outstanding Bridge Facility Obligations (as defined below) in accordance with the

---

[1]    The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: IronNet, Inc. (9446), IronNet Cybersecurity, Inc. (2655), IronNet International, LLC (7621), IronCAD LLC (1162), and HighDegree, LLC (8474). The Debtors' corporate headquarters is located at 7900 Tysons One Place, Suite 400, McLean, VA 22102.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the DIP Documents (as defined below), as applicable.

terms substantially set forth in the Superpriority Secured Debtor-in-Possession Credit Facility Term Sheet attached to the First Interim Order as Exhibit 1 (the "**DIP Term Sheet**"), as modified by the DIP Orders, (ii) up to $3.0 million in accordance with the terms substantially set forth in the DIP Term Sheet, as modified by the First Interim Order, upon entry of the First Interim Order, (iii) up to an additional $1,500,000 upon entry of this second interim order (the "**Second Interim Order**") and (iv) the remaining principal amount available under the DIP Facility in accordance with the terms of the DIP Documents upon entry of the Final Order (such loans described in this paragraph, the "**DIP Loans**") to be funded by ITC Global Advisers, LLC and an affiliate of C5 (as defined below) as further described in the DIP Term Sheet (collectively, the "**DIP Lenders**");

b.      authorizing the Debtors to execute the DIP Term Sheet and the other documents, agreements and instruments delivered pursuant thereto or executed or filed in connection therewith, including the Bridge Documentation (as defined below), as applicable, all as may be reasonably requested by the DIP Lenders (as the same may be amended, restated, supplemented or otherwise modified from time to time, collectively, the "**DIP Documents**");

c.      authorizing the Debtors to use the proceeds of the DIP Loans and Cash Collateral, as further described herein, to, among other things, pay for working capital needs of the Debtors in the ordinary course of business and for the costs and expenses of administering these chapter 11 cases;

d.      granting adequate protection, with respect to each of the Debtors, to the Prepetition Secured Creditors;

e.      authorizing, on the terms set forth in the First Interim Order and herein without duplication, the Debtors to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable, including, without limitation, an agency fee of $300,000 (the "**Agency Fee**") and reasonable fees and disbursements of the DIP Agent's legal and financial advisor pursuant to the DIP Term Sheet;

f.      granting superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code against each of the Debtors' estates to the DIP Lenders, with respect to all obligations owing and outstanding thereunder and under the DIP Documents, as applicable, and the DIP Orders, as applicable (collectively, the "**DIP Obligations**"), with priority over any and all administrative expenses of any kind or nature subject and subordinate only to the Carve Out (as defined below) on the terms and conditions set forth herein, in the DIP Term Sheet and the DIP Documents;

g.      subject to the Carve-Out, granting to the DIP Agent, for the benefit of itself and the DIP Lenders, valid, enforceable, nonavoidable, automatically, validly and fully perfected security interests in and liens on

all of the DIP Collateral (as defined below) pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, including all property constituting Cash Collateral;

h.    subject to and effective upon entry of the Final Order, in each case except to the extent of the Carve-Out, determining that (i) the Debtors have waived any right to surcharge any collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, (ii) the equitable doctrine of marshaling and other similar doctrines shall not apply, and (iii) the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply; *provided*, that upon entry of the Final Order, any DIP Obligations and AP Superpriority Claims (as defined below) may be collected out of the proceeds of any Avoidance Actions;

i.    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the DIP Orders; and

j.    scheduling a final hearing (the "**Final Hearing**") to consider the relief requested in the Motion and approving the form of notice with respect thereto.

This Court having previously considered the interim relief requested in the Motion, the exhibits attached thereto, the *Declaration of Cameron Pforr in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* and the *Declaration of Cameron Pforr, President and Chief Financial Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings*, and the evidence submitted and arguments made at the interim hearing held on October 13, 2023 (the "**Interim Hearing**"); and this Court having previously entered the First Interim Order; and notice of the DIP Motion and the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief

requested in the Motion having been withdrawn, resolved, or overruled by this Court; and this Court having initially approved the Motion on an interim basis pursuant to the First Interim Order [Docket No. 47] and finding that extending such interim relief as contemplated by this Second Interim Order is fair and reasonable and in the best interests of the Debtors, their estates, and all parties-in-interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Term Sheet and the other DIP Documents was and continues to be a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THIS COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A.  **Petition Date**.  On October 12, 2023 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

B.  **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.  **Jurisdiction and Venue**.  This Court has jurisdiction over these chapter 11 cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334. Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C.

---

[3]  The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

§ 157(b)(2).   Venue for these chapter 11 cases and proceedings with respect to the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The bases for the relief sought in the Motion are sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and the Local Bankruptcy Rules.

D.      **Committee Formation**.  On October 30, 2023, the United States Trustee for the District of Delaware (the "**U.S. Trustee**") filed a statement that an official committee of unsecured creditors (a "**Creditors' Committee**") has not been appointed in these chapter 11 cases as of the date of the statement due to an insufficient response from creditors interested in serving on the committee [Docket No. 71].

E.      **Notice**.   Notice of the Motion, the Interim Hearing and this Second Interim Order has been provided by the Debtors in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules to the notice parties set forth in the DIP Motion, and to any other party that has filed a request for notices with this Court, and therefore no other or further notice of the Motion with respect to this Second Interim Order shall be required.

F.      **Debtors' Acknowledgements and Stipulations**.  In entering into the DIP Documents and in exchange for and as a material inducement to the DIP Lenders to agree to provide the DIP Facility, and to the Prepetition Secured Creditors (as defined below) in exchange for their consent to use Cash Collateral and to subordinate their liens as provided for herein, the Debtors acknowledge, represent, stipulate and agree, for themselves and their estates, subject to the challenge rights set forth in paragraph 24 herein, as follows:

1.      Prepetition Director Notes.   On December 2022, April 2023, May 2023, and August 2023, IRNT issued and sold senior secured promissory notes in an aggregate principal amount of $8,475,000 million (the "**Director Notes**") to a total of eight

lenders (the "**Director Noteholders**"), which included seven lenders who are either Company directors or entities affiliated with Company directors.

          2.    <u>Prepetition C5 Notes.</u>  As of the Petition Date, IRNT is party to the following senior secured convertible promissory notes issued to C5 Space Data LP ("**C5**") or affiliates of C5 (collectively, the Prepetition C5 Notes, and together with the Director Notes, the "**Prepetition Secured Notes**"):

    i.    that certain Amended and Restated Senior Secured Convertible Promissory Note, dated as of January 11, 2023, issued by IRNT, in favor of C5 Space Data LP ("**C5**") in the aggregate principal amount of $2,000,000, which amends and restates that certain Senior Secured Promissory, dated as of December 30, 2022, issued by the Company in favor of C5;

    ii.    that certain Senior Secured Convertible Promissory Note, dated as of January 12, 2023, issued by IRNT in favor of C5 in the aggregate principal amount of $3,000,000;

    iii.    that certain Senior Secured Convertible Promissory Note, dated as of February 8, 2023, issued by IRNT in favor of C5 Cyber Partners II SCSP RAIF in the aggregate principal amount of $4,000,000 million;

    iv.    that certain Senior Secured Convertible Promissory Note, dated as of February 27, 2023, issued by IRNT in favor of C5 Transatlantic Investors LP in the aggregate principal amount of $2,250,000 million;

    v.    that certain Senior Secured Convertible Promissory Note, dated as of April 13, 2023, issued by IRNT in favor of Ferrous Investors LP ("**C5 Ferrous**") in the aggregate principal amount of $595,000;

    vi.    that certain Senior Secured Convertible Promissory Note, dated as of May 2, 2023, issued by INRT in favor of C5 Ferrous in the aggregate principal amount of $850,000;

    vii.    that certain Senior Secured Convertible Promissory Note, dated as of May 8, 2023, issued by IRNT in favor of C5 Ferrous in the aggregate principal amount of $400,000;

viii.    that certain Senior Secured Convertible Promissory Note, dated as of July 11, 2023, issued by IRNT in favor of C5 Ferrous in the aggregate principal amount of $1,750,000; and

ix.    the certain Senior Secured Promissory Note, dated as of September 22, 2023, issued by IRNT in favor of C5 Ferrous in the aggregate principal amount of $300,000.

3.    <u>Prepetition Collateral</u>.  Pursuant to the Prepetition Secured Notes and related documentation (the "**Prepetition Secured Note Documents**"), IRNT's obligations under the Prepetition Secured Notes are secured by substantially all of IRNT's assets, excluding certain intellectual property (the "**Prepetition Collateral**").  All of the Debtors' cash, including the cash in their deposit accounts and other accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral.

4.    As of the Petition Date, (a) the Prepetition Secured Notes (i) are secured by legal, valid, binding, enforceable, unavoidable, and perfected liens (the "**Prepetition Liens**") on the Prepetition Collateral, (ii) were granted to, or for the benefit of, the Prepetition Secured Creditors for fair consideration and reasonably equivalent value, (iii) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein), and (iv) are subject and subordinate only to (1) the DIP Liens (after giving effect to the First Interim Order) and (2) the Carve-Out (after giving effect to the First Interim Order); and (b) (i) the prepetition obligations under the Prepetition Secured Notes ("**Prepetition Secured Note Obligations**" and the holders thereof, together with the Bridge Lender (as defined below), the "**Prepetition Secured Creditors**") constitute legal, valid, and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Prepetition Secured Note Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (ii) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition

Secured Note Obligations exist, and (iii) no portion of the Prepetition Secured Note Obligations or any payments made to any or all of the Prepetition Secured Creditors are subject to avoidance, disallowance, disgorgement, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in section 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

5.      <u>Amounts Owed under Prepetition Secured Note Documents</u>. As of the Petition Date, approximately $25,300,00 of indebtedness under the Prepetition Secured Notes was outstanding, which amount is comprised of an amount not less than $23,800,000 in principal amount and accrued and unpaid interest, premiums, and fees in the amount of not less than $1,500,000.

6.      The Prepetition Secured Creditors are entitled, pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including the Cash Collateral, to the extent of any diminution in the value of the Prepetition Collateral occurring from and after the Petition Date (the "**Diminution**"), caused by or arising as a result of, among other things, (a) the incurrence and payment of the DIP Obligations, (b) the use of Prepetition Collateral (including Cash Collateral), (c) the granting of the DIP Liens and the DIP Superpriority Claims, (d) the subordination of the Prepetition Obligations (as defined below) to the DIP Obligations and the Carve-Out, and (e) imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

7.      <u>Bridge Facility</u>.  Pursuant to DIP Term Sheet and the applicable documentation (the "**Bridge Documentation**"), Ferrous Investors LP, an affiliate of C5, as bridge lender (the "**Bridge Lender**"), advanced $1,244,000 to the Debtors on October 10, 2023

and $256,000 to the Debtors on October 11, 2023 to allow for the orderly transition of the Debtors into these chapter 11 cases (the "**Bridge Facility Obligations**;" together with the Prepetition Secured Note Obligations, the "**Prepetition Obligations**").

8.       Pursuant to the Bridge Documentation, each Debtor granted to the Bridge Lender a security interest in and lien on all assets of each Debtor (the "**Bridge Facility Liens**").  On October 11, 2023, the Bridge Lender filed a UCC-1, as well as certain intellectual property security agreements, against each Debtor perfecting the Bridge Facility Liens.  As of the Petition Date, (a) the Bridge Facility Liens (i) are legal, valid, binding, enforceable, and perfected Liens, (ii) were granted to, or for the benefit of, the Bridge Lender for fair consideration and reasonably equivalent value, (iii) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (iv) are subject and subordinate only to valid, perfected, and unavoidable liens permitted under the Prepetition Secured Note Documents (other than the Prepetition Liens) to the extent that such permitted liens are senior to the Liens granted to the Prepetition Secured Creditors pursuant to the Prepetition Secured Note Documents (the "**Senior Permitted Liens**"); and (b) (i)  the Bridge Facility Obligations constitute legal, valid, and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the Bridge Facility Documents, (ii) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Bridge Facility Obligations exist, and (iii) no portion of the Bridge Facility Obligations are subject to avoidance, disallowance, disgorgement, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in section 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

9.      The DIP Lenders willingness to make the DIP Loans is conditioned upon all Bridge Facility Obligations being converted into DIP Roll-up Loans upon entry of the Final Order.  The Bridge Facility was made available to the Debtors on the condition that the Debtors would seek to have such obligations treated as DIP Roll-up Loans.  The DIP Roll-up Loans shall be authorized and approved upon entry of the Final Order as compensation for, in consideration for, and on account of, among other things, the agreement of the DIP Lenders to fund amounts, and provide other consideration to the Debtors under the DIP Facility.

G.      **Cash Collateral**.  For purposes of this Second Interim Order, the term "Cash Collateral" shall mean and include all "cash collateral," as defined in section 363 of the Bankruptcy Code, in or on which the DIP Lenders or the Prepetition Secured Creditors have a lien, security interest or any other interest (including, without limitation, any AP Liens or security interests), whether existing on the Petition Date, arising pursuant to the First or Second Interim Order, or otherwise, and shall include, without limitation:

1.      all cash proceeds arising from the collection, sale, lease or other disposition, use or conversion of any real or personal property, in or on which the DIP Lenders or the Prepetition Secured Creditors have a lien or a replacement lien, whether as part of the DIP Collateral or the Prepetition Collateral, or pursuant to an order of this Court or applicable law or otherwise, and whether such property has been converted to cash, existed as of the commencement of these chapter 11 cases, or arose or was generated thereafter; and

2.      all of the respective deposits, refund claims and rights in retainers of the Debtors on which the DIP Lenders or the Prepetition Secured Creditors hold a lien or replacement lien, whether as part of the DIP Collateral or Prepetition Collateral or pursuant to an

order of this Court or applicable law or otherwise; and the proceeds of any sale, transfer or other disposition of DIP Collateral or Prepetition Collateral.

H.    **Adequate Protection**.  The Prepetition Secured Creditors are entitled, pursuant to sections 361, 363 and 364 of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral, to the extent of any Diminution resulting from, among other things, (i) the incurrence of the DIP Obligations, (ii) the use of Prepetition Collateral (including Cash Collateral), (iii) the granting of the DIP Liens and the DIP Superpriority Claims, (iv) the subordination of the Prepetition Obligations to the DIP Obligations and the Carve- Out, and (v) imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

I.    **Purpose and Necessity of Financing**.  The Debtors continue to require the DIP Facility and use of Cash Collateral to (i) permit the continuation of their businesses and maximize and preserve their going concern value, (ii) satisfy payroll obligations and other working capital and general corporate purposes of the Debtors consistent with the terms set forth in the DIP Documents and the Budget (as defined below), (iii) provide adequate protection to the Prepetition Secured Creditors, (iv) pay fees and expenses related to the DIP Documents and these chapter 11 cases, and (v) for such other purposes as set forth in, or otherwise permitted by, the DIP Documents (including the Budget).  If the Debtors do not obtain continued authorization to use the Prepetition Collateral (including Cash Collateral) and borrow under the DIP Documents, they will suffer immediate and irreparable harm.  The Debtors are unable to obtain adequate unsecured credit allowable only as an administrative expense under section 503 of the Bankruptcy Code, or other sufficient financing under sections 364(c) or (d) of the Bankruptcy Code, on more favorable terms than those set forth in the DIP Documents. A loan facility in the

amount provided by the DIP Documents is not available to the Debtors without granting the superpriority claims, liens and security interests, pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, as provided in the DIP Orders and the DIP Documents.  After considering all alternatives, the Debtors have concluded, in the exercise of their sound business judgment, that the DIP Facility is the best financing available to them at this time.

J.      **Good and Sufficient Cause Shown**.  Good and sufficient cause has been shown for entry of this Second Interim Order. The ability of the Debtors to obtain sufficient working capital and liquidity under the DIP Documents and use of the Prepetition Collateral (including the Cash Collateral) is vital to the Debtors' estates and creditors.  The liquidity to be provided under the DIP Documents and this Second Interim Order will enable the Debtors to continue to operate their businesses in the ordinary course and preserve the value of the Debtors' businesses during the pendency of these chapter 11 cases.  Among other things, entry of this Second Interim Order is necessary to maximize the value of the Debtors' assets and, accordingly, is in the best interests of the Debtors, their estates and their creditors.

K.      **Sections 506(c) and 552(b) Waivers**.  In light of (i) the DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out, and in exchange for and as a material inducement to the DIP Lenders to agree to provide the DIP Facility and (ii) the Prepetition Secured Creditors' agreement to subordinate their liens and superpriority claims to the DIP Obligations, the Carve-Out and the DIP Liens, and to permit the use of the Prepetition Collateral (including Cash Collateral) for payments made in accordance with the Budget and the terms of the DIP Orders, upon entry of the Final Order, each of the DIP Lenders and the Prepetition Secured Creditors are entitled to a marshalling waiver and a waiver of the

provisions of section 506(c) of the Bankruptcy Code, and the exceptions provided in sections 552(b)(1) and (2) of the Bankruptcy Code.

L.      **Good Faith**.  The terms of the DIP Documents and the continued use of the Prepetition Collateral (including the Cash Collateral) pursuant to this Second Interim Order, including, without limitation, the interest rates and fees applicable, and intangible factors relevant thereto, are more favorable to the Debtors than those available from alternative sources. Based upon the record before this Court, the terms of the DIP Documents and the continued use of the Prepetition Collateral (including the Cash Collateral) pursuant to this Second Interim Order have been negotiated in good faith and at arm's-length among the Debtors, the DIP Lenders and the Prepetition Secured Creditors. Any DIP Loans and other financial accommodations made to the Debtors by the DIP Lenders pursuant to the DIP Documents and the First and Second Interim Orders shall be deemed to have been extended by the DIP Lenders in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and each of the DIP Lenders shall be entitled to all protections and benefits afforded thereby.

M.      **Fair Consideration and Reasonably Equivalent Value**.  All of the Debtors have received and will receive fair and reasonable consideration by virtue of their obtaining access to the DIP Loans, the use of the Prepetition Collateral (including the Cash Collateral) pursuant to the DIP Orders and all other financial accommodations provided under the DIP Documents and the DIP Orders. The terms of the DIP Documents, including the Bridge Documentation, and the First and Second Interim Orders are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

N.     **Immediate Entry of Second Interim Order**.   The Debtors have requested immediate entry of this Second Interim Order pursuant to Bankruptcy Rule 4001(c)(2) and Local Rule 4001-2(b).   The permission granted herein to enter into the DIP Documents, to obtain funds thereunder and to use the Prepetition Collateral (including the Cash Collateral) pursuant to this Second Interim Order is necessary to avoid immediate and irreparable harm to the Debtors. This Court concludes that entry of this Second Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for continued access to the financing necessary for the continued flow of supplies and services to the Debtors necessary to sustain the operation of the Debtors' existing businesses and further enhance the Debtors' prospects for a successful sale of substantially all of their assets.

Based upon the foregoing findings and conclusions, the Motion, and the record before this Court with respect to the interim relief requested in the Motion, and after due consideration and good and sufficient cause appearing therefor, **IT IS HEREBY ORDERED THAT**:

1.     DIP Facility Approved on Interim Basis.   The continued interim relief sought in the Motion is granted to the extent set forth herein.   The DIP Facility and the use of Cash Collateral was, under the First Interim Order, and shall continue to be under this Second Interim Order authorized and approved on an interim basis subject to the terms and conditions set forth herein and in the DIP Documents.   All objections to this Second Interim Order, to the extent not withdrawn, waived, settled, or resolved, are hereby denied and overruled on the merits.   This Second Interim Order shall become effective immediately upon its entry.

2.     Authorization of the DIP Documents and the DIP Facility.

a.     The Debtors were, under the First Interim Order, and hereby continue to be expressly authorized to execute and deliver, and upon such execution and

delivery, to perform under the DIP Documents, including the DIP Term Sheet, which are hereby approved and incorporated herein by reference.  Unless and until the Debtors and DIP Lenders enter into the definitive DIP Documents consistent with the terms of the DIP Term Sheet and the DIP Orders, upon entry of the First Interim Order, the Debtors, DIP Lenders and DIP Agent shall be bound by (i) the terms and conditions and other provisions set forth in the DIP Term Sheet and the other DIP Documents and (ii) the First and Second Interim Orders and the DIP Term Sheet shall govern and control the DIP Facility.

b.      Upon entry of this Second Interim Order, the Debtors shall be authorized, subject to the terms and conditions of the DIP Term Sheet and the other DIP Documents, as modified by this Second Interim Order, to borrow up to an aggregate principal amount of $4.5 million under the DIP Facility.

3.      DIP Obligations.  The DIP Term Sheet and the other DIP Documents shall constitute legal, valid, binding obligations of the Debtors, DIP Lenders and DIP Agent, enforceable in accordance with their terms and the terms of the First and Second Interim Orders. The obligations of the Debtors thereunder shall be enforceable against the Debtors and their estates and any successors thereto, including any trustee appointed in these chapter 11 cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of these chapter 11 cases or any other chapter of the Bankruptcy Code, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**").

4.      Amendment of the DIP Documents.  The DIP Documents may from time to time be amended, modified, waived, or supplemented by the parties thereto, in accordance with the terms thereof (and this Second Interim Order) without further order of this Court if the amendment, modification, waiver, or supplement is non-material and in accordance with the DIP

Documents or are necessary to conform the terms of the DIP Documents to this Second Interim Order (which, for purposes of this paragraph 4, excludes the Budget); provided that the Debtors shall provide notice (which may be provided through electronic mail or facsimile) to counsel to any Creditors' Committee (if appointed),  the U.S. Trustee, the DIP Agent, the DIP Lenders, and the Prepetition Secured Creditors, and counsel to 3i, which parties shall have five (5) Business Days from the date of such notice within which to object, in writing, to such amendment, modification, waiver, or supplement.  If any such party timely objects to such amendment, modification, waiver, or supplement to the DIP Documents, such amendment, modification, waiver, or supplement shall only be permitted pursuant to an order of this Court.  Any material amendment, modification, waiver, or supplement to the DIP Documents shall be made only pursuant to Court order, after notice and a hearing on parties in interest.  For the avoidance of doubt, the extension of a Milestone or waiver of the Variance Limit shall not constitute a material amendment, modification, waiver, or supplement to the DIP Documents.

5.      DIP Liens.  Effective immediately upon entry of the First Interim Order, and without any further action under state law, as security for the DIP Obligations and subject in all respects to the Carve-Out, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Lenders, was granted valid, binding, continuing, enforceable, non-avoidable, and automatically and properly perfected security interests and liens on all assets and properties of the Debtors (whether tangible, intangible, real, personal, or mixed), whether now owned or hereafter acquired and wherever located, before or after the Petition Date, including, without limitation, all cash, cash equivalents, accounts, inventory, equipment, equity interests or capital stock in domestic and foreign subsidiaries (subject to any limitation in the DIP Documents), investment property, instruments,

chattel paper, real property, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, receivables, all claims or causes of action (including, any commercial tort claims or causes of action, and subject to entry of the Final Order, the proceeds of Avoidance Actions and all products, offspring, profits, and proceeds thereof) (all of the foregoing collateral, collectively, the "**DIP Collateral**," and the Security Interests (as defined below) thereon and therein, the "**DIP Liens**"); *provided* that, and notwithstanding anything to the contrary herein, the DIP Collateral shall not include Avoidance Actions themselves. For the avoidance of doubt, the DIP Collateral shall include the Prepetition Collateral.

6.    <u>DIP Lien Priority</u>.  The DIP Liens shall be, in all cases, subject to the Carve-Out, and have the priority set forth as follows:

a.    pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Obligations shall be secured by a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all DIP Collateral that, on or as of the Petition Date, is not subject to any existing liens that;

b.    pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Obligations shall be secured by a valid, binding, continuing, enforceable, fully-protected junior security interest and lien upon all DIP Collateral that, on or as of the Petition Date, is not subject to any existing liens that, under applicable law, are senior to, and have not been subordinated to, the Prepetition Liens; and

c.    pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Obligations shall be secured by a valid, binding, continuing, enforceable, fully-perfected first priority priming security interest in and lien on all DIP Collateral, senior in priority to the Prepetition Liens.

d.      The DIP Liens shall be subject, and immediately junior, to valid, perfected, and non-avoidable Senior Permitted Liens in existence on the Petition Date that are not subject to subordination and were either properly perfected as of the Petition Date or subsequently perfected pursuant to section 546(b) of the Bankruptcy Code, including (i) liens arising by operation of law in favor of warehousemen, landlords, carriers, mechanics, materialmen, laborers or suppliers, in each case incurred in the ordinary course of business and not in connection with the borrowing of money, (ii) liens incurred in the ordinary course of business in connection with workers' compensation and other unemployment insurance, or to secure the performance of tenders, surety and appeal bonds, bids, leases, government contracts, trade contracts and other similar obligations (exclusive of obligations for the payment of borrowed money), (iii) rights of setoff or bankers' liens upon deposits of cash in favor of banks or other depository institutions and (iv) any liens at IronNet Cybersecurity, Inc. appearing on **Exhibit 3** to the First Interim Order.[4]

7.      <u>DIP Superpriority Claims</u>.  In addition to the DIP Liens granted herein, effective immediately upon entry of the First Interim Order, all of the DIP Obligations and all amounts owing by the Debtors under the DIP Documents, were deemed to constitute allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code, which have priority, subject and subordinate only to the payment of the Carve-Out, over all other administrative expense claims, adequate protection and other diminution claims, priority and other unsecured claims, and all other claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a),

---

[4]     Nothing in this Second Interim Order is or shall be deemed an admission or stipulation by the Debtors as to the validation of any Senior Permitted Lien.  The Debtors reserve the right to seek to prime the Permitted Liens in connection with the Final Order.

503(b), 506(c) (subject to the entry of the Final Order), 507(a), 507(b), 546, 726, 1113, and 1114 or any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual lien, levy, or attachment (the "**DIP Superpriority Claims**").  The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions.

8.    <u>Priority of DIP Liens and DIP Superpriority Claims</u>.  Other than as set forth herein or permitted under the First and Second Interim Orders, the DIP Term Sheet, or the DIP Documents, the DIP Liens and the DIP Superpriority Claims:  (a) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of the Final Order granting such relief, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552(b) of the Bankruptcy Code; (b) shall not be subordinate to, or *pari passu* with, (i) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (ii) any Liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property; and (c) shall be valid and enforceable against any trustee or any other estate representative elected or appointed in these chapter 11 cases, upon the conversion of any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code or in a Successor Case, and/or upon the dismissal of any of these chapter 11 cases.

30979858.3

9. <u>Use of Proceeds of the DIP Facility and Cash Collateral</u>.  Subject to the Budget as provided for herein, the Debtors shall use Cash Collateral and the proceeds of borrowings under the DIP Facility only for the purposes specifically set forth in the First and Second Interim Orders and the DIP Documents, including to (a) pay fees, interest, and expenses associated with the DIP Facility; (b) to fund, to the extent that usage of Cash Collateral and available cash are not sufficient to cover such expenses, post-petition operating expenses and working capital needs of the Debtors, including, but not limited to, those activities required to remain in, or return to, compliance with laws in accordance with 28 U.S.C. § 1930; (c) to fund fees and expenses incurred in connection with the Restructuring; (d) provide for the ongoing working capital and capital expenditure needs of the Debtors during the pendency of these chapter 11 cases; (e) to pay permitted pre-petition claim payments authorized by this Court; (f) to pay professional fees in connection with these chapter 11 cases; and (g) fund the costs of the administration of these chapter 11 cases (including the Carve-Out), in each case subject to the terms and conditions in the DIP Orders and the DIP Documents.

10. <u>Adequate Protection for the Prepetition Secured Creditors</u>. The Prepetition Secured Creditors are entitled, pursuant to sections 361, 362, 363, 364, and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the applicable Prepetition Collateral, including Cash Collateral, to the extent of any Diminution.  Accordingly, as adequate protection, the Prepetition Secured Creditors are hereby granted the following:

a. <u>Adequate Protection Liens</u>.  Subject to the Carve-Out, to the extent there is Diminution, the Prepetition Secured Creditors were (under the First Interim Order) and hereby are, effective *nunc pro tunc* as of the Petition Date, granted subject to the terms and conditions set forth below, pursuant to sections 361, 363, 364, and 507 of the Bankruptcy Code,

valid, binding, enforceable and perfected replacement liens on and security interests in the DIP Collateral, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions (such adequate protection replacement Liens, the "**AP Liens**"), which AP Liens on the DIP Collateral shall be junior and subordinate only to the Carve-Out and the DIP Liens. The AP Liens shall otherwise be senior to all other security interests in or liens on any of the DIP Collateral.  The AP Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the Prepetition Secured Creditors and not in substitution therefor.

> b.      Prepetition Secured Creditor Adequate Protection Superpriority Claims.  Subject only to the Carve-Out and the DIP Superpriority Claims, to the extent of Diminution, the Prepetition Secured Creditors were pursuant to the First Interim Order and hereby are further granted an allowed superpriority administrative claim (such adequate protection superpriority claims, the "**AP Superpriority Claims**"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and priority and other unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726 , 1113, 1114, or any other provision of the Bankruptcy Code or otherwise, junior only to the Carve-Out and the DIP Superpriority Claims to the extent provided herein and in the DIP Documents, and payable from and having recourse to all prepetition and postpetition property of the Prepetition Secured Creditors and all proceeds thereof (including, subject to entry of the Final Order granting such relief, all proceeds of Avoidance Actions).

11.    <u>Budget</u>.

a.    The Debtors shall use the proceeds of all borrowings under the DIP Facility and Cash Collateral in a manner consistent with the Budget (subject to the Variance Limit (as defined below)), the DIP Term Sheet, DIP Documents, and DIP Orders.  The Budget annexed to the First Interim Order as **Exhibit 4** constituted the initial Budget (the "**Initial Budget**"), which Initial Budget was updated and extended in the form attached to this Second Interim Order as **Exhibit 1** (the "**Updated Budget**," together with the Initial Budget and any subsequently approved budget for the periods covered thereby, the "**Budget**") reflects, for the periods covered thereby, on a line-item basis the Debtors' (i) weekly projected cash receipts (including from non-ordinary course assets sales) ("**Receipts**"), (ii) weekly projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses under these chapter 11 cases (including the estimated fees and expenses of the advisors to any parties to these chapter 11 cases payable by the Debtors), capital expenditures, issuances of any letter of credit, including the fees relating thereto, and any other fees and expenses relating to the DIP Facility) ("**Disbursements**"), and (iii) other information reasonably requested by the DIP Lenders.

b.    On the first business day of each month, the Debtors will provide to the DIP Agent and the DIP Lenders an updated thirteen (13)-week cash flow forecast, in a form consistent with the Initial Budget, containing line items of sufficient detail to reflect the Debtors' (i) Receipts; (ii) Disbursements; and (iii) other information reasonably requested by the DIP Lenders in form and substance reasonably satisfactory to the DIP Lenders.

c.    By no later than 5:00 p.m. Eastern Time on the Thursday (or, if such Thursday is not a business day, the immediately succeeding business day) of the fourth

week after the Petition Date, and thereafter by not later than 5:00 p.m. Eastern Time on the Thursday (or, if such Thursday is not a business day, the immediately succeeding business day) of every week thereafter, the Debtors will provide to the DIP Agent and the DIP Lenders a variance report for the immediately preceding four-week period (each such period, a "**Testing Period**"), in form and substance reasonably satisfactory to the DIP Agent, detailing the following:  (i) the aggregate Disbursements of the Debtors and aggregate receipts during the applicable Testing Period; (ii) any variance (whether positive or negative, expressed as a percentage) between the aggregate Disbursements made during such Testing Period by the Debtors against the aggregate Disbursements for the Testing Period, as set forth in the applicable Budget (including Disbursements in respect of professional fees incurred in these chapter 11 cases by the Debtors during such Testing Period); and (iii) any variance (whether positive or negative, expressed as a percentage) between the aggregate receipts during such Testing Period by the Debtors against the aggregate receipts for the Testing Period, as set forth in the applicable Budget.  Starting with the first Testing Period, and for any Testing Period thereafter: (i) the Debtors shall not allow the aggregate Disbursements (excluding Disbursements in respect of professional fees incurred in these chapter 11 cases by the Debtors during such Testing Period) made or incurred by the Debtors during such Testing Period to be greater than 30% of the aggregate Disbursements for the Debtors set forth in the Budget for such Testing Period; and (ii) aggregate receipts shall not be less than 30% of the aggregate receipts for the Debtors set forth in the Budget for such Testing Period ((i) and (ii) together, the "**Variance Limit**").

        12.   <u>Modification of Automatic Stay</u>.  The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the

terms and provisions of the First and Second Interim Orders, including, without limitation, to: (a) permit the Debtors to grant the DIP Liens, AP Liens, DIP Superpriority Claims, and AP Superpriority Claims; (b) permit the Debtors to perform such acts as the DIP Agent or the Prepetition Secured Creditors each may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Agent under the DIP Documents, the DIP Facility and the First and Second Interim Orders, as applicable; (d) authorize the Debtors to pay, and the DIP Agent to retain, disburse and/or apply, payments made in accordance with the terms of the First and Second Interim Orders; and (e) otherwise to the extent necessary to implement and effectuate the provisions of this Second Interim Order and the DIP Documents.

13.    <u>Automatic Perfection of DIP Liens and Adequate Protection Liens</u>.

a.    The First and/or Second Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection, and priority of the DIP Liens and the AP Liens without the necessity of (i) filing or recording any financing statement, deed of trust, mortgage, security agreement, pledge agreement, control agreement, or other instrument or document that may otherwise be required under the law of any jurisdiction, obtaining "control" (as defined in any applicable Uniform Commercial Code or other law) over any DIP Collateral, and the DIP Agent, shall be deemed, without any further action, to have control over all the Debtors' deposit accounts, securities accounts, and commodities accounts (within the meaning of such Uniform Commercial Code and other law); (ii) taking any other action to validate or perfect the DIP Liens and the AP Liens or to entitle the DIP Liens and the AP Liens to the priorities granted herein; or (iii) the filing or recording any financing statement, deed of trust, mortgage, security agreement, pledge agreement, control agreement, or other instrument or document with

respect to security interests in any jurisdiction outside of the United States in assets located in, titled or arising or protected under the laws of a jurisdiction outside of the United States.

b.      Notwithstanding the foregoing, each of the DIP Agent and the Prepetition Secured Creditors may, each in their sole discretion, enter into and file, as applicable, financing statements, mortgages, security agreements, notices of liens, and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been entered into, filed, or recorded as of the Petition Date.  Without limiting the foregoing, each of the DIP Agent's and the Prepetition Secured Creditors (in the latter case, solely with respect to such AP Liens) may, in their discretion, file a photocopy of the First or Second Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction (whether or not located in the United States) in which any Debtor has real or personal property.

14.      Event of Default.  In addition to any events of default under the DIP Documents, the following shall constitute Events of Default under the DIP Facility (each an "**Event of Default**"):

a.      Conversion of any of these chapter 11 cases to a case under Chapter 7 of the Bankruptcy Code;

b.      Dismissal of any of these chapter 11 cases;

c.      Appointment of a trustee under section 1104 of the Bankruptcy Code;

d.      Appointment of an examiner with expanded or enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under 1106(b) of the Bankruptcy Code;

e.      Failure by the Debtors to make any payment under the DIP Facility when due;

f.      A Budget variance shall exceed the Variance Limit;

g.      Failure by the Debtors to comply with its obligations hereunder or under the DIP Documents; and

h.      Failure to comply with a Milestone (as defined in the DIP Term Sheet).

15.    <u>Credit Bidding</u>.  In connection with any sale process authorized by this Court, whether effectuated through sections 363, 725, or 1123 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code, subject to and upon entry of the First Interim Order, the DIP Agent (at the direction of the DIP Lenders), for the benefit of the DIP Lenders, was granted the right to credit bid the full amount of the DIP Obligations.  Nothing herein shall prejudice the rights of any party under section 363(k) of the Bankruptcy Code.

16.    <u>Rights and Remedies Upon Event of Default</u>.  Without requiring further order from this Court and without the need for filing any motion (except as expressly required by this paragraph 17) for relief from the automatic stay or any other pleading, immediately upon the occurrence of an Event of Default and following five (5) business days' written notice (the "**Notice Period**") by the DIP Agent to the Debtors, counsel to the Debtors, counsel to 3i, counsel to any Creditors' Committee and the United States Trustee (collectively, the "**Notice Parties**") of the occurrence of such Event of Default, subject to an ability to cure, if such Event of Default is capable of being cured, during the Notice Period, to permit the DIP Agent and the DIP Lenders to take any and all actions and remedies to proceed against, take possession of, protect and realize upon the DIP Collateral and any other property of the estate of any Debtor upon which the DIP Agent or any DIP Lender has been or may hereafter be granted liens and

security interests to obtain repayment of the DIP Obligations to the DIP Lenders, including the termination of the DIP Facility and termination of the Debtors' right to use Cash Collateral hereunder; provided, that such notice by the DIP Agent shall not prejudice the rights of the Notice Parties to file a motion during the Notice Period (the "**Opposition Motion**") with this Court opposing the occurrence of an Event of Default; provided, further, that upon the filing of such motion the DIP Agent and the DIP Lenders shall be stayed from taking any actions or remedies against the DIP Collateral until this Court hears and disposes of such motion. During the Notice Period and during the period following the filing of an Opposition Motion, the Debtors may not draw under the DIP Facility but may use Cash Collateral to pay the following amounts and expenses in accordance with the Budget:  (a) expenses that the Debtors have determined in good faith are in the ordinary course and critical to the preservation of the Debtors and their estates, and (b) such other amounts as have been approved in advance in writing by the DIP Lenders.

17.    <u>Carve-Out</u>.

a.    The DIP Liens, AP Liens, Prepetition Liens, and the DIP Superpriority Claims and the AP Superpriority Claims, shall be subject to a carve-out (the "**Carve-Out**") for the following, and in the following priority (i) all fees (and interest) required to be paid to the Clerk of the Bankruptcy Court and to the United States Trustee; (ii) subject to any applicable restrictions in the DIP Orders, the amount of allowed and unpaid fees, costs, and expenses of the estate's court-approved professionals in the Case incurred from and after the occurrence of an Event of Default, in an aggregate amount not to exceed (1) $250,000 in the case of the Debtor's court-approved professionals and (2) $75,000 in the case of court-approved professionals retained by any Creditors' Committee; and (iii) subject to any applicable restrictions in the DIP Orders, the amount of allowed and unpaid fees, costs, and expenses of the estate's court-approved professionals in these chapter 11 cases incurred prior to the occurrence of an Event of Default, not to exceed the amounts set forth in applicable lines of the Budget as of any applicable date of determination; *provided* that in no event shall the DIP Lenders be obligated to loan funds to pay any claims benefiting from the Carve Out (or to advance any funds following a Carve-Out Event), including to the extent that such amounts would, when combined with the amounts advanced under the DIP Facility, exceed the maximum principal amount of commitments under the DIP Facility.

b.    Upon the occurrence and continuance (beyond any applicable grace period) of an Event of Default (as defined herein or in the DIP Documents), the right of the Debtors to pay fees and expenses of professionals retained by order of this Court shall immediately terminate (a "**Carve-Out Event**"), other than to satisfy the Carve Out, and upon such occurrence, the Debtors shall provide immediate notice by facsimile and e-mail to all

professionals informing them that a Carve-Out Event has occurred and further advising them that the Debtors' ability to pay estate professionals is subject to the Carve-Out as provided herein.

c.    Notwithstanding anything herein to the contrary, prior to a Carve-Out Event, the Debtors shall, in accordance with the Budget and the terms of the DIP Documents and subject to the terms of the DIP Orders and any other relevant orders of this Court, be permitted to pay compensation and reimbursement of expenses to professionals allowed and payable under sections 330 and 331 of the Bankruptcy Code and such orders of this Court authorizing the payment of compensation and reimbursement of expenses that have been incurred prior to the occurrence of such Carve-Out Event.

d.    Nothing herein or in the DIP Documents shall constitute a cap on the amount of professional fees and expenses that may be incurred or allowed in these chapter 11 cases; *provided* that no payments of such fees and expenses shall be made in excess of the amounts contained within or inconsistent with the Budget.

e.    The Debtors shall wire transfer funds, each Thursday on a weekly basis, to a client trust account maintained by Young Conaway Stargatt & Taylor, LLP in an amount equal to, but not to exceed, the amounts set forth in the "Restructuring Fees" subheading in the Budget for each such week (the "**Professional Fee Escrow**") and shall utilize amounts held therein to pay professional fees when due.  Upon the occurrence of a Carve-Out Event, the Debtors shall utilize cash on hand to fund the Professional Fee Escrow in an amount necessary to satisfy the Carve-Out, and such funds shall be used by the Debtors to pay professional fees benefiting from the Carve-Out in accordance herewith, with any remaining balance being applied to reduce the DIP Loans.

20.    <u>Limitations on Use of DIP Proceeds, Cash Collateral, and Carve-Out</u>.  No proceeds of the DIP Facility, the Carve-Out, or any Cash Collateral may be used by the Debtors or any other party in interest, or their representatives, to (or support any other party to) (a) investigate or finance any investigation (including discovery proceedings), initiation or prosecution of any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the DIP Agent or the DIP Lenders, or their respective rights and remedies under or in respect of the DIP Facility, (b) in connection with challenging, invalidating, disallowing, recharacterizing, setting aside, avoiding, subordinating (other than to the Carve-Out), in whole or in part, or taking or attempting to take any other action to render unenforceable, the liens, claims, interests and adequate protection of the DIP Agent and the DIP Lenders, including for the avoidance of doubt, objecting to or contesting the validity, extent, amount, perfection, priority, or enforceability of the obligations under the DIP Facility or the DIP Liens, (c) for any purpose that is prohibited under the Bankruptcy Code, the DIP Orders or the DIP Documents, or (d) seek approval of any superpriority claims or grant any lien that is senior to or *pari passu* with the DIP Liens or DIP Superpriority Claims, except as contemplated by the DIP Term Sheet, this DIP Orders or any DIP Document; *provided*, *however*, that the Debtors shall not be precluded from using Cash Collateral and/or proceeds from DIP Loans to contest whether an Event of Default has occurred and is continuing under the DIP Documents, and/or prepare for and participate at any hearing held by this Court regarding any exercise of rights or remedies under the DIP Documents; *provided*, *further*, that up to $10,000 shall be made available to any Creditors' Committee to investigate (but not object to or commence an action or proceeding with respect to) the Prepetition Senior Secured Notes Obligations and the Prepetition Liens.  No portion of such amount may be used to prosecute or support any claims.

21.     <u>Good Faith Under Sections 363(m) and 364(e) of the Bankruptcy Code;</u>
<u>No Modification or Stay of the DIP Orders</u>.   Based on the findings set forth in the First and
Second Interim Orders and the record made during the Interim Hearing, and in accordance with
sections 363(m) or 364(e) of the Bankruptcy Code, as applicable, in the event any or all of the
provisions of the First or Second Interim Order are hereafter modified, amended, waived, or
vacated by a subsequent order of this Court or any other court of competent jurisdiction, each of
the DIP Agent, the DIP Lenders and the Prepetition Secured Creditors are entitled to the full
protections provided in sections 363(m) and 364(e) of the Bankruptcy Code, as applicable.   Any
such modification, amendment, waiver or vacatur shall not affect the validity of any advances
previously made, including advances made hereunder, or any priority or lien granted, including
liens granted hereunder, unless the advances made, or the granting of the priority or lien, is
stayed pending appeal.

22.     <u>Payment of Fees and Expenses</u>. In addition to any fees payable under the
DIP Term Sheet or the DIP Documents, the Debtors shall pay all reasonable and documented
fees and out-of-pocket expenses of the DIP Agent and the DIP Lenders, whether incurred before
or after the Petition Date or in connection with these chapter 11 cases, the DIP Facility or the
Bridge Facility, including the reasonable and documented out-of-pocket expenses of legal
counsel to the DIP Agent and each DIP Lenders and a financial advisor to the DIP Agent
(the "**DIP Professional Fees**"); *provided* however, that the Debtors may defer the payment of
any such fees and expenses if and to the extent liquidity constraints so dictate in the Debtors'
reasonable judgment.   The DIP Professionals shall not be required to file motions or applications
with respect to the DIP Professional Fees, *provided*, however, that any time such professionals
seek payment of fees and expenses from the Debtors, each professional shall provide summary

copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work-product doctrine) by electronic mail to the U.S. Trustee and counsel to any Creditors' Committee contemporaneously with the delivery of such fee and expense statements to the Debtors. The Debtors, any Creditors' Committee, or the U.S. Trustee may dispute the payment of any portion of such invoiced fees and expenses (the "**Disputed Invoiced Fees**") if the Debtors, any Creditors' Committee, or the U.S. Trustee notifies the submitting party in writing, within fourteen (14) days of the receipt of such fee and expense statement or invoice, setting forth the specific objections to the Disputed Invoiced Fees (to be followed by the filing with this Court, if necessary, of a motion or other pleading, with at least ten (10) days prior written notice to the submitting party of any hearing on such motion or other pleading).  The Debtors shall promptly pay in full all such invoiced fees and expenses other than the Disputed Invoiced Fees.

23.     <u>Release of DIP Agent and DIP Lenders</u>.  Subject to entry of the Final Order, each Debtor shall forever waive, discharge, and release each of the DIP Agent and the DIP Lenders and their respective affiliates and representatives, in each case, solely in such capacity (all of the foregoing, collectively, the "**DIP Secured Party Releasees**") from any and all obligations and liabilities to the Debtors (and their permitted successors and assigns) and from any and all "claims" (as defined in section 101(5) of the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"), defenses, setoff, recoupment, other offset rights, and other rights of disgorgement or recovery against any and all

of the DIP Secured Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the DIP Obligations, the DIP Liens, or the debtor–creditor relationship between any of the DIP Lenders, in such capacity, on the one hand, and any of the Debtors, on the other hand, including (a) any recharacterization, subordination, avoidance, disallowance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law, municipal law, or foreign law and (b) any right or basis to challenge or object to the amount, validity, or enforceability of the DIP Obligations or any payments or other transfers made on account of the DIP Obligations, or the validity, enforceability, priority, or non-avoidability of the DIP Liens securing the DIP Obligations, including any right or basis to seek any disgorgement or recovery of payments of cash or any other distributions or transfers previously received by any of the DIP Secured Party Releasees.  Notwithstanding the foregoing, none of the C5 Lenders, in their capacity as a Prepetition Secured Creditor, shall be released pursuant to the foregoing.

24.    <u>Effect of Stipulations on Third Parties</u>.    The stipulations set forth in paragraph F of the First and Second Interim Orders shall be binding upon the Debtors upon entry of the First Interim Order. In addition, such stipulations shall be binding upon each other party in interest, including any Creditors' Committee unless a party in interest having standing, first, commences, by December 30, 2023 (the "**Challenge Period,**" and the date that is the next calendar day after the termination of the Challenge Period in the event that either (a) no Challenge (as defined below) is properly raised during the Challenge Period or (b) with respect only to those parties who properly and timely file a Challenge and only for the matters specifically set forth in such Challenge, such Challenge is fully and finally adjudicated, shall be referred to as the "**Challenge Period Termination Date**"), (i) a contested matter, adversary

proceeding, or other action or claim (as defined in the Bankruptcy Code) challenging or otherwise objecting to the stipulations set forth in paragraph F of the First and Second Interim Orders or (ii) a contested matter, adversary proceeding, or other action or claim (as defined in the Bankruptcy Code) against any Prepetition Secured Creditor relating to any pre-Petition Date act, omission or aspect of the relationship between such Prepetition Secured Creditor and the Debtors ((i) and (ii) being, collectively, the "**Challenges**," and each individually, a "**Challenge**"), and, second, obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding or other action. The filing of a motion seeking standing to file a Challenge Action before the Challenge Period, which attaches a proposed Challenge Action, shall extend the Challenge Period with respect to that party until two business days after the Court approves the standing motion, or such other time period ordered by the Court in approving the standing motion.  Upon the Challenge Period Termination Date and for all purposes in these chapter 11 cases and any Successor Case(s), (1) any and all such Challenges by any party in interest shall be deemed to be forever released, waived and barred and (2) the stipulations contained in paragraph F of the First and Second Interim Orders shall be binding on all parties in interest, including any Creditors' Committee.

26.     No Third-Party Rights.  Except as explicitly provided for herein, this Second Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

26.     Section 506(c) Claims.  Except to the extent of the Carve-Out, upon entry of the Final Order, the Debtors shall irrevocably waive and be prohibited from asserting any claim under section 506(c) of the Bankruptcy Code, and no costs or expenses of administration of these chapter 11 cases or any future proceeding that may result therefrom, including

liquidation in bankruptcy or other proceedings under the Bankruptcy Code shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law.

27.     No Marshaling.  Subject to entry of a Final Order, the DIP Lenders (and after payment in full of the DIP Obligations, the Prepetition Secured Creditors) shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral. Without limiting the generality of the immediately preceding sentence, from and after the entry of the Final Order, no party (other than the DIP Lenders and after payment in full of the DIP Obligations, the Prepetition Secured Creditors) shall be entitled, directly or indirectly, to direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of the DIP Collateral or the Prepetition Collateral (as applicable) after an Event of Default under the DIP Documents.

28.     Section 552(b).  Upon entry of the Final Order, the DIP Agent, the DIP Lenders and the Prepetition Secured Creditors shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception thereunder shall not apply.

29.     Proofs of Claim.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date, if any, in the chapter 11 case or any Successor Case to the  contrary, neither the DIP Agent, the DIP Lenders, the Bridge Lender or the Prepetition Secured Creditors shall be required to file proofs of claim or requests for payment of administrative expenses in this chapter 11 case or any successor case with respect to the DIP Obligations, the Bridge Facility Obligations, the Prepetition Secured Note Obligations or the AP

Superpriority Claims, as applicable, with the DIP Orders constituting a timely filed proof of claim or request for payment of an administrative expense, as applicable, with respect thereto. Notwithstanding the foregoing, each such party is authorized, but not directed or required, in its sole discretion, to file (and amend and/or supplement, as they see fit) a proof of claim or request for payment of an administrative expense with respect thereto in this chapter 11 case or a Successor Case or an aggregate proofs of claim or request for payment of an administrative expense for any claim or obligation described herein.

30.    <u>Binding Effect of this Second Interim Order</u>.    The provisions of this Second Interim Order shall be binding upon and inure to the benefit of the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Secured Creditors, any Creditors' Committee, all other creditors of any of the Debtors and all other parties in interest and, in each case, their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors).   To the extent permitted by applicable law, this Second Interim Order shall bind any trustee or administrator (whether under U.S. law or the laws of any other jurisdiction) hereafter appointed for the estate of any of the Debtors, whether in these chapter 11 cases or in the event of the conversion of any of these chapter 11 cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case, to a liquidation under chapter 7 of the Bankruptcy Code.   Such binding effect is an integral part of this Second Interim Order.

31.    <u>No Modification of the First or Second Interim Orders</u>.    Until the DIP Obligations and the AP Superpriority Claims have been paid in full, the Debtors shall be

30979858.3

36

prohibited from seeking or consenting to, directly or indirectly, any modification, stay, vacatur, waiver, or amendment to the First or Second Interim Order or any provision hereof without the prior written consent of the DIP Agent and each DIP Lenders, and no such consent shall be implied by any action or inaction of the DIP Agent or any DIP Lenders.

32.     <u>Second Interim Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the DIP Term Sheet, any DIP Documents, the First Interim Order and this Second Interim Order, the provisions of this Second Interim Order shall control.

33.     <u>Survival</u>.   The terms and provisions of the First and Second Interim Orders, including the claims, liens, security interests, and other protections granted to the DIP Agent, the DIP Lenders and the Prepetition Secured Creditors pursuant thereto and the DIP Documents, shall continue in these chapter 11 cases (or any Successor Case) as well as following dismissal of these chapter 11 cases (or any Successor Case), and such claims, liens and security interests shall maintain their priority as provided by herein until all the DIP Obligations and AP Superpriority Claims, pursuant to the DIP Documents and/or the First and Second Interim Orders, have been indefeasibly paid in full (such payment being without prejudice to any terms or provisions contained in the DIP Facility that survive such discharge by their terms), and all commitments to extend credit under the DIP Facility are terminated.

34.     <u>Final Hearing</u>.  The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) will be held on November 28, 2023, at 11:00 a.m., prevailing Eastern Time. The deadline to object to the relief sought at the Final Hearing was October 30, 2023 at 4:00 p.m. (ET) for all parties other than the U.S. Trustee and 3i.  To the extent that the U.S. Trustee or 3i intend to object to the relief sought at the Final Hearing, they shall serve and file written objections, which objections shall be served upon (i) counsel to the Debtors, Young Conaway

Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: Sean M. Beach and Kenneth J. Enos (sbeach@ycst.com and kenos@ycst.com); (ii) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Timothy J. Fox (Timothy.Fox@usdoj.gov); and (iii) the DIP Agent; and (iv) counsel to certain of the DIP Lenders, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, Attn: Sean Mitchell (smitchell@paulweiss.com), Grace Hotz (ghotz@paulweiss.com) and Diane Meyers (dmeyers@paulweiss.com) and shall be filed with the Clerk of the Court, in each case, to allow actual receipt of the foregoing no later than 12:00 p.m. (prevailing Eastern Time), on November 27, 2023.

35. <u>Retention of Jurisdiction</u>. This Court has and will retain jurisdiction to enforce this Second Interim Order according to its terms.

# EXHIBIT A

**IronNet**
**Weekly CF**

| | forecast | forecast | forecast | forecast | forecast | forecast | forecast | forecast |
|---|---|---|---|---|---|---|---|---|
| Week Start: | 11/18/23 | 11/25/23 | 12/2/23 | 12/9/23 | 12/16/23 | 12/23/23 | 12/30/23 | 1/6/24 |
| Week End: | 11/24/23 | 12/1/23 | 12/8/23 | 12/15/23 | 12/22/23 | 12/29/23 | 1/5/24 | 1/12/24 |
| **Total HC** | **34** | **34** | **34** | **34** | **34** | **34** | **34** | **34** |
| **Bookings Forecast - Baseline** | - | - | - | - | - | - | 565,185 | - |
| **Beg. Cash Balance** | **484,455** | **545,648** | **524,418** | **630,272** | **1,314,593** | **971,692** | **504,942** | **195,721** |
| Sources of Cash: | | | | | | | | |
| + AR Collections | - | 145,520 | - | 30,000 | - | - | - | - |
| + AR Prior/Partial Payments | - | - | - | - | - | - | - | - |
| + Recurring Billings | - | - | - | - | 34,112 | - | - | - |
| + Collections from Baseline Fcst | - | - | - | - | - | - | - | - |
| (+/-) ELOC Financing | | | | | | | | |
| (+/-) Debt | | | | | | | | |
| (+/-) additional investment | 1,000,000 | 500,000 | 1,500,000 | 3,000,000 | 500,000 | | | |
| **Total Inflow** | **1,000,000** | **645,520** | **1,500,000** | **3,030,000** | **534,112** | **-** | **-** | **-** |
| Uses of Cash: | | | | | | | | |
| (-) Regular Pay - US | - | (154,312) | - | (154,312) | - | (154,312) | - | (154,312) |
| (-) Payroll Tax - US | - | (78,066) | (834,165) | (78,066) | (201,835) | (78,066) | - | (78,066) |
| (-) Retirement - US | - | (17,622) | - | (17,622) | - | (17,622) | - | (17,622) |
| (-) Garnish - US | - | - | - | - | - | - | - | - |
| (-) International Payroll | (73,000) | - | - | - | (73,000) | - | - | - |
| (-) AP Schedule | (478,339) | (316,750) | (310,750) | (381,879) | (439,710) | (116,750) | (130,000) | (383,629) |
| (-) Monthly Recurring | (37,468) | - | (149,231) | (88,800) | (37,468) | - | (79,221) | (37,508) |
| (-) Restructuring Fees | (350,000) | (100,000) | (100,000) | (1,625,000) | (125,000) | (100,000) | (100,000) | (27,000) |
| (+/-) Bank Transfers | | | | | | | | |
| **Total Outflow** | **(938,807)** | **(666,750)** | **(1,394,146)** | **(2,345,679)** | **(877,013)** | **(466,750)** | **(309,221)** | **(698,137)** |
| **End Cash Balance** | **545,648** | **524,418** | **630,272** | **1,314,593** | **971,692** | **504,942** | **195,721** | **(502,416)** |
| Reserve for past-due payroll tax | **1,036,000** | **1,036,000** | **201,835** | **201,835** | **201,835** | **201,835** | **201,835** | 201,835 |
| End Operating Cash Balance | (490,352) | (511,582) | 428,437 | 1,112,758 | 769,857 | 303,107 | (6,114) | (704,251) |