## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| IRONNET, INC., *et al.*,[1] | ) | Case No. 23-11710 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DEBTORS' MEMORANDUM OF LAW
## IN SUPPORT OF (I) APPROVAL OF THE DISCLOSURE STATEMENT ON A FINAL BASIS AND (II) CONFIRMATION OF THE AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF IRONNET, INC. AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

[1] The Debtors in the above captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  IronNet, Inc. (9446), IronNet Cybersecurity, Inc. (2655), IronNet International, LLC (7621), IronCAD LLC (1162), and HighDegree, LLC (8474).  The Debtors' mailing address is: IronNet Cybersecurity, Inc., P.O. Box 7395, Halethorpe, Maryland 21227.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................1

BACKGROUND ................................................................................3

    A.    Prepetition Restructuring Efforts and DIP Term Sheet ...............................3

    B.    The Chapter 11 Cases and the Dual-Track Sale and Confirmation Process ................................................................................5

    C.    The Debtors' Sale Process ................................................................7

    D.    The Voting Results ................................................................8

THE PLAN SHOULD BE CONFIRMED ................................................................12

    I.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code in Accordance with Section 1129(a)(1). ....................................12

    A.    The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code. ................................................................13

    B.    The Plan Satisfies the Seven Applicable Requirements of Section 1123(a). ................................................................14

        1.    Section 1123(a)(1):  Designation of Classes ..................................15

        2.    Section 1123(a)(2):  Classes That Are Not Impaired by the Plan .15

        3.    Section 1123(a)(3):  Treatment of Classes Impaired by the Plan ..16

        4.    Section 1123(a)(4):  Equal Treatment Within Each Class ............16

        5.    Section 1123(a)(5):  Adequate Means for Implementation ..........16

        6.    Section 1123(a)(6):  Amendment of the Reorganized Debtors' Charters ................................................................17

        7.    Section 1123(a)(7):  Provisions Regarding Directors and Officers ................................................................18

    C.    The Discretionary Contents of the Plan Are Appropriate. ....................18

        1.    Debtor Release ................................................................20

        2.    Third-Party Release ................................................................24

        3.    Exculpation ................................................................26

        4.    Injunction ................................................................27

5.  The Settlements Embodied in the Plan, including the 3i Settlement and the Korr Settlement, Should be Approved............28

II. The Debtors Have Complied with the Applicable Provisions of the Bankruptcy Code in Accordance with Section 1129(a)(2)...................................29

III. The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law in Accordance with Section 1129(a)(3). ................................31

IV. The Plan Provides for Court Approval of Certain Administrative Payments in Accordance with Section 1129(a)(4). ................................................35

V. The Debtors Will Disclose the Identity of the New Board in Accordance with Section 1129(a)(5). .......................................................36

VI. The Plan Does Not Require Governmental Regulatory Approval in Accordance with Section 1129(a)(6). .......................................36

VII. The Plan Is in the Best Interests of Creditors and Interest Holders in Accordance with Section 1129(a)(7). ......................................37

VIII. Acceptance of Impaired Classes in Accordance with Section 1129(a)(8). ...........39

IX. The Plan Complies with Statutorily Mandated Treatment of Administrative and Priority Claims in Accordance with Section 1129(a)(9). ......................................................40

X. At Least One Impaired Class of Claims Has Accepted the Plan, Excluding the Acceptances of Insiders, in Accordance with Section 1129(a)(10)................41

XI. The Plan Is Feasible in Accordance with Section 1129(a)(11). ............................42

XII. Statutory Fees Will Be Paid in Accordance with Section 1129(a)(12). ...............44

XIII. The Plan Provides for Continued Payment of Any Retiree Benefits in Accordance with Section 1129(a)(13). ......................................44

XIV. Sections 1129(a)(14), (a)(15), and (a)(16) of the Bankruptcy Code are Inapplicable.................................................................45

XV. The Plan Satisfies the "Cramdown" Requirements of 11 U.S.C. § 1129(b). ........45

A.  The Plan Does Not Discriminate Unfairly.................................46

B.  The Plan Is Fair and Equitable with Respect to Each Deemed Rejecting Class. ................................................47

XVI. The Plan Is the Only Plan Currently on File..........................................48

XVII. The Purpose of the Plan Is Not the Avoidance of Taxes or Securities Laws.........................................................................49

XVIII. Section 1129(e) is Inapplicable. ...........................................................................49

CONCLUSION.................................................................................................................................50

30995367.6

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re 11,111, Inc.*,
   117 B.R. 471 (Bankr. D. Minn. 1990).......................................................................47

*In re 203 N. LaSalle St. L.P.*,
   190 B.R. 567 (Bankr. N.D. Ill. 1995), *rev'd on other grounds sub nom. Bank of Am.*
   *Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999).................37, 46, 48

*In re 710 Long Ridge Rd. Operating Co., II*,
   No. 13-13653 (DHS), 2014 WL 886433 (Bankr. D.N.J. Mar. 5, 2014)................................22

*In re Abeinsa Holding, Inc.*,
   562 B.R. 265 (Bankr. D. Del. 2016)..............................................................................20, 21

*In re Adelphia Commc'ns Corp.*,
   368 B.R. 140 (Bankr. S.D.N.Y. 2007).......................................................................22, 37, 38

*Aetna Cas. & Sur. Co. v. Clerk of U.S. Bankr. Court (In re Chateaugay Corp.)*,
   89 F.3d 942 (2d Cir. 1996) .........................................................................................14

*In re Aleris Int'l, Inc.*,
   No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010) ...........................20

*In re Am. Solar King Corp.*,
   90 B.R. 808 (Bankr. W.D. Tex. 1988)...........................................................................31

*In re Ambanc La Mesa L.P.*,
   115 F.3d 650 (9th Cir. 1997).....................................................................................47

*In re Armstrong World Indus., Inc.*,
   348 B.R. 111 (D. Del. 2006)........................................................................................12

*In re Aspen Limousine Serv. Inc.*,
   193 B.R. 325 (Bankr. D. Colo. 1996)............................................................................13

*In re Aztec Co.*,
   107 B.R. 585 (Bankr. M.D. Tenn. 1989).......................................................................47

*In re Bowles*,
   48 B.R. 502 (Bankr. E.D. Va. 1985)..............................................................................46

*In re Buttonwood Partners*,
   111 B.R. 57 (Bankr. S.D.N.Y.).....................................................................................47

*In re Century Glove, Inc.*,
   Nos. 90–400–SLR, 90–401–SLR, 1993 WL 239489 (D. Del. Feb. 10, 1993).......................32

i

*Century Glove, Inc. v. First Am. Bank of N.Y.*,
   860 F.2d 94 (3d Cir. 1988) ...................................................................................9, 10

*In re Chemtura Corp.*,
   439 B.R. 561 (Bankr. S.D.N.Y. 2010).....................................................................34

*Clarkson v. Cooke Sales & Serv. Co. (In re Clarkson)*,
   767 F.2d 417 (8th Cir. 1985) ..................................................................................43

*In re Coastal Broad. Sys., Inc.*,
   570 F. App'x 188 (3d Cir. 2014) .............................................................................13

*In re Coram Healthcare Corp.*,
   315 B.R. 321 (Bankr. D. Del. 2004) ................................................................14, 26

*In re Drexel Burnham Lambert Grp., Inc.*,
   138 B.R. 723 (Bankr. S.D.N.Y. 1992).....................................................................37

*In re Drexel Burnham Lambert Grp., Inc.*,
   960 F.2d 285 (2d Cir. 1992) ....................................................................................40

*In re Elec. Components Int'l*,
   No. 10-11054 (KJC), 2010 WL 3350305 (Bankr. D. Del. May 11, 2010)...............43

*In re Elsinore Shore Assocs.*,
   91 B.R. 238 (Bankr. D.N.J. 1988) ..........................................................................35

*In re Emerge Energy Servs. LP*,
   No. 19-11563, 2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019) .........................43

*In re Exide Tech.*,
   303 B.R. 47 (Bankr. D. Del. 2003)..........................................................................25

*First Am. Bank of N.Y. v. Century Glove, Inc.*,
   81 B.R. 274 (D. Del. 1988).....................................................................................10

*In re Freymiller Trucking, Inc.*,
   190 B.R. 913 (Bankr. W.D. Okla. 1996) ................................................................46

*Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*,
   10 F.3d 944 (2d Cir. 1993) ......................................................................................14

*In re Genesis Health Ventures, Inc.*,
   266 B.R. 591 (Bankr. D. Del. 2001)........................................................................48

*Gillman v. Con'l Airlines (In re Cont'l Airlines)*,
   203 F.3d 203 (3d Cir. 2000) ....................................................................................26

*Grogan v. Garner*,
   498 U.S. 279 (1991)................................................................................................12

*In re Hercules Offshore, Inc.*,
    565 B.R. 732 (Bankr. D. Del. 2016) ........................................................................20

*In re Idearc Inc.*,
    423 B.R. 138 (Bankr. N.D. Tex. 2009) .....................................................................13

*In re Indianapolis Downs, LLC*,
    486 B.R. 286 (Bankr. D. Del. 2013) ..................................................21, 25, 26, 42

*IRS v. Kaplan (In re Kaplan)*,
    104 F.3d 589 (3d Cir. 1997) ....................................................................................43

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
    987 F.2d 154 (3d Cir. 1993) ..............................................................................13, 46

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986) .......................................................................47

*In re Kaiser Aluminum Corp.*,
    No. 02-10429, 2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006) ............................14

*Key3Media Grp., Inc. v. Pulver.Com, Inc. (In re Key3Media Grp., Inc.)*,
    336 B.R. 87 (Bankr. D. Del. 2005), *aff'd*, No. 03-10323 (MFW), 2006 WL 2842462
    (D. Del. Oct. 2, 2006) ........................................................................................23, 28

*In re Lisanti Foods, Inc.*,
    329 B.R. 491 (D.N.J. 2005), *aff'd*, 241 F. App'x 1 (3d Cir. 2007) ...................10, 35

*In re Madison Hotel Assocs.*,
    749 F.2d 410 (7th Cir. 1984) ...................................................................................32

*In re Magnatrax Corp.*,
    No. 03-11402, 2003 WL 22807541 (Bankr. D. Del. Nov. 17, 2003) ......................14

*In re Maremont Corp.*,
    No. 19-10118 (KJC) (Bankr. D. Del. May 17, 2019) [Docket No. 241] .................43

*Marvel Entm't Grp., Inv. v. MAFCO Holdings, Inc. (In re Marvel Entm't Grp., Inc.)*,
    273 B.R. 58 (D. Del. 2002) ......................................................................................20

*In re Master Mortg. Inv. Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994) ........................................................21, 22, 23

*In re Metrocraft Pub. Serv., Inc.*,
    39 B.R. 567 (Bankr. N.D. Ga. 1984) ........................................................................11

*In re Monnier Bros.*,
    755 F.2d 1336 (8th Cir. 1985) ...................................................................................9

*In re Motors Liquidation Co.*,
    447 B.R. 198 (Bankr. S.D.N.Y. 2011) ......................................................................20

iii

*Myers v. Martin (In re Martin)*,
   91 F.3d 389 (3d Cir. 1996) ............................................................................28

*Norwest Bank Worthington v. Ahlers*,
   485 U.S. 197 (1988).........................................................................................48

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
   848 F.2d 414 (3d Cir. 1988) ...........................................................................10

*In re PC Liquidation Corp.*,
   383 B.R. 856 (E.D.N.Y. 2008) .......................................................................10

*In re Phoenix Petroleum, Co.*,
   278 B.R. 385 (Bankr. E.D. Pa. 2001) .....................................................9, 10, 11

*In re PPI Enters. (U.S.), Inc.*,
   228 B.R. 339 (Bankr. D. Del. 1998), *aff'd*, 324 F.3d 197 (3d Cir. 2003) ...............31

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000) ...................................................................27, 29, 31

*In re River Vill. Assocs.*,
   161 B.R. 127 (Bankr. E.D. Pa. 1993), *aff'd*, 181 B.R. 795 (E.D. Pa. 1995) ...........32

*In re River Village Assoc.*,
   181 B.R. 795 (E.D. Pa. 1995) .........................................................................10

*In re Rivera Echevarria*,
   129 B.R. 11 (Bankr. D.P.R. 1991)...................................................................47

*In re Scioto Valley Mortg. Co.*,
   88 B.R. 168 (Bankr. S.D. Ohio 1988) .............................................................11

*In re Sea Launch Co.*,
   No. 09-12153 (BLS), 2010 Bankr. LEXIS 5283 (Bankr. D. Del. July 30, 2010) ...................45

*In re Sherwood Square Assocs.*,
   107 B.R. 872 (Bankr. D. Md. 1989) ................................................................36

*In re T-H New Orleans L.P.*,
   116 F.3d 790 (5th Cir. 1997) ..........................................................................32

*In re TCI 2 Holdings, LLC*,
   428 B.R. 117 (Bankr. D.N.J. 2010) ............................................................35, 43

*Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*,
   844 F.2d 1142 (5th Cir. 1988) ........................................................................10

*In re Texaco Inc.*,
   84 B.R. 893 (Bankr. S.D.N.Y. 1988)...............................................................13

iv

*In re U.S. Brass Corp.*,
   194 B.R. 420 (Bankr. E.D. Tex. 1996) .......................................................................11

*In re Unichem Corp.*,
   72 B.R. 95 (Bankr. N.D. Ill. 1987) .............................................................................9

*United States v. Energy Res. Co.*,
   495 U.S. 545 (1990) ..................................................................................................43

*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012), *aff'd sub nom. In re W.R. Grace & Co.*, 729 F.3d 332
   (3d Cir. 2013).............................................................................................32, 33, 34

*In re Wash. Mut., Inc.*,
   442 B.R. 314 (Bankr. D. Del. 2011) ........................................................................25

*In re Zenith Elecs. Corp.*,
   241 B.R. 92 (Bankr. D. Del. 1999) .......................................................21, 22, 24, 25

**STATUTES**

11 U.S.C. § 365 .......................................................................................................45

11 U.S.C. § 507(a) ..................................................................................................40

11 U.S.C. § 1114 .....................................................................................................45

11 U.S.C. § 1122 ...............................................................................................*passim*

11 U.S.C. § 1123 ...............................................................................................*passim*

11 U.S.C. § 1125 ...............................................................................................*passim*

11 U.S.C. § 1126........................................................................................1, 9, 39, 40

11 U.S.C. § 1127(a) ................................................................................................31

11 U.S.C. § 1129 ...............................................................................................*passim*

28 U.S.C. § 1930 .....................................................................................................44

31 U.S.C. § 3717.....................................................................................................44

**RULES**

Bankruptcy Rule 9019 ............................................................................................28

Fed. R. Bankr. P. 3019(a) .......................................................................................31

**OTHER AUTHORITIES**

H.R. Rep. No. 95–595 (1977)..................................................................................29

30995367.6

S. Rep. No. 95-989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787...............................................10

30995367.6

IronNet, Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**"), hereby submit this memorandum of law (this "**Memorandum**") in support of final approval of the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of IronNet, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 232] (as modified, amended, or supplemented from time to time, the "**Disclosure Statement**") and confirmation of the *Amended Joint Chapter 11 Plan of Reorganization of IronNet, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 231] (as modified, amended, or supplemented from time to time hereafter, the "**Plan**"),[2] pursuant to sections 1125, 1126, 1129, 1145 and 1146 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), and respectfully represent as follows:

## PRELIMINARY STATEMENT[3]

1.     Approximately three months after entering chapter 11, the Debtors are prepared, with overwhelming acceptance from the Voting Classes and the support of their major constituents, to confirm the Plan on a fully consensual basis.  The Plan implements the Restructuring, pursuant to which the Debtors' business will continue as a going concern, jobs will be preserved, vendor relationships will be maintained, and the Reorganized Debtors will benefit from a deleveraged balance sheet and $15 million in exit financing that positions the Reorganized Debtors for future success.  This is a tremendous result that was achieved through the substantial

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or the Confirmation Order (as defined herein), as applicable.

[3]    Capitalized terms used but not otherwise defined in this Preliminary Statement have the meanings ascribed to such terms elsewhere in this Memorandum.

efforts of the Debtors, the DIP Lender, the Prepetition Secured Parties, and the United States Trustee to reach consensus and maximize value for the Debtors' estates.

2.      The Debtors determined to proceed with the Restructuring set forth in the Plan following a robust post-petition marketing process led by their investment banker, Capstone, who contacted approximately 114 parties to solicit interest in a sale of the Debtors' assets or the equity in the Reorganized Debtors.  During that process, approximately 25 parties executed non-disclosure agreements and were provided access to a data room maintained by Capstone.  The Debtors extended the bid deadline by over three weeks to provide potential bidders with additional time to conduct diligence and submit bids.  Ultimately, the only bid the Debtors received was the Restructuring proposed by the DIP Lender and the Prepetition Secured Creditors set forth in the Plan.  Accordingly, and as set forth in the O'Malley Declaration, the Debtors believe that the Restructuring represents the best, and only, option available to the Debtors and their estates.

3.      The Plan provides for: (i) the payment of Administrative Claims and Priority Tax Claims and renders Other Priority Claims, Other Secured Claims, and OpCo Unsecured Trade Claims Unimpaired; (ii) the settlement of various Claims, including the Korr Settlement and the 3i Settlement; (iii) the distribution of New Common Equity to Holders of DIP Facility Claims, IronNet Secured Note Claims, OpCo Secured Note Claims, and 3i; (iv) the reinstatement or discharge of Intercompany Claims and Intercompany Interests, in the applicable Debtor's discretion; (v) the release and discharge of Subordinated Claims and Equity Interests in IronNet; and (vi) the assumption and assignment of numerous Executory Contracts to the Reorganized Debtors.

4.      As of the Effective Date, the New Board will be appointed and the Debtors' existing officers will remain in their current positions as officers of the Reorganized Debtors.  The

30995367.6

Debtors' assets will vest in the Reorganized Debtors, who will operate their respective businesses and handle post-Effective Date matters, including prosecuting retained Causes of Action, handling the Claims reconciliation process, and working with the Distribution Agent to make distributions to Holders of Allowed Claims at the appropriate time.

5.     This Memorandum presents an analysis of the issues regarding Confirmation pursuant to section 1129 of the Bankruptcy Code, and posits that approval of the Disclosure Statement on a final basis pursuant to section 1125 of the Bankruptcy Code is appropriate.  As provided in detail below, in the Confirmation Declarations,[4] and in the Voting Report,[5] the Plan and the Disclosure Statement satisfy the applicable standards and should therefore be approved.

## BACKGROUND[6]

### A.    Prepetition Restructuring Efforts and DIP Term Sheet

6.     The Debtors (and before the Petition Date, the "**Company**") are a global cybersecurity company, which competes in the Network Detection and Response category.  On August 26, 2021, the Company expanded its capabilities through a business combination (the

---

[4]    As used herein, the *Declaration of Cameron Pforr in Support of Confirmation of Joint Chapter 11 Plan of Reorganization of IronNet, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "**Pforr Declaration**"), the *Declaration of Justin O'Malley in Support of Confirmation of Joint Chapter 11 Plan of Reorganization of IronNet, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "**O'Malley Declaration**"),  and the *Declaration of Robert Wagstaff in Support of Confirmation of Joint Chapter 11 Plan of Reorganization of IronNet, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "**Wagstaff Declaration**" and, collectively, with the Pforr Declaration and the O'Malley Declaration, the "**Confirmation Declarations**"), filed contemporaneously herewith.

[5]    As used herein, the *Certification of Adam J. Fialkowski of Stretto Regarding Voting and Tabulation of Ballots Cast on the Debtor's Amended Joint Chapter 11 Plan of Reorganization of IronNet, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "**Voting Report**"), filed contemporaneously herewith.

[6]    The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the *Declaration of Cameron Pforr, President and Chief Financial Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 4] (the "**First Day Declaration**").

"**Business Combination**") between IronNet, Inc. ("**IronNet**") and LGL Systems Acquisition Corp., which resulted in IronNet becoming a publicly traded company.  The transaction resulted in gross proceeds of approximately $136.7 million to IronNet, which the Company used to generally support corporate infrastructure for growth and global expansion.  All IronNet shareholders rolled 100% of their equity holdings into the new public company created by the Business Combination.

7.      In response to significant financial struggles and tightening liquidity, on or around December 2022, the Company began exploring available options, including a sale of the Company, financing transactions, and loan restructuring.  The Company hired Guggenheim Partners ("**Guggenheim**") and Young Conaway Stargatt and Taylor, LLP to assist in exploring these alternatives.  In the ten months preceding the Petition Date (as defined below), Guggenheim contacted a wide array of potential bidders, but these efforts were ultimately unsuccessful.

8.      Without any actionable proposals from Guggenheim's pre-petition marketing efforts and to address ongoing liquidity needs, the Company and its advisors began discussing a potential restructuring with certain prepetition secured creditors, including ITC Global Advisers LLC, C5, and the Director Noteholders (collectively, the "**Prepetition Secured Creditors**"), that would deleverage the Debtors' balance sheet and position the Company for future success.  The Company, along with its advisers, engaged in months-long arm's length negotiations with the Prepetition Secured Creditors and the DIP Lender, culminating in the entry into that certain *IronNet, Inc. Terms for DIP Financing* on October 10, 2023 (as amended, supplemented, or otherwise modified from time to time, the "**DIP Term Sheet**").

9.      Pursuant to the DIP Term Sheet, the DIP Lender agreed to provide funding for the Chapter 11 Cases, including funding for a post-petition marketing and sale process to test

the value of the Debtors' assets in the marketplace, and agreed to the framework for the Restructuring set forth in the Plan to the extent no higher or better offers were obtained through the sale process.

**B.     The Chapter 11 Cases and the Dual-Track Sale and Confirmation Process**

10.     With committed funding from the DIP Lender, the Debtors commenced the Chapter 11 Cases on October 12, 2023 (the "**Petition Date**") to pursue a "dual-track" sale and confirmation process in an organized manner under the Court's supervision.

11.     In furtherance thereof, on the Petition Date, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Obtain Postpetition Financing and (II) Use Cash Collateral, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Granting Adequate Protection to Prepetition Secured Parties, (D) Modifying the Automatic Stay, (E) Scheduling a Final Hearing, and (F) Granting Related Relief* (the "**DIP Motion**").  The DIP Motion was approved on a final basis on December 11, 2023 [Docket No. 227] and, among other things, authorized the Debtors to obtain postpetition financing in accordance with the DIP Term Sheet.  To implement the dual-track process set forth in the DIP Term Sheet, the Debtors terminated Guggenheim and, shortly following the Petition Date, retained Capstone Capital Markets LLC ("**Capstone**") as their investment banker.

12.     On October 24, 2023, the Debtors filed a motion [Docket No. 66] for approval of sale and bidding procedures, which was approved on November 10, 2023 [Docket No. 117] (the "**Bidding Procedures Order**").  Among other things, the Bidding Procedures Order (i) approved the Bidding Procedures, which established certain key dates and deadlines related to the sale and the auction, and (ii) approved the Plan (as set forth in the DIP Term Sheet) as a Qualified Bid (as defined in the Bidding Procedures Order).  Pursuant to the Bidding Procedures,

the bid deadline was scheduled for December 12, 2023 at 5:00 p.m. (ET) and the auction was scheduled for December 14, 2023 at 10:00 a.m. (ET).

13.     Contemporaneously with their sale and marketing efforts, the Debtors worked with the DIP Lender, the Prepetition Secured Creditors, the United States Trustee, and other interested parties to prepare a plan consistent with the DIP Term Sheet and to resolve various claims and issues between the parties.  On November 20, 2023, the Debtors filed the initial versions of the Plan [Docket No. 162] and Disclosure Statement [Docket No. 163], along with a motion [Docket No. 161] for conditional approval of the Disclosure Statement and approval of procedures for the solicitation of votes on the Plan (the "**Solicitation Procedures Motion**").  The Debtors subsequently filed several amended versions of the Plan and the Disclosure Statement, *see* Docket Nos. 207, 208, 222, 223, and the Solicitation Procedures Motion was approved on December 11, 2023 [Docket No 228] (the "**Disclosure Statement Order**").  On December 12, 2023, the Debtors filed the solicitation versions of the Plan [Docket No. 231] and the Disclosure Statement [Docket No. 232], and commenced the solicitation of votes to accept or reject the Plan shortly thereafter.

14.     On January 4, 2024, as contemplated by the Disclosure Statement Order, the Debtors filed the Plan Supplement [Docket No. 278 (sealed); 279 (redacted)], which was subsequently amended on January 10, 2024 [Docket No. 300].  The Plan Supplement contains the New Organizational Documents, the Rejected Contracts List, a list of retained Causes of Action, the identity of the members of the New Board and the Reorganized Debtors' officers, the Exit Facility documentation, the 3i Takeback Note, the Restructuring Memorandum, and Financial Projections.[7]

---

[7]     Consistent with the Plan, the Debtors reserve the right to amend, modify, or supplement the Plan Supplement. *See* Plan Art. I.A.

C.     **The Debtors' Sale Process**

15.     Following the entry of the Bidding Procedures Order, Capstone continued to run the sale process for the Debtors' assets or the equity in the Reorganized Debtors to determine whether a higher or better offer than the Restructuring set forth in the Plan could be obtained. Among other things, Capstone prepared a company teaser (the "**Teaser**"), a comprehensive confidential information memorandum (the "**CIM**"), and additional supporting information and analyses in an electronic data room (the "**Data Room**") that provided potential investors and bidders with the necessary information upon which to make a proposal.

16.     Capstone solicited approximately 114 potentially interested parties, including, but not limited to, strategic and financial buyers.  More specifically, Capstone distributed the Teaser to potentially interested parties that provided an overview of the Debtors' business and offered to provide additional information upon the execution of a non-disclosure agreement ("**NDA**").  Approximately twenty-five (25) potential buyers executed NDAs and received access to the Data Room.  These potential buyers also received the CIM, which included more information on the Debtors.  The potential buyers were afforded the opportunity to ask any questions they or their advisers had regarding the information shared.  In addition, they had the opportunity to meet with the Debtors' management team to understand their strategic plan for the business first hand, and were given the opportunity to schedule detailed financial, legal, and operational due diligence sessions with the relevant management personnel.  Ultimately, five (5) potential buyers engaged in discussions with the Debtors' management.

17.     To provide potential bidders with additional time to complete due diligence and obtain the required approvals to submit offers, the Debtors extended the bid deadline from December 12, 2023 to January 4, 2024.  Despite the extended bid deadline, the Debtors ultimately did not receive any bids other than the Plan.  Accordingly, on January 9, 2024, the Debtors filed

the *Notice of Cancellation of Auction* [Docket No. 297], cancelling the Auction and stating their

intention to seek confirmation of the Plan on January 18, 2024.

D.      **The Voting Results**

18.      Contemporaneously herewith, the Notice and Claims Agent filed the Voting

Report.  As set forth more fully in the Voting Report, 100% of voting Holders in each Voting Class

voted to accept the Plan:[8]

| Class | Class Description | %Members Accepted | %Members Rejected | Total Dollars Voted | Dollars Accepted | Dollars Rejected | % of Dollars Accepted | % of Dollars Rejected | Class Accepted or Rejected |
|---|---|---|---|---|---|---|---|---|---|
| 3 | IronNet Secured Note Claims | 100% | 0% | $24,908,339.06 | $24,908,339.06 | $0 | 100% | 0% | Accepted |
| 4 | IronNet Unsecured Note Claims | 100% | 0% | $1.00 | $1.00 | $0 | 100% | 0% | Accepted |
| 6 | OpCo Secured Note Claims | 100% | 0% | $0.00 | $0.00 | $0 | 100% | 0% | Accepted |
| 8 | OpCo Unsecured Non-Trade Claims | 100% | 0% | $3,022,157.21 | $3,022,157.21 | $0 | 100% | 0% | Accepted |

19.      The remaining Classes under the Plan were either presumed to accept or

deemed to reject the Plan.  Holders of Claims in Classes 1, 2, and 7 are Unimpaired and

conclusively presumed to have accepted the Plan and, therefore, were not entitled to vote to accept

or reject the Plan.[9]  Holders of Claims and Interests in Classes 9 and 10 are either Unimpaired, in

which case they are conclusively presumed to have accepted the Plan, or Impaired and not entitled

to any recovery, in which case they are conclusively deemed to have rejected the Plan, and

therefore, were not entitled to vote to accept or reject the Plan.  Holders of Claims and Interests in

Classes 5, 11, and 12 (together with Holders of Claims in Classes 9 and 10, to the extent Impaired

---

[8]      *See* Voting Report Ex. A.

[9]      Even though Class 7 is Unimpaired through the Restructuring, Class 7 was entitled to vote solely for purposes of a Sale Transaction and also voted in favor of the Plan.  100% of voting Holders in Class 7 voted in favor of the Plan.

under the Plan, the "**Deemed Rejecting Classes**") are Impaired under the Plan, are entitled to no recovery under the Plan, and are therefore conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.   As discussed below, the Debtors satisfy section 1129(b)'s "cramdown" requirements with respect to the Deemed Rejecting Classes, and the Debtors request that the Court confirm the Plan notwithstanding any such deemed rejection.

### THE DISCLOSURE STATEMENT SHOULD BE APPROVED ON A FINAL BASIS

20.    Pursuant to section 1125 of the Bankruptcy Code, the proponent of a proposed chapter 11 plan must provide "adequate information" regarding that plan to holders of impaired claims and interests entitled to vote on the plan. 11 U.S.C. § 1125.  Specifically, section 1125(a)(1) of the Bankruptcy Code states, in relevant part, as follows:

> [A]dequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan[.]

11 U.S.C. § 1125(a)(1).

21.    The primary purpose of a disclosure statement is to provide all material information that creditors and interest holders affected by a proposed plan need to make an informed decision regarding whether or not to vote for the plan.[10]  Congress intended that such

---

[10]    *See, e.g.*, *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote."); *In re Monnier Bros.*, 755 F.2d 1336, 1342 (8th Cir. 1985) ("The primary purpose of a disclosure statement is to give the creditors the information they need to decide whether to accept the plan."); *In re Phoenix Petroleum, Co.*, 278 B.R. 385, 392 (Bankr. E.D. Pa. 2001) ("[T]he general purpose of the disclosure statement is to provide 'adequate information' to enable 'impaired' classes of creditors and interest holders to make an informed judgment about the proposed plan and determine whether to vote in favor of or against that plan."); *In re Unichem Corp.*, 72 B.R. 95, 97 (Bankr. N.D.

informed judgments would be needed to both negotiate the terms of, and vote on, a plan of reorganization.[11]

22.    "Adequate information" is a flexible standard, based on the facts and circumstances of each case.[12]    Courts in the Third Circuit and elsewhere acknowledge that determining what constitutes "adequate information" for the purpose of satisfying section 1125 of the Bankruptcy Code resides within the broad discretion of the court.[13]    In making a determination as to whether a disclosure statement contains adequate information as required by section 1125 of the Bankruptcy Code, courts typically look for disclosures related to topics such as: (i)  the events that led to the filing of a bankruptcy petition; (ii) the relationship of the debtor with its affiliates; (iii) a description of the available assets and their value; (iv) the company's anticipated future; (v) the source of information stated in the disclosure statement; (vi) the debtor's condition while

---

Ill. 1987) ("The primary purpose of a disclosure statement is to provide all material information which creditors and equity security holders affected by the plan need in order to make an intelligent decision whether to vote for or against the plan").

[11]    *Century Glove,* 860 F.2d at 100.

[12]    11 U.S.C. § 1125(a)(1) ("'[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . "); *see also Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case."); *First Am. Bank of N.Y. v. Century Glove, Inc.*, 81 B.R. 274, 279 (D. Del. 1988) (noting that adequacy of disclosure for a particular debtor will be determined based on how much information is available from outside sources); S. Rep. No. 95-989, at 121 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5907 ("The information required will necessarily be governed by the circumstances of the case.").

[13]    *See, e.g.*, *In re River Village Assoc.*, 181 B.R. 795, 804 (E.D. Pa. 1995) ("[T]he Bankruptcy Court is thus given substantial discretion in considering the adequacy of a disclosure statement."); *Tex. Extrusion Corp. v. Lockheed Corp.* (*In re Tex. Extrusion Corp.*), 844 F.2d 1142, 1157 (5th Cir. 1988) ("The determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court."); *Phoenix Petroleum Co.*, 278 B.R. at 393 (same); *In re PC Liquidation Corp.*, 383 B.R. 856, 865 (E.D.N.Y. 2008) ("The standard for disclosure is, thus, flexible and what constitutes 'adequate information' in any particular situation is determined on a case-by-case basis, with the determination being largely within the discretion of the bankruptcy court."); *In re Lisanti Foods, Inc.*, 329 B.R. 491, 507 (D.N.J. 2005), *aff'd*, 241 F. App'x 1 (3d Cir. 2007). ("The information required will necessarily be governed by the circumstances of the case.").

in chapter 11; (vii) claims asserted against the debtor; (viii) the estimated return to creditors under a chapter 7 liquidation; (ix) the future management of the debtor; (x) the chapter 11 plan or a summary thereof; (xi) financial information, valuations, and projections relevant to a creditor's decision to accept or reject the chapter 11 plan; (xii) information relevant to the risks posed to creditors under the plan; (xiii) the actual or projected realizable value from recovery of preferential or otherwise avoidable transfers; (xiv) litigation likely to arise in a non-bankruptcy context; and (xv) tax attributes of the debtor.[14]    Disclosure regarding all topics is not necessary in every case.[15]

23.    The Disclosure Statement provides "adequate information" to allow Holders of Claims in the Voting Classes to make an informed decision about whether to vote to accept or reject the Plan.  Specifically, the Disclosure Statement contains a number of categories of information that courts consider "adequate information," including, among other things: (i) the background and overview of the Plan; (ii) an overview of the Debtors' operations; (iii) the events leading to commencement of these Chapter 11 Cases; (iv) an overview of these Chapter 11 Cases; (v) a summary of the Plan, including the proposed treatment of Claims and Interests under the Plan and likely distributions to be received on account of each class of Claims and Interests under the Plan; (vi) a discussion of the post-Effective Date wind-down process; (vii) an overview of the Plan confirmation process; (viii) alternatives to confirmation and consummation of the Plan; (ix) an analysis as to the distributions creditors would receive from the Debtors' estates if they liquidated under chapter 7; (x) information regarding the risks being taken by the Holders of Claims prior to

---

[14]    *See, e.g.*, *In re U.S. Brass Corp.*, 194 B.R. 420, 424–25 (Bankr. E.D. Tex. 1996) (listing factors courts have considered in determining the adequacy of information provided in a disclosure statement); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170–71 (Bankr. S.D. Ohio 1988) (same); *In re Metrocraft Pub. Serv., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984) (same).

[15]    *See U.S. Brass Corp.*, 194 B.R. at 424; *see also Phoenix Petroleum Co.*, 278 B.R. at 393 ("[C]ertain categories of information which may be necessary in one case may be omitted in another; no one list of categories will apply in every case.").

voting; (xi) the tax consequences of the Plan; (xii) conspicuous language containing releases of the Debtors, releases of third parties, exculpation and limitation of liabilities, and the injunction to be entered by and in connection with the Plan; and (xiii) such other and further information that informs holders of Claims and Interests of their rights arising from and relating to the Plan.

24.    Accordingly, the Debtor respectfully submits that the Disclosure Statement contains "adequate information," and satisfies section 1125 of the Bankruptcy Code, and the Disclosure Statement should be approved on a final basis.

## THE PLAN SHOULD BE CONFIRMED

25.    To confirm the Plan, the Court must find that the applicable provisions of section 1129 of the Bankruptcy Code have been satisfied by a preponderance of the evidence.[16] The Debtors submit that based on the record of the Chapter 11 Cases, the Voting Report, the Confirmation Declarations, and this Memorandum, the applicable burden is met and the Plan complies with all relevant sections of the Bankruptcy Code, the Bankruptcy Rules, and applicable non-bankruptcy law.  In particular, the Plan fully complies with the requirements of sections 1122, 1123, and 1129 of the Bankruptcy Code.

## I.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code in Accordance with Section 1129(a)(1).

26.    Section 1129(a)(1) of the Bankruptcy Code requires that a plan of reorganization comply with the applicable provisions of the Bankruptcy Code.  A principal objective of section 1129(a)(1) is to ensure compliance with the sections of the Bankruptcy Code

---

[16]    *See, e.g.*, *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006).  Preponderance of the evidence has been described as just enough evidence to make it more likely than not that the fact the claimant seeks to prove is true.  *See Grogan* v. *Garner*, 498 U.S. 279, 286 (1991) ("[T]he preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants . . . ." (citations omitted)).

30995367.6

governing classification of claims and interests and the contents of a plan.  Consequently, the determination of whether the Plan complies with section 1129(a)(1) requires an analysis of sections 1122 and 1123 of the Bankruptcy Code.[17]

**A.    The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.**

27.    The Plan satisfies the classification requirements of section 1122 of the Bankruptcy Code.  Section 1122 provides as follows:

(a)    Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b)    A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.[18]

28.    Claims or interests in a given class need not be identical but should be substantially similar in nature to each other.[19]  The Third Circuit has recognized that plan proponents have significant flexibility in placing similar claims into different classes if there is a rational basis to do so.[20]  Courts have identified grounds justifying separate classification,

---

[17]    *See In re Aspen Limousine Serv. Inc.*, 193 B.R. 325, 340 (Bankr. D. Colo. 1996) ("[P]aragraph (a)(1) 'requires that the plan comply with the applicable provisions of chapter 11, such as sections 1122 and 1123, governing classification and contents of plan.'" (quoting S. Rep. No. 95-989, at 126 (1978))); *In re Texaco Inc.*, 84 B.R. 893, 905 (Bankr. S.D.N.Y. 1988).

[18]    11 U.S.C. § 1122.

[19]    *See In re Coastal Broad. Sys., Inc.*, 570 F. App'x 188, 193 (3d Cir. 2014); *see also In re Idearc Inc.*, 423 B.R. 138, 160 (Bankr. N.D. Tex. 2009) ("[A] plan may provide for multiple classes of claims or interests so long as each claim or interest within a class is substantially similar to other claims or interests in that class.").

[20]    *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (explaining that a classification is proper as long as each class represents a voting interest "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed").

30995367.6

including where members of a class possess different legal rights[21] and where there are good business reasons for separate classification.[22]

29.    The Plan's classification of Claims and Interests[23] satisfies the requirements of section 1122 because (a) each Class contains only Claims or Interests that are substantially similar to the other Claims or Interests in such Class and (b) there are valid business, factual, or legal reasons for the separate classifications under the Plan.  The classifications are based largely on the different rights and attributes of the respective Claims and Interests, including their security and relative priority under the Bankruptcy Code, and the Plan classifies all general unsecured creditors in a single Class.[24]  Thus, the Plan satisfies section 1122 of the Bankruptcy Code.

**B.     The Plan Satisfies the Seven Applicable Requirements of Section 1123(a).**

30.    The Plan also meets the seven (7) requirements of section 1123(a) of the Bankruptcy Code applicable to corporate debtors.  Specifically, section 1123(a) requires that a plan:

(a)    designate classes of claims and interests;

(b)    specify unimpaired classes of claims and interests;

---

[21]    *In re Kaiser Aluminum Corp.*, No. 02-10429, 2006 WL 616243, at *5–6 (Bankr. D. Del. Feb. 6, 2006) (permitting a classification scheme after consideration of the characteristics of each class and creditors' legal rights); *In re Coram Healthcare Corp.*, 315 B.R. 321, 348 (Bankr. D. Del. 2004) (noting that "Section 1122 . . . provides that claims that are not 'substantially similar' may not be placed in the same class; it does not expressly prohibit placing 'substantially similar' claims in separate classes").

[22]    *See Aetna Cas. & Sur. Co. v. Clerk of U.S. Bankr. Court (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996) (finding that the debtor must have a legitimate reason supported by credible proof to justify separate classification of similar, unsecured claims); *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 956–57 (2d Cir. 1993) (finding separate classification appropriate because the classification scheme had a rational basis; separate classification based on bankruptcy court-approved settlement); *In re Magnatrax Corp.*, No. 03-11402, 2003 WL 22807541, at *4 (Bankr. D. Del. Nov. 17, 2003) (permitting separate classification based on valid business, factual, and legal reasons).

[23]    The Plan contains twelve (12) Classes of Claims and Interests.  *See* Plan Art. III.

[24]    *See id.*

30995367.6

(c)     specify treatment of impaired classes of claims and interests;

(d)     provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest;

(e)     provide adequate means for implementation of the plan;

(f)     provide for the prohibition of the issuance of nonvoting equity securities and provide an appropriate distribution of voting power among the classes of securities; and

(g)     contain only provisions that are consistent with the interests of the creditors and equity security holders and with public policy with respect to the manner of selection of the reorganized company's officers and directors.[25]

### 1.     Section 1123(a)(1):  Designation of Classes

31.     Section 1123(a)(1) requires that a plan must designate classes of claims and classes of equity interests, subject to section 1122 of the Bankruptcy Code.  As discussed above, the Plan designates ten (10) Classes of Claims and two (2) Classes of Interests, subject to section 1122.  Accordingly, the Plan satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code.

### 2.     Section 1123(a)(2):  Classes That Are Not Impaired by the Plan

32.     Section 1123(a)(2) requires a plan to specify which classes of claims or interests are unimpaired by the plan.  Article III of the Plan specifies that (a) Class 1 (Other Priority Claims) and Class 2 (Other Secured Claims), and, in the Restructuring, Class 7 (OpCo Unsecured Trade Claims) are Unimpaired and (b) Class 9 (Intercompany Claims) and Class 10 (Intercompany Interests) are either Unimpaired or Impaired, in the applicable Debtor's discretion.  Accordingly, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

---

[25]    11 U.S.C. § 1123(a).

### 3.      Section 1123(a)(3):  Treatment of Classes Impaired by the Plan

33.      Section 1123(a)(3) requires a plan to specify how classes of claims or interests that are impaired by the plan will be treated.  Article III of the Plan sets forth the treatment of Impaired Claims in Class 3 (IronNet Secured Note Claims), Class 4 (IronNet Unsecured Note Claims), Class 5 (IronNet General Unsecured Claims), Class 6 (OpCo Secured Note Claims), Class 8 (OpCo Unsecured Non-Trade Claims), Class 11 (Subordinated Claims), and Class 12 (Equity Interests in IronNet).  Accordingly, the Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

### 4.      Section 1123(a)(4):  Equal Treatment Within Each Class

34.      Section 1123(a)(4) requires that a plan provide the same treatment for each claim or interest within a particular class unless any claim or interest holder agrees to receive less favorable treatment than other class members.  Pursuant to the Plan, the treatment of each Claim against or Interest in the Debtors, in each respective Class, is the same as the treatment of each other Claim or Interest in such Class.  Accordingly, the Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

### 5.      Section 1123(a)(5):  Adequate Means for Implementation

35.      Article IV and various other provisions of the Plan and Plan Supplement provide adequate means for the Plan's implementation, thus satisfying section 1123(a)(5) of the Bankruptcy Code.[26]  These provisions include, without limitation, (a) the establishment of a Professional Fee Escrow Account to secure the payment of Professional Fee Claims; (b) the good-faith compromise and settlement of Claims through the 3i Settlement and the Korr Settlement; (c) the effectuation of the transactions included as part of the Restructuring; (d) the

---

[26]      *See* 11 U.S.C. § 1123(a)(5); Plan Art. IV.

vesting of certain of the Debtors' property in the Reorganized Debtors; (e) the cancellation of certain financial instruments and Interests; (f) the specification of sources of consideration for distributions under the Plan; (g) the approval of the terms of the Exit Facility (including the Secured Convertible Note), the 3i Takeback Note, and related agreements; (h) the issuance of the Reorganized IronNet Equity; (i) specification of the tax treatment and reporting in connection with the transactions contemplated by the Plan; (j) the appointment of the New Board and deemed resignation of the Debtors' directors as of the Effective Date; (k) the provision of authority to the Reorganized Debtors to pursue, settle, or abandon retained Causes of Action; (l) the provision of authority to undertake corporate actions necessary to effectuate the Plan; and (m) the provision of authority to reject or assume Executory Contracts and Unexpired Leases.

36.     Accordingly, the Plan, together with the documents and agreements contemplated by the Plan and the Plan Supplement, provides the means for implementation of the Plan as required by and in satisfaction of section 1123(a)(5) of the Bankruptcy Code.

**6.     Section 1123(a)(6):  Amendment of the Reorganized Debtors' Charters**

37.     In accordance with section 1123(a)(6) of the Bankruptcy Code, the organizational documents of each Debtor have been or will be amended on or before the Effective Date to prohibit the issuance of non-voting equity securities.  Specifically, Article IV.A of the Plan provides that the Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and provisions of the Plan, which shall, among other things, pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, and limited as necessary to facilitate compliance with non-bankruptcy federal laws, prohibit the issuance of non-voting equity securities.  Accordingly, the Plan satisfies section 1123(a)(6).

### 7.        Section 1123(a)(7):  Provisions Regarding Directors and Officers

38.    The seventh requirement of section 1123(a) requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan."[27]  Article IV.O of the Plan provides that the New Board will be appointed as of the Effective Date in accordance with the respective New Organizational Documents.  The Plan also provides that officers and the overall management structure of the Reorganized Debtors will be subject to the required approvals and consents set forth in the New Organizational Documents.  Further, each director, officer, or manager of each Reorganized Debtor will be appointed and serve pursuant to the terms of its respective charters and bylaws or other formation and constituent documents, and the New Organizational Documents, and applicable laws of the respective Reorganized Debtor's jurisdiction of formation.  The identity of the members of the New Board will be disclosed prior to the Effective Date of the Plan.  As set forth in the Plan, the existing officers of the Debtors as of the Effective Date shall remain in their current capacities as officers of the Reorganized Debtors, subject to the ordinary rights and powers of the New Board to remove or replace them and any applicable employment agreements that are assumed pursuant to the Plan.  Because the manner of selecting the New Board of the Reorganized Debtors is consistent with Delaware corporate law and has been fully disclosed to all stakeholders in the Chapter 11 Cases, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

### C.    The Discretionary Contents of the Plan Are Appropriate.

39.    Section 1123(b) of the Bankruptcy Code identifies various discretionary provisions that may be included in a plan.  For example, a plan may impair or leave unimpaired

---

[27]    11 U.S.C. § 1123(a)(7).

30995367.6

any class of claims or interests, provide for the assumption or rejection of executory contracts or unexpired leases,[28] provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate" or "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest,"[29] provide for the sale of substantially all of the property of the estate and for the distribution of the proceeds of any such sale,[30] "modify the rights of holders of secured claims . . . or . . . unsecured claims, or leave unaffected the rights of holders of any class of claims"[31] and may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."[32]

40.    Here, the Plan includes various provisions pursuant to section 1123(b)'s discretionary authority.  For example, the Plan provides for treatment of Executory Contracts and Unexpired Leases,[33] provides a structure for allowance and disallowance of Claims,[34] and sets forth a process for distributions under the Plan to holders of Allowed Claims.[35]

41.    Additionally, Article IX of the Plan provides for releases by the Debtors and certain other parties in interest, as well as discharge, exculpation, and injunction provisions prohibiting parties from pursuing Claims and Causes of Action discharged or released under the Plan.  The Plan also provides for the settlement of all Claims, Interests, Causes of Action, and

---

[28]    *Id.* § 1123(b)(1), (2).

[29]    *Id.* § 1123(b)(3)(A), (B).

[30]    *Id.* § 1123(b)(4).

[31]    *Id.* § 1123(b)(5).

[32]    *Id.* § 1123(b)(6).

[33]    *See* Plan Art. V.

[34]    *See* Plan Art. VII.A.

[35]    *See* Plan Art. VI.

30995367.6

controversies resolved under its terms, including the Korr Settlement and the 3i Settlement.  These provisions are proper because, among other things, they are the product of arm's-length negotiations, are supported by substantial consideration provided by or on behalf of the beneficiaries thereof, have been critical to obtaining the support of the various constituencies for the Plan, and, as part of the Plan, have received overwhelming support from the creditors that voted for the Plan.  The releases, exculpation, injunction, and settlement provisions of the Plan are fair and equitable, are given for valuable consideration, and are in the best interests of the Debtors and their Estates.  None of these provisions, the principal terms of which are discussed below, are inconsistent with the Bankruptcy Code, and therefore, they are permitted under section 1123(b) of the Bankruptcy Code.

### 1.    Debtor Release

42.    When considering releases by a debtor of non-debtor third parties pursuant to section 1123(b)(3)(A), the appropriate standard is whether the release is a valid exercise of the debtor's business judgment and is fair, reasonable, and in the best interests of the estate.[36]  A debtor's decision to release claims against third parties under a plan is afforded deference as a matter of business judgment.[37]

---

[36]    *See In re Abeinsa Holding, Inc.*, 562 B.R. 265, 282 (Bankr. D. Del. 2016) ("A debtor may release claims under § 1123(b)(3)(A) if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."); *see also In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *20 (Bankr. D. Del. May 13, 2010) (finding that where a debtor release is "an active part of the plan negotiation and formulation process, it is a valid exercise of the debtor's business judgment to include a settlement of any claims a debtor might own against third parties as a discretionary provision of a plan"); *In re Motors Liquidation Co.*, 447 B.R. 198, 220 (Bankr. S.D.N.Y. 2011) ("Releases by estates involve a give-up of potential rights that are owned by the estate, and are perfectly permissible in a plan, either as parts of plan settlements or otherwise, though the court must satisfy itself (at least if anyone raises the issue) that the give-up is an appropriate exercise of business judgment, and, possibly, in the best interests of the estate." (footnote omitted)).

[37]    *See, e.g., In re Hercules Offshore, Inc.*, 565 B.R. 732, 757 (Bankr. D. Del. 2016) ("The Court need only determine that the Debtors exercised sound business judgment in deciding to accept the settlement integral to the proposed plan."); *Marvel Entm't Grp., Inv. v. MAFCO Holdings, Inc. (In re Marvel Entm't Grp., Inc.)*, 273 B.R. 58, 78 (D.

43.     In considering whether a debtor's release of claims is appropriate, some courts in this district have also examined the following list of non-exclusive and disjunctive factors (the "**_Zenith_ Factors**"):[38]  (a) an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (b) substantial contribution by the non-debtor of assets to the reorganization; (c) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success; (d) an agreement by a substantial majority of creditors to support the injunction, specifically if the impaired class or classes "overwhelmingly" votes to accept the plan; and (e) a provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.[39]  As a disjunctive list, these factors provide a way of "weighing the equities of the particular case after a fact-specific review."[40]

44.     The Debtor Release represents a sound exercise of the Debtors' business judgment and is also appropriate under each of the _Zenith_ Factors.  First, an identity of interest exists between the Debtors and the Released Parties because each of the Released Parties shares

---

Del. 2002) ("[U]nder the business judgment rule . . . a court will not interfere with the judgment of a board of directors unless there is a showing of gross and palpable overreaching.  Thus, under the business judgment rule, a board's decisions will not be disturbed if they can be attributed to any rational purpose and a court will not substitute its own notions of what is or is not sound business judgment."  (second alteration in original) (internal quotation marks and citations omitted)).

[38]    These factors were first articulated as the standard for approving a third-party release.  _See In re Master Mortg. Inv. Fund, Inc._, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994).

[39]    _In re Zenith Elecs. Corp._, 241 B.R. 92, 110 (Bankr. D. Del. 1999); _see also In re Indianapolis Downs, LLC_, 486 B.R. 286, 303 (Bankr. D. Del. 2013) ("These factors are neither exclusive nor are they a list of conjunctive requirements.").

[40]    _Indianapolis Downs_, 486 B.R. at 303.  Not each factor is relevant in every case, and releases may be approved where only one or two factors are present.  _See, e.g._, _Abeinsa_, 562 B.R. 265 (approving release where the released parties were actively involved in negotiating the plan and four impaired creditor classes voted overwhelmingly in favor).

the common goal of, and are integral parties to, confirming the Plan and implementing the transactions thereunder.  This unified interest in formulating and confirming the Plan establishes an identity of interest under applicable law.[41]  The indemnification rights of certain of the Released Parties, including directors and officers, pursuant to, among other things, the Debtors' existing corporate governance documents, also establishes an identity of interest between the Debtors and such parties.[42]

45.    Second, many of the Released Parties have made a substantial contribution to the Chapter 11 Cases.  For example, the Released Parties include entities that, among other things, were active in the complex negotiations resulting in the Plan or agreed to compromise or waive their own rights and Claims.  Notably, the DIP Lender and DIP Agent contributed by, among other things, agreeing to backstop and support the Plan, consenting to the use of cash collateral, equitizing their Claims, and providing the DIP Facility and the Exit Facility.  C5 is also providing the Exit Facility and each Holder of C5 Notes and Director Notes agreed to equitize its Claims under the Plan.  The Debtors' board, including the Independent Director, and management worked diligently to achieve a successful, value-maximizing reorganization process, while simultaneously running a sale process, in addition to their regular duties.[43]  Without these and other contributions

---

[41]    *See, e.g.*, *Zenith*, 241 B.R. at 110 (finding an identity of interest with debtor where certain released parties who "were instrumental in formulating the Plan" shared an identity of interest with debtor "in seeing that the Plan succeed and the company reorganize"); *In re 710 Long Ridge Rd. Operating Co., II*, No. 13-13653 (DHS), 2014 WL 886433, at *15 (Bankr. D.N.J. Mar. 5, 2014) (finding identity of interest where both debtor and non-debtor released parties shared a common goal of "confirming [a plan] and implementing the transactions contemplated thereunder").

[42]    *See Master Mortg.*, 168 B.R. at 937 (noting that an indemnity relationship may satisfy the identity of interest factor); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 268 (Bankr. S.D.N.Y. 2007) (considering the "identity of interest" factor in the context of a third-party release and stating that "[t]o the extent that the third party releases are congruent with the indemnification obligations, and the [d]ebtor[] would be liable for any liability imposed on such person[]" an identity of interest is established).

[43]    *See* Pforr Decl. ¶¶ 49-50.

from the Released Parties, the Debtors would not be poised to successfully reorganize and emerge from chapter 11 on a fully consensual basis.

46.    Third, the Debtor Release is essential to the success of the Plan.  Without providing the Debtor Release, the Debtors do not believe they would have been able to secure the substantial benefits provided by the Plan, including a deleveraged balance sheet, and a meaningful opportunity to emerge from the Chapter 11 Cases and operate a more efficient business.  In short, had the Debtor Release not been provided, the Debtors' chances of reorganizing and maximizing value for the benefit of all stakeholders would have been diminished.

47.    Fourth, a substantial majority of creditors support the Debtor Release. Significantly, the Debtor Release, as a critical piece of the Plan, is supported by all Classes of Claims entitled to vote on the Plan and the Debtors did not receive a single filed objection to the Plan, including with respect to the Debtor Release.[44]  This is a significant endorsement of the Debtor Release.  It reinforces and affirms the Debtors' determination that the Debtor Release is a valid exercise of their business judgment and is in the best interests of the Estates.  Indeed, there could be no better evidence as to the reasonableness and fairness of the Debtor Release than the support of those creditors most affected by a release of the Debtors' Claims and Causes of Action against the Released Parties.[45]

---

[44]    Holders of Equity Interests in IronNet, Subordinated Claims, and IronNet General Unsecured Claims are not Releasing Parties under the Plan.

[45]    *See Master Mortg.*, 168 B.R. at 938 (stating that creditor approval of a release is "the single most important factor" to determine whether a release is appropriate); *see also Key3Media Grp., Inc. v. Pulver.Com, Inc. (In re Key3Media Grp., Inc.)*, 336 B.R. 87, 97–98 (Bankr. D. Del. 2005) (granting a settlement of estate causes of action over a creditor's objection because, among other things, a majority of creditors approved of the settlement), *aff'd*, No. 03-10323 (MFW), 2006 WL 2842462 (D. Del. Oct. 2, 2006).

30995367.6

48.     Accordingly, for the reasons set forth above, the Debtor Release is a reasonable exercise of the Debtors' business judgment, satisfies the *Zenith* Factors, and should be approved under section 1123(b)(3)(A) of the Bankruptcy Code.

**2.      Third-Party Release**

49.     Pursuant to Article IX.C of the Plan, the Debtors seek a consensual Third-Party Release from the following parties:

(a)     all Holders of Claims that vote to accept the Plan and do not affirmatively opt out of granting the releases contained in Article IX.C of the Plan;

(b)     all Holders of Claims that are entitled to vote to accept or reject the Plan but that either (x) do not vote to accept or to reject the Plan or (y) vote to reject the Plan and do not affirmatively opt out of granting the releases contained in Article IX.C of the Plan;

(c)     all Holders of Claims that are presumed to accept the Plan;

(d)     all Holders of Claims that are deemed to reject the Plan and fail to timely object to the releases contained in Article IX.C of the Plan, subject to the express exclusion of the Holders of Equity Interests in IronNet, Holders of Subordinated Claims, and Holders of IronNet General Unsecured Claims;

(e)     the DIP Agent and the DIP Lender;

(f)     C5;

(g)     the Bridge Lender;

(h)     each Holder of C5 Notes;

(i)     each Holder of Director Notes;

(j)     any Successful Bidder, if applicable;

(k)     3i;

(l)     Korr Acquisitions Group, Inc.; and

(m)     all other Released Parties (other than (1) any Debtor Releasing Party and (2) any Related Person of any Released

Parties, except to the extent such Released Party is legally entitled to bind such Related Person to the releases contained in the Plan under applicable non-bankruptcy law).

50.     The Debtors submit that the Third-Party Release is fully consensual and consistent with governing law.  As the Court has recognized, "Courts in this jurisdiction have consistently held that a plan may provide for a release of third party claims against a non-debtor upon consent of the party affected."[46]  As set forth above, the Non-Debtor Releasing Parties definition under the Plan excludes any party that opts out of the Third-Party Release on its Ballot. It also excludes parties who are deemed to reject the Plan and timely object to the Third-Party Release.  Notably, the Plan expressly excludes the Holders of IronNet General Unsecured Claims, Subordinated Claims, and Equity Interests in IronNet from the Third-Party Release, such that the only Holders of Claims who are deemed to reject the Plan and potentially subject to the Third-Party Release are Holders of Intercompany Claims.   As a result, the Non-Debtor Releasing Parties have consented to the Third-Party Releases because such parties had the opportunity to affirmatively opt out of the releases, but did not do so.

51.     Notably, many of the Non-Debtor Releasing Parties negotiated the Plan and consented to their inclusion as Non-Debtor Releasing Parties in connection therewith, including the DIP Agent, the DIP Lender, C5, the Bridge Lender, and the Holders of the C5 Notes and Director Notes.  In addition, as part of the 3i Settlement and the Korr Settlement, 3i and Korr Acquisitions Group, Inc. agreed to their inclusion as Non-Debtor Releasing Parties.

---

[46]     *Indianapolis Downs*, 486 B.R. at 306; *see also In re Exide Tech.*, 303 B.R. 47, 74 (Bankr. D. Del. 2003) ("The 'Releases by Holders of Claims' provision applies to release both prepetition and postpetition claims against the Releases, but it binds only those creditors and equity holders who accept the terms of the Plan.  Because it is consensual, there is no need to consider the *Zenith* factors."); *In re Wash. Mut., Inc.*, 442 B.R. 314, 350 (Bankr. D. Del. 2011).

52.     Numerous courts have recognized that a chapter 11 plan may include a release of non-debtors by other non-debtors when such release is consensual.[47]   Consensual releases are permissible on the basis of general principles of contract law.[48]   Here, all parties in interest had ample opportunity to evaluate and exercise their right to manifest consent to the Third-Party Release.  The Ballots quoted the entirety of the Third-Party Release provision in the Plan and clearly informed parties of the steps they should take to opt-out of the Third-Party Release.  Thus, affected parties were on notice of the Third-Party Release and of their ability to opt out.  The fact that 13 of the 40 voting parties opted out of the Third-Party Release on their Ballots demonstrates that the instructions were clear and parties received adequate notice of the ability to opt-out of the Third-Party Release.  As such, the Third-Party Release is consensual as to all Claims who decided not to affirmatively opt out of the Third-Party Release.

53.     Based on the foregoing, the Debtors have established that the Third-Party Release is consensual, and there is no need to consider the factors governing non-consensual third-party releases under *Continental*[49] and its progeny.  Accordingly, the Debtors submit that the Third-Party Release should be approved.

### 3.     Exculpation

54.     In addition to the releases discussed above, the Exculpation in Article IX.D exculpates the Exculpated Parties[50] for any liability that may otherwise arise out of or relate to,

---

[47]   *See, e.g.*, *Indianapolis Downs*, 486 B.R. at 305 (collecting cases).

[48]   *Coram Healthcare*, 315 B.R. at 336.

[49]   *See Gillman v. Con'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 213–14 (3d Cir. 2000).

[50]   "**Exculpated Party**" means collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the officers and directors of the Debtors, and any other person serving as a fiduciary of the Debtors' Estates, in each case, who served at any time between the Petition Date and the Effective Date of the Plan; (c) the Committee; and

among other things, the Debtors' restructuring and sale process, the Chapter 11 Cases, solicitation of the Plan, and the negotiations and agreements made in connection therewith.  The Exculpation is appropriately limited and does not exculpate acts or omissions that are determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.[51]  The Debtors believe that the Exculpation is critical because the Exculpated Parties have participated in the Chapter 11 Cases in good faith, and such provision is necessary to protect them from collateral attacks related to any good-faith acts or omissions in connection with, or related to, among other things, the marketing process, the Chapter 11 Cases, and the Plan.[52]  Moreover, the Debtors are unaware of any claims against any Exculpated Party that would be subject to the Exculpation under the Plan.[53]  Accordingly, the Debtors believe that the exculpation provision is consistent with applicable law and should be approved.

### 4.      Injunction

55.      The Injunction in Article IX.E is necessary to, among other things, enforce the Debtor Release, the Third-Party Release, and the Exculpation.  Importantly, the Injunction implements the same by permanently enjoining all persons and entities from commencing or continuing in any manner any claim that was released or exculpated pursuant to such provisions. The Debtors believe that the Injunction is narrowly tailored to achieve that purpose and therefore should be approved.

---

(d) all financial advisors, attorneys, accountants, investment bankers and other professionals retained by the Debtors or the Committee in these Chapter 11 Cases.

[51]   *See* Pforr Decl. ¶ 54.

[52]   *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 246–47 (3d Cir. 2000) (observing that the debtors and certain other parties, such as the unsecured creditors' committee members and the professionals retained by such committee, who provided services to assist in the reorganization, are entitled to a "limited grant of immunity . . . for actions within the scope of their duties").

[53]   *See* Pforr Decl. ¶ 56.

30995367.6

5.     **The Settlements Embodied in the Plan, including the 3i Settlement and the Korr Settlement, Should be Approved**

56.     The Plan reflects and incorporates certain settlements and compromises, including, without limitation, the 3i Settlement and the Korr Settlement, as permitted by section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.   Compromises are favored in bankruptcy because they minimize the costs of litigation and further the parties' interests in expediting administration of a bankruptcy estate.[54]   In deciding whether to approve a compromise under Bankruptcy Rule 9019, the Court must determine if the settlement is fair, reasonable, and in the interests of the estate.[55]

57.     The compromises and settlements pursuant to and in connection with the Plan, including, without limitation, the 3i Settlement and the Korr Settlement, are fair, reasonable, and in the best interests of the Debtors, their Estates, and their creditors for the reasons set forth herein.   Pursuant to the 3i Settlement, 3i agreed to settle its IronNet Unsecured Note Claim, equal to approximately $7,934,390, in exchange for the 3i Settlement Consideration, which includes (a) 10.4% of the New Common Equity, subject to dilution by the Management Incentive Plan and any equity (including any equity-like instrument) issued in connection with the Exit Facility, (b) a Cash payment of $1,000,000, (c) reimbursement of reasonable and documented legal fees not to exceed $500,000, and (d) the 3i Takeback Note, which was included in the Plan Supplement, which is a senior promissory note in the principal amount of $1.4 million.   3i also entered into a Restructuring Support Agreement with the Debtors pursuant to which it agreed to support the Plan.

---

[54]    *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).

[55]    *See, e.g., Key3Media Grp.*, 336 B.R. at 92 (citation omitted)).   Additionally, the Third Circuit applies the four-factor Martin balancing test for considering motions to approve settlements under Bankruptcy Rule 9019, weighing: (i) the probability of success in litigation; (ii) the likely difficulties in collection; (iii) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (iv)the paramount interest of the creditors.   *In re Martin*, 91 F.3d at 393.

Pursuant to the Korr Settlement, Korr agreed to settle its IronNet Unsecured Note Claim, in the amount of approximately $515,908, for a cash payment equal to $500,000, which is equal to the aggregate principal amount of the Korr Note excluding interest and fees.  The Debtors submit that each of these settlements is fair and equitable and represents a valid compromise and settlement that should be approved in connection with Confirmation of the Plan.

58.     Based upon the foregoing, the Plan complies fully with the requirements of sections 1122 and 1123 of the Bankruptcy Code.  Therefore, the Plan satisfies the requirement of section 1129(a)(1) of the Bankruptcy Code.

## II.     The Debtors Have Complied with the Applicable Provisions of the Bankruptcy Code in Accordance with Section 1129(a)(2).

59.     The Debtors have satisfied section 1129(a)(2), which requires that the proponent of a plan of reorganization comply with the applicable provisions of the Bankruptcy Code.  No party has objected to Confirmation on the basis that the Plan fails to satisfy this provision of the Bankruptcy Code.

60.     Section 1129(a)(2) incorporates the disclosure and solicitation requirements of section 1125 of the Bankruptcy Code.[56]  Section 1125 prohibits the solicitation of acceptances or rejections of a plan "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved . . . by the court as containing adequate information."[57]  The Court conditionally approved the Disclosure

---

[56]   *See* H.R. Rep. No. 95–595, at 412 (1977) ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also PWS Holding Corp.*, 228 F.3d at 248 ("We agree with the District Court's conclusion that § 1129(a)(2) requires that the plan proponent comply with the adequate disclosure requirements of § 1125.").

[57]   11 U.S.C. § 1125(b).

Statement and found that it contained adequate information within the meaning of section 1125.[58] In addition, the Court considered and approved, among other things, (a) all materials to be transmitted to those creditors entitled to vote on the Plan;[59] (b) the timing and method of delivery of the Solicitation Packages;[60] (c) the deadline for voting and the rules for tabulating votes to accept or reject the Plan;[61] and (d) the timing and method of publication of notice of the Confirmation Hearing and related matters.[62]

61.     Thereafter, the Debtors and the Notice and Claims Agent transmitted Solicitation Packages to Holders of Claims in Class 3 (IronNet Secured Note Claims), Class 4 (IronNet Unsecured Note Claims), Class 6 (OpCo Secured Note Claims), Class 7 (OpCo General Unsecured Trade Claims,[63] and Class 8 (OpCo General Unsecured Non-Trade Claims).  The Solicitation Packages were distributed promptly after the entry of the Disclosure Statement Order and in accordance with the Court's instructions.[64]  In addition, the Debtors caused the Publication Notice to be published in the *New York Times* in accordance with the Disclosure Statement Order.[65]

---

[58]     *See* Disclosure Statement Order ¶ 2 ("[T]he Disclosure Statement . . . contain[s] adequate information for solicitation purposes under sections 105 and 1125 of the Bankruptcy Code[.]").

[59]     *See id.* ¶¶ 5-10.

[60]     *See id.* ¶¶ 9-12.

[61]     *See id.* ¶¶ 4-17.

[62]     *See id.* ¶ 13.

[63]     As noted above, Class 7 is unimpaired through the Restructuring and was entitled to vote solely for purposes of a Sale Transaction.

[64]     *See Affidavit of Service* [Docket No. [275]; *Supplemental Affidavit of Service* [Docket Nos. 276 & 277].

[65]     *See Affidavit of Publication of the (I) Approval of Disclosure Statement on an Interim Basis; and (II) the Hearing to Consider (A) Final Approval of the Disclosure Statement as Containing Adequate Information and (B) Confirmation of the Plan* [Docket No. 305].

30995367.6

Following the distribution of the Solicitation Packages, all Ballots complying with the Solicitation

Procedures were duly tabulated and each Class voted unanimously in favor of the Plan.[66]   Pursuant

to section 1127(a) of the Bankruptcy Code and applicable precedent, those votes are treated as

votes to accept the Plan.[67]

62.     The Debtors thus have complied with the applicable provisions of the

Bankruptcy Code, including section 1125, and have therefore satisfied section 1129(a)(2).

## III.   The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law in Accordance with Section 1129(a)(3).

63.     Section 1129(a)(3) of the Bankruptcy Code requires that a plan of

reorganization be "proposed in good faith and not by any means forbidden by law."[68]   No party

has objected to Confirmation on the basis that the Plan fails to satisfy this provision of the

Bankruptcy Code.

64.     The Third Circuit has found that "good faith" requires that "there is a

reasonable likelihood that the plan will achieve a result consistent with the standards prescribed

under the Code."[69]   To satisfy this requirement, the plan proponent must establish that the plan

"(1) fosters a result consistent with the Bankruptcy Code's objectives; (2) has been proposed with

honesty and good intentions and with a basis for expecting that reorganization can be effected, and

---

[66]   *See* Voting Report ¶¶ 13-16, Ex. A.

[67]   *See* Fed. R. Bankr. P. 3019(a); *In re Am. Solar King Corp.*, 90 B.R. 808, 826 (Bankr. W.D. Tex. 1988) ("[I]f a modification does not 'materially' impact a claimant's treatment, the change is not adverse and the court may deem that prior acceptances apply to the amended plan as well.").

[68]   11 U.S.C. § 1129(a)(3).

[69]   *In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339, 347 (Bankr. D. Del. 1998) (quotation omitted), *aff'd*, 324 F.3d 197 (3d Cir. 2003); *see also PWS Holding Corp.*, 228 F.3d at 242 ("[F]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." (alterations in original) (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986))).

(3) exhibited a fundamental fairness in dealing with the creditors."[70]  The good faith requirement must be viewed in light of the totality of the circumstances surrounding the establishment of the chapter 11 plan.[71]

65.    In assessing good faith, courts should look to the chapter 11 plan itself to determine whether it seeks relief in good faith and is otherwise consistent with the Bankruptcy Code.[72]  Failure to satisfy the section, on the other hand, generally requires a finding of "misconduct in bankruptcy proceedings, such as fraudulent misrepresentations or serious nondisclosures of material facts to the court."[73]  Accordingly, where the plan satisfies the purposes of the Bankruptcy Code and has a good chance of succeeding, the good faith requirement of section 1129(a)(3) is satisfied.[74]  The Plan clearly meets the Third Circuit standard for satisfying good faith.

66.    First, the Plan clearly fosters a result consistent with two of the Bankruptcy Code's primary objectives:  reorganization and value maximization.[75]  Among other things, the Plan eliminates more than $47 million[76] in pre-petition funded debt, enables the Debtors to

---

[70]    *In re W.R. Grace & Co.*, 475 B.R. 34, 88 (D. Del. 2012), *aff'd sub nom. In re W.R. Grace & Co.*, 729 F.3d 332 (3d Cir. 2013).

[71]    *In re T-H New Orleans L.P.*, 116 F.3d 790, 802 (5th Cir. 1997).

[72]    *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984).

[73]    *In re River Vill. Assocs.*, 161 B.R. 127, 140 (Bankr. E.D. Pa. 1993), *aff'd*, 181 B.R. 795 (E.D. Pa. 1995).

[74]    *In re Century Glove, Inc.*, Nos. 90–400–SLR, 90–401–SLR, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993) (citing *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985)).

[75]    *W.R. Grace*, 475 B.R. at 88 ("The Supreme Court of the United States has specifically identified two purposes of Chapter 11 as:  (1) preserving going concerns; and (2) maximizing property available to satisfy creditors." (citing *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship (In re LaSalle)*, 526 U.S. 434, 453 (1999))).

[76]    *See* Wagstaff Decl. ¶ 15.

30995367.6

maintain relationships with key vendors, preserves jobs, and provides the Debtors with an appropriate level of operational capital post-emergence.

67.     Second, the Plan was proposed, and its confirmation was pursued, with honesty, good intentions, and a reasonable hope of success.  Whether a plan is proposed for honest and good reasons depends on "whether the debtor intended to abuse the judicial process, whether the plan was proposed for ulterior motives, or if no realistic probability for effective reorganization exists."[77]  Here, the Debtors filed for chapter 11 protection with the legitimate intent to deleverage their capital structure and reorganize as a going concern.[78]  The Plan offers the Debtors the best chance to effectively reorganize and achieve this goal.

68.     The Debtors have acted in good faith and within the letter and spirit of the Bankruptcy Code.  As described above, before the Petition Date, the Debtors considered a range of strategic alternatives to address their liquidity needs and ensure value maximization, and pursued a marketing process to raise debt or equity financing or a sale involving the acquisition of the Debtors by a third party.  Throughout this period, the Debtors engaged with the DIP Lender on the terms of a restructuring transaction, which resulted in the DIP Term Sheet that provided the framework for the Plan and, now, a fully consensual Confirmation.  The DIP Term Sheet provided for the Restructuring transaction that the Debtors now seek to effectuate, which will right-size the Debtors' capital structure and provide them with adequate financing to operate their business post-emergence, as well as a parallel track sale process to ensure that value was maximized (although no actionable bids were received).  The Plan, including the Plan Supplement and the

---

[77]  *W.R. Grace*, 475 B.R. at 88 (citing *In re Sound Radio, Inc.*, 93 B.R. 849, 853 (Bankr. D.N.J. 1988), *aff'd in part, remanded in part*, 103 B.R. 521 (D.N.J. 1989), *aff'd*, 908 F.2d 964 (3d Cir. 1990) (unpublished table decision)).

[78]  *See* Pforr Decl. ¶ 4.

other documents necessary to effectuate the Plan, were negotiated in good faith and at arm's-length by all parties involved.[79]

69.     Third, the Plan exhibits a fundamental fairness in dealing with creditors. Whether a plan exhibits a fundamental fairness in dealing with creditors depends on whether the plan treats creditors fairly and its confirmation comports with due process.[80]   As a matter of process, the Debtors have extended and adhered to a confirmation schedule that was negotiated with the DIP Lender and approved by the Court.  The Debtors also have complied with applicable noticing requirements under the Bankruptcy Rules and Local Rules relating to the Plan, ensuring that all stakeholders receive a fair opportunity to participate in the Confirmation process.  As further evidence of the Plan's fairness, the United States Trustee does not object to the Plan and all Classes of Claims entitled to vote on the Plan have voted in favor of the Plan.

70.     Indeed, creditors' overwhelming support provides additional evidence of the Plan's and plan proponents' good faith.  The overwhelming support for the Plan is the direct result of the Debtors' extensive negotiations with their key creditor constituencies and estate fiduciaries regarding a plan structure and confirmation timeline that would minimize the Debtors' time in chapter 11 and maximize value.

71.     Accordingly, the "good faith" requirement of section 1129(a)(3) is satisfied.[81]

---

[79]   *See* Pforr Decl. ¶¶ 4-5, 26.

[80]   *W.R. Grace*, 475 B.R. at 89.

[81]   *See In re Chemtura Corp.*, 439 B.R. 561, 608–09 (Bankr. S.D.N.Y. 2010) (finding that the "good faith requirement" was met because, among other things, the debtor negotiated and reached agreements with several parties in interest to put forward a chapter 11 plan that, "in the aggregate[,] demonstrate[d] a good faith effort on the part of the debtor to consider the needs and concerns of all major constituencies in this case").

30995367.6

IV.     **The Plan Provides for Court Approval of Certain Administrative Payments in Accordance with Section 1129(a)(4).**

72.     Section 1129(a)(4) of the Bankruptcy Code requires bankruptcy court approval of certain professional fees and expenses paid by the plan proponent, by the debtor, or by a person issuing securities or acquiring property under the plan.  This section of the Bankruptcy Code has been construed to require that all payments of professional fees that are made from estate assets be subject to review and approval by the bankruptcy court as to their reasonableness.[82]  No party has objected to Confirmation on the basis that the Plan fails to satisfy this provision of the Bankruptcy Code.

73.     All payments made or to be made by the Debtors or Reorganized Debtors for services rendered and expenses incurred in connection with the Chapter 11 Cases have been approved by, or are subject to approval of, the Court.  In particular, Article II of the Plan provides for the payment only of Allowed General Administrative Claims and Professional Fee Claims.[83] Finally, the Court will retain jurisdiction after the Effective Date to grant or deny applications for allowance of compensation or payment of expenses authorized pursuant to the Bankruptcy Code or the Plan.[84]  Thus, the Plan complies fully with the requirements of section 1129(a)(4).

---

[82]     *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 145 (Bankr. D.N.J. 2010) ("Under its clear terms, 'any payment' made or to be made by the plan proponent or the debtor for services 'in or in connection with' the plan or the case must be approved by or 'subject to the approval of' the bankruptcy court as 'reasonable.'"); *accord Lisanti v. Lubektin (In re Lisanti Foods, Inc.)*, 329 B.R. 491, 503 (D.N.J. 2005) ("Pursuant to § 1129(a)(4), a Plan should not be confirmed unless fees and expenses related to the Plan have been approved, or are subject to the approval, of the Bankruptcy Court.").

[83]     *See* Plan Art. II (emphasis added); *see also In re Elsinore Shore Assocs.*, 91 B.R. 238, 268 (Bankr. D.N.J. 1988) (holding that the requirements of section 1129(a)(4) were satisfied where the plan provided for payment of only "allowed" administrative expenses).

[84]     *See* Plan Art. X.

V.   **The Debtors Will Disclose the Identity of the New Board in Accordance with Section 1129(a)(5).**

74.     Section 1129(a)(5)(A) of the Bankruptcy Code provides that a court may confirm a plan only if the plan proponent discloses "the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan."[85]   In general, "[t]he [d]ebtor should have first choice of its management, unless compelling cause to the contrary exists."[86]   No party has objected to Confirmation on the basis that the Plan fails to satisfy this provision of the Bankruptcy Code.

75.     The identity of the members of the New Board will be identified prior to the Effective Date.   The Plan further provides that the Debtors' existing officers will remain in place following the Effective Date, subject to the rights of the New Board to remove or replace them.[87]   The officers and directors or managers are highly qualified, and their appointment is consistent with the interests of creditors and equity security holders and with public policy.   Accordingly, the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

VI.   **The Plan Does Not Require Governmental Regulatory Approval in Accordance with Section 1129(a)(6).**

76.     The Bankruptcy Code permits confirmation of a plan only if any regulatory commission that will have jurisdiction over the debtor subsequent to confirmation has approved

---

[85]   11 U.S.C. § 1129(a)(5)(A).

[86]   *See In re Sherwood Square Assocs.,* 107 B.R. 872, 878 (Bankr. D. Md. 1989).

[87]   *See* Pforr Decl. ¶¶ 15, 30.

any rate change provided for in the debtor's plan.[88]  Because the Plan does not provide for any rate

changes, section 1129(a)(6) of the Bankruptcy Code is inapplicable to the Chapter 11 Cases.

## VII.   The Plan Is in the Best Interests of Creditors and Interest Holders in Accordance with Section 1129(a)(7).

77.   Section 1129(a)(7) of the Bankruptcy Code requires that, with respect to

each class, each holder of a claim or an equity interest in such class either:

(a)   has accepted the plan; or

(b)   will receive or retain under the plan . . . property of a value, as of the
effective date of the plan, that is not less than the amount that such holder
would so receive or retain if the debtor were liquidated under chapter 7 of
[the Bankruptcy Code].[89]

No party has objected to Confirmation on the basis that the Plan fails to satisfy this provision of

the Bankruptcy Code.

78.   The "best interests" test applies to individual dissenting holders of claims

and interests, rather than classes[90] and is generally satisfied through a comparison of the estimated

recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of the debtor's estate

against the estimated recoveries under the debtor's plan of reorganization.[91]  As the language of

section 1129(a)(7) makes clear, the best interests test applies only to non-accepting impaired

claims or interests; if a class of claims or interests is presumed to accept or unanimously approves

a plan, the best interests test is deemed satisfied for all members of that class.[92]  Here, the best

---

[88]   11 U.S.C. § 1129(a)(6).

[89]   *Id.* § 1129(a)(7)(A).

[90]   *In re LaSalle*, 526 U.S. at 441–42 n.13 ("The 'best interests' test applies to individual creditors holding impaired
claims, even if the class as a whole votes to accept the plan.").

[91]   *See Adelphia*, 368 B.R. at 251 (Section 1129(a)(7) was satisfied where an impaired holder of a claim would
receive "no less than such holder would receive in a hypothetical chapter 7 liquidation").

[92]   *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 761 (Bankr. S.D.N.Y. 1992).

interests test must be satisfied with respect to Holders in Class 5 (IronNet General Unsecured Claims), Class 11 (Subordinated Claims), Class 12 (Equity Interests in IronNet), and, depending on whether such Claims or Interests are Impaired or Unimpaired in the applicable Debtor's discretion, Class 9 (Intercompany Claims) and Class 10 (Intercompany Interests).

79.    To find that a plan satisfies the best interests test, the Court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if each of the Debtors' Chapter 11 Cases were converted to a chapter 7 case and the assets of such Debtors' estates were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the Plan that such holder would receive if the Plan were confirmed and consummated.[93]

80.    To calculate the probable distribution to rejecting Holders if the Debtors were liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtors' assets if their chapter 11 cases were converted to chapter 7 cases.[94] In a liquidation scenario, recovery values on the Debtors' assets would likely be depressed relative to their values in the context of a reorganization. Distributions available to unsecured creditors are then reduced by (a) the claims of any secured creditors to the extent of the value of their collateral, (b) the costs and expenses of liquidation, and (c) other administrative expenses and costs of both the chapter 7 case and the chapter 11 case, such as the compensation

---

[93]    *See Adelphia*, 368 B.R. at 251–52.

[94]    *See id.* at 251–54.

of a trustee, counsel and other professionals retained by the trustee,[95] asset disposition expenses, and all unpaid administrative expenses incurred by the debtor in the chapter 11 case.  Once these costs and expenses have been calculated, the bankruptcy court must determine the probable distribution to remaining stakeholders from the available proceeds in such liquidation.  Unless the probable distribution in a liquidation has a value greater than the distributions to be received by dissenting stakeholders under the plan, the plan satisfies the best interests test as to such stakeholders.

81.    The Plan meets the requirements of section 1129(a)(7).  The Disclosure Statement includes a liquidation analysis (the "**Liquidation Analysis**"), which shows (a) the expected recoveries if these cases were converted to chapter 7 and (b) the expected recoveries under the Plan.  Based upon the Liquidation Analysis, and explained in further detail in the Wagstaff Declaration, the Debtors calculate that expected recoveries to each non-accepting Holder in an Impaired Class are greater than or equal to the expected recoveries to such Holders in a chapter 7 liquidation.  Accordingly, the best interests test of section 1129(a)(7) of the Bankruptcy Code is satisfied.

## VIII.    Acceptance of Impaired Classes in Accordance with Section 1129(a)(8).

82.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.[96]  Pursuant to section 1126(c), a class of impaired claims accepts a plan if holders of at least two-thirds in dollar

---

[95]    *See id.* at 254 ("[T]he chapter 7 trustee's advisors would be entitled to reasonable compensation for services rendered and related expenses incurred, which would be entitled to treatment as administrative expense claims. Given the amount of time such professionals would be required to devote to become familiar with the Debtors and the issues related to these cases, such fees and costs would reduce overall recoveries." (footnote omitted)).

[96]    11 U.S.C. § 1129(a)(8).

30995367.6

amount and more than one-half in number of the allowed claims in that class that actually submit ballots vote to accept the plan.[97]  A class that is not impaired under a plan, and each holder of a claim or interest in such class, is conclusively presumed to have accepted the plan.[98]  Conversely, a class is deemed to have rejected a plan if the plan provides that the holders of claims or interests of such class are Impaired and are not accorded any property under the plan on account of such claims or interests.[99]

83.    As set forth in the Voting Report, Class 3 (IronNet Secured Note Claims), Class 4 (IronNet Unsecured Note Claims), Class 6 (OpCo Secured Note Claims), and Class 8 (OpCo Unsecured Non-Trade Claims) each voted to accept the Plan.[100]  Thus, the only Impaired Classes not voting to accept the Plan are the Deemed Rejecting Classes.  Section 1129(a)(8) is not satisfied.  Nevertheless, as discussed more fully above and below, the Plan may nevertheless be confirmed because the Debtors have satisfied section 1129(a)(10) of the Bankruptcy Code—at least one Impaired Class accepted the Plan—and section 1129(b), which allows the Debtors to "cram down" any rejecting classes under certain conditions that are satisfied here.

## IX.    The Plan Complies with Statutorily Mandated Treatment of Administrative and Priority Claims in Accordance with Section 1129(a)(9).

84.    Section 1129(a)(9) of the Bankruptcy Code generally requires that persons holding claims entitled to priority under section 507(a) receive payment in full in cash unless the

---

[97]  *Id.* § 1126(c).

[98]  *Id.* § 1126(f); *see also In Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 290 (2d Cir. 1992) ("If the claimholder's interests are unimpaired, the claimholder is conclusively presumed to have accepted the plan, and his participation in or approval of the reorganization plan is not necessary for the plan to gain confirmation by the bankruptcy court." (internal quotation marks omitted)).

[99]  11 U.S.C. § 1126(g).

[100]  As mentioned above, although Class 7 is unimpaired through the Restructuring, Class 7 was entitled to vote solely for purposes of a Sale Transaction and also voted in favor of the Plan.

holder of a particular claim agrees to different treatment.  No party has objected to Confirmation on the basis that the Plan fails to satisfy this provision of the Bankruptcy Code.

85.    Under the Plan, unless the Debtors and the Holders of the following Claims agree to less favorable treatment, (a) Holders of Allowed General Administrative Claims will be paid the full unpaid amount of such Allowed General Administrative Claim in Cash; (b) Holders of Allowed Professional Fee Claims will be paid in Cash and, to the extent that the funds held in the Professional Fee Escrow Account are not sufficient to satisfy all Allowed Professional Fee Claims in full, the Reorganized Debtors will use Cash on hand to increase the size of the Professional Fee Escrow Account as necessary to do so; (c) Holders of Allowed DIP Facility Claims will receive their Pro Rata Share of 89.6% of the New Common Equity, subject to dilution by the Management Incentive Plan and any equity (including any equity-like instrument) issued in connection with the Exit Facility, and the Settlement Consideration; (d) Holders of Allowed Priority Tax Claims will receive, at the option of the Debtors, (i) the full unpaid amount of such Allowed Priority Tax Claim in Cash or (ii) equal annual installment payments in Cash, of a total value equal to the Allowed amount of such Priority Tax Claim, over a period ending not later than five (5) years after the Petition Date; and (e) Holders of Allowed Other Priority Claims will receive payment in full in Cash or other treatment rendering such Claim Unimpaired.

86.    Therefore, the Plan complies with section 1129(a)(9) of the Bankruptcy Code.

## X.    At Least One Impaired Class of Claims Has Accepted the Plan, Excluding the Acceptances of Insiders, in Accordance with Section 1129(a)(10).

87.    Section 1129(a)(10) of the Bankruptcy Code requires that "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any

acceptance of the plan by any insider."[101]    No party has objected to Confirmation on the basis that the Plan fails to satisfy this provision of the Bankruptcy Code.

88.    "The Plan provides for consolidation of the Debtors solely for purposes of voting, Confirmation, and distribution, but not for any other purpose."[102]    As set forth in the Voting Report, Class 3 (IronNet Secured Note Claims), Class 4 (IronNet Unsecured Note Claims), Class 6 (OpCo Secured Note Claims), and Class 8 (OpCo Unsecured Non-Trade Claims) have voted to accept the Plan.    Thus, the Plan satisfies section 1129(a)(10).

## XI.    The Plan Is Feasible in Accordance with Section 1129(a)(11).

89.    Section 1129(a)(11) requires the bankruptcy court to find that a plan is feasible as a condition precedent to confirmation.    Specifically, the bankruptcy court must determine that:

> [c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.[103]

No party has objected to Confirmation on the basis that the Plan fails to satisfy feasibility.

90.    For a plan to satisfy the feasibility standard under section 1129(a)(11), the evidence presented must show that the proposed plan offers a "reasonable assurance of success."[104] To demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success; rather,

---

[101]    11 U.S.C. § 1129(a)(10).

[102]    *See* Plan Introduction.

[103]    11 U.S.C. § 1129(a)(11).

[104]    *See Indianapolis Downs*, 486 B.R. at 298.

30995367.6

only a reasonable assurance that the provisions of a plan can be performed is required.[105]  "This is a low threshold."[106]  A court may find that a plan is feasible if "[t]he information in the [d]isclosure [s]tatement, the [s]upporting [d]eclaration, and the evidence proffered or adduced at the Confirmation Hearing (i) is persuasive and credible, (ii) has not be controverted by other evidence, and (iii) establishes that the . . . [p]lan is feasible and that there is a reasonable prospect of the [r]eorganized [d]ebtors" being able to meet their financial obligations.[107]

91.    Based on all evidence in the record, on the Effective Date, the Reorganized Debtors will have sufficient operating cash and liquidity to meet their financial obligations under the Plan and fund ongoing business operations.  The financial projections for the Reorganized Debtors, annexed to the Plan Supplement as Exhibit I (the "**Financial Projections**"), demonstrate that the Reorganized Debtors will have sufficient cash flow to fund Plan-related obligations and ongoing business operations through at least the end of 2025.[108]  The Wagstaff Declaration similarly supports a finding of feasibility based on Riveron RTS, LLC's analysis and work with the Debtors.[109]

92.    Further, under the Plan, the DIP Lender and C5 (who are also providing the Exit Facility) will be the owners of and lenders to the Reorganized Debtors, in addition to the other

---

[105]    *See United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990); *IRS v. Kaplan (In re Kaplan)*, 104 F.3d 589, 597 (3d Cir. 1997); *Clarkson v. Cooke Sales & Serv. Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir. 1985) ("[T]he feasibility test contemplates 'the probability of actual performance of the provisions of the plan. . . . The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts.'" (quoting *In re Bergman*, 585 F.2d 1171, 1179 (2d Cir. 1978)).

[106]    *In re Emerge Energy Servs. LP*, No. 19-11563, 2019 WL 7634308, at *15 (Bankr. D. Del. Dec. 5, 2019).

[107]    *In re Elec. Components Int'l*, No. 10-11054 (KJC), 2010 WL 3350305, at *9 (Bankr. D. Del. May 11, 2010).

[108]    *See In re Maremont Corp.*, No. 19-10118 (KJC) (Bankr. D. Del. May 17, 2019) [Docket No. 241] (finding plan feasible based on three-year projections); *TCI 2 Holdings, LLC*, 428 B.R. at 151 (same).

[109]    *See* Wagstaff Decl. ¶¶ 12-17.

holders of the Reorganized IronNet Equity, and will have every incentive to ensure the Reorganized

Debtors succeed.[110]   The Exit Facility, these operational changes, and other factors, as evidenced

by the Pforr Declaration, the Wagstaff Declaration, and the Financial Projections, demonstrate that

"[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further

financial reorganization, of the" Debtors or Reorganized Debtors.   The feasibility threshold of

section 1129(a)(11) is therefore satisfied.

## XII.    Statutory Fees Will Be Paid in Accordance with Section 1129(a)(12).

93.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of all

fees payable under 28 U.S.C. § 1930.

94.    Pursuant to Article II.D of the Plan, all fees pursuant to 28 U.S.C.

§ 1930(a)(6) and any interest assessed pursuant to 31 U.S.C. § 3717 ("**U.S. Trustee Fees**") that

are due and owing as of the Effective Date will be paid by the Debtors in full in Cash on the

Effective Date.   After the Effective Date, the Reorganized Debtors will pay any and all U.S.

Trustee Fees in full in Cash when due and payable.   The Debtors and Reorganized Debtors remain

obligated to pay U.S. Trustee Fees until the earliest of the closure, dismissal, or conversion to a

case under chapter 7 of the Bankruptcy Code of the case of that particular Debtor for whom the

Debtors or Reorganized Debtors, as set forth in the Plan, is responsible.   The Plan, therefore,

complies with section 1129(a)(12) of the Bankruptcy Code.

## XIII.   The Plan Provides for Continued Payment of Any Retiree Benefits in Accordance with Section 1129(a)(13).

95.    Section 1129(a)(13) of the Bankruptcy Code provides that a plan must

provide for continued, post-confirmation payments of all retiree benefits at the levels established

---

[110]    *See* Pforr Decl. ¶ 39.

in accordance with section 1114 of the Bankruptcy Code.  No party has objected to Confirmation

on the basis that the Plan fails to satisfy this provision of the Bankruptcy Code.

96.    The Debtors do not provide "retiree benefits" within the meaning of section

1129(a)(13).  Article V.F of the Plan nevertheless provides that, subject to the provisions of the

Plan, all Compensation and Benefits Programs—which are defined to include retirement benefits,

if any—will be treated as Executory Contracts under the Plan and, with the consent of the DIP

Agent, will be deemed assumed on the Effective Date pursuant to the provisions of sections 365

and 1123 of the Bankruptcy Code.[111]  Accordingly, even if the Debtors provided retiree benefits

before the Effective Date, such benefits would be maintained in satisfaction of section 1129(a)(13)

of the Bankruptcy Code.

## XIV.    Sections 1129(a)(14), (a)(15), and (a)(16) of the Bankruptcy Code are Inapplicable.

97.    None of the Debtors are (a) required to pay any domestic support

obligations, (b) individuals, or (c) nonprofit corporations or trusts.    Accordingly, sections

1129(a)(14) through (16) of the Bankruptcy Code are not applicable.[112]

## XV.    The Plan Satisfies the "Cramdown" Requirements of 11 U.S.C. § 1129(b).

98.    All Impaired Classes entitled to vote (Class 3 (IronNet Secured Note

Claims), Class 4 (IronNet Unsecured Note Claims), Class 6 (OpCo Secured Note Claims), and

Class 8 (OpCo Unsecured Non-Trade Claims)) have voted to accept the Plan.  Class 5 (IronNet

General Unsecured Claims), Class 11 (Subordinated Claims), and Class 12 (Equity Interests in

IronNet) and, to the extent Impaired under the Plan, Class 9 (Intercompany Claims) and Class 10

---

[111]    *See* Pforr Decl. ¶ 41.

[112]    *See In re Sea Launch Co.*, No. 09-12153 (BLS), 2010 Bankr. LEXIS 5283, at *41 (Bankr. D. Del. July 30, 2010) ("Section 1129(a)(16) by its terms applies only to corporations and trusts that are not moneyed, business, or commercial.").

30995367.6

(Intercompany Interests) were deemed to reject the Plan, requiring the Debtors to "cram down" these Classes pursuant to section 1129(b) of the Bankruptcy Code.  Section 1129(b) provides that if all applicable requirements of section 1129(a), other than section 1129(a)(8), are met, a plan may be confirmed so long as it does not discriminate unfairly and is fair and equitable with respect to each class of claims and interests that is impaired and has not accepted the plan.[113]  The Debtors' satisfaction of these conditions is discussed in detail below.  No party has objected to Confirmation on the basis that the Plan fails to satisfy this provision of the Bankruptcy Code.

### A.    The Plan Does Not Discriminate Unfairly.

99.    The Plan does not discriminate unfairly with respect to Deemed Rejecting Classes.  The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists.[114]  Rather, courts typically examine the facts and circumstances of the particular case to determine whether unfair discrimination exists.[115]  At a minimum, however, the unfair discrimination standard prevents creditors and interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications

---

[113]    *See* 11 U.S.C. § 1129(b); *see John Hancock Mut. Life*, 987 F.2d at 157 n.5 ("Under [Section 1129(b)], the plan must also satisfy all of the requirements of [Section 1129(a)] except for subsection (a)(8) . . . and must not 'discriminate unfairly' against and must be 'fair and equitable' with respect to all impaired classes that do not approve the plan.").

[114]    *See In re 203 N. LaSalle St. L.P.*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established"), *rev'd on other grounds sub nom. Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999).

[115]    *See In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) (explaining that "whether or not a particular plan does [unfairly] discriminate is to be determined on a case-by-case basis"); *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (finding that determination of unfair discrimination requires court to "consider all aspects of the case and the totality of all the circumstances").

for doing so.[116]   In other words, section 1129(b)(1) does not prohibit discrimination between classes; it prohibits only discrimination that is unfair.[117]   Accordingly, between two classes of claims or two classes of interests, there is no unfair discrimination if (a) the claims or interests in each such class are dissimilar from those in the other class,[118] or (b) taking into account the particular facts and circumstances of the case, there is a reasonable basis for disparate treatment of otherwise similar claims or interests.[119]

100.   Here, no Deemed Rejecting Class is similarly situated to another Class, given their distinctly different legal character from all other Claims and Interests.   The unfair discrimination prong of the cramdown test is thus satisfied.

**B.     The Plan Is Fair and Equitable with Respect to Each Deemed Rejecting Class.**

101.   Sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) provide that a plan is fair and equitable with respect to a class of impaired unsecured claims or interests if the plan provides that the holder of any claim or interest that is junior to the claims or interests of such class will not receive or retain any property under the plan on account of such junior claim or interest.   This central tenet of bankruptcy law—the "absolute priority rule"—requires that, if the holders of claims or interests in a particular class that votes to reject a plan receive less than full value for their stakes, then no holder of claims or interests in a junior class may receive property under the

---

[116]   *See In re Ambanc La Mesa L.P.*, 115 F.3d 650, 654–55 (9th Cir. 1997); *In re Aztec Co.*, 107 B.R. 585, 589–91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986).

[117]   *In re 11,111, Inc.*, 117 B.R. 471, 478 (Bankr. D. Minn. 1990).

[118]   *See, e.g., Johns-Manville Corp.*, 68 B.R. at 636.

[119]   *See, e.g., In re Buttonwood Partners*, 111 B.R. 57, 63 (Bankr. S.D.N.Y.); *In re Rivera Echevarria*, 129 B.R. 11, 13 (Bankr. D.P.R. 1991).

plan on account of such claims or interests.[120]  The absolute priority rule also requires that senior

classes cannot receive more than a 100 percent recovery for their claims.[121]

102.    The Plan satisfies the absolute priority rule with respect to all Deemed

Rejecting Classes.  No Holders of Claims and Interests junior to such Holders will receive or retain

any property on account of their Claims and Interests,[122] and no Holders of Claims or Interests

senior to Holders in Deemed Rejecting Classes are receiving more than full payment on account

of the Claims in such senior Classes.[123]  Accordingly, the Plan satisfies the requirements of sections

1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) of the Bankruptcy Code and is fair and equitable with

respect to all Deemed Rejecting Classes.

## XVI.    The Plan Is the Only Plan Currently on File.

103.    Section 1129(c) of the Bankruptcy Code provides, as applicable, that a

bankruptcy court may confirm only one plan.  The Plan is the only chapter 11 plan filed by any

party in the Chapter 11 Cases and the only one submitted to this Court for confirmation.  Section

1129(c) therefore permits confirmation of the Plan.

---

[120]    *In re LaSalle*, 526 U.S. at 441–42 (explaining that, under the absolute priority rule, "a plan may be found to be 'fair and equitable' only if the allowed value of the claim [in a dissenting class of impaired unsecured creditors] is to be paid in full . . . or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property'" (citations omitted)); *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) (stating that "the absolute priority rule provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan)," *rev'd on other grounds* (alteration in original) (internal quotation marks and citations omitted).

[121]    *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 612 (Bankr. D. Del. 2001).

[122]    To the extent Intercompany Claims in Class 9 or Intercompany Interests in Class 10 are Reinstated, such treatment is for the Reorganized Debtors' administrative convenience only and is not on account of such Holders' existing Claims or Interests.  *See* Plan Art. III.H.

[123]    *See* Disclosure Statement at 25.

30995367.6

## XVII.  The Purpose of the Plan Is Not the Avoidance of Taxes or Securities Laws.

104.    "[O]n request of a party in interest that is a governmental unit, the court may not confirm a plan if the principle purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."[124]   The primary purpose of the Plan is not the avoidance of taxes or the avoidance of the application of the Securities Laws.[125]   No party has objected to Confirmation on the basis that the Plan fails to satisfy this provision of the Bankruptcy Code.  Accordingly, section 1129(d) likewise permits confirmation of the Plan.

## XVIII. Section 1129(e) is Inapplicable.

105.    The provisions of section 1129(e) of the Bankruptcy Code apply only to "small business cases" as defined therein. The Chapter 11 Cases are not "small business cases." Accordingly, section 1129(e) of the Bankruptcy Code is inapplicable in the Chapter 11 Cases.

*[Remainder of Page Intentionally Left Blank]*

---

[124]   11 U.S.C. § 1129(d).

[125]   *See* Pforr Decl. ¶ 46.

30995367.6

## <u>CONCLUSION</u>

For the reasons set forth in this Memorandum and in the Confirmation Declarations, the Debtors submit that the Plan fully satisfies all applicable requirements of the Bankruptcy Code and respectfully request that the Court confirm the Plan. The Debtors further submit that the Disclosure Statement contains "adequate information" within the meaning of the Bankruptcy Code and respectfully request approval of the Disclosure Statement on a final basis.

Dated: January 16, 2024
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Elizabeth S. Justison*
Sean M. Beach (No. 4070)
Kenneth J. Enos (No. 4544)
Elizabeth S. Justison (No. 5911)
Timothy R. Powell (No. 6894)
Kristin L. McElroy (No. 6871)
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Emails:  sbeach@ycst.com
        kenos@ycst.com
        ejustison@ycst.com
        tpowell@ycst.com
        kmcelroy@ycst.com

*Counsel for the Debtors and*
*Debtors in Possession*